

Approved: _A. M. Griswold_
ANDREA M. GRISWOLD/DAMIAN WILLIAMS
Assistant United States Attorneys

Before: HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York

**16 MAG 7713**

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

     - v. -

IRFAN AMANAT,

      Defendant.

- - - - - - - - - - - - - - - - - x

:
: **SEALED COMPLAINT**
:
: Violations of
: 15 U.S.C. §§ 78j(b),
: 78ff; 17 C.F.R. §
: 240.10b-5; 18 U.S.C. §§
: 371, 1343, 1349 & 2.
:
: COUNTY OF OFFENSE:
: NEW York

SOUTHERN DISTRICT OF NEW YORK, ss.:

    MELISSA ATKIN, being duly sworn, deposes and says that she is a Postal Inspector with the United States Postal Inspection Service (the "USPIS") and charges as follows:

### COUNT ONE
**(Conspiracy To Commit Securities Fraud, Make False Statements In Annual And Quarterly SEC Reports And Make False Statements To Auditors)**

    1. From at least in or about 2009 through in or about April 2012, in the Southern District of New York and elsewhere, IRFAN AMANAT, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, namely (a) to commit fraud in connection with the purchase and sale of securities issued by KIT digital, Inc. ("KITD"), in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) to make and cause to be made false and misleading statements of material fact in applications, reports, and documents required to be filed with the Securities and Exchange Commission ("SEC") under the Securities Exchange Act of 1934 and the rules and regulations thereunder, in violation of Title 15, United States Code, Sections 78m(a) and 78ff; and (c) to make and cause to be made false and misleading statements and omissions to KITD's

auditors, in violation of Title 15, United States Code, Section 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2.

## Objects Of The Conspiracy

### Fraud In Connection With The Purchase And Sale Of Securities

2.   It was a part and an object of the conspiracy that IRFAN AMANAT, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities issued by KITD, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing KITD to make untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### False Statements In Annual And Quarterly SEC Reports

3.   It was further a part and an object of the conspiracy that IRFAN AMANAT, the defendant, and others known and unknown, willfully and knowingly, in applications, reports, and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations thereunder, would and did make and cause KITD to make statements that were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78m(a) and 78ff.

### False Statements To Auditors

4.   It was further a part and an object of the conspiracy that IRFAN AMANAT, the defendant, and others known and unknown, including officers of KITD, an issuer with a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, willfully and knowingly, would and did, directly and indirectly, make and cause to be made materially false and

misleading statements, and omit to state, and cause other persons to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which such statements were made, not misleading, to accountants in connection with (i) audits and examinations of the financial statements of KITD, required to be filed with the SEC pursuant to rules and regulations enacted by the SEC; and (ii) the preparation and filing of documents and reports, required to be filed with the SEC pursuant to rules and regulations enacted by the SEC, in violation of Title 15, United States Code, Section 78ff and Title 17, Code of Federal Regulations, Section 240.13b2-2.

Overt Acts

5.    In furtherance of the conspiracy and to effect its illegal objects, IRFAN AMANAT, the defendant, and his co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. On or about March 4, 2010, IRFAN AMANAT emailed a false balance confirmation, for the benefit of KITD's auditors, that Enable, an investment company IRFAN AMANAT at times controlled, maintained an account on KITD's behalf with a balance in excess of $2 million.

b. On or about March 16, 2011, IRFAN AMANAT emailed a false balance confirmation, for the benefit of KITD's auditors, that Enable maintained an account on KITD's behalf with a balance in excess of $2 million.

c. On or about March 14, 2012, IRFAN AMANAT caused a false balance confirmation to be emailed, for the benefit of KITD's auditors, that Enable maintained an account on KITD's behalf with a balance in excess of $2 million.

(Title 18, United States Code, Section 371.)

**COUNT TWO**
**(Securities Fraud)**

6.    From at least in or about 2009 through at least in or about April 2012, in the Southern District of New York and elsewhere, IRFAN AMANAT, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes

and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, IRFAN AMANAT, on behalf of Enable, engaged in an illegal scheme to deceive KITD shareholders, members of the investing public, KITD's independent auditors and others concerning KITD's true operating performance and financial results by making and causing to be made false statements to KITD's independent auditors which falsely described the status of KITD's multi-million dollar investment with Enable and omitted to disclose material facts necessary to make the statements made complete, accurate, and not misleading, thereby causing KITD's publicly reported financial results to be false and misleading.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2.)

## COUNT THREE
### (Conspiracy to Commit Wire Fraud: Maiden Capital Investors)

7.    From in or about March 2009 through in or about June 2012, in the Southern District of New York and elsewhere, IRFAN AMANAT, the defendant, and others known and unknown, willfully and knowingly, combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

### Object Of The Conspiracy

8.    It was a part and an object of the conspiracy that IRFAN AMANAT, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

4

### COUNT FOUR
### (Wire Fraud: Maiden Capital Investors)

9.    From at least in or about March 2009 through in or about June 2012, in the Southern District of New York and elsewhere, IRFAN AMANAT, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, IRFAN AMANAT and others schemed to defraud investment advisory clients in Maiden Capital, an investment advisory firm managed by Stephen Maiden ("Maiden"), including through IRFAN AMANAT providing Maiden with false account statements regarding Maiden Capital's investment in Enable, knowing such false account statements were intended to be presented, and were presented, to Maiden Capital investors.

(Title 18, United States Code, Sections 1343 and 2.)

### COUNT FIVE
### (Aiding and Abetting Investment Adviser Fraud)

10.    From in or about March 2009 through in or about June 2012, in the Southern District of New York and elsewhere, IRFAN AMANAT, the defendant, willfully and knowingly aided and abetted an investment advisor who used the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud clients and prospective clients; (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) to engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, to wit, IRFAN AMANAT aided and abetted fraud by Maiden, an investment advisor, in which Maiden made false and materially omissive statements to investors about the status of their investments in Maiden Capital and Maiden Capital's investments in Enable.

(Title 15, United States Code, Sections 80b-6 and 80b-17; Title 18, United States Code, Section 2.)

        The bases for my knowledge and for the foregoing
charges are, in part, as follows:

        11.   I have been a Postal Inspector with the USPIS for
approximately four years.   I am currently assigned to a team that
is  responsible  for  investigating  violations  of  the  federal
securities laws, as well as wire and mail fraud laws and related
offenses.   I have participated in numerous investigations of these
offenses, and I have made and participated in making arrests of
numerous individuals for committing such offenses.

        12.   The  information contained in this affidavit is based
upon my personal knowledge, as well as information obtained during
this investigation, directly or indirectly, from other sources,
including  electronic  communications  obtained  pursuant  to  a
judicially authorized search warrant, a review of bank and trading
account records, documents provided by others, and from speaking
with investors in Enable, including Maiden.   Because this affidavit
is prepared for limited purposes, I have not set forth each and
every fact I have learned in connection with this investigation.
Where conversations and events are referred to herein, they are
related in substance and in part.     Where dates, figures, and
calculations are set forth herein, they are approximate.

## Background

### The Amanat Brothers and Related Entities and Accounts

        13.   In or about 2006, IRFAN AMANAT, the defendant, was banned
by the SEC from associating with any broker or dealer for a period
of five years and ordered to cease and desist from committing or
causing any violations or future violations of Section 10(b)or
Rule 10b-5 of the Securities Exchange Act of 1934.

        14.   At  various  times  relevant  to  this  Complaint,  IRFAN
AMANAT, the defendant, and his brother, Omar Amanat (collectively,
the "Amanat Brothers"), deposited funds raised from U.S.-based and
foreign investors into accounts affiliated with at least four
investment vehicles (the "Amanat Investment Vehicles").

        15.   At  various  times  relevant  to  this  Complaint,  IRFAN
AMANAT, the defendant, managed the Amanat Investment Vehicles.   In
this role, IRFAN AMANAT was primarily responsible for, among other
things,  trading  strategies  and  account  management,  including
preparing client account statements.

        16.   One of the Amanat Investment Vehicles was Enable Invest
Ltd.  ("Enable"), a company based in Dubai.   At various times,

6

Individual-1 was an employee of Enable with whom the Amanat Brothers communicated.

17.  At various times relevant to this Complaint, the Amanat Investment Vehicles were affiliated with certain United States-based accounts and entities including a U.S.-based brokerage account (the "U.S. Brokerage Account") and a trading account (the "U.S. Trading Account"), as well as certain U.S.-based bank accounts (the "U.S. Bank Accounts").

18.  At various times relevant to this Complaint, the Amanat Investment Vehicles were also affiliated with certain foreign-based accounts and entities.

### KIT digital, Kaleil Isaza Tuzman and Robin Smyth[1]

19.  At all times relevant to this Complaint, KITD was a provider of end-to-end video asset management software and related services, with a focus on Internet Protocol-based interactive media, headquartered in Prague, Czech Republic and New York, New York. At various times relevant to this Complaint, KITD maintained a U.S.-based bank account (the "KITD Bank Account").

20.  At various times relevant to this Complaint, Kaleil Isaza Tuzman ("Tuzman") was the Chairman of the Board of Directors and Chief Executive Officer ("CEO") of KITD. At all times relevant to this Complaint, Robin Smyth ("Smyth") was the Chief Financial Officer ("CFO") of KITD.

21.  From at least in or about 2007 up to in or about 2012, KITD employed, at different times, two accounting firms as independent auditors to perform year-end audits of KITD's financial statements and quarterly reviews of selected KITD financial information.

22.  On or about November 21, 2012, after an internal investigation led by KITD's audit committee, KITD filed a Form 8-K, which is a report that public companies must file with the SEC to announce major events to the marketplace.  In the Form 8-K, KITD announced to the investing public that KITD had discovered various errors and irregularities in its historical financial statements and that it would have to issue restated financial statements.  On the first trading day following this announcement, the price of KITD's common stock plummeted more than 64% from the

---

[1]     Smyth has pleaded guilty and is cooperating with the Government. The information provided to the Government by Smyth has proven reliable and has been corroborated by other independent evidence.

previous day's closing price.  In or about December 2012, KITD's stock was delisted from the NASDAQ where it had been traded since August 2009.  KITD subsequently declared bankruptcy.

### Stephen Maiden and Maiden Capital[2]

23.  At all times relevant to this Complaint, Maiden operated the Maiden Capital Opportunity Fund (the "Maiden Fund") in North Carolina through his investment advisory firm, Maiden Capital LLC ("Maiden Capital").   At all relevant times, Maiden Capital maintained an account at a bank located in North Carolina (the "Maiden Capital Account").

24.  At all times relevant to this Complaint, Maiden Capital was an unregistered investment advisory firm managing portfolios of securities and providing advice on client investments in exchange for a fee based on total assets under management and additional performance-based returns.  Maiden was the managing member of Maiden Capital and ran the Maiden fund.  Maiden was obligated to make decisions based on the best interests of his clients.

25.  At various times relevant to this Complaint, IRFAN AMANAT, the defendant, Tuzman, Omar Amanat and Maiden, through Maiden Capital, were each investors in a privately held special purpose investment vehicle (the "KIT SPIV"), which was controlled by Tuzman.  The KIT SPIV invested in KITD.

### Relevant Public Company Accounting Principles

26.  At all times relevant to this Complaint, KITD was required to comply with the federal securities laws, which are designed to ensure that a company's financial information is accurately recorded and disclosed to the public.

27.  Specifically, pursuant to the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, KITD was required to: (a) file with the SEC annual financial statements (on SEC Form 10-K) that had been audited by independent certified public accountants; (b) file with the SEC quarterly financial reports (on SEC Form 10-Q); and (c) make and keep books, records and accounts that accurately and fairly reflected KITD's business transactions.

---

[2]    Maiden has pleaded guilty and is cooperating with the Government. The information provided to the Government by Maiden has proven reliable and has been corroborated by other independent evidence.

28.  At all times relevant to this Complaint, KITD's public filings with the SEC included financial statements which contained, among other things, an income statement and a balance sheet.  A company's balance sheet reports the company's assets, liabilities, and shareholder equity as of a specific date.  As part of the requirement that KITD keep accurate books and records, KITD was required to accurately report the nature of its purported assets, including whether assets were held in cash or otherwise.

### The Schemes to Defraud

29.  Between at least in or about 2009 and at least in or about April 2012, IRFAN AMANAT, the defendant, with the knowledge of Tuzman, Omar Amanat, and others, deceived KITD's auditors about KITD's true financial health by misrepresenting the status of KITD's investment in Enable.  Specifically, IRFAN AMANAT repeatedly misrepresented to KITD's auditors that Enable maintained more than $2 million in liquid assets in an asset management account on behalf of KITD when, in truth, and as IRFAN AMANAT well knew, Enable was insolvent and KITD's investment in Enable had long been lost.  As IRFAN AMANAT well knew, these misrepresentations were material to the audit of KITD's financial statements and, ultimately, to the investing public.  As a result of IRFAN AMANAT's misrepresentations, various KITD annual financial filings were materially false.

30.  Between at least in or about March 2009 until at least in or about June 2012, IRFAN AMANAT, the defendant, working with Maiden, Omar Amanat, and others, devised and carried out a scheme to hide the fact that Maiden Capital's investment in Enable had been lost, including through poor trading decisions and fraudulent misappropriation.  Rather than disclose the Enable losses to investors in Maiden Capital, as Maiden was legally obligated to do, Maiden concealed the Enable losses with the knowledge and assistance of IRFAN AMANAT and Omar Amanat, who also did not want the Enable losses to be exposed.  By generating and providing Maiden with fictitious Enable account statements, IRFAN AMANAT helped Maiden succeed in covering up the losses for over three years.  Despite this scheme to defraud Maiden Capital investors, Maiden Capital's insolvency was ultimately exposed and Maiden was unable to meet investor redemption requests.  Maiden Capital collapsed in July 2012.

### The Amanat Brothers Solicit Investments for Enable

31.  Based on my review of electronic communications exchanged between IRFAN AMANAT, the defendant, Omar Amanat,

Tuzman, Maiden, and others, as well as interviews with Maiden and
Smyth, I have learned, among other things, the following:

        a.    In or about the summer of 2008, the Amanat Brothers
solicited   investments   for   the   Amanat   Investment   Vehicles,
including Enable.

        b.    In or about June 2008, Omar Amanat solicited Tuzman
to invest in Enable on behalf of KITD. To induce Tuzman to invest,
Omar Amanat told Tuzman that he would raise money for and invest
in the KIT SPIV, the special purpose investment vehicle controlled
by Tuzman. IRFAN AMANAT also invested in the KIT SPIV.

        c.    In or about June 2008, as part of Omar Amanat's
agreement to raise money for the KIT SPIV, Omar Amanat induced
Maiden to invest approximately $1 million from Maiden Capital into
the KIT SPIV.

        d.    On or about June 16, 2008, IRFAN AMANAT emailed
Omar Amanat regarding problems that could arise because of the
*quid pro quo* arrangement pursuant to which KITD would be investing
in Enable in return for investments in the KIT SPIV. IRFAN AMANAT
wrote: "It was tricky, [Smyth] voiced the exact concerns about
arms length transactions . . . but ironically he offered to open
the brokerage accounts and put 250k token money in now . . . ."

        e.    The same week, Omar Amanat emailed IRFAN AMANAT and
requested his help to "delete all of my emails from the yahoo site
but download them onto my laptop." Omar Amanat expressed "concern[]
about them subp[o]ening yahoo at some point." IRFAN AMANAT
responded: "Set up your outlook to pull all your email from yahoo
and delete it. If you need help I can walk you through it." Omar
Amanat responded: "Can you just get on skype? I just spoke with
[K]aleil [Tuzman]."

        f.    In or about July 2008, Tuzman sought approval from
KITD's Board of Directors (the "KITD Board") for KITD's available
cash to be placed in Enable for "cash management" purposes,
stating:

> [Enable] is associated with Omar Amanat and
> Irfan Amanat, who are each investors in the
> KIT [] SPIV, and through that vehicle,
> investors indirectly in KIT digital. The
> Amanat brothers have been very helpful to the
> company over time . . . [and] have played a
> critical role in facilitating the KIT Media
> financing through their relationships.

        g.    In or about August 2008, after Tuzman obtained
approval from the KITD Board, KITD invested approximately $6.5
million in Enable. Maiden subsequently learned that Tuzman had

redirected the funds from Maiden Capital's $1 million investment in the KIT SPIV into Enable, as part of KITD's $6.5 million investment, without Maiden's knowledge or authorization.

        h.    As of on or about September 30, 2008, over 70% of KITD's cash was invested with Enable.

<u>Misappropriations From the Amanat Investment Vehicles</u>

    32.   Based on my review of electronic communications exchanged between IRFAN AMANAT, the defendant, and Omar Amanat, my review of relevant account records related to the Amanat Investment Vehicles, and interviews of investors, I have learned, among other things, the following:

        a.    In total, since at least January 2008, the Amanat Brothers raised more than $10 million for the Amanat Investment Vehicles, including Enable. Of this money, Omar Amanat, with the knowledge of IRFAN AMANAT, improperly diverted more than $3 million for his personal use.

        b.    The Amanat Brothers discussed Omar Amanat's misappropriations over email. For example:

           i.    On or about July 21, 2008, IRFAN AMANAT emailed Omar Amanat regarding wires from accounts maintained by one of the Amanat Investment Vehicles: "Om[ar] . . . [w]e need to talk about your wires out. It is getting out of control again, and I am very disappointed."

           ii.    The next day, on or about July 22, 2008, IRFAN AMANAT received wire transfer information advising AMANAT that of $2,253,081.63 deposited in the U.S. Brokerage Account, Omar Amanat had withdrawn $1,682,403.22.    IRFAN AMANAT forwarded this breakdown to Omar Amanat and stated: "This is very, very upsetting. If their numbers are right, you have put us all in a tremendous hole. We can't go on like this." Omar Amanat responded, in part, by indicating that $500,000 of these funds had been invested in KITD. IRFAN AMANAT then stated:

> Even with the 500k in kit, if their accounting is right, you have wired out over $1.1 mil of our money, and I have no idea to where. At this rate, you are making all of us broke, again. [Our Uncle] has been expecting his money for months, I can't cover any longer. . . . I can't bail us out again, this is the last cash we have. I really have no idea what you are thinking.

11

iii.     The next month, in or about August 2008, IRFAN AMANAT emailed Omar Amanat after learning about additional large wires initiated by Omar Amanat:

> [Y]our withdrawals from this account created accounting and goodwill problems. . . . [Our Uncle] has been requesting his funds for 6 months, he is owed 140k, and because of your wires, no one else can be paid. . . .  Do not confuse capital from new investors as profits; they are two different line items.  And by constantly spending more than we are making, you are using all the liquidity, and pushing us to insolvency.

c.     In total, between January 2008 and at least January 2009, Omar Amanat, with the knowledge of IRFAN AMANAT, diverted more than $3 million out of accounts affiliated with the Amanat Investment Vehicles, including the U.S. Brokerage Account.  Omar Amanat then used this money for his own purposes, including on luxury properties in Manhattan, New York. IRFAN AMANAT never disclosed these misappropriations to investors, to whom he owed a fiduciary duty.

Irfan Amanat Causes Trading Losses in the U.S. Trading Account

33.  Based on my review of electronic communications exchanged between IRFAN AMANAT, the defendant, and Omar Amanat, my review of certain account records, and interviews of investors in the Amanat Investment Vehicles, I have learned, among other things, the following:

a.     Between June 2008 and November 2008, IRFAN AMANAT, the defendant, lost millions of dollars trading in the U.S. Trading Account.  Specifically, of more than $7 million deposited into the U.S. Trading Account between June 2008 and September 2008, the U.S. Trading Account incurred trading losses in excess of $5.5 million.

b.     Notwithstanding these trading losses, IRFAN AMANAT falsely represented positive trading returns to investors.  For example:

i.   On or about October 12, 2008, IRFAN AMANAT sent an email to Maiden, an investor, in which IRFAN AMANAT falsely stated that Enable "ha[s] been making good profits . . . trading has been smooth and profitable - no huge profits, but with the markets [] going psychotic these days, I am happy to be taking things safe."  In truth and in fact, by September 30, 2008, the U.S. Trading Account contained less than $113,000.  IRFAN AMANAT

12

never disclosed these losses to investors, other than to Maiden as described below.

        ii.  On or about January 5, 2009, Maiden forwarded an email to IRFAN AMANAT stating that he was "confused by the returns" on his Enable statement, which reflected a profit of approximately $8,000 for the month, as he "expected quite a bit more." IRFAN AMANAT forwarded the email to Omar Amanat. Omar Amanat replied to IRFAN AMANAT: "Coordinate w[ith] me on this. [Maiden] needs to show good year end returns. Say you didn't include the waiving of the fees or something." After IRFAN AMANAT asked Omar Amanat what "annual % return" had been represented to Maiden, Omar Amanat responded: "He wants to show closer to 17 percent. It's all irrelevant since he can't withdraw . . . ."

        b.  The Amanat Brothers also used new investor funds to pay redemptions to prior investors in a Ponzi-like fashion. For example:

        i.  By in or about November 2008, after certain Enable investors had requested redemptions the Amanat Brothers were unable to pay, Omar Amanat sought an additional "$2 million short term" investment from Maiden, purportedly for the purpose of investing in Enable, and which Omar Amanat promised to return to Maiden within a week. In November 2008, Maiden wired $2 million to an account affiliated with Enable. Contrary to Omar Amanat's representations to Maiden, however, the Amanat Brothers then misappropriated Maiden's entire investment and used a significant portion to pay redemptions to Enable investors, thereby concealing the Enable losses.

        ii.  On or about December 18, 2008, Omar Amanat emailed IRFAN AMANAT to discuss, among other things, Maiden's attempts to recoup the $2 million investment. Omar Amanat stated: "Maiden has tried to reach me and is asking for his $2mln back. In a post madoff world everyone is suspicious. This is a major problem and red flag for me. As u know. I don't have any ability to repay it. . . . This is a major disaster – of madoff proportions – if maiden suspects fraud of some sort and notifies the authorities I'm cooked. All in all this is some pickle of a situation this time."

        iii. On or about February 11, 2009, Maiden again emailed the Amanat Brothers and stated: "I've spoken to you both about getting [] 500k back – but now [I] really need it. [I] have redemptions to meet next week . . . . Not sure the holdup. But pls pls pls send it over today. Pls ok this. I can't operate my business – I have almost no free trading cash in my account and have to meet redemptions." Minutes later, IRFAN AMANAT forwarded the email to Omar Amanat, asking "Om[ar], can we do anything?"

13

Omar Amanat responded: "Yes, send him back $500k asap.   Oh I forgot, we don't have it !!!!!!!!!!! That is why this is an absurd question . . . ."

### IRFAN AMANAT Helps Conceal the Losses From Maiden Investors

34.   Based  on  my  review  of  electronic  communications exchanged between IRFAN AMANAT, the defendant, Omar Amanat, and Maiden, and interviews with Maiden, I have learned, among other things, the following:

a.   In or about March 2009, on a telephone call in which IRFAN AMANAT, Omar Amanat, Tuzman and Maiden participated, Maiden learned that Enable was insolvent and that Maiden Capital's investment in Enable had been lost.   It was clear to Maiden that, prior to that call, Tuzman, who had invested millions of dollars in Enable on behalf of KITD, had already learned that Enable was insolvent.

b.   Following this call, Maiden spoke directly with Omar Amanat, including to express concern that the Enable losses could cause Maiden Capital to collapse.   Omar Amanat reassured Maiden that a solution would be reached to cover up the Enable losses.   In the interim, Maiden understood that IRFAN AMANAT would provide false monthly statements to Maiden, which would falsely confirm the existence of Maiden Capital's investment with Enable when, in truth, the funds were not available, having been lost or misappropriated.

c.   Shortly  thereafter,  using  fictitious  account numbers generated by IRFAN AMANAT, and with the knowledge of Omar Amanat, Maiden began generating fictitious client statements that failed to disclose the Enable losses and were distributed to Maiden Capital investors.

d.   Thereafter, between at least in or about March 2009 and in or about February 2012, IRFAN AMANAT provided Maiden with false account statements purporting to show Maiden Capital's positive balance with Enable and consistently positive monthly returns.   For example:

i.   On or about July 8, 2010, IRFAN AMANAT emailed Maiden a false statement for June 2010 reflecting an ending balance for Maiden Capital of $2,459,919.88, a purported gain from the prior month's returns.

ii.   On or about May 6, 2011, Maiden emailed IRFAN AMANAT asking for his purported Enable balance because he "ha[d] to get my num[ber]s out today" to Maiden Capital investors.   Later that day, IRFAN AMANAT emailed Maiden a false statement for April 2011 reflecting an ending balance of 2,519,650.95, a purported gain from the prior month's statement.

iii.    On or about December 12, 2011, IRFAN AMANAT emailed Maiden a false statement for November 2011 reflecting an ending balance for Maiden Capital of $2,556,481.33, a purported gain from the prior month's returns.

iv.    In or about February 2012, after Maiden emailed IRFAN AMANAT asking for his January 2012 statement, IRFAN AMANAT emailed Maiden both a false balance of $2,580,327.45, another purported gain, and a "template spreadsheet so you can calculate" the desired false return for future months.  Based on speaking with Maiden, I learned, among other things, that Maiden used the spreadsheet provided by IRFAN AMANAT to create false month-end numbers for Maiden Capital's investment with Enable.

v.    In truth and in fact, during the period in which IRFAN AMANANT sent Maiden account statements showing positive returns and a total Maiden Capital balance of more than $2 million, both IRFAN AMANAT and Maiden, as well as Omar Amanat and Tuzman, had known since at least March 2009 that Maiden Capital's investment in Enable had long been lost.

vi.    To facilitate Maiden's efforts to hide the fact that investments by Maiden Capital clients in Enable had been lost, Omar Amanat wired hundreds of thousands of dollars to the Maiden Capital Account to support Maiden Capital, including to allow Maiden to repay investors whose redemption requests could not be forestalled and thus to continue to keep secret from Maiden investors the Enable losses.

vii.    By in or about July 2012, Maiden was unable to continue to forestall redemption requests, and Maiden Capital collapsed.  In total, Maiden Capital investors lost more than $8 million, including an investment in Enable of more than $2 million.

Irfan Amanat Misleads KITD's Auditors and Investors

35.  Based on my review of electronic communications exchanged between IRFAN AMANAT, the defendant, Omar Amanat, Tuzman, and Maiden, account confirmations Enable provided to KITD, interviews with Smyth, and my review of KITD's publicly filed annual financial statements and internal books and records, I have learned, among other things, the following:

a.    In addition to providing Maiden with account statements falsely confirming Maiden Capital's investment in Enable, IRFAN AMANAT also misled KITD's auditors by falsely confirming that Enable maintained more than $2 million of KITD's funds in an asset management account earning a steady interest rate.  Specifically:

i.    On or about March 4, 2010, approximately a year after the March 2009 telephone call on which the Amanat

Brothers informed Maiden of Enable's insolvency, which call Tuzman also participated in, IRFAN AMANAT emailed an annual balance confirmation statement to Smyth, which falsely affirmed, for the benefit of KITD auditors, that Enable maintained an asset management account on KITD's behalf with a balance of $2,031,609.43, earning a rate of interest of 1 Month Libor plus 150 basis points.

        ii.    On or about March 16, 2011, IRFAN AMANAT emailed an annual balance confirmation statement to Smyth, which falsely affirmed, for the benefit of KITD auditors, that Enable maintained an asset management account on KITD's behalf with a balance of $2,067,844.14, earning a rate of interest of 1 Month Libor plus 150 basis points.

        iii.    The following year, on or about March 14, 2012, IRFAN AMANAT caused Individual-1 to email an annual balance confirmation statement to Smyth, which falsely affirmed, for the benefit of KITD auditors, that Enable maintained an asset management account on KITD's behalf, which contained $2,103,882.38 on deposit.

        b.    IRFAN AMANAT knew that these false annual balance confirmations were prepared for KITD's auditors, that they were necessary and material to KITD's audited financial statements, and that the resulting financial statements would be misleading to investors.  For example:

        i.    On or about March 9, 2011, one week before IRFAN AMANAT submitted the audit confirmation for KITD's fiscal year 2010, Tuzman emailed IRFAN AMANAT: "[I]rfan, [o]ur auditors require a confirmation note today (which our CFO Robin Smyth sent to you and cc'd [the KITD Auditor]) regarding KIT digital balance with Enable.  Without this confirmation KIT digital cannot get a clean audit for 2010.  This is vital, as you know from the past."

        ii.    On or about March 11, 2012, three days before IRFAN AMANAT caused Individual-1 to submit the audit confirmation for KITD's fiscal year 2011, Tuzman emailed IRFAN AMANAT: "We need the Enable audit confirmation on KIT digital invested funds, or we cannot complete our 2011 10-K and annual report, and will have a material deficiency in our numbers.  This must be done immediately (the 10-K is being completed tomorrow on Tuesday) . . . . Naturally, if we do not get this confirmation, there can be never be any positive outcome of any kind."

WHEREFORE, I respectfully request that an arrest warrant be issued for IRFAN AMANAT, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

MELISSA ATKIN
POSTAL INSPECTOR
UNITED STATES POSTAL INSPECTION
SERVICE

Sworn to before me this
1st day of DECEMBER, 2016

HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

17