UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.                                          No. 15-CR-536 (PGG)

GAVIN CAMPION,

                        Defendant.

**SENTENCING MEMORANDUM ON BEHALF OF
GAVIN CAMPION**

February 11, 2019                   WALDEN MACHT & HARAN LLP

                                    Jim Walden
                                    Brian D. Mogck
                                    Jeffery L. Ding
                                    1 Battery Park Plaza, 34th Floor
                                    New York, NY 10004
                                    Tel: (212) 335-2030
                                    Fax: (212) 335-2040

                                    *Attorneys for Defendant Gavin Campion*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

I.   Gavin's Personal History and Character....................................................................4

   A.   Gavin Had a Stressful and Cold Childhood...................................................... 5

   B.   Gavin Has Built a Loving Family..................................................................... 6

   C.   ███████████████████████████████ ..................................... 10

   D.   Gavin Has Found Success by Living His Working-Class Values ..................... 12

      1.  Beginning at McDonald's.......................................................... 13
      2.  Admission to University ............................................................ 13
      3.  Entry into Advertising............................................................... 14
      4.  Role at KITD.............................................................................. 16
      5.  Post-KITD Entrepreneurship .................................................... 21

   E.   Gavin Has Consistently Displayed Loyalty and Generosity............................. 25

II.  STATEMENT OF THE OFFENSE.............................................................................27

   A.   Gavin Failed to Disclose What He Knew About the Fraudulent Scheme at KITD.......... 27

   B.   Gavin Fully Accepted Responsibility for His Conduct .................................... 28

   C.   Gavin Neither Originated, Directed, Nor Arranged the Fraudulent Transactions........... 29

   D.   Gavin Made Numerous Attempts To "Stop the Fraud".................................... 31

      1.  Meeting with Smyth.................................................................... 32
      2.  Meeting with Tuzman and Smyth in New York .......................... 32
      3.  Continued Discussions with Tuzman.......................................... 33
      4.  Escalation to KITD Board Members .......................................... 33
      5.  Restructuring Plan...................................................................... 35
      6.  Executive Team Meeting in Ely ................................................. 36
      7.  Resignation ................................................................................ 37

   E.   Gavin Sought Legal Advice and Attempted to Contact the SEC ...................... 37

   F.   Other than His Salary, Gavin Did Not Profit from the Fraudulent Scheme .................... 38

III. GAVIN HAS PROVIDED SUBSTANTIAL ASSISTANCE TO THE GOVERNMENT.....38

   A.   Gavin's Assistance Was Significant and "Invaluable".................................... 39

B.  Gavin's Assistance Was "Truthful, Complete, and Reliable" .......................................... 40

C.  Gavin's Assistance Was "Essential" and Extensive ...................................................... 40

D.  Gavin's Assistance Was Costly and Traumatic. ............................................................. 41

E.  Gavin's Assistance Was Immediate and Timely ............................................................ 42

IV. A NONCUSTODIAL SENTENCE IS WARRANTED UNDER SECTION 3553(A) .......... 42

A.  The Nature and Circumstances of the Offense Warrant a Noncustodial Sentence ........... 43

    1.  Gavin Is Not a Typical Sophisticated White-Collar Defendant ................................ 43
    2.  Gavin Was Motivated by Human Concern, Not Greed ............................................ 44
    3.  Gavin Did Not Originate, Direct, or Arrange the Fraudulent Transactions and
       Made Numerous Attempts to Stop the Fraud .......................................................... 45

B.  Gavin's History and Characteristics Warrant a Noncustodial Sentence .......................... 47

C.  A Noncustodial Sentence Satisfies the Sentencing Goals of Retribution, Deterrence,
    Incapacitation, and Rehabilitation ..................................................................................... 50

    1.  A Prison Term is Not Necessary to Adequately Reflect the Seriousness of the
       Offense or to Promote Respect for the Law ........................................................... 51
    2.  A Noncustodial Sentence Adequately Provides Just Punishment .............................. 54
    3.  A Noncustodial Sentence Affords Adequate General and Specific Deterrence ......... 55
    4.  A Prison Term Is Not Necessary to Protect the Public ............................................ 61
    5.  A Prison Term Would Not Advance the Goals of Rehabilitation ............................. 62

D.  The Need to Avoid Unwarranted Sentencing Disparities Justifies a Noncustodial
    Sentence ............................................................................................................................ 63

V. FINANCIAL ASPECTS OF THE SENTENCE ..................................................................... 65

A.  A Fine Is "Not Recommended" By the Probation Department ........................................ 65

B.  Gavin Did Not Derive any Property from the Fraudulent Scheme, so Forfeiture is
    Not Warranted ................................................................................................................... 65

C.  The Burden of Restitution Should be Apportioned Across Co-Defendants According
    to Relative Culpability and Financial Circumstances ...................................................... 66

CONCLUSION ............................................................................................................................... 67

# TABLE OF AUTHORITIES

## Cases

*Gall v. United States*,
   552 U.S. 38 (2007) ........................................................................ 56, 61, 63

*Honeycutt v. United States*,
   137 S.Ct. 1626 (2017) ........................................................................ 66

*Koon v. United States*,
   518 U.S. 81 (1996) ........................................................................ 42

*Pepper v. United States*,
   562 U.S. 476 (2011) ........................................................................ 42

*Rosales-Mireles v. United States*,
   138 S. Ct. 1897 (2018) ........................................................................ 51

*Tapia v. United States*,
   564 U.S. 319 (2011) ........................................................................ 51

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........................................ 47, 52, 53

*United States v. Algahaim*,
   842 F.3d 796 (2d Cir. 2016) ........................................................ 53

*United States v. Chin Chong*,
   No. 13-CR-570, 2014 WL 4773978 (E.D.N.Y. Sept. 24, 2014) ............ 54

*United States v. Cole*,
   765 F.3d 884 (8th Cir. 2014) ........................................................ 54, 61

*United States v. Collado*,
   No. 07-CR-1144, 2008 WL 2329275 (S.D.N.Y. June 5, 2008) ............ 62

*United States v. Contorinis*,
   692 F.3d 136 (2d Cir. 2012) ........................................................ 66

*United States v. Corsey*,
   723 F.3d 366 (2d Cir. 2013) ........................................................ 52

*United States v. Coughlin*,
   No. 06-CR-20005, 2008 WL 313099 (W.D. Ark. Feb. 1, 2008) ............ 61

*United States v. Davis*,
   No. 07-CR-727, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) ............ 48

*United States v. Discenza*,
   No. 14-CR-273, 2016 WL 3443586 (S.D.N.Y. May 31, 2016) ............ 55

*United States v. Edwards*,
   595 F.3d 1004 (9th Cir. 2010) ........................................................ 55

*United States v. Emmenegger*,
   329 F. Supp. 2d 416 (S.D.N.Y. 2004) ........................................ 53

iii

*United States v. Gil-Guerrero*,
   No. 17-773-CR, 2018 WL 6720837 (2d Cir. Dec. 21, 2018) ............... 66

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012) ........................................... 53

*United States v. Gutierrez*,
   No. 10-CR-84, 2010 WL 3418309 (E.D. Wisc. Aug. 27, 2010) ........... 50

*United States v. Hawkins*,
   380 F. Supp. 2d 143 (E.D.N.Y 2005) ........................................... 55

*United States v. Johnson*,
   No. 16-CR-457-1, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ......... 53

*United States v. K*,
   160 F. Supp. 2d 421 (E.D.N.Y. 2001) ........................................... 61

*United States v. Leonard-Allen*,
   No. 09-CR-190, 2010 WL 2490770 (E.D. Wisc. June 16, 2010) ......... 50

*United States v. Marsh*,
   No. 10-CR-480, 2011 WL 5325410 (E.D.N.Y. Oct. 26, 2011) ........... 49

*United States v. Mohammed*,
   315 F. Supp. 2d 354 (S.D.N.Y. 2003) ........................................... 53

*United States v. Nesbeth*,
   188 F. Supp. 3d 179 (E.D.N.Y. 2016) ........................................... 54

*United States v. Parris*,
   573 F. Supp. 2d 744 (E.D.N.Y. 2008) ...................................... 52, 53

*United States v. Ranum*,
   353 F. Supp. 2d 984 (E.D. Wis. 2005) ........................................... 45

*United States v. Singh*,
   877 F.3d 1017 (2d Cir. 2017) ..................................................... 29

*United States v. Smith*,
   No. 1:06-CR-00394, 2009 WL 249714 (N.D. Ohio Feb. 2, 2009) ....... 62

*United States v. Warner*,
   792 F.3d 847 (7th Cir. 2015) ..................................................... 61

*United States v. Zacharias*,
   365 F. Supp. 256 (S.D.N.Y. 1973). ............................................. 57

*Wasman v. United States*,
   468 U.S. 559 (1984) ................................................................. 4

*Williams v. New York*,
   337 U.S. 241 (1949) ................................................................. 4

*Wisconsin v. Mitchell*,
   508 U.S. 476 (1993) ................................................................. 44

## Statutes

8 U.S.C. § 1182 ........................................................................................... 58

15 U.S.C. § 78ff ......................................................................................... 43

18 U.S.C. § 3553 ................................................................................... passim

18 U.S.C. § 3664 ......................................................................................... 66

18 U.S.C. § 981 ........................................................................................... 65

28 U.S.C. § 2461 ......................................................................................... 65

## Sentencing Guidelines

U.S.S.G. § 3E1.1 ......................................................................................... 29

U.S.S.G. § 5K1.1 ........................................................................... 1, 39, 42, 67

## Legislative History

S. Rep. No. 98-225 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182 ............................................. 55

## Secondary Sources

1 W. LeFave & A. Scott, Substantive Criminal Law § 3.6(b) (1986) ......................................... 44

Allan Ellis, John R. Steer, & Mark H. Allenbaugh, *At a 'Loss' for Justice: Federal
Sentencing for Economic Offenses*, 25 Crim. Just. 34 (2011) ............................................. 52

Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199 (2013) ........... 57

Frank O. Bowman, III, *Damp Squib: The Disappointing Denouement of the Sentencing
Commission's Economic Crime Project (And What They Should Do Now)*, 27 Fed.
Sent'g Rep. 270 (2015) ...................................................................................... 52

Merriam-Webster Medical Dictionary ....................................................................... 11

R. Rahme & R. Moussa, *The Modic Vertebral Endplate and Marrow Changes: Pathologic
Significance and Relation to Low Back Pain and Segmental Instability of the Lumbar
Spine*, 29 Am. J. Neuroradiology 838 (2008) ................................................................. 11

Sally S. Simpson, *White-Collar Crime: A Review of Recent Developments and Promising
Directions for Future Research*, 39 Ann. Rev. Soc. 309 (2013) ............................................. 56

Gavin Campion respectfully submits this memorandum and supporting letters and exhibits to assist the Court in evaluating an appropriate sentence.

We respectfully request that the Court accept the recommendation of the Probation Department that "You Honor . . . impose a sentence of Time Served."  Presentence Investigation Report ("PSR") at p. 52 (Dkt. 906).  As set forth below, a noncustodial sentence is the appropriate sentence, under 18 U.S.C. § 3553(a) and U.S.S.G. § 5K1.1, in light of Mr. Campion's substantial assistance to the Government, his undisputed efforts to stop the fraud at KIT Digital, his limited role in the scheme, his good motives and lack of greed (including the fact that he did not profit from the fraud), his impressive rehabilitation and important contributions to law-promoting technologies, his serious medical issues, and his vital role as sole emotional and financial support of his young family.

## PRELIMINARY STATEMENT

While working as the president of KIT Digital ("KITD") and a member of its board, Gavin became aware of a fraudulent scheme to inflate KITD's revenue to meet market expectations for KITD's earnings.  Chief Executive Officer, Kaleil Isaza Tuzman, conceived of the fraud and directed it.  Gov't Sent'g Memo. at 2.  Chief Financial Officer, Robin Smyth, led the efforts to execute the fraudulent scheme, enlisting many others who were actively and directly involved in carrying it out, including Tomas Petru, Petr Stransky, Nigel Regan, and Rima Jameel.  Gov't Sent'g Memo. at 2; Tr. 3892:22–3893:2.  When Gavin was first told about the scheme, he regrettably thought of it as their scheme, and thought that he could get on with his operations and integration responsibilities.  He thought he should take care of the employees and find a way to fix the company from within.  He was wrong.  On a number of occasions, his job responsibilities intersected with the scheme.  He signed the Form 10-K for 2010, which contained misstatements. From August 2010 to March 2012, he participated in quarterly investor calls where Smyth and/or

Tuzman made misstatements.  He was also present at periodic meetings with Tuzman and Smyth where Tuzman and Smyth discussed plans to continue the scheme to inflate revenues.  And in February 2012, at the request of Smyth, he executed signature pages Smyth had sent that went with fake license contracts; Gavin did not know at the time they were fake, but he also did not adequately confirm with Smyth that they were legitimate, despite knowing of the fraudulent scheme.  Gavin regrettably never told the auditors, investors, or authorities what Tuzman, Smyth, and others were doing to create, book, and communicate the fake revenue.

Between 2011 and early 2012, Gavin confronted Tuzman directly and repeatedly, on some occasions with Smyth's support.  When that failed, he escalated the issue to two KITD board members, although Gavin should have been more explicit that the practices he was red-flagging were "fraudulent."  As the Government acknowledged, Gavin "tr[ied] to do the right thing and stop a fraud." Tr. 7101:9–18 (Government rebuttal summation).  When these directors refused to engage or intervene, Gavin devised a plan to restructure the company, which would have eliminated the opportunity and pressure to rely on any fake revenue.  After Tuzman was forced to resign, the new CEO initially approved Gavin's restructuring plan, but then inexplicably reversed course and refused to take steps to stop the fraud.  At that point, exhausted and exasperated, in April 2012, Gavin resigned from KITD.

Notwithstanding his efforts to "stop a fraud," Gavin deeply regrets that he stayed at KITD after learning of the fraudulent revenue scheme and failed to alert the investing public or the authorities.  He understands and regrets how his failure to disclose important information misled and harmed those he had a duty to tell.  Unprepared as he was for the role of a public company president, he naïvely thought his only duty was to change the way KITD operated to salvage the company and protect its employees.  He tried to repair the ship, force the captain to change course,

and look after the crew on board.  But he was blind to the harmful pollution the ship left in its wake.

Almost four years after Gavin left KITD behind, the FBI visited Gavin in Australia and advised him that he was a target of a criminal investigation into KITD.  At his own expense, Gavin agreed to fly to the United States and stay in the United States until he resolved his liability.  He voluntarily provided hundreds of important documents to the prosecutors of the U.S. Attorney's Office.  He was truthful and complete in his many debriefings.  He agreed to testify at Tuzman's trial and did so with clarity and integrity.

Also during his cooperation, Gavin suffered attacks by individuals he was never able to identify.  In support of its September 2016 application requesting that Gavin's plea documents remain sealed, the Government described a number of incidents that Gavin had reported since he began cooperating, when he had been harassed, punched, and had his car and house burglarized.  *See* Sealed Affirmation and Application (Dkt. 169); (*see also* Ex. 1 (October 2016 Police Report); Ex. 2 (Victoria Police statutory declaration).).

In the nearly seven years since Gavin left KITD (including the two and a half years of his cooperation), Gavin has worked hard to make three different Australian companies thrive, supported his ex-wife and two small children, has been a champion of compliance in his enterprises, and obeyed the terms of his pre-trial release.  Despite all the physical ailments and anxiety from which he suffers, *see infra* Section I.C, Gavin remains the sole support for his family.  Before and after KITD, Gavin has consciously associated himself with companies that focus on their culture and employees, and aim to create social good.  Gavin co-founded a company that develops knowledge-management software with a focus on compliance and information governance within large corporations.  He also co-founded a video-editing and analysis technology

company, whose applications range from the prevention of video piracy, ███████████

████████████, to services in the education sector.  He has also been heavily involved in a

successful start-up focused on compliance in the call-recording sector.  Gavin has been forthright,

open, and honest about his legal troubles with these companies and their investors.  Even knowing

about Gavin's conviction and history with KITD, Gavin's current and former colleagues, *as well*

*as investors* in these companies, have written this Court in support of Gavin, affirming their faith

in his integrity and work ethic.

As the PSR states, Gavin "acknowledged that his actions were wrong and expressed

remorse," PSR ¶ 191, and he has done everything in his power to cooperate and assist the

Government in its investigation and prosecution.  Long before he was approached by the FBI, he

tried—imperfectly, but sincerely—to bring the fraud to an end.  His physical fragility and severe

anxiety would make him especially vulnerable in prison.  And he is the sole support for his young

children and ex-wife ███████████████████  Moreover, despite his failings at KITD, he has

otherwise conducted himself with honor—as the many letters submitted on his behalf attest—and,

despite his conviction, some of the largest and most successful companies in the world still want

to do business with him because of his integrity and vision.  Gavin has made great strides at

rehabilitation in the nearly seven years since he left KITD, and he presents no risk of recidivism,

such that putting him in prison is simply unnecessary.  To the contrary, a noncustodial sentence,

with appropriate conditions, based upon his repeated efforts to "stop a fraud" and his cooperation,

will send a powerful message to others.

## I.   GAVIN'S PERSONAL HISTORY AND CHARACTER

"[T]he underlying philosophy of modern sentencing is to take into account the person as

well as the crime by considering 'information concerning every aspect of a defendant's life.'"

*Wasman v. United States*, 468 U.S. 559, 572 (1984) (quoting *Williams v. New York*, 337 U.S. 241, 250 (1949)).

### A.  Gavin Had a Stressful and Cold Childhood

Gavin was born and raised in Cheshire, Northern England, just south of Manchester.  PSR ¶ 214.  He is the eldest of three sons and was raised in a working-class family.  PSR ¶ 214.  The Campion home was an "uncomfortable" place.  PSR ¶ 215.  His father, Patrick Campion, travelled often for work, "which unfortunately resulted in less and less quality time with [his] wife and children."  (P. Campion Ltr.)  When he was home with the family, Patrick was generally "distant, anxious, and stressed."  PSR ¶ 215.  ███████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████  Gavin's parents fought constantly, PSR ¶ 215, and they have since divorced, (P. Campion Ltr.).  According to Gavin's youngest brother, Keith, ████████████████████████████████████████. (Keith Campion Ltr.)

Owing to this tense and uncomfortable upbringing, Gavin's family has never been close. PSR ¶ 215.  Gavin, in particular, grew up insecure and lonely, and has a distant relationship with his parents. *See* PSR ¶ 214–15.  Over the last 20 years, Gavin has seen his parents only a handful of times.  Gavin has not seen his brother, Neil Campion, in the 20 or so years since Gavin left England.  None of his brothers are close to their parents.  (Keith Campion Ltr.)  Patrick "regret[s] that [Gavin] did not enjoy the full support network common in most families."  (P. Campion Ltr.)

Gavin and Keith, who still lives in Northern England, are very close.  PSR ¶ 214; (Keith Campion Ltr.)  Keith praises Gavin for "fill[ing] th[e] gap" left by their parents by being a "caring and nurturing older brother."  (Keith Campion Ltr.)  Gavin's support for his youngest brother continued after childhood.  Gavin was Keith's best man at his wedding and is now the godfather

of one of Keith's sons.  (Keith Campion Ltr.); PSR ¶ 214.  Gavin has continued to provide Keith

and his family with "emotional and financial support."  (Keith Campion Ltr.) ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

### B.  Gavin Has Built a Loving Family

Gavin met Amy Wakeling in 1997.  They were engaged to be married shortly thereafter.

PSR ¶ 219.  Amy is from Australia, and, in 1998, Gavin and Amy decided to move to Melbourne.

(Amy Campion Ltr.)  For Gavin, the move to Australia was a chance to break free from negative

dynamics in his life and start a new family with Amy.  (*See* Amy Campion Ltr.)  Within days of

arriving in Melbourne, Gavin and Amy were married in a small backyard ceremony with no guests.

*See* PSR ¶ 219.  The next day, they moved into a one-room apartment that shared a bathroom with

other building residents.

Amy and Gavin were determined to build a new life together in Melbourne.  Gavin and

Amy are the proud parents of two sons, ████████ .  PSR ¶ 219; (Amy Campion Ltr.) ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

Unfortunately, Gavin and Amy's relationship did not survive his traumatic experience at

KITD.  They separated in 2014.  PSR ¶ 219. ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████   Gavin and Amy are now divorced.   Gavin

blames himself for the break up.   ████████████████████████████████████

████████████████████████████████████   Gavin lives nearby in a separate

residence, a few short kilometers away.  (Amy Campion Ltr.); PSR ¶ 221.  Gavin shares custody

of ████████████, who are with him three days a week.  (*See* Amy Campion Ltr.)

Gavin and Amy enjoy a warm, collaborative relationship, directing their energies to "co-

parent[ing] the boys."  (Amy Campion Ltr.; *see also* S. Blackmore Ltr.); PSR ¶ 219.  As Michelle

Wright, Amy's best friend, observed, "[e]ven after the couple['s] separation, Gavin continued to

put the welfare of his children and wife as top priorities," (M. Wright Ltr.), understanding that

Amy's welfare is integral to the happiness of their children, (J. Eldridge Ltr.).  Amy wrote "on

behalf of those who have no voice in this process – his children":

> They are the ones who need him the most, the ones most impacted
> by the choices of adults around them, the ones who if you asked
> would talk of their personal hero, their very own super star.  Other
> people may write about hard work and business advice and
> support… but I want to write about a man who hobbles up the
> driveway to push his two little boys on their go carts, takes them to
> the movies and to museums, to see dinosaur skeletons in real life
> and wild animals at the zoo, who buys them facemasks with snorkels
> and takes them to the beach, who builds complicated LEGO
> structures and teaches them about science and space.  A man who
> reads bedtime stories and tells them silly jokes.  A man who built a
> chicken run so the boys could have chickens and quails and learn
> about where eggs come from and about caring for animals.  Gavin
> is involved in all aspects of the children's lives.  He picks them up
> and drops them off from school and kinder[garten] on his days.  He
> makes them lunch and washes their uniforms.  He attends school
> meetings with teachers where his work schedule allows.  Gavin is a
> generous and loving father.

(Amy Campion Ltr.)  Suzy Blackmore, a friend who lives near Gavin and his family in Australia and who regularly visits them, wrote that "[w]itnessing Gavin as a father is a privilege" and that Gavin "is one of the proudest fathers [she] know."  (S. Blackmore Ltr.)  She attributes Gavin's "solid work ethic [to] his desire to be the best father he can be," and that "███████ are always his top priority."  (S. Blackmore Ltr.)  Gavin "is profoundly in love with his boys," and he is "attentive, patient, and loving[,] provides structure, and ensures they maintain a healthy balanced diet."  (S. Blackmore Ltr.)  "Gavin often works overnight so that he can have free time during the day to spend with his kids."  (C. Darvall Ltr.)

Gavin does his best to be an active father, despite his own medical issues.  (S. Blackmore Ltr.); *see also infra* Section I.C.  "Gavin never lets his children see the physical pain he is in, nor does he allow it to take away from the precious time he has with them."  (S. Blackmore Ltr.)  Blackmore witnessed Gavin's importance in ████████ lives, especially in their formative years:

> I see the adoration ████████ have for their father.  Both highly intelligent and inquisitive, they turn to their father for answers to the infinite questions they each have about life, the world, and even the universe.  Gavin is thoughtful with his answers, taking great care to respond in such a way that allows them to think for themselves and to give their independence and creativity plenty of room to flourish.

(S. Blackmore Ltr.)  Gavin and Amy believe in "the importance of remaining a strong force for the sake of their children," which is their "paramount" concern.  (S. Blackmore Ltr.)  Despite their divorce, Gavin and Amy "vacationed together with the kids in 2018," and they "ensure Christmas is spent together, every year."  (S. Blackmore Ltr.)  Gavin's friends and family uniformly attest that Gavin is a "doting father," (Andy Campion Ltr.), committed to "his responsibilities for the care and upbringing of his children," (T. Place Ltr.; *see also* S. Blackmore Ltr.; J. Cadwallender Ltr.; R. Campion Ltr.; J. Eldridge Ltr.)

Amy is only able to work one day per week as a marketing assistant.  (*See* Amy Campion Ltr.)  "[D]ue to ███████████ and needing to be able to care for [their] young children, [Amy, ███████████] rely on Gavin's support to contribute to [their] basic cost of living."  (Amy Campion Ltr.; *see also* S. Blackmore Ltr.; J. Eldridge Ltr.)  "[They] live month to month at the moment, so [doing so] without [Gavin's financial support] would definitely cause [them] a financial burden."  (Amy Campion Ltr.)  Any ██████████████████████ would cause "extreme difficult[y]" for their already tight finances.  (Amy Campion Ltr.)  "With no support structure [where they live], [Amy is] not sure how [she] would cope [if Gavin is not with them]."  (Amy Campion Ltr.)  "[She] would need to make drastic changes to [their] lives to continue to look after the boys alone, perhaps . . . selling the house and moving into a smaller unit to access money to pay for childcare so [she] could continue working."  (Amy Campion Ltr.)  Given ██████████ ███████ and lack of support structure, this disruption would be a particularly difficult burden to bear.

Neither Gavin nor Amy had ever visited Melbourne or knew anyone in the city when they first moved there in 1998.  To this day, Gavin and Amy's closest family members are approximately 3,400 kilometers away, and the others are in the United Kingdom.  (*See* Amy Campion Ltr.)  With their closest family thousands of kilometers away, and their social circle diminished by this legal process, Amy, ████████████ need and rely on Gavin.  (*See* Amy Campion Ltr.)  Gavin's legal troubles have, thus, greatly affected his young sons, especially the roughly 15 weeks Gavin spent in the United States assisting the Government with this matter, leaving ████████████ temporarily fatherless in Australia.  ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

**C.** ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

          ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[1] Modic type III is a "relatively rare" form of "[d]egenerative vertebral endplate and subchondral bone marrow changes."  R. Rahme & R. Moussa, *The Modic Vertebral Endplate and Marrow Changes:  Pathologic Significance and Relation to Low Back Pain and Segmental Instability of the Lumbar Spine*, 29 Am. J. Neuroradiology 838, 838 (2008).  It is believed "to represent subchondral bone sclerosis."  *Id.*  Scheuermann's disease is the "osteochondrosis [*i.e.*, bone degeneration followed by calcification] of the vertebrae associated in the active state with pain and kyphosis [*i.e.*, exaggerated outward curvature of the . . . spine]."  Merriam-Webster Medical Dictionary, https://www.merriam-webster.com/medical/.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

**D.  Gavin Has Found Success by Living His Working-Class Values**

Lacking opportunity as a child and young adult, Gavin has always believed "hard work []
was going to make the difference for him."  (J. Wall Ltr.)  Gavin believes in self-reliance, but also
believes that each of us, no matter how determined and diligent, needs human concern and
encouragement.  Gavin has a "willingness to always put his company, clients and colleagues ahead
of his own personal ambitions or financial gain."  (G. Lee Ltr.)  He is "a loyal, kind[,] trustworthy

person who . . . put[s] [the] needs of others before his own." (K. Schonfelder Ltr.) Gavin "takes [his] responsibility for his people['s] well[-]being seriously." (T. Place Ltr.) Gavin has lived these values at each stage of his journey from Cheshire to Melbourne to Dubai to Prague and back to Melbourne, as many friends and colleagues have attested.

### 1.   Beginning at McDonald's

Gavin began working early in life. At the age of 12, while still in school, he took on a paper route. PSR ¶ 216. At age 13, during his school holidays, Gavin began working full-time as a manual laborer on nearby farms. PSR ¶ 216. When he was around 15 years old, Gavin decided to leave school, where he had been constantly bullied. At 16, Gavin started working full-time at a local McDonald's restaurant. PSR ¶ 216. He worked in the kitchen as a cook and at the front counter taking orders and serving food. (J. Eldridge Ltr.) After three years of hard work, Gavin experienced success for the first time and became a floor manager at age 19. PSR ¶ 216.

### 2.   Admission to University

Gavin completed the curriculum at Hartford High school in Northwich, U.K., in 1988. PSR ¶ 233. He performed well at Hartford and received grades of As and Bs. PSR ¶ 233. However, he struggled at the next stage of education, where his grades were not good enough to advance to the university system. *See* PSR ¶ 233. Nonetheless, the success he had at McDonald's between ages 16 and 19 gave him the confidence to try to better himself. Gavin resolved to try again for admission to university, so he went back to school for another year to re-take his exams while working at McDonald's part-time. Gavin's perseverance paid off when he received an offer to attend Huddersfield Polytechnic (later renamed University of Huddersfield) to study marketing. Gavin thus became the first member of his extended family to attend university.

While at Huddersfield, Gavin continued to work part-time at McDonald's to fund his studies and living expenses, and did so until 1994, when he was 24 years old. *See* PSR ¶ 216.

13

Gavin became an inspiration for his friends and colleagues at McDonald's, who could not recall one of their ranks making it to university.  (J. Eldridge Ltr.)  In 1995, Gavin graduated with a Bachelor of Arts Degree in Marketing.  PSR ¶ 232.  This pivotal achievement made Gavin believe he was capable of doing things he had always thought were reserved to a different class of people.

        3.     Entry into Advertising

After working for three years in a few entry-level advertising positions in England, Gavin and Amy moved to Australia in 1998, where Gavin found a job at an advertising agency in Melbourne, ██████████.  (G. Lee Ltr.); PSR ¶¶ 217–18.  According to Grant Lee, then CEO of ████████, certain aspects of Gavin's drive and personality stood out "[f]rom the first interview."  (G. Lee Ltr.)  Lee also observed that Gavin "had a very strong 'moral compass.'" (G. Lee Ltr.)  Lee admired Gavin's willingness to "take on any challenge, even if it was not really in his skill set."  (G. Lee Ltr.)

About nine months after Gavin started, Lee resigned from his position as CEO of ████ ██████████ in order to start his own advertising agency.  (G. Lee Ltr.)  Lee "had no hesitation in approaching Gavin, and one other [person], to offer them a partnership in the agency."  (G. Lee Ltr.)  Together, they formed ██████████ in late 1999, in Melbourne.  (G. Lee Ltr.)  Gavin and Lee "shared [a] vision for ██████████ . . . to create a new type of business that was focused on building a corporate culture that enabled all employees to share in the success of the agency."  (G. Lee Ltr.)  Gavin was immediately attracted to the idea of creating a business that puts its people first.  (See G. Lee Ltr.)

        ██████████ was "perhaps best known in the industry for their desire to look after and nurture their staff."  (C. Darvall Ltr.)  Memorialized in an employee charter, ██████████'s vision was to be "a place you look forward to going to when you wake up because it provides every employee the opportunity to fulfill their career goals."  (Ex. 8 (██████████ Employee Charter).)

"Their staff charter centered around respect, compassion and understanding, not the norm in advertising during that time." (C. Darvall Ltr.) ███████ promised to share up to 25% of the agency's profit with its staff. (Ex. 8 (███████ Employee Charter).)  Gavin and his partners refused to take market rate salaries at ███████ preferring instead to invest in their employees.  In 2001, when the agency still had no profit, Gavin and the two other principals put their own money up to pay bonuses to staff.  As Gavin's friend and former ███████ employee Kerry Schonfelder recalled, Gavin "demonstrated a genuine commitment by foregoing personal income to ensure that staff were paid on time."  (K. Schonfelder Ltr.)

███████ quickly became a success, which Lee attributes in "large part . . . to Gavin's ability and work ethic." (G. Lee Ltr.)  Gavin's role was to work in account management, running key advertising accounts.  At its peak, ███████ employed about 25 people and had an annual revenue of over $3 million Australian dollars (US$2.2 million).  *See* PSR ¶ 241; (G. Lee Ltr.)  In 2001, ███████ was named Australian Integrated Advertising Agency of the year.  PSR ¶ 241.

In 2005, while still a partner at ███████, Gavin started a sister agency called Factory 212, later renamed the ███████.  *See* PSR ¶ 240; (G. Lee Ltr.)  "As CEO of this new business, Gavin proceeded to create a similar corporate culture that he had been a part of at ███████." (G. Lee Ltr.)  At ███████ and ███████, Gavin "would present the companies['] values during a pitch to assess a cultural fit with a client." (C. Darvall Ltr.)  ███████ was an immediate success and quickly grew. (G. Lee Ltr.)  At its peak, ███████ employed about 40 people with an annual revenue of $4 million Australian dollars (US$3 million). (*See* G. Lee Ltr.)  ███████ was named the Australian Online advertising agency of the year in 2006. (C. Darvall Ltr.)  Lee credits ███████'s rapid success to "Gavin's hard work, skill and commitment to providing his team with a great corporate culture." (G. Lee Ltr.)

Around 2005, Gavin's senior partners arranged a deal for Roo Group to purchase 51% of

███████████.  *See* PSR ¶ 241.   Roo Group was an online video broadcasting technology

company, based in New York City.  (*See* G. Lee Ltr.)  Around 2006, Roo Group also agreed to

acquire ██████.  PSR ¶ 240.

4.    Role at KITD

a.    *Gavin's job responsibilities*

In late 2007, Tuzman took over Roo Group and renamed it KIT Digital ("KITD").  Tr.

3904:9–13; Tr. 3909:9–16.  At that time, Gavin traveled to New York to meet with Tuzman and

his business associates, during which they discussed cost-cutting and the possibility of integrating

██████ with KITD.  Tr. 3907:21–3908:3.  Gavin had never been to New York before, and had

only travelled to the United States once before.  Gavin was initially in awe of Tuzman.  He had

never "met anybody so impressive in business; Harvard graduate, Wall Street, obviously very,

very successful, said he spoke seven languages, used business terms and words that [Gavin] never

heard before."  Tr. 3909:1–8.  Tuzman talked openly about his wealth and his ambition to raise

enough money to finance a campaign for the U.S. Senate.  Tr. 3916:2–3920:9 (McCrae).  Dan

Hart, Tuzman's friend from Harvard who eventually joined the board of KITD, announced at the

meeting that the plan was to keep the company private and then sell it off in nine to twelve months.

Tr. 3907:16–20, 3908:17–23.  Thus, when Gavin agreed to join the company, he thought he was

joining a small, private company for a short-term project.  Tr. 3908:17–23.

After the meeting, Lee was "shocked" to learn that Tuzman had offered Gavin the role of

president of KITD.  (G. Lee Ltr.)  Although Lee had confidence in Gavin, Lee knew Gavin lacked

the experience needed to be president of a large, international company, which might someday be

publicly traded.  (G. Lee Ltr.)  Lee did not believe Gavin was "equipped to handle such a role,"

being "the CEO at a small advertising agency in Melbourne."  (G. Lee Ltr.)  Henrik Eklund, who

worked with Gavin at KITD after it acquired Eklund's company, also "suspect[ed that Gavin] lacked some of the formal administrative training and knowhow needed to run a fast-growing global company group," or "how to protect various stakeholders." (H. Eklund Ltr.)  Nonetheless, Gavin became president of KITD in April 2008.  Tr. 3910:1–5.  In November 2008, Tuzman asked Gavin to join the board of KITD.  *See* Tr. 3910:6–12.  Gavin recalls that, when he asked why, Tuzman told Gavin that, as president, investors expected him to be on the board.  Gavin recalls Tuzman assuring him that there would be experienced members on the board with him, and Gavin agreed to join.

Gavin had no understanding and requested but received no training for the role and duties of a president and director, much less of a public company president and director.  He also had no experience with technology or video companies.  Both ██████████ and ████████ were private advertising agencies without any outside investors prior to their acquisitions by KITD.  Gavin had no prior experience with public companies whatsoever, much less with U.S. securities laws and regulations.  In fact, Gavin does not recall knowing what the Securities and Exchange Commission was during his tenure as president of KITD.  Gavin testified at trial that he thought the SEC was "where [one] sent the financials and they got posted."  Tr. 4641:14–4642:8.  He told prosecutors that he had no knowledge of SEC filing requirements.  Tr. 4633:25–4634:3.  Nonetheless, he accepted the role believing it would be a valuable learning experience to work with Tuzman and others, who seemed to have impressive pedigrees and business acumen.  Gavin thought he could rely on them and trust them.

Gavin did not have a traditional president's role.  He was not familiar with the role and recalls never receiving a job description.  He thought he would be using his advertising experience to help video content providers monetize their views.  It was clear that Tuzman was in charge of

the company and Gavin reported directly to him.  Tr. 3921:13–14.  Gavin spent most of his time

integrating the operations and personnel of KITD's steady stream of acquisitions, of which there

were approximately 20 during Gavin's tenure.  Tr. 4105:13–24.  Tuzman "was in charge of

mergers and acquisitions at KIT Digital."  Tr. 4106:5–7.  But Tuzman also injected himself into

all aspects of KITD, big and small, from broader company strategies and geographical expansions

to booking business flights and paying outside vendors.  Tr. 3922:13–3923:14.  Gavin was not

responsible for accounting, finance, acquisitions, due diligence, or contracts related to acquisitions;

the relevant teams reported to Smyth and Tuzman.  *See* Tr. 2293:3–12.  "It was the ultimate

responsibility of Robin Smyth" to compile "the financial statements and accounting [for the]

accuracy of information about KITDigital's operations in th[e] 10-Ks."  Tr. 4640:16–25.  Gavin

recalls only rarely interacting with outside investors or clients.  Gavin does not recall having any

interaction with KITD's auditors.

In March 2012, Gavin transitioned to the role of Chief Restructuring Officer, where his

focus was supposed to be "[e]xecution of the 'structuring for success' cost reduction plan."  (Ex. 9

(Transition Agreement).)  For reasons explained further below, *see infra* Section II.D, Gavin

resigned in April 2012.

### b.  *Abusive work environment*

Tuzman subjected Gavin and others to a "horrific" working environment.  Tr. 3923:15–17.

███████████████████████████████████████████ was "all too aware of the toxic experience

of working for Kit Digital."  (██████████)  ███████████████████████████████████████,

"found the whole atmosphere quite toxic and decided to leave the company."  (████████████)

Tuzman often told stories to intimidate others.  Gavin recalls that Tuzman talked about

visiting the infamous drug lord Pablo Escobar's house when he was a child.  *See* Tr. 4774:18–20.

Gavin also recalled one board meeting where the topic of a loan to Omar Amanat was discussed.

"Tuzman told [Gavin] that he would have Omar Amanat 'killed' because Omar Amanat ha[d] stolen $2 million from KIT digital." *See* Tr. 46:15–20 (oral decision on motions in *limine*).  When things did not go the way he wanted, Tuzman would "scream," "bully[] and intimidat[e] through his words."  Tr. 3720:15–19 (Government proffer), 4225:5–11 (Campion testimony).  Gavin recalls that Tuzman kept a baseball bat in his office, which he would often carry with him and swing around in the office and point it at people.[2]  One board member, Stephen Felscher, was pushed out for asking too many questions about a loan to an investment fund.  Tr. 2569:6–14.

At KITD, "[t]he expectations . . . were unbearable," and Tuzman had Gavin working constantly.  Tr. 3923:23–3924:8.  Gavin does not remember taking a single day off during his time at KITD.  Gavin was once kept awake for sixty-four hours straight.  Tr. 3925:6–8.  "[C]onstant travelling [was] required while he worked at KITD."  PSR ¶ 226.  During the final year of KITD, Gavin sent or received an average of over 400 emails a day.  *See* Tr. 3921:2–12.  On one occasion, Tuzman berated Gavin for not responding to calls and emails because Gavin had slept through the night from 1 a.m. to 9 a.m. on a Saturday morning, and Tuzman demanded that, "if you are ever going to do that again, let me know in advance."  Tr. 3924:20–3925:5.  Others were also subjected to Tuzman's abuse.  ███████ wrote that "[he] could get calls at 4 am in the morning from Mr Tuzman where he demanded answers/results etc." (████████████) He thought "the 'atmosphere' was quite bizarre, bordering to threatening." (███████████)

Gavin's experience at KITD was all the more disorienting because, shortly after joining KITD, the company headquarters moved first to Dubai, and then to Prague.  Tr. 3910:15–18;

---

[2] A 2010 Forbes article detailed an incident where one of Tuzman's companies "labored under a crushing lease on a 40,000-square-foot office building in Los Angeles, and the landlord refused to bend on terms."  Christopher Steiner, *Startup.com: The Sequel*, Forbes (Oct. 7, 2010), https://www.forbes.com/forbes/2010/1025/entrepreneurs-jumptv-kit-digital-startup-the-sequel.html#3d0227d2449a.  In response, "[b]aseball bat in hand, Tuzman said he would destroy [the] offices and any capital improvements [his company] had made unless the landlord allowed him to buy out the leases.  'I can play hardball,' says Tuzman." *Id.*

3912:11–16.  Gavin and Amy went not knowing anyone in either place and not speaking either of the local languages.  ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

  █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

Gavin was ill-equipped to deal with this stress and abuse.  Gavin tried to cope by focusing on KITD's operations and its employees.  Gavin felt out of his depth and started to believe there was something wrong with him, given that Tuzman and others were apparently successful, educated, experienced, multi-millionaires.  Gavin lived in a perpetual state of confusion, anxiety, and fear.

Gavin was not alone.  He recalls a steady stream of frightened and upset staff members appearing in his office, scared and in tears.  He was prepared to testify that ██████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████       Gavin felt he could not walk away from these people when he could do something to support them.

5.    Post-KITD Entrepreneurship

After Gavin resigned from KITD in April 2012, he returned to Australia. Despite his fragile mental and physical health, Gavin knew he had to work to support his family, including his then one-year-old son. Gavin resolved to work only for companies that contributed to the social good, such as in the compliance, audit, and anti-piracy and security sectors, only with people who share his values, and not to overstep his qualifications. He went to work helping to launch start-up companies, just as he had done with ██████████ and ██████.

Gavin's first job post-KITD was as a consultant and part-time chief executive officer of ███████████, a small, private, Melbourne-based start-up technology company. PSR ¶ 238. Unfortunately, the small firm had limited funds and additional funding never materialized. As a result, the company struggled to pay its operating team. Consistent with his actions throughout his career, and notwithstanding the immense personal financial pressure he was under, Gavin recalls refusing to pay himself for long periods of time, and ensuring that if he was paid, he was paid last and after he was satisfied that the operating team had been paid. When Gavin perceived that his operating plan was not going to be implemented, he promptly resigned. PSR ¶ 238.

In 2013, a friend and former █████████ colleague approached Gavin to help with his small private company, █████████████, based in Melbourne that employed about seven people. *See* PSR ¶ 237. Gavin recognized that the technology could be made into an effective vehicle to help large corporations and banks organize and distribute information and processes to employees in a highly-regulated environment. Gavin then cofounded a new company called ██████ █████████████████, which appointed Gavin as its managing director to execute this vision.

Under his leadership, ██████ deployed over 20,000 licenses at a major banking institution in Australia,[3] and secured a deal with a leading Asian telecommunications company.[4]

In 2015, before Gavin was aware he had any personal legal issues, ██████'s management took the company public. *See* PSR ¶ 237.  Recognizing that he did not possess the necessary qualifications to be the CEO of a public company, he resigned the CEO position and helped ██████ hire a more experienced leader.  PSR ¶ 237.  Gavin also ensured that the ██████ board was filled with experienced and qualified leaders ████████████████████████████████████ ████████████████████████████ and hired a compliance team and a full-time CFO.  Gavin was focused on being in "strict compliance with applicable regulatory and general legal requirements, processes and protocols."  (S. Papadopoulos Ltr.)  Once ██████ went public, the new management team did not believe they could keep Gavin on after he pleaded guilty in this matter.  PSR ¶ 237.  He was required to resign in 2016.  PSR ¶ 237.

In 2014, while Gavin was still at ██████, he was approached by another friend to join a company called ██████████████, and Gavin agreed.  *See* PSR ¶ 236.  During his time at ██████ as a consultant and director, Gavin helped reposition the company's product as a compliance technology for financial services firms, ensuring recording, auditing, and control of telephone calls.  PSR ¶ 236.  ██████ now has clients all over the world, including the United States, the United Kingdom, and Australia.  PSR ¶ 236.  After Gavin pleaded guilty in this matter, he was also required to resign from ██████.  PSR ¶ 236.



[3] *See* ████████████████████████████████████████████████████████████████

[4] *See* ████████████████████████████████████████████████████████████
████████████████

In 2015, Gavin founded a company called ███████████. PSR ¶ 234; (C. Richardson Ltr.) Gavin helped ████ take control of the patent underlying a video technology from another company and has been instrumental in building a successful company around it. (G. Bongiorno Ltr.) "Gavin has . . . driven [████] into areas where [its] technology can also create social good." (G. Bongiorno Ltr.) For example, "[t]he ████ technology [can be used to] counter[] piracy of video content, a $40bn [per annum] problem in the US alone, something Gavin is very passionate about stopping." (G. Bongiorno Ltr.); *see also* PSR ¶ 234. A major movie studio in the United States is currently testing the technology on a trial basis. (C. Richardson Ltr.)

███████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████ "Gavin drove a program that [was adopted by ████ to provide] initial deployments for [of the ████ technology] free [to government agencies]." (G. Bongiorno Ltr.) ███████████████████████

███████████████████████████████

███████████████████████████████

█████████████████████

Gavin has also led efforts to apply ████'s technology to the education sector. (G. Bongiorno Ltr.) ████ now "provide[s] the technology[] to a number of Universities including two of the US's biggest Universities and [it also has] a NYC based partner on board to roll [the technology] out across the higher education market." (G. Bongiorno Ltr.) "Gavin has driven this and provided the technology at a discounted rate in the education sector." (G. Bongiorno Ltr.)

████ was listed on the Australian Stock Exchange in 2015.  As with ████, Gavin resigned as CEO when ████ went public and "brought in an expert CEO."  (A. Paul Ltr.); PSR ¶ 234.  Gavin remains a consultant for ████ and assists with the creative design and commercialization of the technology.  *See* PSR ¶ 234.

████ is aware of Gavin's legal situation and has "chosen to continue to work with [Gavin] (and would do so again)."  (C. Richardson Ltr.; *see also* G. Bongiorno Ltr.)  ████ Executive Chairman Gerard Bongiorno noted that Gavin has "learn[ed] the lessons from KIT and charged forward and is super vigilant and constantly asking questions and ensures [████] always seek the right advice."  (G. Bongiorno Ltr.)  "[████]'s key investors are [also] aware of the KIT situation and have made the decision to continue to back Gavin and ████.]"  (G. Bongiorno Ltr.)  Gavin "has been open with [k]ey clients and channel partners including two of the world's largest computing companies who have undertaken their own investigations and decided to continue to work with Gavin."  (G. Bongiorno Ltr.)  Adrian Paul, an investor in companies in which Gavin has been involved and who met Gavin only three years ago, thought Gavin "was put in a situation that he should never have been put in and did his best."  (A. Paul Ltr.)  "Key investors have been happy to stay involved with ████ Technologies," and they "will continue to support businesses that Gavin is involved with."  (A. Paul Ltr.)  David Valentino, representative of another investor group in companies that Gavin has worked with or founded, noted that "[w]hen Gavin's legal issue arose, he came to us straight away and has been very open about the issue with us and other investors."  (D. Valentino Ltr.)

> Whilst it is a shame that the situation arose, we find Gavin to be a hardworking and honourable business man.  He has ensured absolute appropriate compliance and takes a conservative approach to communication.  He has ensured that all public market communications are heavily vetted by a large group of experts, including ourselves.

> Along with the rest of the investors in these companies, [Valentino] stand[s] behind Gavin and will continue to manage investment in these companies.

(D. Valentino Ltr.)  Henrik Eklund, a former KITD colleague, also noted that he and Gavin "have a strategic relationship between [their] new company[ies] ███ and ███ and work closely together with market development."  (H. Eklund Ltr.)

Last year, in 2018, Gavin partnered with his mentor Grant Lee to work on a company culture and anti-bullying tool, ██████.  *See* PSR ¶ 235.  With full knowledge of this case, Lee "had no hesitation in asking Gavin to work with [him] again."  (G. Lee Ltr.)  "██████ is dedicated to creating outstanding corporate cultures by rewarding positive behaviors and eliminating workplace bullying and harassment."  (G. Lee Ltr.); *see also* PSR ¶ 235.  It does so by creating systems for escalation of improper behavior to management and to ensure management addresses the complaints.  Having been subjected to bullying at KITD, Gavin was eager to help with this project and has been doing so on a pro bono basis.  The system also provides a methodology for staff to escalate anything they see that is improper.  Gavin has owned his conviction and is using his experience to help others by improving workplace compliance and culture.

### E.  Gavin Has Consistently Displayed Loyalty and Generosity

Gavin's friends and colleagues attest to Gavin's character in the dozens of letters submitted to the Court.  "Gavin showed an unwavering commitment and loyalty to help people that were his friends, rather than leave them with no one[.  H]e will do anything for a friend in need."  (J. Wall Ltr.; *see also* J. Eldridge Ltr.; J. Younger Ltr.)  Jonathan Wall, Gavin's close friend from university, wrote about the traumatic experiences from Gavin's early life that has shaped who he is.

> [Gavin] literally saved at least 3 people's lives. These include saving a friend from suicide multiple times after he repeatedly slashed his wrists and supporting him for years afterwards, diving in to help a friend who had been set upon and stabbed, putting his fingers in his chest to stop the bleeding, resuscitating him and getting him to hospital, resuscitating a friend who had badly overdosed and continuing to support that friend to this day, leaping into a bunch of armed football hooligans at the Mcdonald's store he worked at to rescue a colleague who was being kicked while unconscious and suffered serious injuries himself. I don't know anybody else I've met, who can claim to have done that.

(J. Wall Ltr.) Gavin's friend, James Eldridge, witnessed one of these incidents and is amazed by Gavin's courage and loyalty to this day. (J. Eldridge Ltr.) Wall describes Gavin as someone who "puts others first, often to his own detriment, it's based on experiences, it's the core of who he is." (J. Wall Ltr.)

Not only has Gavin sacrificed financially for his employees, he naturally shows the same solicitude for his friends and family. ███████████████████████████████████ ██████████, (C. McCorkell Ltr.), Gavin "regularly called and visited [her] home to check on [her] personal welfare" (K. Schonfelder Ltr.) Gavin also ensured that "█████████ would continue to pay [Schonfelder's] full salary for as long as it took [her] to recover." (K. Schonfelder Ltr.) As many of his friends and family can attest, Gavin will always "make an effort and spend time for anyone who needs his support." (Katrina Campion Ltr.) Gavin "always had a clear dedication to his staff, and in turn his staff were dedicated to him." (C. Darvall Ltr.) His friend and former colleague Tristan Place also talked about Gavin's "significant contributions to so many individuals as both a mentor and manager." (T. Place Ltr.) "He's the guy you call when things go wrong, he's dependable and [a] wonderful friend to many." (C. Darvall Ltr.)

Tristan Place further spoke of how Gavin supported local youth sports by donating equipment and time. (T. Place Ltr.) "His willingness to share skills, knowledge and expertise has raised the prospects of many colleagues . . . ." (T. Place Ltr.) Gavin has also "donated to charities

that sponsor disadvantaged children, most notably Australian Aboriginal Children, through the Smith Family Charity." (H. Perlen Ltr.; *see also* S. Blackmore Ltr.) He has also worked in local boxing gyms to help establish programs for underprivileged children. (H. Perlen Ltr.; S. Blackmore Ltr.)

Gavin had also instructed his accountant to establish a trust that would be a vehicle to donate to good causes, including assisting disadvantaged children and honesty in politics. (H. Perlen Ltr.; *see also* Ex. 10 (September 2011 Email).) In 2011, aware of the fraudulent conduct at KITD and believing Tuzman would buy out KITD's shareholders (including Gavin), Gavin wanted to make sure he did not personally profit from Tuzman taking KITD private, so he instructed his accountant to direct any money he might receive from KITD to charity. (Ex. 10 (September 2011 Email).) Ultimately, Gavin did not make any money from KITD stock, so there was no KITD money to put in the trust and give away. (H. Perlen Ltr.)

## II.     STATEMENT OF THE OFFENSE

On June 30, 2016, Gavin pleaded guilty to one count of "conspiracy to commit securities fraud," and one substantive count of "securities fraud." 6/30/2016 Plea Tr. at 20:22–21:5. His plea was preceded by the execution of a cooperation agreement with the U.S. Attorney's Office for the Southern District of New York. Gov't Sent'g Memo. at 6.

### A.     Gavin Failed to Disclose What He Knew About the Fraudulent Scheme at KITD

Gavin was president of KITD from about April 2008 to April 2012 and was a member of the KITD board of directors from approximately November 2008 to March 2012. 6/30/2016 Plea Tr. at 18:20–23. As such, he had a duty to speak up when he became aware of the fraudulent scheme and a duty not to facilitate it. 6/30/2016 Plea Tr. at 18:23–24. In late 2009 or early 2010, Gavin learned that Tuzman and Smyth had devised a scheme to overstate KITD's revenue to the

public because KITD's actual revenue was falling short of market expectations.  6/30/2016 Plea Tr. at 18:25–19:3.  Because of Gavin's operations role, his limited prior experience, and his lack of training in accounting or finance, Gavin did not *discover* the fraud; Tuzman and Smyth told him about it over time.  Although Gavin did not know many logistics of the accounting fraud scheme, he "agreed to go along" and not blow the whistle for some time.  6/30/2016 Plea Tr. at 19:3.  Gavin participated in earnings calls and signed an annual report, but failed to check for or correct the inaccuracies or publicly disclose what he knew.  6/30/2016 Plea Tr. at 19:18–23.  Although he did not make any false statements on the earnings calls, and was not responsible for putting together KITD's public filings, Gavin "knew that [failing to disclose] was wrong and that [they] should have been truthful in [KITD's] financial report to the public," and he "realized that [he] should not have agreed to [stay quiet]."  6/30/2016 Plea Tr. at 20:3–11.  As the Presentence Investigation Report states, Gavin has "acknowledged that his actions were wrong and expressed remorse."  PSR ¶ 191.  Gavin "deeply regretted [his] actions even before [he] knew [he] would have to account for them" because he knew it was morally wrong to keep quiet about a fraud.  6/30/2016 Plea Tr. at 20:11–12.

### B.  Gavin Fully Accepted Responsibility for His Conduct

Gavin accepted responsibility for his misconduct promptly and unreservedly, surrendered voluntarily, and cooperated fully and completely with the Government.  PSR at p. 49; Gov't Sent'g Memo. at 5–7.  When Gavin first received a call from the Federal Bureau of Investigation in January 2016, PSR at p. 49; *see also* Tr. 3896:2–9, he immediately flew overnight from Perth, Australia (where he had been travelling), back to Melbourne, Australia, in order to meet with them first-thing in the morning, *see* Tr. 3896:11–17.  After the meeting, Gavin hired an attorney and decided to travel to New York voluntarily, giving up his rights to extradition hearings in Australia that he was advised would be protracted, in order to cooperate with the Government, with no

promises as to disposition and being advised by the Government that he faced nearly 20 years in prison.  *See* Tr. 3896:23–3897:10; 3898:24–3899:25; PSR at p. 49–50; Gov't Sent'g Memo. at 8. "[Gavin]'s prompt decision to forgo lengthy extradition proceedings allowed the Government to utilize his cooperation to full effect at Tuzman's 2017 trial."  Gov't Sent'g Memo. at 8.  Gavin has "truthfully admit[ed] the conduct comprising the offense(s) of conviction," he "voluntar[ily] terminat[ed]" his association with KITD, "voluntar[ily] resign[ed]" his position at KITD and refused to return when asked, he "voluntar[ily] surrender[ed]" in New York, "manifest[ed] the acceptance of responsibility" in his proffers to the Government, U.S.S.G. § 3E1.1, Commentary, Application Note 1, and his "plea of guilty" and truthful admission of his offense conduct and other relevant conduct is itself "significant evidence of acceptance of responsibility," *id.* at Application Note 3.

Gavin is remorseful that his failure harmed KITD investors; he knows he has no one to blame but himself for his own failure to tell the truth about a significant fraud.  Gavin also respectfully asks this Court to consider his admitted failure in the full context of his experience at KITD.  Gavin asks this Court to consider "*why* he broke the law," his degree of "moral culpability," and all of the mitigating circumstances surrounding his crime—all of which is consistent with Gavin's complete and demonstrated acceptance of responsibility.  *United States v. Singh*, 877 F.3d 1017, 19–21 (2d Cir. 2017).  Gavin seeks not to minimize his offense but to apprise this Court of the human dimensions of his case.

### C.  Gavin Neither Originated, Directed, Nor Arranged the Fraudulent Transactions

Gavin was aware of only some of the fraudulent activities occurring at KITD.  The Offense Conduct section of the PSR "acknowledge[d] that Gavin Campion was not involved in [a number of the fraudulent schemes]."  PSR at p. 7 n.1, p. 11 n.2, p. 15 n.4, p. 29 n.5.  Of the fraudulent

transactions that Gavin did learn about, he did not direct or arrange them.  "[Gavin]'s role in the fraud was much more limited than that of Tuzman and Smyth."  Gov't Sent'g Memo. at 5. "Tuzman conceived the fraud [and] Smyth was primarily in charge of executing many of the main components of the fraud."  PSR at p. 50.  It was "the CEO and CFO," not Gavin, "[who] devised a scheme to overstate the company's revenue to the public."  PSR ¶ 188; *see also* Tr. 2266:18–23; 2302:9-12; PSR ¶¶ 94, 95.  Specifically, "the CEO and the CFO entered into various technology licensing contracts that they knew would not actually result in revenue."  PSR ¶ 189.  "Smyth, Tomas Petru, Nigel Regan, Petr Stransky" and Tuzman were the ones "involved in setting up these fake licenses at KIT Digital."  Tr. 4128:9–16.  Smyth "generally handled the details of setting up these dodgy licenses," not Gavin.  Tr. 4126:4–6; *see also* PSR ¶ 107.  Smyth reported directly to Tuzman, not to Gavin.  Tr. 2293:13–14.  It was not until late 2012 or early 2013, after Gavin had left KITD, that Smyth told Gavin that there were nearly $20 million of fake licenses.  Tr. 4469:3–8.  Gavin was astonished.  Tr. 4469:5–8.  It was not until 2014 that "Smyth, who had consistently sa[id Gavin] hadn't done anything wrong, then let [Gavin] know that . . . he had [Gavin] sign a couple of [dodgy] licenses."  Tr. 4469:9–15.  When Gavin learned of this, he was "surprised," "upset," and "furious."  Tr. 4647:10–18.

"The CEO and CFO decided to use the company's own cash to pay off these phony receivables."  PSR ¶ 189.  It was Smyth who came up with this round-tripping idea.  Tr. 4630:4–7.  Gavin did not write the side letters or purchase agreements, did not negotiate the acquisitions, did not choose the escrow, and did not order the round tripping—all of that was done by Tuzman and/or Smyth.  Tr. 4840:16–4842:20, 4842:23–4843:6.  Gavin did not travel to Dubai to set up escrow accounts through Rima Jameel, as Smyth and Tuzman apparently did.  *See* Tr. 2329:6–11. Furthermore, Gavin did not interact with or make representations to the auditors regarding KITD's

accounting or finances, as Smyth and Tuzman did.  *See* Tr. 2287:24–2288:4.  Gavin did not sign

management representation letters to the auditors, as Smith and Tuzman did.  *See* Tr. 2288:5–

2289:4.  Gavin did not sign SOX § 302 certifications, as Smyth and Tuzman did.  *See* Tr. 2286:14–

22; 2443:18–2446:13.  Gavin did not conspire with Rima Jameel to falsify documents to hide the

fraud from the auditors, as Smyth apparently did.  *See* Tr. 2479:20–2480:1.  Later, Tuzman

instructed Gavin to "put the dodgy licenses into the [sales] pipeline tool" in order to create "an

audit trail for the dodgy licenses," but Gavin refused because he "didn't want to actively help Mr.

Tuzman with his fraud."  Tr. 4175:11–22.  Each time Gavin was asked to actively participate in

the fraudulent scheme, he refused or avoided taking any action.  He recognizes now that was not

enough to avoid participating in a scheme, which he sincerely regrets.

Among Tuzman, Smyth, and Gavin, Gavin "was the least involved in the scheme."  Gov't

Sent'g Memo. at 2.  As the Government explains, and as Gavin acknowledges, his failing was that

he "knew that the numbers being reported were fraudulent and did not correct the false and

misleading statements that Tuzman and Smyth made on those [earnings] calls," and that he did not

adequately "confirm the legitimacy of the documents he signed prior to signing them."  Gov't

Sent'g Memo. at 5; *see also* PSR ¶ 190.

### D.  Gavin Made Numerous Attempts To "Stop the Fraud"

Gavin was informed of the fraudulent activities of Tuzman and Smyth gradually, and

"[o]ver time," Gov't Sent'g Memo. at 4, and decided not to disclose the fraudulent practices long

enough for Tuzman to take the company private again, Tr. 4221:6–11.  This was wrong.  But Gavin

felt a responsibility to the employees at KITD, and he believed Tuzman's rants that "the company

would fail or collapse . . . if the scheme wasn't used to make the revenues where the market

expected the revenues to be."  Tr. 3894:20–23. Tuzman told Gavin the market is never wrong and

Gavin did not want to bring the company down; it was full of people he wanted to look after and

for whom he felt a personal responsibility.  He erroneously but genuinely believed it was his duty to try to stop the fraud and try to fix the company from within.  He wanted to save the company and its employees—but he disregarded the impact on investors, in part because Tuzman kept saying he was taking the company private.  Gavin now understands that he should have disclosed what he knew about the fraud.  Nevertheless, although Gavin did not publicly expose the fraud, or leave KITD earlier, between late 2010 to early 2012, Gavin tried to stop the fraud on no fewer than seven occasions before resigning.  Tr. 4210:11–4211:21; *see also* PSR at p. 50; Gov't Sent'g Memo. at 5.

### 1.  Meeting with Smyth

In 2011, Gavin met with Smyth to object to the continued improprieties at KITD.  Tr. 4213:1–22.  Gavin told Smyth that "[they] needed to confront Mr. Tuzman and explain that the company was never going to meet the market expectations and that he needed to re-message it and that there were behavioral traits of Mr. Tuzman in operations that [they] wanted to stop."  Tr. 4213:11–22.

### 2.  Meeting with Tuzman and Smyth in New York

Subsequent to these discussions, Gavin called for a meeting with Tuzman, and he and Smyth flew from Prague to New York to meet with Tuzman.  Tr. 4213:2–9.  "[Gavin] and SMYTH confronted TUZMAN about stopping the use of fake licenses, and that TUZMAN needed to stop his bullying of them and other KITD employees."  PSR ¶ 163.  Gavin specifically told Tuzman that KITD needed to "[c]ommunicate to the public market that it was going to do different numbers, the actual numbers that it was capable of doing . . . – meaning that there wouldn't have to be fraud."  Tr. 4212:4–4212:15.  Smyth "explain[ed] to Mr. Tuzman in quite some detail the status of the elephant [*i.e.*, the fabricated receivables]."  Tr. 4218:11–16.  Tuzman responded that, "it wasn't a problem because he was going to buy the company anyway and take it private."  Tr.

4212:16–4212:20; *see also* PSR ¶ 163.  Gavin "was joyful and relieved" at Tuzman's response because he believed Tuzman was "buying his own problem and the investors are going to get paid, the company will be OK, and [he] can go home to Australia now."  Tr. 4221:4–11; *see also* Tr. 3894:18–3895:17 ("that to me meant, OK, the shareholders will get their money and everything will be OK and Mr. Tuzman's buying his own problem").  Gavin thought he could finally leave KITD.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████.

### 3.  Continued Discussions with Tuzman

In the months after the New York meeting, Tuzman continued to assure Gavin that he would take KITD private but never did.  Tr. 4221:15–4222:19.  At one point when Gavin challenged him, Tuzman "aggressively" and "dismissive[ly]" told Gavin that he had the money to take KITD private, Tr. 4222:4–10, and that he planned on "us[ing] part of his management compensation package to clean up the elephant once he took it private," Tr. 4222:22–4223:7. Months passed and Tuzman failed to follow through on taking KITD private.  "Tuzman never bought the company, and the fraud continued."  Gov't Sent'g Memo. at 5.

### 4.  Escalation to KITD Board Members

Around January 2012, Gavin and Smyth had another conversation about the "dodgy licenses."  Gavin was checking in on Smyth, who was "depressed, sick, exhausted," and "broken," ████████████████████████, when Smyth said for the first time, "it's a five letter word, Gavin, beginning with F [*i.e.*, fraud]."  Tr. 4266:16–4267:6.  Gavin began to understand the gravity of the situation.  In January or February 2012, Gavin and Smyth had additional discussions about

the fraud, and Smyth indicated that "[h]e was considering going to the authorities." Tr. 4268:11–14. But he did not. Gavin was anxious and fearful. He told Smyth that he would "report [the fraud] to the board." Tr. 4268:19–24.

Gavin escalated the issue to the board of directors, specifically, two members of the Audit Committee,[5] because he believed the "[fraud] needed to end." Tr. 4268:19–4269:1; PSR ¶ 163, at p. 50. In February 2012, Gavin approached KITD director Lars Kroijer before a board meeting in Prague. Tr. 4442:5–12. Gavin decided to speak with Mr. Kroijer because he "was the person [Gavin] was friendliest with on the board" and the "most approachable." Tr. 4442:13–15. He reported to Mr. Kroijer that Tuzman was "bullying operations into doing things they absolutely shouldn't be doing." Tr. 4442:17–18. Gavin told Mr. Kroijer that he needed help. Tr. 4443:15–17. Mr. Kroijer was "hesitant to help" because "if [they] stand up to Kaleil we'll just get a little white letter . . . , [which] meant [they] would get kicked off the board." Tr. 4444:10–16; 4444:20–4445:2; *see also* PSR ¶ 163. Mr. Kroijer suggested they speak with KITD lead director Wayne Walker. Tr. 4444:10–19.

Later that day, Gavin and Mr. Kroijer arranged to offer Mr. Walker a ride home from a dinner with the KITD board members. Tr. 4446:1–11. During the ride, Gavin told Mr. Walker that "Mr. Tuzman was bullying operations into things they absolutely should not be doing." Tr. 4446:15–20. As he spoke with Mr. Walker and Mr. Kroijer in the car, Gavin felt "really scared" and was "crying [his] eyes out." Tr. 4446:25; 4447:15. This is because Gavin believed "[t]hey were all . . . great friends of Mr. Tuzman's, had been to school with him and all the rest of it. And [he] really felt this was going to come back on [him] in a really bad way, but [he] had to try to do

---

[5] *See* KITD Amendment to Form 10K for Year Ended Dec. 31, 2011 (April 30, 2012), https://www.sec.gov/Archives/edgar/data/1076700/000114420412025055/v311209_10k-a.htm (listing L. Kroijer and W. Walker as members of the Audit Committee).

something." Tr. 4446:25–4447:7.  In response, Mr. Walker's only statement to Gavin was, "That's your problem to deal with," and Mr. Walker "got out of the car . . . faster than [Gavin] ha[s] ever seen anyone get out of a car."  Tr. 4447:18–23; *see also* PSR ¶ 163.  Mr. Kroijer assured Gavin that he would raise it with the board the next day, but when he did, Tuzman "shut it down very, very quickly," in a "[v]ery sharp and aggressive" tone.  Tr. 4448:3–25.

As the Government described this episode in its rebuttal summation at Tuzman's trial, Gavin "tr[ied] to do the right thing and stop a fraud."  Tr. 7101:9–18.

### 5.    Restructuring Plan

Feeling that he had nowhere now to turn, Gavin resolved to fix the company from within. He developed a plan that would reset the company and force Tuzman to communicate the company's real state to the investors.  As the PSR states, Gavin "planned a restructure of the company, including proper financial controls to eliminate future needs and opportunities for these false practices."  PSR ¶ 191.  Gavin sent an email dated February 18, 2012, to senior KITD executives, proposing a plan to restructure the company in a manner aimed at "surfacing fraudulent activity."  Tr. 4768:17; *see also* Tr. 4269:13–4271:10 (discussing email from Gavin dated February 18, 2012 (attached hereto as Mogck Decl. Ex. 12)); PSR at p. 50.  In the email, Gavin said he would "suggest a new structure" for "[f]inancial controls."  (Ex. 12 (February 18, 2012 Email).) Gavin also wrote that "[w]e can not rely on 'hail mary's' and aggressive deal structuring or M&A to carry us through quarters."  (Ex. 12 (February 18, 2012 Email).)  This reference to "Hail Marys" (in the colloquial sense of a desperation play in American football) was an attempt at "[s]urfacing the elephant."  Tr. 4271:6–10.  Gavin further recalls that he asked the Chief Administrative Officer, Barak Bar Cohen, to take over finance and bring in a new external team.  Gavin proposed this plan because he was "looking for ways to end the fraud"—"to restructure the operations of the company such that fraud wouldn't be required."  Tr. 4270:10–22.  Gavin "was trying to put pressure on Mr.

Tuzman to remessage the business to the public market . . . , putting pressure on by changing up operations." Tr. 4270:17–22.

Tuzman confronted Gavin about this email because he "wasn't happy that [Gavin] was trying to outsource finance and bring an external accounting firm in." Tr. 4271:14–19. Tuzman also "wasn't happy about the phrase hail Marys . . . because [Gavin] had also put in the sentence aggressive deal structuring and M and A, . . . [so] that hail Marys stood out as *something else* and could only stand out as the elephant." Tr. 4271:14–24 (emphasis added).

6.     Executive Team Meeting in Ely

Subsequently, the executive team met in Ely, England, a town north of London, for "executive week." Tr. 4270:4–9. During the meeting, Gavin again confronted Mr. Tuzman about re-messaging the company, and two other executives also challenged Tuzman as to "why couldn't the business just be remessaged to the market." Tr. 4272:4–15. That meant "set[ting] the market's expectations about what the company was really capable of doing." Tr. 4272:16–19. Tuzman was "furious, very angry, banged his hands on the table and said that it's not about remessaging to the market, I've already remessaged to the market, it's about you doing your jobs. You [are] shit at your jobs." Tr. 4272:20–24. Nonetheless, Gavin recalls the executives resolved to adopt, develop and execute the plan, and Gavin felt that the scheme could not continue if they followed through with his plan. However, in April 2012, Gavin recalls that the interim CEO went back on the decision and abandoned the plan.

7.    Resignation

In April 2012, his efforts to stop the fraud having been unsuccessful and seeing no intention to stop the fraud from current management, Gavin resigned from KITD.  *See* Tr. 3895:23–3896:1; 4452:10–16.  He was 39 years old at the time.[6]

### E.  Gavin Sought Legal Advice and Attempted to Contact the SEC

In late 2012, Gavin became aware that an SEC enforcement lawyer was looking to speak with him.  Fully willing to speak with the SEC about KITD, Gavin instructed an Australian attorney to reach out to the SEC.  Gavin understands that the attorney left a message with the SEC on Gavin's behalf.  If the SEC ever tried to reach out to Gavin again subsequent to this call, Gavin never knew about it.  If that had happened, Gavin believes he would have started cooperating then. Gavin consulted with several prominent law firms, including one in New York, during and after his employment at KITD and none advised him to contact the authorities.  Desperate to leave KITD behind in his life and believing he had no further obligations relating to KITD, he thought he could move on.  He strongly believes, if any one of his lawyers had advised him to contact the authorities, he would have done so, just has he had instructed his attorney to call the SEC when he became aware that they wanted to speak with him.  Further, after Smyth left KITD, he told Gavin that "[h]e was very scared of being blamed by Mr. Tuzman for the fraud, and asked [Gavin] to commit to come over and tell the truth."  Tr. 4454:2-3.  Gavin agreed.  Tr. 4472:6–14.  However, it is noteworthy that Gavin never asked Smyth to testify in defense of him—and the reason is that

---

[6] There is other evidence of Gavin's refusals to advance the fraud.  Gavin "stalled" and eventually killed a project called Project Budweiser and "slowed it down and found every reason not to run it" because "Mr. Tuzman instructed that the revenue [from the deal] be used pay off the elephant [*i.e.*, the fabricated receivables]" and Gavin "didn't want to . . . actively support Mr. Tuzman's fraud."  Tr. 4162:2–4163:14.  Gavin also stated during his proffers that he refused to return to KITD after he resigned to take the CEO position.  *See* Tr. 389:2–19 (testimony of Joseph Mullin regarding such discussions).  Gavin recalls that, in April 2012, having resigned, he was then approached, separately, by board members Dan Hart, by phone, and Joe Mullin, who flew to where Gavin was staying in France, asked him not to take another job, and said that they wanted to bring him back into the company.  *See* Tr. 389:2–19.

Gavin had been repeatedly assured that he was not personally committing fraud.  When Gavin was first informed in 2016 that he had broken the law and had personal criminal liability in connection with the fraud at KITD, Gavin was shocked, but he immediately surrendered, took responsibility for his conduct, and unreservedly cooperated with the Government.

### F.  Other than His Salary, Gavin Did Not Profit from the Fraudulent Scheme

Gavin received stock options as part of his annual compensation at KITD.  Tr. 3911:4–25. In total, Gavin accumulated options to purchase more than a million shares of KITD stock.  Tr. 3911:4–8.  But Gavin never exercised them.  Tr. 3912:1–5.  In fact, Gavin's longtime accountant confirmed that Gavin "was not in receipt of any proceeds from Kit Digital shares or any Kit Digital options."  (Ex. 11 (Aug. 31, 2017 H. Perlen Ltr.); H. Perlen Ltr.)  Thus, Gavin also gave up the shares he had received as proceeds of the sale of ████████ to KITD, forfeiting the value he had created in the six years prior to joining KITD.  Gavin did not want to profit from shares in a company that he knew were overvalued based on fraud.  As his accountant attested, "[a]part from drawing a salary during his time at KITD, [Gavin] has not profited nor received any other funds from KITD."  (H. Perlen Ltr.)  By contrast, the trial testimony alone established that Smyth made $740,000 from his stock compensation, Tr. 2291:6–7, and Tuzman's company, KIT Media, was paid $20 million in 2010 alone from its investment in KITD, Tr. 2292:4–6.

### III.    GAVIN HAS PROVIDED SUBSTANTIAL ASSISTANCE TO THE GOVERNMENT

In its sentencing submission, the Government indicated that it "intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence [Gavin] in light of the factors set forth in Section 5K1.1(a) of the Guidelines."  Gov't Sent'g Memo. at 1.  Those factors are:

(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3) the nature and extent of the defendant's assistance;

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

(5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a). We respectfully refer the Court to pages 50–51 of the PSR and pages 5–8 of the Government's sentencing submission concerning the nature and extent of Gavin's cooperation. However, the following pertinent facts merit discussion here.

### A.   Gavin's Assistance Was Significant and "Invaluable"

"[Gavin]'s cooperation with the Government was invaluable." Gov't Sent'g Memo. at 7. "The information that [Gavin] provided to the Government during his initial proffers and subsequent meetings with the Government was significant and essential in advancing the Government's long-running investigation of [] Tuzman." Gov't Sent'g Memo. at 7; *see also* PSR at p. 51. "[Gavin] was [also] a key Government witness at trial." Gov't Sent'g Memo. at 6. As the Government explained:

> [Gavin] clearly and fully testified about the roles of his co-conspirators, and served as a central narrator of the conduct at issue. While the emails and documentary evidence in these cases were very powerful evidence of the defendants' guilt, [Gavin]'s testimony brought the criminal conspiracy to life, and provided the jury with direct proof of the criminal schemes, particularly against Tuzman.

Gov't Sent'g Memo. at 7; *see also* PSR at p. 51. In short, Gavin "was an excellent cooperating witness," and "a key Government witness at trial." Gov't Sent'g Memo. at 6–7.

### B.  Gavin's Assistance Was "Truthful, Complete, and Reliable"

The information Gavin provided was "invaluable," "truthful, complete, and reliable." Gov't Sent'g Memo. at 7; *see also* PSR at p. 51.  "[Gavin] candidly acknowledged what he knew and did not know."  Gov't Sent'g Memo. at 6.  "Because of [Gavin]'s role in the fraud, his knowledge about certain aspects of the fraud was necessarily limited."  Gov't Sent'g Memo. at 6. However, on the topics that he did have knowledge, Gavin "provided specifics about who was involved, their roles, and the means and methods of the scheme."  Gov't Sent'g Memo. at 6.  His "information was corroborated by other witnesses, including Smyth and Steven Maiden, as well as documents."  Gov't Sent'g Memo. at 6; *see also* PSR at p. 51.  The information Gavin provided was further "corroborated by other documentary evidence."  Gov't Sent'g Memo. at 7.  Gavin's testimony "was plainly credited by the jury, which returned a swift guilty verdict."  Gov't Sent'g Memo. at 6.

### C.  Gavin's Assistance Was "Essential" and Extensive

"[T]he nature and extent of [Gavin]'s assistance was significant and essential."  Gov't Sent'g Memo. at 7.  As part of his cooperation, Gavin participated in about 20 meetings with the Government, including the prosecutors, FBI, U.S. Postal Inspection Service, and the Securities and Exchange Commission, and was in the U.S. for about 15 weeks.  Tr. 3896:11–3897:13; Tr. 4614:1–16; PSR at p. 49; Gov't Sent'g Memo. at 6.  Gavin "provided information that was crucial to the Government investigation," Gov't Sent'g Memo. at 6, including many key documents, some of which we believe became important trial exhibits. ████████████████████

████████████████████  In December 2017, Gavin provided four days of vital testimony at Tuzman's trial, including many hours of aggressive cross examination.  *See* Gov't Sent'g Memo. at 6; *see also* PSR at p. 50.  Gavin testified "about the specifics of the fraud, including the origins of the scheme, how the scheme evolved, Tuzman's role in the scheme, and specifics of their

misconduct." Gov't Sent'g Memo. at 6; *see also* PSR at p. 50. Gavin "was able to provide a clear and complete explanation of complicated subjects," and "[his] testimony was important in establishing that Tuzman was the architect of the fraud scheme and in rebutting Tuzman's claim that he was somehow unaware and uninvolved." Gov't Sent'g Memo. at 6; *see also* PSR at p. 50. "[Gavin]'s testimony helped lead to Tuzman's conviction." Gov't Sent'g Memo. at 7.

### D.  Gavin's Assistance Was Costly and Traumatic.

Gavin's cooperation also took a toll on him and his family. He had to leave his family in Australia for over three months as he cooperated with the Government's investigation in New York. *See* Gov't Sent'g Memo. at 7 ("[B]ecause of the length of the trial, [Gavin] lived in the United States for approximately a month, away from his family, as he waited to testify."); *see also* PSR at p. 51. As the Government's sentencing memorandum attests, "[d]uring his time at KITD, Tuzman repeatedly verbally abused [Gavin] and others, including Smyth," and "[t]he legacy of that abuse was made clear when [Gavin] visibly shook on the witness stand when he was asked to identify Tuzman." Gov't Sent'g Memo. at 7. "[Gavin's] emotional injury was exacerbated by the cooperation process and his testifying at trial." Gov't Sent'g Memo. at 7; *see also* PSR at p. 51. Prior to Gavin's initial visit to the United States, his car was broken into and his legal documents stolen. *See* Sealed Affirmation and Application (Dkt. 169); (*see also* Ex. 2 (Victoria Police statutory declaration).). Following the trip, Gavin was followed, assaulted, and persons unknown tried to break into his house. *See* Sealed Affirmation and Application (Dkt. 169); (*see also* Ex. 1 (October 2016 Police Report).). Gavin has also incurred significant expenses relating to his assistance, including traveling costs and legal fees and related expenses, which necessitated the sale of his home. (H. Perlen Ltr.)

### E.  Gavin's Assistance Was Immediate and Timely

Gavin's cooperation was prompt and he surrendered voluntarily.  *See* PSR at p. 49.  When the FBI first contacted Gavin in January 2016, Tr. 3896:2–9; *see also* PSR at p. 49, he was traveling in Perth, Australia, Tr. 3896:11–17.  Gavin immediately flew back to Melbourne, Australia, to meet with the investigators.  Tr. 3896:11–17.  After engaging with prosecutors in January 2016, the Government allowed Gavin's new counsel (the undersigned) time to prepare for a proffer meeting.  Gavin waived extradition even before obtaining a cooperation agreement so that he could begin helping the Government.  Tr. 3896:23–3897:10; 3898:24–3899:25; *see also* PSR at p. 49.  Gavin came voluntarily to New York to meet with prosecutors in May 2016, Gov't Sent'g Memo. at 5, having postponed a surgery to do so.  "[Gavin]'s prompt decision to forgo lengthy extradition proceedings allowed the Government to utilize his cooperation to full effect at Tuzman's 2017 trial."  Gov't Sent'g Memo. at 8.

*        *        *

Gavin's cooperation was significant, substantial, and timely.  This Court should grant the Government's anticipated motion pursuant to U.S.S.G. § 5K1.1 and depart substantially from the Guidelines range.

### IV.   A NONCUSTODIAL SENTENCE IS WARRANTED UNDER SECTION 3553(A).

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 114 (1996).  "Underlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'"  *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).  **The**

Probation Department recommended that "Your Honor depart from the guidelines sentencing range and impose a sentence of Time Served . . . ." PSR at p. 52. We respectfully request that the Court adopt the recommendation of the Probation Department, based on Gavin's extensive and substantial cooperation with the Government, and the totality of the circumstances, including Gavin's lesser role, his efforts to stop the fraud, his serious medical problems, and his family's dependence on his continued presence. Here, a noncustodial sentence would be "sufficient, but not greater than necessary, to comply with the purposes set forth in [§ 3553(a)(2)]." 18 U.S.C. § 3553(a).

### A.   The Nature and Circumstances of the Offense Warrant a Noncustodial Sentence

#### 1.   Gavin Is Not a Typical Sophisticated White-Collar Defendant

When Gavin joined KITD, he thought he would have an operations role at a private company. Tr. 3908:17–23, 4105:13–24. Gavin had no prior experience with U.S. public companies and governance, *see supra* Sections I.D.1–3, and no background, education, training, or knowledge of U.S. securities laws and regulations, *see supra* Section I.D.4.a. Gavin was out of his depth and plainly not "equipped to handle such a role." (G. Lee Ltr.) These are not excuses, but they are relevant mitigating circumstances of the offense and differentiate him from other co-defendants.[7]

---

[7] The Securities Act provides that "no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation." 15 U.S.C. § 78ff(a). Gavin testified at trial that he had no knowledge of SEC filing requirements, Tr. 4633:25–4634:3, "[he] didn't even know what the Securities and Exchange Commission was," Tr. 4641:14–19, or "the details of what it did," Tr. 4641:25–4642:3. Gavin elaborated that he thought the SEC was "where [one] sent the financials and they got posted." Tr. 4641:14–4642:8. And regardless of whether the Court might find that Gavin indeed had "no knowledge" and is, thus, ineligible for a sentence of imprisonment on the substantive securities fraud count, or that he merely had minimal knowledge of U.S. securities laws and his duties as a public company officer and director, it remains that Gavin's ignorance and lack of executive "situational awareness" place his conduct at the very low end of the culpability spectrum.

2.     Gavin Was Motivated by Human Concern, Not Greed

We also ask the Court to consider Gavin's reasons for going along and failing to disclose the fraud to investors.  The Supreme Court has stated that, "[t]he defendant's motive for committing the offense is one important factor" in determining a sentence." *Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993).  "[I]t is not uncommon for a defendant to receive a minimum sentence because he was acting with good motives . . . ." *Id.* (quoting 1 W. LeFave & A. Scott, Substantive Criminal Law § 3.6(b), p. 324 (1986)).

Gavin's conduct unfortunately prioritized the interests of KITD's employees over the interests of KITD's investors.  But Gavin's conduct was not malicious or greedy.  Tuzman told Gavin that "the company would fail or collapse . . . if the scheme wasn't used to make the revenues where the market expected the revenues to be."  Tr. 3894:20–23.  Gavin saw that Tuzman's strategy of acquisition and integration left hundreds of employees around the world, at companies with good technology, trusting in KITD management—in Gavin specifically—for stability in their jobs and their lives.  From a sense of duty and loyalty to the company and its employees, which had been the hallmark of Gavin's leadership throughout his career, Gavin wanted to fix the company from within.  He felt it would be cowardly to walk away.  Gavin also felt compassion for Tuzman and Smyth.  ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████  Notwithstanding the abuse, Gavin believed he had a moral obligation to help these two seemingly desperate men at what seemed like the hours of their greatest need.  Gavin regrettably kept trying to transform the company from within instead of exposing what the investors had a right to know.

44

Gavin was not motivated by personal gain. A "defendant's culpability [i]s mitigated [where] he did not act for personal gain or for improper personal gain of another." *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005). In *Ranum*, the defendant was "a loan officer convicted of misapplying bank funds." *Id.* at 985. The court found that the defendant had "no personal stake in making the loans," "[n]or did he intend to harm the bank," and "[w]hen the loans went bad, defendant made attempts to protect the bank." *Id.* at 990. The court thus concluded that a significant variance was appropriate. *Id.* Here, although Gavin was granted stock options and had stock in KITD, he never exercised the options, Tr. 3912:1–5, "was not in receipt of any proceeds from Kit Digital shares or any Kit Digital options," (Ex. 11 (Aug. 31, 2017 H. Perlen Ltr.)), and stated as far back as 2011 that he did not want to be personally enriched from KITD, (Ex. 10 (September 2011 Email)). Gavin understood that he could have sold his stock or exercised his options for millions of dollars at any time. He did not. (H. Perlen Ltr.; Ex. 11 (Aug. 31, 2017 H. Perlen Ltr.).) As in *Ranum*, a significant downward variance is appropriate here because Gavin "did not act[ed] for personal gain or for improper personal gain of another." *Ranum*, 353 F. Supp. 2d at 990.[8]

### 3. Gavin Did Not Originate, Direct, or Arrange the Fraudulent Transactions and Made Numerous Attempts to Stop the Fraud

The Probation Department found that Gavin neither originated, directed, nor executed the fraudulent transactions, and in fact made repeated efforts to stop the fraud. As to the fraudulent schemes themselves, "Tuzman conceived the fraud [and] Smyth was primarily in charge of executing many of the main components of the fraud." PSR at p. 50. It was "the CEO [Tuzman]

---

[8] The defendant in *Ranum* still received a prison sentence of a year and a day, but he was *more culpable* than Gavin: he did not try to stop the fraud and he was not a cooperator who provided substantial assistance to the Government. The defendant there "made repeated loans outside of his authority over an extended period of time, abusing his employer's trust. When things started to go badly, defendant was not honest with his employer, recklessly loaned . . . more money and attempted to conceal what he had done." *Ranum*, 353 F. Supp. 2d at 989–90..

and CFO [Smyth that] devised a scheme to overstate the company's revenue to the public." PSR ¶ 188; *see also* Tr. 2266:18–23; 2302:9-12; PSR ¶¶ 94, 95. Although Gavin was the president and a member of the KITD board, he was not responsible for accounting, finance, acquisitions, due diligence, or contracts related to acquisitions, as Smyth and Tuzman were. *See* Tr. 2293:3–12. Smyth, as CFO, was responsible for the "financial statements and accounting accuracy of information about KITDigital's operations in [the company's] 10-Ks." Tr. 4640:16–25. It was Smyth who came up with the idea of round tripping. Tr. 4630:4–7. The evidence adduced at trial showed that Gavin was the target of pressures to allow Tuzman and others to continue carrying out the fraud, not the source of these pressures, nor the intended or actual beneficiary of them.

Gavin learned of the fraudulent activities gradually, and when he began to understand their scope, he "made efforts in stopping the fraud." PSR ¶ 163. Between late 2010 to early 2012, Gavin made no fewer than seven attempts at stopping the fraud. Tr. 4210:11–4211:21; PSR at p. 50. (1) He confronted Smyth about the fraud in 2011. Tr. 4213:1–22. (2) Gavin and Smyth then flew from Prague to New York to "confront[] TUZMAN about stopping the use of fake licenses." PSR ¶ 163. (3) Subsequent to this meeting, Gavin continued to press Tuzman as to when he would take KITD private and "clean up the elephant." Tr. 4222:22–4223:7. (4) Gavin told two members of the audit committee that "Mr. Tuzman was bullying operations into things they absolutely should not be doing." Tr. 4442:16–18, 4446:15–20. (5) In a February 18, 2012 email to senior KITD executives, Gavin proposed a restructuring plan whose purpose was "surfacing fraudulent activity." Tr. 4768:17; *see also* Tr. 4269:13–4271:10; PSR at p. 50. Gavin "planned a restructure of the company, including proper financial controls to eliminate future needs and opportunities for these false practices." PSR ¶ 190. (6) At an executive team meeting in Ely, United Kingdom, Gavin again confronted Tuzman about re-messaging the company. *See*

Tr. Tr. 4270:4–9, 4272:4–15.  In April 2012, Gavin resigned from KITD, having failed to convince either Tuzman or the new CEO to stop the fraud.

As the Government made clear during trial, Gavin "tr[ied] to do the right thing and stop a fraud."  Tr. 7101:9–18 (Government rebuttal summation).  Gavin's attempts to stop the fraud should weigh heavily as mitigating circumstances of the offense, which we submit warrant a noncustodial sentence.

### B.  Gavin's History and Characteristics Warrant a Noncustodial Sentence.

Under Section 3553(a)(1), the Court must also consider Gavin's specific history and personal characteristics.  First, Gavin has had no other infractions–criminal, regulatory, or civil– in his life.  The many letters in support of Gavin attest to his track record of integrity, honesty, generosity, and selflessness.  (*See, e.g.*, S. Blackmore Ltr.; J. Cadwallender Ltr.; Amy Campion Ltr.; K. Campion Ltr.; J. Eldridge Ltr.; G. Lee Ltr.; A. Paul Ltr.; C. Richardson Ltr.; K. Schonfelder Ltr.)  As a court in this district has explained:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006).  We respectfully submit that Gavin's history and characteristics strongly support a noncustodial sentence.

Gavin has pulled himself up by his bootstraps.  He grew up in a working-class family in Northern England, dropped out of school to work at a local McDonald's restaurant when he was 16, was promoted to floor manager at 19, and worked there until age 24 while earning a marketing degree.  *See supra* Sections I.A–B.  In Australia, Gavin's hard work, determination, and

perseverance yielded two successful advertising agencies.  *See supra* Section I.D.3.  Even after his

disastrous turn at KITD, Gavin set about immediately to reestablish his life.  He has since helped

lead three technology companies in Australia to great success.  *See supra* Section I.D.5.  Two of

these companies are focused on compliance related issues, and a third aims to end online video

piracy and ███████████████████████████████████████████.  *See supra*

Section I.D.5.

More importantly, Gavin is a committed family man, which this Court may consider when

deciding Gavin's sentence.  *See United States v. Davis*, No. 07-CR-727, 2008 WL 2329290, at *5

(S.D.N.Y. June 5, 2008).  In *Davis*, the court sentenced the defendant to probation in part because

he was "in many ways the primary caretaker of his six children and is deeply involved with their

daily lives."  *Id.* at *2.  The defendant's wife also stated that "their children would be 'traumatized'

if their father were sent to jail and that she cannot imagine they could survive without him."  *Id.* at

*3.  The court thus found that any custodial sentence would "halt[ defendant]'s significant positive

impact on his children's life," and "would be disastrous to [his] family."  *Id.* at *5.

Similarly, as Gavin's ex-wife and many friends and family members have more movingly

attested, Gavin is a devoted father to ████████████ and a loyal partner to Amy.  (Andy Campion

Ltr.; *see also* S. Blackmore Ltr.; J. Cadwallender Ltr.; R. Campion Ltr.; J. Eldridge Ltr.; M. Wright

Ltr.)  Gavin "is profoundly in love with his boys," and he is "attentive, patient, and loving[,]

provides structure, and ensures they maintain a healthy balanced diet."  (S. Blackmore Ltr.)  "Even

after the couple's separation, Gavin continued to put the welfare of his children and wife as top

priorities."  (M. Wright Ltr.) ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ Without Gavin, it "would be impossible

48

[for Amy] to help look after the children [by herself]," and "[Amy] is not sure how [she] would cope [without him]." (Amy Campion Ltr.) Gavin embraces that responsibility and by all accounts is fulfilling it consistently, honorably, and lovingly. Amy, ███████████ simply cannot manage to be without Gavin's love and support. According to their mother, "Gavin's help with the children is invaluable . . . ." (Amy Campion Ltr.)

Finally, we ask the Court to consider Gavin's serious health issues in deciding an appropriate sentence. We submit that Gavin's "various health problems argue in favor of a reduced sentence." *United States v. Marsh*, No. 10-CR-480, 2011 WL 5325410, at *26 (E.D.N.Y. Oct. 26, 2011); *see also* 18 U.S.C. § 3553(a)(2)(D) (mandating consideration of "the need for the sentence imposed . . . to provide the defendant with needed . . . medical care . . . in the most effective manner"). ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



Other courts have found similar "serious health problems" militate against a custodial sentence. *See, e.g.*, *United States v. Leonard-Allen*, No. 09-CR-190, 2010 WL 2490770, at *2–3 (E.D. Wisc. June 16, 2010) (imposing a sentence of probation in part because defendant suffered from "cervical spine problems, for which she underwent surgeries," had "received treatment, including medication, for depression," among other health problems); *United States v. Gutierrez*, No. 10-CR-84, 2010 WL 3418309, at *3 (E.D. Wisc. Aug. 27, 2010) (issuing a noncustodial sentence in part because of defendant's "serious medical problems," including a "back injury [] serious [enough to] requir[e] three surgeries," and for which "[s]he continued to take strong pain pills on a daily basis"). Given Gavin's numerous and significant health problems, a term of imprisonment would leave him vulnerable and take him away from his doctors' care in Australia, further jeopardizing his fragile physical and psychological condition.

### C.  A Noncustodial Sentence Satisfies the Sentencing Goals of Retribution, Deterrence, Incapacitation, and Rehabilitation

Section 3553(a)(2) requires a sentencing court to consider the need for the sentence imposed (1) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (2) "to afford adequate deterrence to criminal conduct," (3) "to

protect the public from further crimes of the defendant," and (4) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *See Tapia v. United States*, 564 U.S. 319, 325 (2011)) (summarizing these considerations as "retribution, deterrence, incapacitation, and rehabilitation"). "District courts must determine in each case what constitutes a sentence that is 'sufficient, but not greater than necessary' to achieve [these] purposes." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1903 (2018) (citation omitted). We respectfully submit that a noncustodial sentence is sufficient to accomplish the purposes of sentencing set forth in § 3553(a)(2).

1. <u>A Prison Term is Not Necessary to Adequately Reflect the Seriousness of the Offense or to Promote Respect for the Law</u>

a. *The Guidelines range is not a valid proxy for the seriousness of the offense because the loss amount vastly overstates the seriousness of the offense, warranting a variance*

Gavin has pleaded guilty to securities fraud and conspiracy to commit securities fraud. Gavin accepts responsibility for his failings at KITD. Although securities fraud is no doubt a serious offense, we respectfully submit that Gavin's relatively minor, passive, ignorant role, coupled with his repeated efforts to stop the fraud, place his offense conduct on the less serious end of the spectrum. Nonetheless, Gavin's Guidelines offense level dramatically overstates the seriousness of Gavin's offense and has no relationship to his culpability or moral blameworthiness. Gavin's offense level of 36 is overwhelmingly driven by the 22-point enhancement for loss under Section 2B1.1(b)(1). PSR ¶¶ 195, 206. The recommended Guidelines range for Gavin would be 15 to 21 months without the loss enhancement, as compared to 188 to 235 months with the enhancement. The § 2B1.1 loss enhancement has been the subject of extensive criticism by both

courts and commentators for often massively overstating the seriousness of the offense.[9]

It should be noted that one of the victims of the fraudulent schemes, Grant Lee, a large shareholder of KITD, submitted a letter in support of Gavin for his sentencing. (G. Lee Ltr.) "In [Lee's] case[,] the shares [he] held were worth more than $500,000 AUD [US$358,420] shortly before the negative announcements and when the shares stopped being traded." (G. Lee Ltr.) But Lee is adamant that he "do[es]n't hold [Gavin] responsible in any way for the demise of KIT Digital" and his losses as a result. (G. Lee Ltr.) This statement from an investor, coupled with Gavin's resignation from KITD over six months before the fraud was disclosed, during which time Smyth continued working at KITD, Tr. 2266:24–2267:2, and Tuzman remained involved with the company and potential investors in trying to purchase the company,[10] should dissuade the Court from giving much if any weight to the alleged loss amount in fashioning Gavin's sentence.

Considering the real conduct and circumstances at issue here, it is plain that, when Gavin was properly advised of his culpability under the law, he demonstrated complete respect and obedience to it by foregoing extradition, cooperating with prosecutors, accepting responsibility, and assisting law enforcement in prosecuting the other culpable parties. We therefore respectfully

---

[9] *See, e.g.*, *United States v. Corsey*, 723 F.3d 366, 377 (2d Cir. 2013) (Underhill, J., concurring) (noting "the loss guideline is fundamentally flawed"); *Adelson*, 441 F. Supp. 2d at 515 (describing calculations under Guideline 2B1.1 as "absurd on their face"); *United States v. Parris*, 573 F. Supp. 2d 744, 745, 754 (E.D.N.Y. 2008) (noting "the Sentencing Guidelines for white-collar crimes [can produce] a black stain on common sense"); *see also* Allan Ellis, John R. Steer, & Mark H. Allenbaugh, *At a 'Loss' for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 35 (2011) ("the fraud guideline often . . . produces sentences disproportional to the actual seriousness of the offense"); Frank O. Bowman, III, *Damp Squib: The Disappointing Denouement of the Sentencing Commission's Economic Crime Project (And What They Should Do Now)*, 27 Fed. Sent'g Rep. 270, 272–74 (2015) (arguing that when the Sentencing Commission added specific offense characteristics to the Guidelines, it did not account for the fact that the loss guideline already incorporated many factors relevant to the seriousness of a fraud offense).

[10] *See, e.g.*, Kaleil Isaza Tuzman, *Former Chairman and CEO Kaleil Isaza Tuzman Sends Letter to KIT digital Board of Directors*, PR Newswire (Nov. 23, 2012), https://www.prnewswire.com/news-releases/former-chairman-and-ceo-kaleil-isaza-tuzman-sends-letter-to-kit-digital-board-of-directors-180584761.html (attached hereto as Mogck Decl. Ex. 13).

request that the Court impose a non-Guidelines sentence based on an individualized application of the § 3553(a) sentencing factors.[11]

> ### b.   Gavin is significantly less culpable than his co-defendants and prison time is not warranted

As this Court has recognized, relative culpability is an important sentencing factor in multidefendant cases. *See, e.g.*, Sent'g Tr. at 51, *United States v. Soghoyan*, No. 10-CR-895 (S.D.N.Y. July 22, 2013), ECF No. 722 (sentencing defendant to a below-Guidelines term because "[she] falls on the lower end in terms of culpability") (attached hereto as Mogck Decl. Ex. 14); Sent'g Tr. at 27, *United States v. Schonhorn*, No. 16-CR-828 (S.D.N.Y. Nov. 14, 2018), ECF No. 26 ("consider[ing] the issue of relative culpability") (attached hereto as Mogck Decl. Ex. 15). Gavin's involvement in the fraudulent accounting scheme was *different in kind* from that of Tuzman and Smyth.  It was "much more limited than that of Tuzman and Smyth."  Gov't Sent'g Memo. at 5.  "Tuzman conceived the fraud [and] Smyth was primarily in charge of executing many of the main components of the fraud," PSR at p. 50, whereas Gavin "agreed to go along with the

---

[11] *See United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) ("Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence."); *United States v. Johnson*, No. 16-CR-457-1, 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (refusing to apply a 16-level loss enhancement because "the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime" and because the loss enhancement is "fundamentally flawed, especially as loss amounts climb"") (internal quotation marks and citations omitted)).; *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012)) ("There is no better illustration of the irrationality of [the loss enhancement] than the instant case: for of the total of 30 Guidelines points calculated by the Probation Department and endorsed by the Government as reflecting the proper measure of Mr. Gupta's crime and punishment, no fewer than 20—or two-thirds of the total—are exclusively the product of Rajaratnam's and his companies' monetary gain, in which Mr. Gupta did not share in any direct sense."); *Parris*, 573 F. Supp. 2d at 745, 750 (granting a substantial downward variance because the loss enhancement of 18 levels was "draconian" and the result of "the kind of piling-on of points for which the guidelines have frequently been criticized" (citation and internal quotation marks omitted));"); *Adelson*, 441 F. Supp. 2d at 512 (criticizing the guidelines range, which increased by 24 levels under § 2B1.1, for "expos[ing], more broadly, [] the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004)) ("The Guidelines place undue weight on the amount of loss involved in the fraud. . . .  In many cases, including this one, the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence."); *United States v. Mohammed*, 315 F. Supp. 2d 354, 357 (S.D.N.Y. 2003) ("[A]cross a wide range of diverse types of schemes and thefts, the amount of the loss . . . may be a less accurate proxy for the seriousness of the offense.").

scheme . . . ," PSR ¶ 188. Gavin's relative culpability is manifest in the fact that his "role in the offense was mostly as a passive participant and [he] was not the typical white collar defendant the court had observed in similar criminal schemes." *United States v. Cole*, 765 F.3d 884, 886–87 (8th Cir. 2014) (affirming noncustodial sentence in fraud case in part because defendant "had no prior contact with law enforcement and was 'markedly different' than 'most of the fraudsters who appear before th[e] Court.'").

Gavin's relative culpability is also not reflected in the Guidelines range, which is a function of the § 2B1.1 loss table. Unlike every other co-defendant, Gavin made numerous serious attempts to stop the fraud. Significantly, Gavin's failure to disclose the fraud was not motivated by any desire for personal gain or the gain of anyone else. Gavin's motive—saving the company to protect the employees—is starkly different from the motivation of every other participant in the scheme, as well as from the typical white-collar defendant. Gavin has also made every effort to atone for his mistakes by cooperating fully and completely with the Government in this case, which itself promotes respect for the law.

2.    A Noncustodial Sentence Adequately Provides Just Punishment

Section 3553(a)(2)(A) requires the Court to consider the need for the sentence imposed "to provide just punishment for the offense," among other factors discussed below. "In imposing 'just punishment' for a particular offense, a sentencing judge cannot ignore the additional penalties and hardships that will attach as a result of conviction." *United States v. Chin Chong*, No. 13-CR-570, 2014 WL 4773978, at *6 (E.D.N.Y. Sept. 24, 2014) (citations omitted); *see also United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016) ("[E]mbrac[ing] the impact and significance of the collateral consequences facing a convicted felon as bearing upon a just punishment is the enlightened view . . . ."). As explained further *infra* Sections IV.C.3.b–c, Gavin is barred from serving as an officer or director of a U.S. public company, he has lost two jobs as a direct

54

consequence of this legal matter, he is prohibited from traveling to the U.S., and he has suffered financially, physically, and psychologically.  The Court may order restitution as appropriate, as well as other conditions, such as community service.  We respectfully submit that imposition of a custodial sentence would be greater than necessary and thus not just punishment.

3.      A Noncustodial Sentence Affords Adequate General and Specific Deterrence

Section 3553(a)(2)(B) requires the Court to consider the need for the sentence imposed "to afford adequate deterrence to criminal conduct," that is, to promote general and specific deterrence.  The drafters of Section 3553(a) recognized that there are cases where "release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose."  S. Rep. No. 98-225, at 92 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3275.  In this vein, the Ninth Circuit has observed that "Section 3553(a) . . . does not require the goal of general deterrence be met through a period of incarceration."  *United States v. Edwards*, 595 F.3d 1004, 1016–17 (9th Cir. 2010).  Similarly, courts in the Second Circuit have found that "interests of general deterrence [can be] adequately served without imposing a prison sentence."  *United States v. Hawkins*, 380 F. Supp. 2d 143, 177 (E.D.N.Y 2005); *see also United States v. Discenza*, No. 14-CR-273, 2016 WL 3443586, at *2 (S.D.N.Y. May 31, 2016) (noting "probation both reflects the seriousness of the offense and promotes general deterrence while accounting for [defendant]'s history of providing valuable medical services").  For the reasons set forth below, we respectfully submit that a noncustodial sentence is sufficient to promote the general and specific deterrence purposes of sentencing in Gavin's case.

a.  *Message to Similarly-Situated Executives*

Insofar as white-collar crime has been thought to be amendable to general deterrence, it is because offenders are assumed to be rational actors, motivated by self-interest, and apt to engage

in long-term planning and a deliberate risk/return calculation, factoring in the applicable regulations and regulatory environment.  *See* Sally S. Simpson, *White-Collar Crime:  A Review of Recent Developments and Promising Directions for Future Research*, 39 Ann. Rev. Soc. 309, 316 (2013).  But sending Gavin to prison would send a confusing message to the business community because Gavin's case is not a case about one of those economically-rational actors.  Gavin did not strategize a scheme to game the system; he did not plan, direct, or take active steps to execute it; he did not devise ways to hide it from auditors or direct anyone else to do so.  In short, Gavin is dissimilar to most white-collar defendants in securities fraud cases.

Gavin was motivated by a sense of obligation to protect a fundamentally good company and its hundreds of quality employees who depended on management (especially Gavin, as the person responsible day-to-day for operations and integration) to keep the ship afloat.  There was no personal upside to the fraud for Gavin, so there was no calculating risk/return.  He had no knowledge of SEC regulations or public company duties, so there was no effort to exploit gray areas or enforcement gaps.

Here, sending Gavin to prison would send the wrong message to executives who are considering, or are already trying to, stop corporate fraud.  *See Gall v. United States*, 552 U.S. 38, 54 (2007) (observing that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.").  If they were to learn that an executive with Gavin's background, character, conduct, and cooperation went to prison, they will be discouraged and reasonably fear that resistance to the fraud and cooperation with law enforcement cannot put them on the path to atonement, rehabilitation, and a more promising future.  "An enlightened system of criminal justice should not be based upon a policy

'all hope abandon ye who enter here.'  It should encourage hope." *United States v. Zacharias*, 365 F. Supp. 256, 257 (S.D.N.Y. 1973).  A noncustodial sentence in this case will encourage hope for people who take steps to stop fraud and cooperate in the prosecution of fraudsters.

Moreover, imposing a noncustodial sentence in this case could increase the likelihood that any similarly-situated executives will *themselves* take steps, as Gavin did, to be held accountable and cooperate with the justice system because they will see that realigning their personal interests with the interests of justice is the only way out.

- Gavin alone confronted Smyth and Tuzman, tried to restructure the company and introduce proper financial controls, escalated grave concerns about operations and Tuzman's behavior to Audit Committee members, and eventually resigned and refused to return.  When the SEC wanted to contact Gavin in 2013, he instructed his attorney to call the SEC and he understands that his attorney did so.  This type of conduct increases the likelihood that crime will be detected, thus increasing the "certainty of apprehension," which criminologists believe is "the more effective deterrent."  *See* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201–02 (2013).

- In January 2016, when the FBI and USPIS contacted him in Australia, he voluntarily and immediately flew to Melbourne to meet with them, and, shortly thereafter, gave up his right to an extradition hearing, flew to New York, and immediately cooperated with prosecutors.  This type of conduct also increases the likelihood that offenders will be apprehended.

- Gavin pleaded guilty, cooperated extensively with prosecutors, and testified for the government at the trial of Tuzman and Amanat.  This type of conduct increases the likelihood that offenders will be convicted and punished.

Insofar as the sentence of Gavin can reasonably be expected to have an effect on general deterrence of white-collar crime, it will likely be by encouraging other executives who have sadly gone along with fraudulent schemes to walk away and help shine a light on the scheme and its architects.  The sentence that fits Gavin's culpability, resistance, exit, and ultimate cooperation is a noncustodial sentence.

Gavin's conviction also sends the message to executives that they will be held accountable for their role—even a relatively passive role—in corporate fraud.  They will suffer, as Gavin has suffered, an array of both formal and informal sanctions.  These sanctions are visible to others and also serve as a general deterrent to securities fraud offenses.

### b.     Formal Sanctions

Having accepted responsibility and pleaded guilty, Gavin is now a felon.  Gavin is subject to a permanent bar from serving as an officer or director of a public company traded on any U.S. exchange.[12]   He is prohibited from traveling to the United States as a consequence of his conviction, under 8 U.S.C. § 1182(a)(2)(A)(i)(l).  His inability to travel to the United States keeps him from important business meetings—a continual reminder to him, and everyone working with him, of the grave consequences of violating U.S. law.

---

[12] Specifically, Section VII of the Final Judgment in *SEC v. Gavin Campion*, 16-cv-8940-AJN (S.D.N.Y. Nov. 2, 2017), ECF No. 22 (attached hereto as Mogck Decl. Ex. 17), provides that Gavin "is prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78j] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]."

c.    *Informal Sanctions*

Gavin has suffered anguish and has witnessed the anguish of his ex-wife and his family.

████████████████████████████████████████████████████████████████

████████████████████████    Gavin lost two jobs he needed at companies he helped to found—not

for any misconduct at those companies, but for his misconduct at KITD.    ████████████████████

████████████████████████████████████████████████    The legal

fees he has incurred since 2016 have erased his savings and required him to sell his house.  (H.

Perlen Ltr.)  The facts that he pleaded guilty and testified as a cooperating witness at Tuzman's

trial have been reported by Reuters, Bloomberg, Seeking Alpha, and the Sydney Morning Herald,

adding to his public shame.

d.    *Conclusion on General Deterrence*

Insofar as Section 3553(a) requires that the Court consider the message to the public sent

by its treatment of Gavin Campion, we respectfully submit that securing his guilty plea and his

cooperation through this prosecution, and all the aforementioned formal and informal sanctions

that have resulted, are sufficient to send that message.

But insofar as custodial sentences in securities fraud cases might serve the goal of general

deterrence, we ask the Court to consider that this factor weighs more heavily and more properly in

sentencing the defendants whose conduct is far more culpable, who engaged in risk/reward

calculations when devising and executing the fraud, who used their sophistication to profit from

deceit, who did nothing to stop it, who failed to voluntarily cooperate with the government, and

who still fail to accept responsibility or express remorse for their crimes.  The message this Court

sends to society concerning Gavin Campion—a man whom the prosecutors in this case held up as

**"trying to do the right thing and stop a fraud,"** Tr. 7101:13–18—should be different in kind

from the message it sends concerning such other defendants.

In Gavin's case, the consideration of general deterrence does not weigh so heavily as to require a prison term.  Rather, a noncustodial sentence (perhaps with other conditions, such as substantial community service) will have the appropriate—sufficient but not greater than necessary—general deterrent effect.

e.      <em>Specific Deterrence</em>

Section 3553(a)(2)(B) also requires the Court to consider the need for the sentence imposed to promote specific deterrence.   The trial record, the PSR, the Government's sentencing submission, and the letters submitted by Gavin's business partners, friends, and family leave no doubt that Gavin's offense was aberrational.  He accepts responsibility for his failure to disclose the fraud to investors and auditors; he could have and should have done more than he did to stop the fraud and be truthful.  This process has carved that lesson into the deepest levels of his psyche. At KITD, he wrongly trusted and went along with sophisticated, credentialed, and wealthy businessmen; he now knows better that his conscience and working-class values are a far better guide to the conduct of his enterprises.  When Gavin first became aware that there was something inappropriate occurring at KITD, Gavin was only 36 years old, and was only 39 years old when he resigned.  The fact that he was a relatively young man when he went along with the fraud—less experienced and confident as an executive and less wise and responsible as a man—mitigates his culpability and supports the conclusion that there is little to no need to specifically deter the man who stands before the court now.  Close business associates and investors wrote in support of Gavin, praising his integrity in handling his businesses.  (G. Bongiorno Ltr.; H. Eklund Ltr.; G. Lee Ltr.; A. Paul Ltr.; C. Richardson Ltr.; D. Valentino Ltr.)   He has been an exemplary entrepreneur for the last seven years since leaving KITD.  There is no dispute that there is no need for specific deterrence in Gavin's case.

60

4.      A Prison Term Is Not Necessary to Protect the Public

Gavin has been working for almost seven years since he left KITD.  There is not an iota of wrong in his association with three different companies that he helped to found and grow. Colleagues and investors uniformly praise his integrity and want to work with him.  (G. Bongiorno Ltr.; H. Eklund Ltr.; G. Lee Ltr.; A. Paul Ltr.; C. Richardson Ltr.; K. Schonfelder Ltr.; D. Valentino Ltr.)  The Government and this Court have allowed Gavin to travel internationally and within the United States (Los Angeles) following his plea to pursue his business endeavors.  It would manifestly disserve the public interest to put a man like that (especially a foreign citizen) in a U.S. prison.

Section 3553(a)(3)'s requirement that courts consider the "kinds of sentences available" was meant to afford flexibility to the sentencing judge by "provid[ing] alternatives to incarceration where necessary."  *United States v. K*, 160 F. Supp. 2d 421, 431 (E.D.N.Y. 2001).  Probation, for example, is not "an act of leniency," but is a "substantial restriction of freedom."  *Gall*, 552 U.S. at 44; *see also Cole*, 765 F.3d at 886 (noting the "numerous restrictions" the defendant would endure with a three-year probationary sentence as justification for the substantial downward variance from the Sentencing Guidelines range of 135 to 168 months).

Courts have recognized that society can in fact benefit from sentencing individuals to non-custodial sentences that would allow them to use their skills to better serve the community.  *United States v. Coughlin*, No. 06-CR-20005, 2008 WL 313099, at *7 (W.D. Ark. Feb. 1, 2008). (sentencing a Walmart executive who pled guilty to aiding and abetting wire fraud and filing false tax returns, yielding a guideline range of 27 to 33 months of imprisonment, to five years' probation, including 27 months of home detention and 1,500 hours of community service in part because defendant's "expertise is better put to use than wasted in the physical deterioration of unnecessary imprisonment"); *United States v. Warner*, 792 F.3d 847, 854 (7th Cir. 2015) (despite a Guidelines

range of 46 to 57 months, the court affirmed a sentence of a defendant to two years' probation; district court found that due to defendant's extensive philanthropy, "'society will be best served by allowing [defendant] to continue his good works' outside of prison"); *United States v. Smith*, No. 1:06-CR-00394, 2009 WL 249714, at *4 (N.D. Ohio Feb. 2, 2009) (finding community service would put defendant's abilities as an accountant and lawyer to "good use," and commented that those "abilities [] would otherwise be wasted during a more lengthy prison term"); *United States v. Collado*, No. 07-CR-1144, 2008 WL 2329275, at *5 (S.D.N.Y. June 5, 2008) (noting "community would be better served by having [defendant] in it and available to provide substance abuse treatment to others").

We submit that the public interest is best served by putting Gavin's skills to continued good use in the anti-piracy, ██████████, and education efforts of ███. (G. Bongiorno Ltr.); *see supra* Section I.D.5. "[Gavin] is a key asset of [████]." (G. Bongiorno Ltr.) ████ recognizes Gavin's critical skills "as a visionary and driving the technical strategy of the business." (G. Bongiorno Ltr.) This Court should sentence Gavin to a noncustodial term so he can continue this important law-promoting work and allow him to atone through any other forms of community service this Court deems appropriate.

5.   <u>A Prison Term Would Not Advance the Goals of Rehabilitation</u>

Gavin admits and understands he should not have stayed silent about the fraud. He quit KITD in April 2012 when his efforts to stop the fraud failed, but Gavin knows he should have done more earlier—he should have spoken up immediately. He has spent the past nearly three years of his cooperation endeavoring to make it right. Gavin's resignation and departure from KITD should weigh heavily in the Court's consideration of both specific deterrence and the need for rehabilitation, for it is "a circumstance that distinguished his conduct not only from that of all his codefendants, but from the vast majority of defendants convicted of conspiracy in federal

court." *Gall*, 552 U.S. at 56–57 (affirming district court's sentence of probation and criticizing the Eighth Circuit for "ignor[ing] the critical relevance of Gall's voluntary withdrawal" from the conspiracy).  Gavin has a solid seven-year track record post-KITD of supporting his family and building responsible companies promoting important public goods (*e.g.*, antipiracy and compliance).  "Compared to a case where the offender's rehabilitation occurred after he was charged with a crime, the District Court here ha[s] greater justification for believing [defendant]'s turnaround was genuine, as distinct from a transparent attempt to build a mitigation case." *Id.* at 57.

### D. The Need to Avoid Unwarranted Sentencing Disparities Justifies a Noncustodial Sentence

Under Section 3553(a)(6), the Court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."[13]  A non-custodial sentence is consistent with the sentences imposed on securities fraud defendants who cooperated with the Government and were less culpable than other co-defendants. *See, e.g.*, Sent'g Tr. at 46, 58, *United States v. Berke*, No. 17-CR-450 (S.D.N.Y. Apr. 17, 2018), ECF No. 63 (cooperator sentenced to time served after pleading guilty to trading on inside information "out of greed and hubris") (attached hereto as Mogck Decl. Ex. 16); Sent'g Tr. at 16, 18–19, *United States v. Cunniffe*, No. 15-CR-287 (S.D.N.Y. Nov. 6, 2017), ECF No. 265 (cooperator sentenced to probation after pleading guilty to trading on inside information for own profit) (attached hereto as Mogck Decl. Ex. 18); Sent'g Tr. at 3–4, *United States v. Kaplan*, No. 10-CR-1186 (S.D.N.Y. Mar. 25, 2014), ECF No. 21 (cooperator sentenced to time served after pleading guilty to securities fraud charges despite conduct that was "at a much starker level of

---

[13] The purpose is to "eliminat[e] disparity on a *national* level." *United States v. Tejeda*, 146 F.3d 84, 87 (2d Cir. 1998) (emphasis in original).

culpability than the two main defendants") (attached hereto as Mogck Decl. Ex. 19); Sent'g Tr. at

13, 46, *United States v. Fortuna*, No. 15-CR-287 (S.D.N.Y. Feb. 13, 2013), ECF No. 28

(cooperator sentenced to probation after pleading guilty to trading on inside information for own

profit) (attached hereto as Mogck Decl. Ex. 20); Sent'g Tr. at 7, 12–13, *United States v. Goel*, No.

10-CR-90 (S.D.N.Y. Sept. 24, 2012), ECF No. 54 (cooperator sentenced to probation after

pleading guilty to providing inside information) (attached hereto as Mogck Decl. Ex. 21); *see also*

Sent'g Tr. at 6–8, 20–21, *United States v. Li*, No. 15-CR-870 (S.D.N.Y. June 13, 2016), ECF No.

18 (defendant sentenced to probation after pleading guilty to overstating his hedge fund's

performance to investors and misleading SEC concerning bad trades but self-reported to SEC)

(attached hereto as Mogck Decl. Ex. 22); Sent'g Tr. at 17, 19, 40, *United States v. Schulman*, No.

16-CR-442 (E.D.N.Y. Sept. 26, 2017), ECF No. 155 (defendant sentenced to probation after being

convicted for drunkenly providing inside information about a potential acquisition) (attached

hereto as Mogck Decl. Ex. 23).

Securities fraud defendants who received a prison term notwithstanding their cooperation

were significantly more culpable, motivated by personal profit, or presented other aggravating

factors not present in Gavin's case.  *See* Sent'g Tr. at 27–29, *United States v. Schonhorn*, No. 16-

CR-828 (S.D.N.Y. Nov. 14, 2018), ECF No. 26 (imposing a year-and-a-day sentence despite

extensive cooperation because defendant "participated in corrupt behavior for a period of five or

six years," "knew beyond any question that bribing Mr. Kang was illegal, but he did so in a way

that can only be described as with abandon," "committed obstruction of justice and bank fraud

along the way," and while not most culpable, defendant was "more culpable than [the third

participant] given the magnitude of both the bribes he paid and the business he conducted with the

[pension] fund") (attached hereto as Mogck Decl. Ex. 15); Sent'g Tr. at 21–22, *United States v.*

*Grossman*, No. 09-CR-136 (S.D.N.Y. May 3, 2012), ECF No. 59 (imposing 36 month sentence despite extensive cooperation because the Court was "not confident that Mr. Grossman has been rehabilitated" since "[h]e was convicted of fraud before this case, he cooperated with the government before this case, and he served time before this case," yet "[n]othing about those experiences deterred him or discouraged him from engaging in the fraud that is the basis of the charges here") (attached hereto as Mogck Decl. Ex. 24); *see also* Sent'g Tr. at 7–9, *United States v. Khan*, No. 17-CR-221 (S.D.N.Y. Jan. 10, 2018), ECF No. 36 (imposing a year-and-a-day sentence despite efforts to cooperate because defendant in food stamp fraud case conducted "[m]ost of the unlawful transactions . . . himself" and his actions "undermine[] a critical government program") (attached hereto as Mogck Decl. Ex. 25).

## V.   FINANCIAL ASPECTS OF THE SENTENCE

### A.  A Fine Is "Not Recommended" By the Probation Department

We embrace the Probation Department's recommendation that a fine is "not recommended." PSR at p. 48. As Gavin's financial disclosures make clear, Gavin has a net worth of negative $532,083, and a monthly income of less than $1,400, PSR ¶ 242, with three dependents, so Gavin "is unable to pay a fine," PSR ¶ 245.

### B.  Gavin Did Not Derive any Property from the Fraudulent Scheme, so Forfeiture is Not Warranted

Gavin's Cooperation Agreement and his plea to the Information reflect that Gavin agreed to forfeit "any and all property, real or personal, that constitutes or is derived from the commission of the offenses alleged in Counts One and Two." GX 3503-11 (Cooperation Agreement), at 2 (citing 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461). With respect to forfeiture, it is undisputed that Gavin worked like a dog at KITD, received a modest salary for an executive, received only one similarly modest performance bonus, and never profited from any stock-based compensation.

(*See* H. Perlen Ltr.; KITD Amendment to Form 10-K for Year Ended Dec. 31, 2010 (May 2, 2011),

https://www.sec.gov/Archives/edgar/data/1076700/000114420411025575/v220591_10ka.htm.)

"Criminal forfeiture focuses on the disgorgement by a defendant of his 'ill-gotten gains.'" *United*

*States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012).  Gavin had none.[14]  Therefore, ordering

forfeiture in any amount would be inappropriate in Gavin's case.

### C.  The Burden of Restitution Should be Apportioned Across Co-Defendants According to Relative Culpability and Financial Circumstances

Gavin's Cooperation Agreement provides that "the defendant shall make restitution in an

amount to be specified by the Court in accordance with Title 18, United States Code, Sections

3663, 3663A, and 3664," which "amount shall be paid according to a plan established by the

Court."   GX 3503-11 (Cooperation Agreement), at 1.   Thus, we have no objection to the

recommendation in the PSR that Gavin pay an amount of restitution deemed appropriate by the

Court.  *See* PSR at p. 55 (Probation Department's recommendation that, pursuant to 18 U.S.C.

§ 3663A, Gavin should pay restitution equal to "10% of gross monthly income over a period of

supervision to commence 30 days after the date of the judgment . . . .").

Nevertheless, pursuant to 18 U.S.C. § 3664(h), because "more than 1 defendant has

contributed to the loss of a victim, the court may make each defendant liable for payment of the

full amount of restitution *or may apportion liability among the defendants to reflect the level of*

---

[14] The Supreme Court held, in *Honeycutt v. United States*, 137 S.Ct. 1626 (2017),), that "[f]orfeiture pursuant to [21 U.S.C.] § 853(a)(1) is limited to property the defendant himself actually acquired as the result of the crime," *id.* at 1635, so a defendant cannot be held jointly and severally liable for property acquired by co-conspirators under that forfeiture statute.  One court in this District has held, however, that "Second Circuit precedent mandates joint and several liability under Section 981," *Lasher v. United States*, No. 12-CR-868, 2018 WL 3979596, at *10 (S.D.N.Y. Aug. 20, 2018), thus holding that *Honeycutt* does not apply to the forfeiture statute at issue here.  Nevertheless, in a recent appeal to the Second Circuit, the United States Attorney for the Southern District of New York filed a supplemental brief conceding that "the reasoning of *Honeycutt*—insofar as it rejects joint and several liability as a basis for forfeiture—also applies to forfeiture under 18 U.S.C. § 981(a)(1)(C)."  *United States v. Gil-Guerrero*, No. 17-773-CR, 2018 WL 6720837, at *4 (2d Cir. Dec. 21, 2018).).  We believe this recent concession should remove from Gavin's sentencing the issue of any joint and several liability for other defendants' acquisition of property as a result of the crime.

*contribution to the victim's loss and economic circumstances of each defendant*." (emphasis added).  There is no question that the other co-defendants contributed to—conceived, directed, caused—the losses at an entirely different level than Gavin, so much so that one of the victims, Grant Lee, wrote a letter to the Court in support of Gavin stating, "I don't hold [Gavin] responsible in any way for the demise of KIT Digital."  (*See* G. Lee Ltr.)  With respect to the economic circumstances of the other defendants, although we have not seen their Presentence Investigation Reports, we have no doubt they show assets far in excess of Gavin's *significantly negative* current net worth.  *See* PSR at p. 41 (total net worth of -$532,083).  We also ask the Court to consider Gavin's current financial condition and, in particular, the needs of his two minor children and their mother, who are dependent upon Gavin's modest income, in determining an appropriate amount of restitution.

## CONCLUSION

For all the foregoing reasons, we respectfully request that this Court grant the Government's anticipated motion under U.S.S.G. § 5K1.1, find that a significant variance is warranted, and, in light of the § 3553(a) factors, accept the recommendation of the Probation Department that an appropriate sentence for Gavin is a noncustodial sentence, with appropriate community service, restitution, and/or other appropriate conditions.

Dated: February 11, 2019                    Respectfully submitted,
        New York, New York


                                            /s/ Jim Walden
                                            Jim Walden
                                            Brian D. Mogck
                                            Jeffery L. Ding
                                            WALDEN MACHT & HARAN LLP
                                            One Battery Park Plaza, 34th Floor
                                            New York, New York 10004
                                            (212) 335-2030
                                            jwalden@wmhlaw.com
                                            bmogck@wmhlaw.com
                                            jding@wmhlaw.com

                                            *Attorneys for Defendant Gavin Campion*