

45 WEST 29TH STREET, SUITE 303
NEW YORK, NEW YORK 10001
CHAUDHRYLAW.COM

August 15, 2019

**VIA ECF**
The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

  Re: *United States v. Irfan Amanat*, 15 Cr. 536 (PGG)

Dear Judge Gardephe:

  As the Court is aware, we were recently retained as counsel for defendant Irfan Amanat in the above-referenced matter.  A *Fatico* hearing regarding alleged obstruction of justice is scheduled for September 5, 2019.  When we were substituted as counsel on July 24, 2019, we promised to inform the Court within three weeks whether the *Fatico* hearing is necessary.

  We write to request that the Court grant a postponement of the *Fatico* hearing.  This request is based upon information which we have recently uncovered and which, in our opinion, makes proceeding with the *Fatico* hearing at this time impossible. We have been reviewing the voluminous documents in this case, and although there are a lot of things we still do not know, there are also a series of alarming facts that we have unearthed that raise potentially serious issues for all the parties, some of which go to the very integrity of the convictions.

  The bases for our request will be explained in more detail below. The facts we have reviewed raise issues which potentially include serious prosecutorial misconduct, and may result in grounds for motions to dismiss the charges, a request for a new trial, a request for further discovery, and a request to modify Irfan Amanat's bail conditions. We may uncover additional issues as we continue to review the documents.  We have conferred with *Curcio* counsel for Omar Amanat, Grainne O'Neill, for whom many of the same issues pertain, and it is our understanding counsel for Omar Amanat will join in the instant application.

*The Facts Raise Serious Issues as to Whether a Government Informant was Communicating With and Advising the Defendants Throughout the Criminal Proceedings*

Spyros Enotiades, a government "confidential source" for over 30 years, is the root cause of the issues we have been investigating.  Mr. Enotiades is the witness the Government intended to call at the remand hearing until he purportedly faked a heart attack.  Mr. Enotiades is also the witness the Government intends to call at the *Fatico* hearing. But much more than that, Mr. Enotiades has been intimately involved in the defense of Omar and Irfan Amanat.  Very soon after the arrests of the Amanat brother, Mr. Enotiades was hired by Omar as a consultant to help him with his defense against the charges in this case. Mr. Enotiades was later consulted by Irfan Amanat for the same purpose.

Mr. Enotiades' life as a government agent is profiled in an article about him entitled "The Man Who Captures Criminals for the D.E.A. by Playing Them," which appeared in the July 30, 2018 edition of The New Yorker magazine and is annexed hereto as *Exhibit A*.  Mr. Enotiades throughout his career as a source for and agent of the Government, has been paid by the Government to collect information.  Mr. Enotiades has reaped significant rewards during his career as an informant to the tune of multi-millions of dollars.  The New Yorker article states that Mr. Enotiades has been paid over $6 million throughout his career as an agent of the Government.  *See Exhibit A*.  We believe that Mr. Enotiades' role in this case and all other cases is no different than that of an undercover agent.  Mr. Enotiades gains the trust of his targets and gathers information which he then shares with the Government.

Little is known about the many prior cases in which Mr. Enotiades was involved, but we do know that Mr. Enotiades previously testified in 2011 on behalf of the Government in this district as a confidential source in *United States v. Chigbo Umeh*, 09-CR-00542-JSR, a case prosecuted by former AUSA Randall Jackson.  Notably, during that trial Mr. Enotiades acknowledged he has never paid any taxes on any of the money paid to him by the Government in his 30 plus years as a confidential source.  At a minimum, information surrounding Mr. Enotiades' willful failure to pay taxes constitutes *Giglio* material.

Even if the Government were to withdraw the request for a two-point enhancement for obstruction of justice, Mr. Enotiades' involvement in this matter presents constitutional issues far beyond the alleged obstruction of justice.  Both Omar and Irfan Amanat were arrested in 2016.  In March 2017, Mr. Enotiades began communicating with Omar Amanat, and shortly thereafter, Irfan Amanat as well. As noted above, Mr. Enotiades represented to the Amanats that he was a consultant who could help them resolve their criminal charges.  So, at the outset, an agent of the Government was in communications with Omar and Irfan Amanat, who were defendants represented by counsel following their arrests.  Within a few weeks after he began consulting with the defendants, Mr. Enotiades requested a "mobilization fee" and stated that he had "to purchase cases from younger agents" in what he portrayed was an attempt to resolve the criminal charges against Omar Amanat.  On April 22, 2017, Mr. Enotiades signed a contract to work with the Amanat brothers and was paid a sum of money.

In other words, a Government agent was paid by the Amanat brothers for what the brothers thought would be assistance in the defense of their cases.  Many questions arise from this arrangement:

- Did Mr. Enotiades report these payments to his handlers?
- Were the prosecutors in this case aware of this arrangement?
- Did the prosecutors or other agents instruct Mr. Enotiades to become involved with the Amanat brothers for the sole purpose of gathering information as the Government had in dozens of cases in the past?
- Is there a *Hammad Memo*[1] pursuant to DOJ policy for preclearance to send Mr. Enotiades to communicate with Omar and Irfan Amanat despite being represented by counsel?

All of these questions open a "Pandora's Box" of possible constitutional violations.

Next, Mr. Enotiades, as an agent of the Government, insisted that Omar Amanat fire his then counsel and retain Randall Jackson, the attorney whom Mr. Enotiades used to work with when Mr. Jackson was an AUSA in this district and with whom Mr. Enotiades continues to share a personal relationship.  Thus, since Mr. Enotiades is acting as an agent of the Government and is communicating further with Omar Amanat despite the fact that Mr. Amanat is represented by counsel, he is interfering with Mr. Amanat's right to and choice of counsel.  This, too, has enormous implications.

It is our understanding that Mr. Enotiades continued to advise Omar Amanat and Mr. Jackson on trial strategy during the course of his trial as well.  Was this information shared with the Government?  Was Mr. Enotiades paid by the Government for this information?

Furthermore, as it pertains to Irfan Amanat, while he was represented by counsel, Mr. Enotiades advised Irfan Amanat not to take the Government's plea offer. On August 7, 2017, in text messages, Mr. Enotiades instructed Omar Amanat to tell his brother, Irfan not to take the Government's plea deal despite the fact that Irfan's attorney is advising him to take the deal.  Omar states to Mr. Enotiades that Irfan is going to take the deal and Mr. Enotiades responds that, "if I was in Irfan's position I would insist upon a real deal.  Real deal= Give the plea and Take a pre-agreed sentence."  Not only did Omar Amanat relay these directions from Mr. Enotiades to Irfan Amanat, but Mr. Enotiades relayed these instructions directly to Irfan Amanat during an in-person meeting.  Put plainly, an agent of the Government was communicating with Irfan Amanat in violation of his right to counsel, and, more notably, a Government agent was advising Irfan Amanat not to take the plea offer that another representative of the Government was making.  This is no different than another AUSA communicating directly with the defendant not to take the Government's plea offer.

These communications with Omar Amanat and Irfan Amanat by a Government agent are just the tip of the iceberg.  The Government has not produced any discovery regarding the work

---

[1] In *United States v. Hammad*, 858 F.2d 834 (2d Cir. 1988), the Second Circuit suppressed evidence that the prosecutor, through his alter ego, the informant, communicated with a party known to be represented by counsel in violation of Model Code of Professional Responsibility DR 7-104(A)(1).  Upon information and belief, DOJ/SDNY maintains a policy that pursuant to *Hammad*, a memo must be prepared as to why it is necessary to violate a defendant's right to counsel.

Mr. Enotiades has done for the Government over many years. Every report authored by Mr. Enotiades' handlers—fellow Government agents—are admissions of a party opponent and relevant to Mr. Enotiades' credibility. Nor has any information regarding payments received by Mr. Enotiades throughout his career as an agent of the Government, or specifically his payments with regards to the Amanats, been disclosed.

The potential implications of the Government's improper conduct are far reaching and extremely serious. As mentioned previously, these facts could possibly lead to (1) a motion to change Irfan Amanat's bail conditions; (2) a motion for prosecutorial misconduct; (3) a motion for a new trial; and (4) a motion to dismiss the charges in the interests of justice. These issues not only affect the *Fatico* hearing, but they affect the integrity of the Amanats' convictions themselves. Additionally, the issues raised herein may require a DOJ "clean team" to address them. Until discovery is provided on these issues and an evidentiary hearing conducted, the necessary motions and possible outcomes are unknown.

Only after the conclusion of Irfan Amanat's trial did the Government provide limited 3500 material with regards to Mr. Enotiades. The Government provided only a small sample of text messages between Mr. Enotiades and Omar Amanat. The Government has failed to provide any of the hundreds of text messages exchanged between Irfan Amanat and Mr. Enotiades or the entirety of the text messages exchanged between Mr. Enotiades and Omar Amanat. The Government also has not provided any information regarding the payment made by Omar Amanat to Mr. Enotiades. We are entitled to discovery generated by Mr. Enotiades' involvement in this case including a list of his Government handlers and cases he has worked on over the years.

In summary, an agent of the Government was communicating with both Omar and Irfan Amanat following their arrests and when they were represented by counsel. These communications included making a recommendation for a change of counsel to an attorney Mr. Enotiades had a prior relationship with while working as a government informant and advising one of the defendants not to take the plea offer. These communications continued prior to, during, and after trial. As the limited 3500 material provided demonstrates, the AUSAs assigned to this case knew about Mr. Enotiades' interactions with the Amanats at a minimum in the summer and fall of 2018, and maybe sooner—all times prior to Irfan Amanat's trial. None of this information was provided to prior counsel for Irfan Amanat.

***The Law Supports the Ordering of Discovery and an Evidentiary Hearing in this Case on the Issue of Governmental Misconduct***

The facts presented above raise the possibility that prosecutorial misconduct has infected the criminal proceedings in this case. If indeed, as is certainly possible, Mr. Enotiades was acting as a government agent or informant throughout the time he was acting as a consultant to the Amanats, the issue arises whether the prosecutors in this case knew and approved of his actions, or whether some other part of the prosecutorial apparatus of the United States was involved.

If so, the Government may be held responsible for a number of constitutional violations such as interference with the right to counsel, or a violation of Fifth Amendment due process rights. It is well settled that: "In federal court, if the government violates a protected right of the defendant,

due process principles may bar the government from invoking the judicial process to obtain a conviction, if the government's conduct 'reached a demonstrable level of outrageousness.'" *United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991).  The Fifth Amendment right to due process may be "violated by government action that is fundamentally unfair or shocking to our traditional sense of justice, or conduct that is so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused." *United States v. Bout*, No. 08 Cr. 365 (SAS), 2011 WL 2693720, at *3 (S.D.N.Y. July 11, 2011).

When the possibility of prosecutorial misconduct arises, the Second Circuit has recognized that the issue must be addressed through an evidentiary hearing at which the facts can be determined.  When prosecutorial misconduct is involved a "hearing allows for a searching inquiry into the particulars" and "provides the district judge with an opportunity to observe the demeanor and assess the credibility of various witnesses." *Cuervelo,* 949 F. 2d at 567.  Thus, a hearing "is the *preferred* course of action . . . where disputed factual issues exist." *Id.*

In a case such as this, prior to an evidentiary hearing, the defense should receive the right to discovery to obtain the necessary information needed to fully and fairly litigate the issue of prosecutorial misconduct.  Under similar circumstances, a Court in this district granted discovery and a hearing.  *United States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006). In *Stein*, the defendants alleged that the Government had engaged in misconduct when it pressured KPMG to abandon its policy of paying the defendants' defense costs, including their attorneys' fees. *Id*. at 350. Before entertaining the defendants' motion to dismiss the indictment, the Court ordered an evidentiary hearing and discovery. *Id.* at 352. At the hearing, the Court granted the defendants the opportunity to "offer any evidence, to question any witnesses, or to make any offer of proof" regarding the Government's alleged misconduct. *Id*.

Other courts in the Second Circuit have also shown their preference for fact discovery and a hearing surrounding allegations of government misconduct. *See, e.g*., *United States v. Koschtschuk*, No. 09 Cr. 96 (S)(M), 2010 WL 584018, at *6 (W.D.N.Y. Feb. 16, 2010) (granting the defendant's request for discovery of materials relevant to outrageous governmental conduct, namely that the government had "instructed [an informant] to instigate the commission of criminal activity"); *United States v. Santiago*, 987 F. Supp. 2d 465, 467 (S.D.N.Y. 2013) (holding hearing on allegations of government misconduct regarding pre-indictment delay).

Courts outside the Second Circuit have similarly held evidentiary hearings to address claims of prosecutorial misconduct. For example, in *United States v. Koubriti*, 336 F. Supp. 2d 676, 677 & 681 (E.D. Mich. 2004), the defendants alleged that the Government had engaged in misconduct by withholding documents and by making misleading statements to the court. The court held a hearing at which the Government acknowledged that "at least one document ... was intentionally not disclosed but unquestionably should have been." *Id.* at 678.  Due to the evidence revealed at the hearing, the court ordered the government to make a thorough review of its records to determine whether the defendants' constitutional rights "had been violated by either the *intentional or inadvertent* withholding of material exculpatory information." *Id.* (emphasis added). This review led the Government to move to dismiss certain charges.  The court observed: **"It is a fair statement that at the inception of this review no one, least of all the Court, could have anticipated the nature and scope of the issues . . . that would ultimately be involved in this**

**investigation.**" *Id.* (emphasis added); *See also, e.g.*, *United States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1416 (D. Md. 1986) (holding hearing on allegations that the Government deliberately breached the attorney-client privilege and lacked candor with the court); *United States v. Montgomery*, 998 F.2d 1468, 1471 (9th Cir. 1993) (noting that district court held hearing on the defendant's motion to dismiss indictment due to government misconduct).

*Conclusion*

The facts available to the defense and alleged in this memo raise the possibility that prosecutorial misconduct has infected the entire course of the criminal proceedings in this case. This misconduct, if proven, may involve grave constitutional violations which may result in the overturning of the convictions or other remedies.

In order to fully and fairly litigate the issue of prosecutorial misconduct, the defense requests that this Court order an evidentiary hearing on the issue, preceded by discovery during which the defense will be able to obtain access to the facts now in possession of the Government regarding its relationship with their longtime agent and informant Mr. Enotiades.

Therefore, the defense respectfully requests a conference before this Court to more fully explain its position and to set a schedule for the future proceedings.

We thank the Court for its attention to these matters.

Respectfully submitted,

/s/ Priya Chaudhry
Priya Chaudhry
Seth J. Zuckerman

Cc: All counsel of record (via ECF)