**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 18, 2020

BY CM/ECF

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:     United States v. Omar Amanat and Irfan Amanat
        S8 15 Cr. 536 (PGG)

Dear Judge Gardephe:

       The Government respectfully writes in opposition to the "emergency bail application" in light of coronavirus/COVID-19 and supplemental letter filed by defendant Omar Amanat ("Omar"), and the tag-along motion filed by his brother, defendant Irfan Amanat ("Irfan"). (Dkt. 1057, 1062, 1063). For the following reasons, the Court should deny Omar's and Irfan's motions.

    1.    Background

        a.    Omar's December 2017 Remand and Post-Conviction Obstruction

       After his conviction at trial in December 2017, the Court ordered Omar be detained until his sentencing. (Omar Trial Tr. 7326-28). The Court concluded that it could not "find that there is clear and convincing evidence that Mr. Amanat will not flee pending sentence if his bail is continued," including because of (a) his ties to Dubai; (b) his fabrication of evidence — which "evince[d] a disregard and a disdain for the Court and for legal process"; and (c) "it is highly likely that a term of imprisonment will be imposed on Mr. Amanat, and it is likely to be substantial." (*Id.* at 7328). Since December 2017 and while in BOP custody, Omar engaged in still further obstructive conduct by, among other things, attempting to present falsified evidence to the Court to falsely show that certain cooperating witnesses had been paid to testify against them. (Dec. 11, 2019 Gov't Ltr. (Dkt. 1049)). Thus, not only is Omar is a risk of flight — as the Court has already found — but he is also a demonstrated danger to the community — engaging in additional obstructive conduct while awaiting sentencing.

        b.    Irfan's October 2018 Conviction and Pre-Trial Obstructive Conduct

       After his conviction at trial in October 2018, the Court ordered Irfan be detained until his sentencing. The Court concluded that the defendant was a risk of flight, finding: "[G]iven

the verdict that I have discussed, the magnitude of the evidence; my belief that it is unlikely that an appeal would be successful; given my belief Mr. Amanat faces a substantial prison sentence; given his extensive ties with Dubai, which is a country that we do not have an extradition agreement; given his other foreign travel; and given my belief that the bond posted by his aunt is not sufficient at this time to ensure his return to court, I find that there is not clear and convincing evidence that he will not flee and he will be detained pending sentence." (Irfan Trial Tr. 946-952). The Government respectfully submits that before trial, Irfan, like his brother, engaged in obstructive conduct by, among other things, attempting to present falsified evidence to the Court to falsely show that certain cooperating witnesses had been paid to testify against them. (Dec. 11, 2019 Gov't Ltr. (Dkt. 1049)). Thus, not only is Irfan is a risk of flight — as the Court has already found — but he is also a demonstrated danger to the community — engaging in obstructive conduct with Omar while Omar was detailed pending sentencing and while Irfan was awaiting his own trial

2.    BOP and MDC Are Capable of Protecting the Health and Safety of Inmates

Omar first contends that the Bureau of Prisons ("BOP") generally, and the Metropolitan Detention Center ("MDC") where Omar is housed specifically, are "unable to protect the health and safety of defendants in their custody" from coronavirus/COVID-19. (Dkt. 1057, at 4). Irfan joins this argument. (Dkt. 1062, at 2). Omar and Irfan are incorrect.

BOP is well prepared to handle the risks posed by coronavirus/COVID-19, as with other infectious diseases and other medical conditions.[1] Since at least October 2012, BOP has had a Pandemic Influenza Plan in place. *See BOP Health Management Resources*, available at https://www.bop.gov/resources/health_care_mngmt.jsp.[2] Moreover, beginning approximately two months ago, in January 2020, BOP began to plan specifically for the coronavirus/COVID-19 to ensure the health and safety of inmates and BOP personnel. *See Federal Bureau of Prisons COVID-19 Action Plan*, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. As part of its Phase One response to coronavirus/COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.* In addition, BOP stood up "an agency task force" to study and coordinate its response to coronavirus/COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ)

---

[1]    As of the date of this letter, no inmates in BOP custody have been diagnosed with COV-19. *See BOP COVID-19 Coronavirus Disease Resource*, available at https://www.bop.gov/coronavirus/index.jsp. Two BOP personnel (in New Hampshire and Texas) were recently diagnosed with COVID-19. *See id.*

[2]    *See also Module 1: Surveillance and Infection Control*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf; *Module 2: Antiviral Medications and Vaccines*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_2.pdf; *Module 3: Health Care Delivery*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf; *Module 4: Care for the Deceased*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_4.pdf.

and the Office of the Vice President. BOP's planning is structured using the Incident Command System (ICS) framework." *Id.*

On Friday, March 13, 2020, BOP, after coordination with DOJ and the White House, implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.* BOP's national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For example, BOP (a) suspended social visits for 30 days (but increased inmates access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmates movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.* In addition, BOP has implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its infectious disease management programs. *Id.* As part of BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.*

Omar also makes general complaints about the fact that MDC does not have a medical facility attached to it and that COVID-19 tests are not available on site. (Dkt. 1057, at 7). It is true that MDC is not one of BOP's Federal Medical Centers ("FMCs"). On a case-by-case basis, BOP's health professionals send inmates for consultations and treatments at New York City hospitals and other medical facilities. The availability of COVID-19 tests is generally limited nationwide, and BOP is working to test inmates where needed.

Accordingly, BOP is able to protect the health and safety of defendants in its custody from coronavirus/COVID-19.

### 3.    Conditions "Specific" to Omar in MDC Do Not Require His Release

Omar next maintains that conditions specific to his Unit at MDC warrant release. (Dkt. 1057, at 8).[3] First, he asserts that a family member of another inmate "recently visited . . . Europe," and that this inmate has "flulike symptoms." (*Id.*). As noted above, no inmates in BOP custody and no BOP personnel have been diagnosed with COVID-19. *See BOP COVID-19 Coronavirus Disease Resource*, available at https://www.bop.gov/coronavirus/index.jsp. Second,

---

[3]    Omar's complaints appear to be based on a Tweet. *See The Coronavirus Is Spreading and Reportedly There's No Soap at This Federal Jail in Brooklyn*, Mother Jones (Mar. 9, 2020), available at https://www.motherjones.com/politics/2020/03/the-coronavirus-is-spreading-and-reportedly-theres-no-soap-at-this-federal-jail-in-brooklyn/.

Omar asserts that no soap and toilet paper are available in his Unit.  The Government has conferred with BOP and confirmed that soap and toilet paper, like all personal hygiene items, are available to all inmates.  Moreover, inmates are able to purchase additional soap and toilet paper at the commissary.  Third, Omar complains that hand sanitizer has not been available to inmates, notwithstanding the availability of soap and water.  *See CDC Coronavirus Disease 2019 (COVID-19), How to Protect Yourself*, available at https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html ("If soap and water are not readily available, use a hand sanitizer that contains at least 60% alcohol.").  Because of its alcohol content, BOP does not typically permit or provide alcohol-based sanitizer.  BOP is in the process of considering the possibility of non-alcohol-based sanitizer.  In short, Omar's claims do not support his release.

4.      The Defendants' Health Conditions Do Not Require Their Release

Omar claims that because of his heart condition, he is "uniquely vulnerable" to COVID-19.  (Dkt. 1057).  Omar's filing includes one paragraph of detail about his health condition.[4]  The Government requested that defense counsel provide Omar's heath records so that the Government could understand the details of his condition.  Defense counsel provided health records from December 2018 — over one year ago.  The Government has obtained Omar's current health records and will provide them to the Court and Omar.  There is nothing in Omar's submission or his health records to suggest that he is "uniquely vulnerable" to COVID-19 or that BOP will be unable to effectively test and treat him, particularly in light of the efforts and planning that BOP has made and is making, as detailed above.  While it is true that Omar's family has a history of heart disease and Omar has been diagnosed with hyperlipidemia, the Government notes that (a) the primary health condition for which Omar appears to have been treated recently is a foot fracture that he suffered while playing basketball (*see also* Dkt. 1063, a 1 ("[Omar] has been hospitalized and has suffered multiple head injuries, a broken tooth, and a broken heel. . . ")), and (b) he refused a flu shot in November 2019.[5]

Irfan makes no attempt to argue that his health conditions counsel in favor of his release.

5.      Additional Factors Do Not Require the Defendants' Release

Omar also argues that various additional factors support his immediate bail.  Specifically, he asserts that he should be bailed because (a) he would like to be able to care for his aging parents; (b) he has struggled to maintain contact with his children while in prison; (c) he was

---

[4]      The Government also refers the Court to its May 13, 2019 *ex parte* letter.

[5]      In his supplemental letter, Omar also adds that he is at "increased risk of death" from COVID-19 due to his diabetes, heart disease, and lung disease.  ((Dkt. 1063, at 1).  The CDC page cited in footnote 1, however, talks only about people who "may be at higher risk for more serious complications" from COVID-19; it does not suggest that such people are at imminent risk of death.  The remainder of the supplemental letter does not advance any new facts, and the doctor's note appended as Exhibit A is almost two years old and says nothing about risks or complications related to COVID-19.

convicted of a non-violent crime; and (d) fasting during Ramadan makes him more susceptible to COVID-19.  (Dkt. 1057, at 9-10).  Irfan also argues that he should be released so that he can care for his parents.  (Dkt. 1062, at 2-3).  None of these arguments is unique to the defendants.  Moreover, the Court has already considered many of them, including the defendants' family circumstances and their white-collar convictions, in initially denying Omar bail pending his sentencing.  (Omar Trial Tr. 7283-85, 7311-12).

6.     The Defendants Face Substantial Prison Terms

a.     Omar

Omar also argues that he should be bailed because his applicable Guidelines are lower than the Guidelines range that the Probation Department has calculated and because he "may have already served all or a majority of his sentence in the MCC and MDC."  (Dkt. 1057, at 10-11).  Omar is wrong.  Omar has been in custody for approximately 27 months since his conviction in December 2017.  As set forth in the Government's sentencing submission and *Fatico*-related submissions, the Government believes that Omar's total offense level is 35, resulting in an applicable Guidelines range of 168 to 210 months' imprisonment.  (Dkt. 807, at 13-24; Dkt. 993, at 10-23; 1049).  The Government's present Guidelines calculation is as follows:

- Counts One through Four are grouped, pursuant to U.S.S.G. § 3D1.2(d).

- The base offense level is seven, pursuant to U.S.S.G. § 2B1.1(a)(1).

- Twenty levels are added, pursuant to U.S.S.G. § 2B1.1(b)(1)(k), because the applicable loss amount is between $3.5 million and $9.5 million, calculated as follows.  The applicable loss for Counts One through Three (Maiden Capital fraud) is $7.3 million (Dkt. 807, at 14-16), and for Count Four (market manipulation conspiracy) is between $3.41 million and $10.4 million.  (Dkt. 993, at 10-23).

- Two levels are added, pursuant to U.S.S.G. § 2B1.1(b)(10)(B), because a substantial part of the scheme was committed from outside the United States.  (Dkt. 807, at 21-22).

- Four levels are added, pursuant to U.S.S.G. § 2B1.1(b)(19)(A)(iii), because Omar was "a person associated with an investment advisor."  (Dkt. 807, at 22-23).

- Two levels are added, pursuant to U.S.S.G. § 3C1.1, because Omar obstructed justice both by admitting fabricated evidence at trial and by attempting to present falsified evidence to the Court to falsely show that certain cooperating witnesses had been paid to testify against them.  (Dkt. 807, at 23-24; Dkt. 1049).

The Government continues to believe that a Guidelines sentence of 168 to 210 months' imprisonment is appropriate in light of the serious crimes for which he was convicted and his

continued disregard for the law, as demonstrated by his obstructive conduct during trial and while in prison.  There is thus no basis to bail him now.

   b. <u>Irfan</u>

   Irfan similarly argues that he should be bailed because his counsel's "preliminary review and research shows that an accurate loss calculation would result in a sentencing guideline range for Mr. Amanat that would be far less than the time he has already served," approximately 17 months.  (Dkt. 1062, at 4).  Irfan does not present a Guideline calculation.  The Government respectfully submits that because Irfan's total offense level is 35, the resulting applicable Guidelines range is 168 to 210 months' imprisonment, calculated as follows:

- Counts One, Two, Three, and Six are grouped, pursuant to U.S.S.G. § 3D1.2(d).

- The base offense level is seven, pursuant to U.S.S.G. § 2B1.1(a)(1).

- Eighteen levels are added, pursuant to U.S.S.G. § 2B1.1(b)(1)(J), because the applicable loss amount is between $3.5 million and $9.5 million, calculated as follows.  The applicable loss for Counts One through Three (Maiden Capital fraud) is $7.3 million (Dkt. 807, at 14-16), and for Count Six (KITD securities conspiracy) approximately $2 million.[6]

- Two levels are added, pursuant to U.S.S.G. § 2B1.1(b)(9)(C), because the defendant violated an administrative order by engaging in the offense conduct, to wit, the SEC's 2006 order.

- Two levels are added, pursuant to U.S.S.G. § 2B1.1(b)(10)(B), because a substantial part of the scheme was committed from outside the United States. (Dkt. 807, at 21-22).

- Four levels are added, pursuant to U.S.S.G. § 2B1.1(b)(19)(A)(iii), because Irfan was "a person associated with an investment advisor."  (Dkt. 807, at 22-23).

- Two levels are added, pursuant to U.S.S.G. § 3C1.1, because Irfan obstructed justice by attempting to present falsified evidence to the Court to falsely show that certain cooperating witnesses had been paid to testify against them.  (Dkt. 807, at 23-24; Dkt. 1049).

---

[6] The Government has suggested that the applicable loss amount for Count for Irfan for Count Six be limited to $2 million, which reflects the Enable piece of the fraud.  As noted in the Government's prior submission, the Government believes that the applicable loss amount for Tuzman is at least $22.9 million.  (Dkt. 993).

The Government believes a substantial sentence will be appropriate in light of the serious crimes for which he was convicted and his disregard for the law, as demonstrated by his obstructive conduct.  Even if the Court were to vary downward from the Guidelines range of 168 to 210 months, any appropriate sentence should substantially exceed the approximately 17 months that he has served thus far.  There is thus no basis to bail him now.

*      *      *      *      *

Accordingly, the Court should deny Omar's and Irfan's motions for bail.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney


By:      /s/
Joshua A. Naftalis
Andrea M. Griswold
Daniel M. Tracer
Assistant United States Attorneys
(212) 637-2310/1205/2329

cc:      Defense Counsel (via ECF)