**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

        vs.

    Case No.: S8-15-CR-00536 (PGG)

IRFAN AMANAT,

        Defendant.

**SENTENCING MEMORANDUM ON BEHALF OF**
**IRFAN AMANAT**

Priya Chaudhry
Seth J. Zuckerman
CHAUDHRYLAW PLLC
45 West 29th Street, Suite 303
New York, New York 10001
priya@chaudhrylaw.com
szuckerman@chaudhrylaw.com
Tel.: (212) 785-5550
Fax: (212) 898-9040

*Attorneys for Defendant*
*Irfan Amanat*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES…………………………………………………………...iv

I.    PRELIMINARY STATEMENT……………………………………………..1

II.   IRFAN'S PERSONAL HISTORY
      AND CHARACTERISTICS……………………………………….……..2

III.  THE HARSH CONDITIONS OF
      IRFAN'S CONFINEMENT AT MDC…..…………..…………………..……29

      A.  COVID-19………………………………………………………..…29

      B.  Extortion and Violence …………………………………...…..…32

IV.   THE GOVERNMENT'S EVIDENCE AT TRIAL,
      EVEN ACCEPTED ENTIRELY AS TRUE,
      SHOWED ONLY THAT IRFAN PLAYED
      A MINIMAL ROLE IN THE CRIMINAL ACTIVITY
      HERE………………………………………………………….....33

V.    THE ADVISORY GUIDELINES CALCULATION……………………….37

      A.  The Probation Department Recommendation……..………………….......38

      B.  Challenges to Sentencing Enhancements……………………………………39

            1.  The PSR Incorrectly Imposes a Four-Level
                Enhancement For Being a Person Associated
                With A Broker or Dealer……………………………………39

            2.  The PSR Incorrectly Imposes a Two-Level
                Enhancement For "A Substantial Part of the
                Fraudulent Scheme Was Committed Outside
                the U.S." or Because the Conduct Constituted
                "Sophisticated Means"……..…………….…………………..41

      C.  The Guidelines Calculation Should Be Reduced Based
          On Irfan's Minimal Role in Maiden's And Tuzman's
          Criminal Activity…………………………………………………..…43

            1.  Applicable Law………………………………………………43

       2.  **Irfan Was a Minimal Participant in the Criminal Activity**…………45

   *D.  The Guidelines Calculation Substantially Overstates*
     *Irfan's Culpability Because It Is Almost Entirely Based*
     *On Losses Caused By Others Through Conduct Outside*
     *Of Irfan's Control*………………………………………………………48

**VI.**   **The Loss Calculation Here**……………………………………………48

   *A.  Loss Amount Attributable to Irfan*………………………………………...…52

     1.  **Relevant Facts about Maiden Capital**
        **and the Steve Maiden Crime Machine**………………………………...52

     2.  **The Probation Department Unjustifiably Tags Irfan**
        **With $8 Million Of Loss Because Loss Calculation**
        **In Fraud Cases Must Subtract Any Losses Incurred**
        **Before The Defendant's Fraud**………………………………………...53

     3.  **For Jointly Undertaken Criminal Activity,**
        **Loss Attributed To The Defendant Must**
        **Be Within The Scope Of Defendant's**
        **Agreement And Foreseeable To The Defendant**……………………………57

     4.  **Irfan's Conduct Did Not <u>Cause</u> Any Losses**
        **To Any Victims, As He Did Not "Make"**
        **Any False Statements**………………………………………………...60

     5.  **The Supreme Court's Decision in *Stoneridge***
        **Fairly Provides a Basis for this Court to find**
        **No Loss Attributable to Irfan**……………………………………………61

     6.  **The Supreme Court's Decision in *Janus***
        **Also Fairly Provides a Basis for This Court**
        **to Find No Loss Attributable to Irfan**…………………………………62

     7.  **There Should Be No Loss Attributable to Irfan from KIT Digital**……...…64

**VII.**  **A BALANCED CONSIDERATION OF ALL**
     **RELEVANT FACTORS UNDER 18 U.S.C. § 3553(a)**
     **DEMONSTRATES THAT A SENTENCE WELL**
     **BELOW THE GUIDELINES RANGE IS SUFFICIENT,**
     **BUT NO GREATER THAN NECESSARY, TO**
     **ACHIEVE THE GOALS OF SENTENCING**…………………………………64

*A.  A Sentence Well Below the Guidelines Range Is Consistent With Sentences Imposed On Substantially Similar Defendants Convicted Of Similar Conduct*……………………………………..66

**1.   Irfan's Life Of Service To His Community, Friends and Family Warrant Leniency**…………………………………………..66

*B.  A Sentence Well Below The Guidelines Range Will Be More Than Sufficient To Achieve The Goals Of Specific And General Deterrence*……………………………………………..67

*C.  An Extended Period Of Incarceration Will Impose Substantial Burdens On Irfan's Mother and His Four Children In The Middle Of A Global Pandemic*……………………………………………………………..70

*D.  Irfan Has Already Been Punished More Severely Than Similarly Situated Defendants*……………………………………………71

*E.  A Sentence of Time-Served Serves the Interests of the Federal Prison System and Is Fair to Irfan*………………………………73

**VIII.   CONCLUSION**…………………………………………………………..76

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Dura Pharmaceuticals, Inc. v. Broudo,*
    544 US 336 (2005)…………………………………………………………………63

*Janus Capital Group, Inc. v. First Derivative Traders,*
    564 U.S. 135, 142 (2011)…………………………………………………...…62, 63, 64

*Rita v. U.S.,*
    551 U.S. 338, 351 (2007)……………………………………………………...65

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,*
    522 U.S. 148 (2008)………………………………………………….........61, 62, 63, 64

*THE RESERVE FUND SECURITIES AND DERIVATIVE LITIGATION,*
    Nos. 09 MD.2011(PGG), 09 Civ. 4346(PGG),
    2012 WL 12356743 (S.D.N.Y. October 8, 2012)…………………………………….61

*U.S. v. Adelson,*
    441 F. Supp. 2d 506, 509 (S.D.N.Y. 2013)……………………………...…..48, 66

*U.S. v. Bills,*
    401 Fed. Appx 622, 624 (2d Cir. 2010)……………………………………….…70

*U.S. v. Blaszczak,*
    *No. 17-CR-357 (LAK) (S.D.N.Y. Sept. 13, 2008)*……………………………..…70, 71

*U.S. v. Booker,*
    543 U.S. 220 (2005)…………………………………………………………..70

*U.S. v. Corsey,*
    723 F.3d 366, 380 (2d Cir. 2013)…………………………………………...48, 50

*U.S. v. Crosby,*
    397 F.3d 103, 113 (2d Cir. 2005)……………………………………...…..38, 65

*U.S. v. Dorvee,*
    616 F.3d 174, 182 (2d Cir. 2010)…………………………………………...65

*U.S. v. Ebbers,*
    *458 F.3d 110 (2d Cir. 2006)*……………………………………………..63

*U.S. v. Evans,*
    744 F. 3d 1192 (10th Cir. 2014)……………………………………………...54, 55, 56, 57

*U.S. v. Gupta,*
    904 F.Supp.2d 349, 354 (S.D.N.Y. 2012)…..……………….….……..…1, 49, 50, 67, 68

*U.S. v. Isola,*
    548 Fed. Appx 723, 725 (2d Cir. 2013)…………………………………………………70

*U.S. v. Johnson,*
    964 F.2d 124, 128 (2d Cir. 1992)…………………………………...……….…...70

*U.S. v. Johnson,*
    No. 16-cr-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. April 27, 2018)…..…….48

*U.S. v. Kirk Tang Yuk,*
    885 F.3d 57, 88 n. 16 (2d Cir. 2018)………………………………………………..43

*U.S. v. Nkanga,*
    18-CR-713 (JMF), 2020 WL 1529535 *1 (SDNY Mar. 31, 2020),
    18-CR-713 (JMF), 2020 WL 1695417 (SDNY Apr. 7, 2020)…………………………..73

*U.S. v. Perez,*
    08-cr-429, 2016 WL4775536, *2 (S.D.N.Y. Sept. 14, 2016)……………………………43

*U.S. v. Rutkoske,*
    506 F.3d 170 (2d Cir. 2007)…………………………………………………...63

*U.S. v. Soborski,*
    708 Fed. Appx. 6, 11 (2d Cir. 2017)……………………………………....44, 47

*U.S. v. Studley,*
    47 F.3d 569 (2d Cir. 1995)………………………………………..............57-60

*U.S. v. Tatum,*
    138 F.3d 1344, 1346 (11th Cir. 1998)…………………………………………46

*U.S. v. Turk,*
    626 F.3d 743 (2d Cir. 2010)……………………………………………...55

*U.S. v. Velazquez,*
    No. 16-cr-233, 2017 WL 2782037, *4 (S.D.N.Y. May 26, 2017)………………………69

## **Statutes**

15 U.S.C. § 78c………………...…………………………………………………..40,41

18 U.S.C. § 3553……..…………………………………….......................................passim

U.S.S.G. § 1B1.3……………………………………..…………....44, 50, 57, 58, 59, 60

U.S.S.G. § 2B1.1…………………………………………………..……..……..passim

U.S.S.G. § 2B1.4…….…………………………………………………………..…38

U.S.S.G. § 2F1.1, 1987 Fraud Sentencing Guidelines……....……………………………38

U.S.S.G. § 3B1.2…...……………..…….…………………………………..…43, 44, 45, 47

U.S.S.G. Amendment 794, Nov. 1, 2015……………………………...…………..….43, 45

**Other Authorities**

David Cantón-Cortés et al., *The Interactive Effect of Blame Attribution with Characteristics of Child Sexual Abuse on Posttraumatic Stress Disorder*, 200 J. Nerv. Ment. Dis. 329 (2012)…………………………………………………………………………………...2

Patricia Coffey et al., *Mediators of the Long-Term Impact of Child Sexual Abuse: Perceived Stigma, Betrayal, Powerlessness, and Self-Blame*, 20 Child Abus. Negl. 447 (1995)……………2

Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform (Punishment Purposes)*, 58 Stan. L. Rev. 67, 80 (2005)………………………………………69

Tessa L. Messman-More & Prachi H. Bhuptani, *A Review of the Long-Term Impact of Child Maltreatment on Posttraumatic Stress Disorder and Its Comorbidities: An Emotion Dysregulation Perspective*, 24 Clin. Psychol. Sci. Prac. 154 (2017)…………………………………………………………………………………...2

Sarah E. Ullman, *Relationship to Perpetrator, Disclosure, Social Reactions, and PTSD Symptoms in Child Sexual Abuse Survivors,* 16 J. Child Sex Abus. 19 (2007)…………………...2

United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview*, https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview (March, 2016)......................................................................................69

United States Sentencing Commission, *Recidivism and the "First Offender",* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf (May, 2004)....................................69

*U.S.S.G. Section 3553(a) "requires a court to take account of a defendant's character in imposing sentence. And how could it be otherwise, for on this day of judgment, must not one judge the man as a whole?"[1]*

## I.    PRELIMINARY STATEMENT

Defendant Irfan Amanat respectfully submits this memorandum in connection with his sentencing. Irfan's entire relationship with the criminal justice system has been bookended by two unprecedented global catastrophes: it began during the 2008 Global Financial Crisis, and now he stands to be sentenced after being incarcerated for thirty-four months during the worst global pandemic in 100 years.

We ask this Court to consider Irfan's exceptional life of service to others, which is described in detail in the more than 80 letters of support that have been submitted along with this memorandum.[2] We ask the Court to consider that, even according to the Government, Irfan's conduct in this case was far less culpable than that of other participants in the offense, and, indeed, far less culpable than that of most financial fraud defendants sentenced in this district.

We also ask Your Honor to consider that many other Judges in this district have sentenced financial fraud defendants similarly situated to Irfan to sentences well below the advisory sentencing guidelines range, and to sentences similar to the one we request here. We also ask Your Honor to consider the severe burden that Irfan's incarceration places on his 81-year old mother, who is not well and has no one to care for her, and to consider his four children, who are lost without him. This is a burden made much worse by a global pandemic that has separated his mother and children from him, and that makes the conditions of Irfan's

---

[1] *United States v. Gupta,* 904 F.Supp.2d 349, 354 (S.D.N.Y. 2012).
[2] The compilation of letters is attached as Exhibit A. For the Court's convenience, each letter is individually numbered. Citations to specific letters in this memorandum are referred to as "Ex. A-__."

confinement to date at the MDC that much more harsh.  We ask Your Honor to impose a sentence of time-served, which, as of this filing is approximately thirty-three months imprisonment, and will be longer on the date of sentencing. We submit that such a sentence is just and fair, because it takes account of the history and characteristics of the defendant, the facts and circumstances of the offense, the sentences imposed on others who have been convicted of similar crimes, and meets the statutory requirement of 18 U.S.C. § 3553(a) that a court impose a sentence that is "not greater than necessary" to achieve the goals of punishment.

## II.     IRFAN'S PERSONAL HISTORY AND CHARACTERISTICS

Often a moment defines us. For twelve-year old sweet, loving, brilliant, goofy, nerdy, pudgy Irfan Amanat,[3] that moment was when ███████████████. Cloaked in the guise of a Koran teacher, this monster instead taught Irfan a lesson about ungodly evil and utter fear. After those terrifying, painful, humiliating months locked in a room with the monster who ████████████████████████ Irfan emerged permanently changed. For like ████ ██████████████████, Irfan believed he was to blame.[4] Where the peaceful, wise lessons of the Koran should have blossomed, instead the monster planted in Irfan seeds of guilt, shame, and terror. Today the poisonous vines of those corrupt seeds still weave through Irfan's soul.  Nearly forty years later, now sitting in the MDC awaiting his day of judgment, a part of fifty-year-old Irfan's soul remains forever trapped in that monster's room, alone and petrified. And in a real sense, what happened to that sweet, innocent twelve-year-old Irfan in that room of terrors led him to the cell at the MDC where he awaits this Court's sentence.

---

[3] Ex. B-1 (Photo of 12-year-old Irfan)
[4] https://pubmed.ncbi.nlm.nih.gov/22456587/,
https://onlinelibrary.wiley.com/doi/abs/10.1111/cpsp.12193 ,
https://www.sciencedirect.com/science/article/abs/pii/0145213496000191,
https://www.tandfonline.com/doi/abs/10.1300/J070v16n01_02

Irfan was the oldest of twenty-seven first cousins,[5] 

████████████████. Unbeknownst to any adults, ██████████████████████

███████████████████████████████—and Irfan blamed himself for this. In fact, he *still* blames

himself for this. Submerged in the guilt for this entirely misplaced blame, twelve-year-old Irfan

decided he will do anything to protect his family. A child's declaration became the adult's

mission. In needless penance for what the monster did to his siblings and cousins, Irfan made it

his life's mission to throw himself on any sword to spare them.

Irfan believed—and still believes—that he failed ████████████████ forty years ago.

In a deep, tragic, bottomless moral calculus, Irfan will always feel that he █████████████████

███████████████████████████. At the age of twelve, Irfan vowed to be his "brother's

keeper."[6] And so in 2008, when the quicksand of world's markets grabbed a hold of Omar and

threatened to suck him in entirely, Irfan decided to protect his little brother. Until then, Irfan had

led a steadfast life of hard work, dedication to his parents, complete devotion to his wife and

children, and humility. But when his brother was in trouble, Irfan impulsively threw himself into

the fire and made the mistakes for which he is being sentenced now.

For all that he did wrong between 2009 and 2012, Irfan's only motivation was to follow

through on his twelve-year old's promise: to protect his brother at any cost. That cost has entirely

bankrupted Irfan of everything that mattered to him. He not only failed to "save" Omar, but he

lost his cherished marriage of twenty-four years, lost three critical years of fatherhood, lost his

own father, and for the past thirty-three months, has been unable to protect or care for a single

---

[5] On his mother's side, Irfan has twenty-seven first cousins—all of whom live in America. On his father's side, Irfan has an additional fourteen first cousins—none of whom live in America. Irfan is the oldest of all cousins living in America, and the second oldest of all forty-one first cousins.

[6] *Genesis* 4:9.

person he loves.

Irfan is defined by whom he loves and how he loves. In the most heart-wrenching, heartbreaking, and sincere letters, Irfan's beloved paint a vivid picture of the universe that is Irfan Amanat. His love, generosity, selflessness, brilliance, self-sacrifice, and humility are the planets; the people he loves are his stars.  Irfan's own parents and children are the suns he revolves around. Irfan has touched so many lives: he has shared his talents with so many people, and he has lived for the happiness of those around him. These past thirty-three months, the hearts of so many people have been broken, and Irfan's imprisonment has left a black hole in their lives.

In the four-day trial, the Court heard tiny snippets of what Irfan did, with absolutely no mention of who Irfan is. Below we tell the story of the big-hearted and brilliant Irfan Amanat.

*Born with Huge Heart and Talent*

Sharif and Hamida Amanat immigrated from India to Queens with nothing but their educations. Their first child, Irfan, was born fifty years ago with a brilliant mind. Like many immigrant families, the Amanat's culture dictates that the oldest child set an example for all that follow; Irfan was the model oldest cousin. From a young age, precocious Irfan brought perfect grades home to his humble house, and then showered his parents and elders with respect. The Amanat parents—brilliant academics themselves—instilled in Irfan the values which still define him today: generosity, selflessness, and kindness. They modeled these virtues by happily turning their home into a mini-Ellis Island in Queens—a waystation for relatives far and wide just landing on these shores, giving countless people shelter, food, and love until they could stand on their own feet on this new land.

Irfan, or "Iffi" as he is affectionately known, was the perfect little ambassador for the

Amanat family; while his parents tried to guide and help their relatives, Irfan doted on his

younger cousins—always with a smile and patience rare in a child of his age. He always made

time to make anyone around him feel special. In the words of those who know him best:

> "Not only was he always there for [his siblings and cousins], helping them in any way he could; he was there to offer support and guidance too. A gifted child, Iffi excelled in his studies and was their much loved mentor."[7]

> "But [older brothers] can also be what I saw Irfan being, which is studious, caring, and helpful. We all thought of Irfan as a child prodigy, a gifted kid who was a little nerdy and a little pudgy but above all was just nice and kind to everyone."[8]

> "I remember one time when I was about seven years old at Irfan's house and about eight of the older boy cousins were swimming in the pool. Being the youngest I wanted to join but they wouldn't let me. Then one of them yelled at me for tossing the volleyball that came out of the pool to someone else. I ran away crying and Irfan came to console me and invited me back to the pool. To me that story sums up Irfan's character in a nutshell....Someone looking to help the weaker ones when nobody else cares."[9]

> "But he always, always got off the computer when me and the other younger cousins wanted to play. He would set us up on it, and share his computer with us, show us how it worked, and set up age appropriate games. Not every kid in his position would have done that."[10]

> "As a child, pre-teen and teenager, Irfan would give up his bedroom for me and my sisters when we needed to stay at his house. He always went out of his way to make us feel welcome."[11]

*Science Fiction to Science Reality*

A gifted student and natural nerd, Irfan's first two loves were computers and science

fiction. While other children his age horsed around and played sports, Irfan spent his early years

---

[7] Ex. A-3 (Letter from aunt Anjum Mahmood)
[8] Ex. A-5 (Letter from cousin Jamal Mahmood)
[9] Ex. A-6 (Letter from first cousin Naeem Mahmood)
[10] Ex.A-5 (Letter from cousin Jamal Mahmood)
[11] Ex. A-8 (Letter from first cousin Zara Shoham)

crawling inside computers to unlock their secrets and exploring unknown fictional worlds. Irfan's academic prowess earned him a seat at Hunter College High School and he excelled there to find a place in the class of 1993 at The Johns Hopkins University. After finishing with top marks at Johns Hopkins, Irfan followed his passion to combine his big brain and his big heart: he wanted to create medical devices that would help people with major diseases live better lives. Irfan wanted to turn the concepts he'd read about in science fiction into a scientific reality for those in need.[12] With this noble goal, Irfan obtained a Masters in Biomedical Informatics from Rutgers.

But as described fully later below, Irfan's most salient character trait—self-sacrifice— trumped his goal. He set aside his own dreams for his father and then his brother, and not for the last time.

*A Little Time to Do Anything For Those He Loves*

Letter after letter recalls moments of Irfan's life where he made time to help a loved one in need—each time he changed that person's life by showing up, showing he cared, and proving to them that they are not alone. As told by the people Irfan loves:

> "One vivid memory I have of him is one night, when I came home very late, I saw my basement was flooded. My children and I were alone and panicked, since we did not have a sump pump and could not get hold of a plumber that late at night. I called some friends, and the next thing I knew, Irfan was ringing the doorbell with a sump pump in his hand. A few hours later, everything was taken care of, and he had done it all with a smile on his face."[13]

> "One uncle praises Irfan for helping shovel his steep driveway in the winter. An aunt regularly relies on Irfan to give her a ride to the airport, even in the worst of weather.  A cousin is grateful to Irfan for always checking up on her parents since she lives thousands of miles away.  Another cousin commends Irfan for making his new wife and mother-in-law feel welcomed into the family.  Irfan even greets the manager of the local pancake house with a warm

---

[12] Ex. B-6 (Photo of Irfan with robotic arm device he was helping create.)
[13] Ex. A-10 (Letter from friend Muznah Mirza)

smile and a discussion about how the manager's parents and children are doing."[14]

"He was one of the first people at the hospital when my dad came out of surgery. He would help him walk when he was regaining the strength in his legs. He would routinely make work trips into NY with my father and run errands for him. The few times my parents have had to travel, Irfan has dropped them to the airport and picked them up regardless of the time, day or night."[15]

"I recall the summer of 2016-I had just unraveled myself out of a painful divorce...Unemployed, emotionally broken, living in the basement of a relative, and now picking up the pieces of my life to somehow provide for my girls, it seemed like an unattainable journey... Iffie always had a way to lift my spirits and give me some hope after a good chat over Dunkin Donuts Blueberry flavored coffee. More importantly, he lifted up my daughters when I simply could not. If there was a family function to attend, or a children's program, where I simply had no strength left after a working my two jobs and juggling the girls, Iffie would come and take us. With him, all 3 of us, always felt safe, loved, and worthy."[16]

"During one occasion when Naveed's father had a sudden stroke (in the UK), whilst we were away (in the US) with Irfan and his family. Irfan was very helpful in offering to take care of our children, to cut his trip short and to do all that he could to ensure we were able to reach Naveed's father in time. We were very touched by his kindness."[17]

"He was the reliable cousin for my children and they depended on him to solve their computer issues. My daughter had lost her high school essay and was crying when she couldn't recover the document. Irfan drove from New York and spent the evening recovering it for her."[18]

"Like [Irfan] says, 'We have a little time to do anything so we should do it for those that we love.'"[19]

"When I had heartbreaks or job stress, he has been my shoulder to cry on. As a young adult, I was completely heartbroken this one time (I had thought this woman might have been the one, but she had different thoughts) and he drove

---

[14] Ex. A-11 (Letter from second cousin Farhan Yunus)
[15] Ex. A-12 (Letter from first cousin Ammaar Ali Amanat)
[16] Ex. A-13 (Letter from cousin Reema Mahmood)
[17] Ex. A-60 (Letter from friends Naveed and Shazia Choudri)
[18] Ex. A-15 (Letter from aunt and uncle Syed and Tanveer Khadri)
[19] Ex. A-16 (Letter from niece ██████ Sandhu)

hours to come console me."[20]

"More personally, he always found the time to talk to me about whatever programming project or app I was working on. No matter how small or inconsequential it was, he made me feel like it was something positive and that he was interested in what I was doing."[21]

*A Natural Born Teacher and Cheerleader*

Well before he became a highly respected Teaching Assistant at The Johns Hopkins University, (a job reserved for the select top students at that elite university), Irfan began teaching everything he learned to everyone around him. In fact, he seemed driven in his unquenchable thirst for knowledge and excellence by a desire to share what he learned with everyone else. In this way, too, he influenced all in his orbit.

"Irfan fostered my learning by teaching me the basics of computer science in working environments by showing me how computers effected the markets."[22]

"When I was in elementary school, I showed in interest in computers. Irfan took the time to teach me the ins and outs; whether it was building a computer from scratch, or figuring out how to troubleshoot when problems arose during regular usage of a computer."[23]

Moreover, when people around him struggled, Irfan supported them with infinite patience and encouragement, always letting them know he believed in them even when they lost faith in themselves.

"He was steadfast in his dedication in helping me find my path. Not once did he give up on me or throw his hands in the air, like it is common behavior of most men in my culture. With every crazy idea came the same sentence 'You can do anything you want. I believe in you'."[24]

"I can honestly say that Irfan played a large role in helping me get to where I am and if it were not for him, I'm not sure how the course of my life would

---

[20] Ex. A-1 (Letter from life-long friend Dale Sang)
[21] Ex. A-18 (Letter from family friend Akif Patel)
[22] Ex. A-2 (Letter from cousin Abrar Husain)
[23] Ex. A-19 (Letter from first cousin Ali Quraishi)
[24] Ex. A-20 (Letter from former wife Fatima Sami)

have gone."[25]

Irfan's devotion to teaching and helping others followed him into imprisonment. While housed at the MCC, Irfan became certified and worked as a "Suicide Watch Companion" under the Psychology Department, where he monitored people put on suicide watch for 6-8 hours a day. He worked at both the MCC and MDC, was paid 30 cents per hour, and found it deeply fulfilling to help people in distress. At the MCC, Irfan also taught GED courses, worked in the library, and taught a class in astrophysics.[26]

*Irfan Became the 'Atlas' of His Family*

Irfan has always felt a deep sense of responsibility for those around him. As a child and teenager, he naturally took care of younger cousins and siblings. When he became a young adult, Irfan willingly became "Atlas" in the family, taking all of the weight of the family's burdens on his shoulders. As told by the people he lifted up, Irfan seemed to be there for everyone, all the time.

> "He became everyone's favorite uncle; he was never too busy to take a vanload of kids out for ice cream, or to Kidnetic (for free, of course). Never arrogant, never flashy. He just looked like a man who wanted to be there for everyone in his life, but I knew that behind his smile he carried a lot of weight on his shoulders."[27]

> "He has helped so many people when they were in tough times get back on their feet from offering them a spot on his couch to getting them employment ready. Even when my own husband was out of work, he made sure he passed along a good word and his resume to all his contacts. He is the type of person you don't even have to ask for a favor, he just shows up. No matter how busy he was, there was no job was beneath him."[28]

---

[25] Ex. A-19 (Letter from first cousin Ali Quraishi)
[26] Following the Government's separation order between Irfan and Omar, Irfan was not allowed to work in any capacity.
[27] Ex A-5 (Letter from first cousin Jamal Mahmood)
[28] Ex. A-21 (Letter from friend Yasmeen Al-Shehab)

"Days when I was exhausted, he would step in; even though he had a draining day too. When I was unsure of what to do with a baby who had a 104-degree temperature, he would assure me that everything would be ok; even though he was truly worried. Days when the kids would be jumping around the house, making a ruckus and driving me up the wall, Irfan would take the kids out so I would have some quiet time; even though he hadn't slept a wink the night before."[29]

"When I think of Irfan, I see him running around, with a kid in tow, respectfully acquiescing to my parents demands and trying to squeeze in his work when he could. Always exhausted, always smiling and never asking us of anything. It is rare when you meet someone whose simplest demand of you is to be happy, but Irfan Amanat is that person."[30]

*A Role Model for the Whole Family*

Irfan's role models are his parents, and he genuinely sees them as the best people he has ever known. Unknown to Irfan, in emulating their virtues, he has been a role model to countless people over the years. The letters to the Court show that Irfan both made a mark in the lives of everyone around him, and also set the mark for others to follow. Irfan's selfless, noble love touched those around him and inspired them to want to be like him. Cousin Ali declares, "Irfan as well as his father Dr. Sharif Amanat (who unfortunately recently passed), are the two single greatest influences on my life."[31]

Sana Amanat, his younger sister, describes him as "...someone who gives more than he takes, has the best of intentions and has lifted up communities all around him."[32]

Others whose lives Irfan touched and changed tell of their admiration for Irfan:

"I have always regarded him as one of the most intelligent people I know and despite the right he has to be arrogant I have always been amazed by his ability to stay humble."[33]

---

[29] Ex. A-20 (Letter from former wife Fatima Sami)
[30] Ex. A-9 (Letter from sister Sana Amanat)
[31] Ex. A-19 (Letter from first cousin Ali Quraishi)
[32] Ex. A-9 (Letter from sister Sana Amanat)
[33] Ex. A-2 (Letter from cousin Abrar Husain)

"He is one of the most selfless people I have ever met. He spent every day of his life concerned about the welfare of his parents, his brother and sister, his wife, his children, my mother and me. And I know that was just the tip of the iceberg of folks he has helped and been there for."[34]

"Irfan's kind personality and support on nonprofit initiatives without making any exhibit of it made me think of the beautiful parents and family environment that he grew up. The image of Irfan in my mind is someone who never says "NO" if there is a purposeful project for others presented to him"[35]

"For the elders he was someone we could depend on; always there to give a hand to relatives and strangers alike. Humble and kind is he. He was there for me when my husband unexpectedly passed away and twenty years later he continued to be a great source of help."[36]

"Irfan was a role model and provided an example for the rest of us, never fixated on material things...When I was in my late teens, I was struggling emotionally and financially. I remember one time when my car had broken down, it was Irfan helped me get it fixed so that I could return to school, never asking anything in return."[37]

"The second thing about Irfan: he never changed his character. He was still the same person he was as a kid. Always kind to others, always willing to help people, to pay for others. He stopped to talk to people, no matter who you were, especially younger people who might have felt out of place or ignored. He was never too good for anyone, never aloof, never flashy or arrogant, always genuine."[38]

"Indeed, Irfan's reputation as an upstanding member of our family is without question. Although I was only a teenager in the 90s, my mother was unphased when Irfan acquired tickets to a U2 concert and without hesitation invited my younger brother and I to the show. Irfan was charged with the responsibility of watching over us that night. I can testify, that not only was it a pivotal night in cementing my love for the band itself, but in hindsight it is equally significant in demonstrating the level of responsibility Irfan has shouldered in our family."[39]

---

[34] Ex. A-19 (Letter from first cousin Ali Quraishi)
[35] Ex. A-22 (Letter from former colleague Murat Ozturk)
[36] Ex. A-3 (Letter from aunt Anjum Mahmood)
[37] Ex. A-23 (Letter from cousin Shahana Polselli)
[38] Ex. A-5 (Letter from first cousin Jamal Mahmood)
[39] Ex. A-7 (Letter from life-long friend Mohib Husain)

*He Only Kissed His Bride*

Another goal of Irfan's was to marry a sweet, gentle, smart woman so that they could share a simple, hard-working life and start their own family. At age 24, Irfan met the woman of his dreams, 19-year old Fatima Sami; three years later, they were married.  In a true testament to who Irfan is, Fatima was the first woman he ever kissed—and he waited until after they were married.[40]

Married young, Irfan and Fatima grew up together as a married couple. Though tightly bonded to each other, the dark tendrils of Irfan's ████████████ marred their marriage, sending them into couples' therapy several times. Nonetheless, Irfan and Fatima's twenty-four year marriage produced the four most important people in Irfan's life, his children, ages 20, 17, 14, and 7.

Though their marriage weathered many storms, Irfan's arrest and incarceration ultimately capsized his family. Fatima divorced Irfan last year, while he was in the MDC in 24-hour COVID lockdown, and remarried in June of this year. Irfan's total heartbreak is compounded by the fact that not only was Fatima his wife, they were best friends. Fatima's letter to the Court—as an ex-wife to a man who gravely disappointed her—speaks volumes to Irfan's character and nature. With nothing to gain or lose, Fatima writes beautifully of the friend, man, and father Irfan is.

*Irfan Is Devoted to His Children and Is a Model Father*

Irfan has always loved children and dreamed of being the type of father Sharif was. In this ambition, too, Irfan was an over-achiever.  "Countless school projects, endless after school

---

[40] Ex. B-2 (Photos of Irfan and Fatima)

activities, overnight camping trips in the rain, late night runs to Target for supplies, early morning trips to Dunkin Doughnuts before school just to say have a great day and I love you; Irfan was enthusiastically present and happy to do anything for his kids."[41]

By being a hands-on father who loved being a jungle gym for his four children, Irfan bonded deeply with all of his kids. "For all four of them, Irfan was a very involved father, one who loved being in the presence of his children and whose children just loved to be close to him. He hugged them regularly. He shared wisdom and words of encouragement with them. He was a caring father who seemed to hide his stress from his children; he always saved a little bit of his strength and energy for them, so he could be there for them the way they needed."[42]

Nothing in this world made Irfan happier than wearing his "dad jeans" while having a science fiction debate with one of his kids while another one climbed onto his head just to hang out.[43]  Everyone who knows Irfan, knows that he is an exemplary father. In the words of his good friend, Yasmeen Al-Shehab, "There was not a task he hasn't been involved in with [the kids] from changing kids diapers, holding them all night when they were sick, to letting any and all children climb him like a jungle gym. He was available to navigate the tough moments too by providing words of wisdom as the kids are starting to tackle the world on their own."[44]

Fatima beautifully narrates his unique relationship with their children—███████  ████
███  aka "Little Joey", and  ████

███████  *(age 20)*

> "Rather than "letting [████ be" to avoid an uncomfortable conversation,
> Irfan spent time daily talking to ████ about whatever interests or current
> events happened during the day. Sometimes Irfan would babble about random

---

[41] Ex. A-20 (Letter from former wife Fatima Sami)
[42] Ex. A-5 (Letter from first cousin Jamal Mahmood)
[43] Ex. B-3  (Photos of Irfan with his four children)
[44] Ex. A-21 (Letter from friend Yasmeen Al-Shehab)

things. He just wanted to be present, creating a space for ▮▮▮ to engage."[45]

█████ *(age 17)*

"█████ looks up to her father with such adoration and awe. Since he has been away the light in █████ eyes has dimmed. She now craves for the daily texts from Irfan and she was the first one, the bravest one of all the kids, to visit him in MDC."[46]

█████ *(Little Joey) (age 14)*

"Our family and close friends call [█████] Little Joey because if Irfan were a kangaroo, she would be riding in his pouch. She is 100% Irfan's little girl and he melts when it comes to his █████ Papaya.... Irfan knew this approach was probably not the best so he found ways to combine █████ love of imagination with learning those important math facts... When █████ fell sick, she would ask for Irfan because he would read her extra stories or buy her that special treat to eat. When she was scared at night, she would call for Irfan to be by her side until she fell asleep. Whether Irfan was sleep deprived or had work to do, he would drop everything to be by █████ side."[47]

█████ *(age 7)*

"It was simple-pure love felt by a toddler for his father. No words needed but it spoke volumes. Every night Irfan would tell █████ stories of far-off lands and adventures. Even today, while Irfan is incarcerated, he sends █████ letters and drawings of the stories he once told."[48]

For a man whose greatest joy is holding, hugging, teaching, and laughing with his beloved children, the punishment of separation from them for the past thirty-three months has been almost unbearable. Irfan's best friend, Dale Sang, writes "[to] Not be able to watch his children grow older, help them when they need or simply be there to see the special moments in life has been very difficult. His marriage did not survive this ordeal and I know that will live



---

[45] Ex. A-20 (Letter from former wife Fatima Sami)
[46] Ex. A-20 (Letter from former wife Fatima Sami)
[47] Ex. A-20 (Letter from former wife Fatima Sami)
[48] Ex. A-20 (Letter from former wife Fatima Sami)

with him for the rest of his life."[49]

And for those children who adore and rely on their father—the undeserved punishment is crushing. All who know Irfan's family attest to the wrecking ball that Irfan's incarceration has been on his sweet, innocent children who desperately need him back.

Fiaz Sami, the brother of Fatima and Irfan's ex-brother-in-law, unflinchingly tells of the utter wreckage in the lives of his nieces and nephews—Irfan's children—due to Irfan's incarceration.[50] We urge the Court to read this letter carefully, and below point out some of the most poignant excerpts:



> I am writing to you with humility, on behalf of ███ Amanat, ████ Amanat, ███ Amanat, and ███ Amanat. These are the four children of Irfan Amanat. Irfan's children are my nephews and nieces. I am writing to you to beg for Irfan's release from custody for time already served. If I could present myself before you and beg on my hands and knees then I most certainly would do so.
> …
>
> I have been witnessing the deterioration of Irfan's children since October 30, 2018.
>
> [███ development into a man is greatly diminished as he does not know how to properly grieve for his father under these circumstances. He is still stuck developmentally as a teenager while his peers are shouldering adult responsibilities. At a time when he should be expanding his understanding of the world, he is still holding onto hope that he will be able to spend time with his father Irfan…his only hope in life is to see his father again. From the moment he was born, ███ beamed with happiness for living life. The sad reality now is that his only ambition in life is to see his father released as soon as possible. The emotional pain I see ███ living with daily is heartbreaking for me to witness.
> …
>
> Before Irfan was incarcerated, [███ was the happiest little girl who greeted family with the warmest of hugs. In recent years, her ability to socialize within the family has been reduced as she spends more time by herself, focused on her academic goals…When I speak with her about the situation regarding her father Irfan, she has little to say other than to break down in tears and start

---

[49] Ex. A-1 (Letter from life-long friend Dale Sang)
[50] Ex. A-25 (Letter from former brother-in-law Fiaz Sami)

crying.…There is no way to measure this suffering between father and daughter. It is real and it is a heavy suffering that I hope can be offered as a means for mercy.

…

In many ways  and Irfan share the closest bond. When ▮▮▮ was born, she was a quiet child who would often cling to Irfan for security…It is currently impossible to talk to ▮▮▮ about the situation because I have seen her completely shut down. Of all of Irfan's four children, it is for ▮▮▮ that I am most concerned. ▮▮▮ is old enough to be aware of the situation her father is in, and young enough that a single year away from her father is an eternity. The years ▮▮▮ has lost without her father, and as a young child who adores her father, are never coming back. Because of her young age, I grieve for how she is growing up with an experience of life that is far from what any of her peers are experiencing. Because she is an inherently quiet child, she is further isolated and has a very difficult time relating to other children her age. Of all of Irfan's children, ▮▮▮ is hurting the most.

…

▮▮▮ barely knows his father Irfan as he was 4 years old when Irfan was incarcerated.

Irfan is living with the consequences of his actions by serving time. What is not known beyond the family is the price ▮▮▮ ▮▮▮ ▮▮▮ and ▮▮▮ are paying. The penalty they pay from their hearts might only be documented in this letter, and the few words I have available to describe their hurt throughout this process does not cover the depth of their pain. The price they are paying is offered absolutely, freely, involuntarily, and innocently from their hearts. And this is everything they have to offer as children. [51]

Others, too, write of the devastation of Irfan's children. "His eldest son ▮▮▮ struggles to look at pictures and reminisce when we talk about the good times to the point where I feel like he avoids seeing us because reliving those memories is too painful. ▮▮▮ his eldest daughter is wise and mature beyond her years. ▮▮▮ who is the epitome of the daddy's girl-is who I worry about the most. Every day is a struggle for her. Her dad is her whole world, her safe place and she continues to be lost without him. The youngest ▮▮▮ speaks of his baba less and less and sadly I feel like the memories of his dad are fading." [52]

---

[51] Ex. A-25 (Letter from former brother-in-law Fiaz Sami)
[52] Ex. A-21 (Letter from Yasmeen Al-Shehab)

With each birthday, graduation, homework assignment, swim meet, story time, and hug missed, Irfan suffers, and his children suffer too. In fact, Irfan spends every moment suffering for the pain he has caused the people he vowed to protect. Their well-being was his responsibility, and now their agony is too. "...the family unit now broken. He was the one who took care of them. The youngest wouldn't part with him...Irfan would shower his kids with love and affection!"[53] Irfan's innocent children deserve to be showered with love and affection by their father again.  Irfan vows to make up for the years lost by never again breaking their hearts.

*A Father Figure to Many*

Not only did Irfan play a critical role in the lives of his own children, but by virtue of his generous, loving nature, Irfan is a father figure to many. "As I was struggling to get along with my own parents, I came to consider him as a second father figure in my life."[54] Ihsaam, like many young adults, clashed with his own father and felt alone, hurt, and abandoned. But Irfan showed Ihsaam that there are adults whose sole purpose is to create happiness in the children around them. Ihsaam writes: "Any other adult I know would not do that but he was always different and was always up for anything if it would make us happy."[55]

Ali Quraishi, Irfan's much younger cousin, writes of how positively Irfan influenced him as a child. As a testament to the lasting love and eternal faith in Irfan's character, Ali says, "I look forward to the day my son can start looking up to him like I did and hope he is given the opportunity to get to know him soon."[56]

Putting all children first comes naturally to Irfan, and has meant the world to those

---

[53] Ex. A-3 (Letter from aunt Anjum Mahmood)
[54] Ex. A-26 (Letter from Ihsaam Al-Shehab)
[55] Ex. A-26 (Letter from best friend of ███ Irfan's eldest son Ihsaam Al-Shehab)
[56] Ex. A-19 (Letter from first cousin Ali Quraishi)

children.

> "Just because we were the youngest, he never made us feel like our voices didn't matter. In fact, he always made sure our voices were heard even if it meant that both of our families would have to wait in line for almost an hour to meet princesses at Disney World."[57]

> "[Irfan] continued to be a father to the fatherless. Not only was he my unofficial "co-parent", he took on his brothers 3 youngest children as well. It was expected to walk into the Amanat family house to find Iffie buried under a bunch of kids. And when the house was quiet and the kids were not present, it had meant that he took them out on an adventure (9 kids!!!) often all on his own."[58]

As a child, ███ Isble was deeply hurt by her abusive father, who eventually abandoned her and the rest of her family. Luckily for her, Irfan ("Iffi Uncle") was part of her life, and no matter how many children of his own climbed and clung to him, Irfan always had room for more. ███ writes: "They took care of me and made me feel loved when I was so lost in my own family's issues. Iffi uncle was there for me when my father wasn't."[59]

Irfan's love of children may only be outdone by their love for him.  Irfan's preternatural ability with children has helped him find children otherwise lost in deep sorrow.  "My husband and I found my stepson, Ben, after he was abducted by his biological mother, and abused and neglected for 6 years. As such, Ben was shy and somewhat suspicious of everyone he met. But the first time he met Irfan, Ben bonded with him immediately. I watched in awe as they sat and talked about Star Wars and space, and Irfan got down on the carpet to play with him."[60]

Sayeed and Yasmeen Al-Shehab started as friends with Irfan and Fatima and through the years, they became as close as family. Their children are best friends with each other, and the Al-Shehab children clearly also view Irfan as a second father whom they love deeply. "My children

---

[57] Ex. A-27 (Letter from best friend of ███ Irfan's Eldest Daughter)
[58] Ex. A-13 (Letter from cousin Reema Mahmood)
[59] Ex. A-28 (Letter from niece ███ Isble)
[60] Ex. A-23 (Letter from cousin Shahana Polselli)

miss him, my son looks to him as a second father whom he can reach out to if he felt uncomfortable discussing a topic with his parents."[61] "I cannot put into words how deeply all of our children adore him and need him in their lives. He is kind, patient and so smart. He has the gift to connect with children on their level unlike most adults."[62]

Yasmeen describes vividly the genuine love her children feel for Irfan, and their absolute pain in losing this time with him: "At my son's graduation party in 2019, he broke down on the mike wishing Irfan uncle was there to celebrate with him. My daughter's main college essay was a tribute to him this year which earned her admission into many of the nation's top colleges. It takes a village to raise children and Irfan is a significant part of ours. Throughout the years we imagined celebrating milestones of our children together. There is an enormous hole in all of hearts as we feel his absence."[63]

*A Dedicated Son*

Irfan's parents are truly his heroes.[64] He sees them as the source of his intelligence and his virtues. In exchange, Irfan has showered them with a devotion pure, inspiring, and remarkable. After graduating from college, Irfan was excited to begin his lifelong dream of scientific research in creating medical devices. But his father, Sharif, needed him—and so Irfan sacrificed his dream for his father's desire. "Even though his heart was set on academics and research, he agreed to assist me launch few new business projects where his help was needed. It was due to his contributions that the business launched and became a great success."[65] This was the first big act of setting his own life aside for his parents, and became a trademark for Irfan.

---

[61] Ex. A-24 (Letter from family friend Sayeed Al-Shehab)
[62] Ex. A-21 (Letter from friend Yasmeen Al-Shehab)
[63] Ex. A-21 (Letter from friend Yasmeen Al-Shehab)
[64] Ex. B-4 (Photos of Irfan with his parents, Dr. Sharif Amanat and Hamida Amanat)
[65] Ex. A-29 (Posthumous Letter from father Dr. Sharif Amanat)

In fact, in his fifty years of life, Irfan has only lived outside of his family home for a handful of years. Even after his own marriage and starting his own family, Irfan considered it his joyful duty to care for his parents. Though he has three siblings, Irfan was the one at his parents' side whenever they needed him.

> "I admired how Irfan interacted with his parents. Out of all his siblings his parents always reached out to him because he ensured their needs were not neglected...Irfan had a way to resolve conflict with his parents which I mimicked when I found myself in such situations with my father."[66]

> "Irfan always made time for his parents. We could be on a safari in middle of Disney World, but I have never seen him dismiss a call from his mother or father. He was their rock, their support and the coolness of their eyes."[67]

Because of the rising anti-Muslim attacks following September 11, 2001, Irfan moved his family from Los Angeles to Dubai for two reasons. First, it became very dangerous for his children to be Muslim in America, and Irfan feared that the serious anti-Muslim violence inflicted on his own brother in childhood in Queens would find his innocent children. As a modern and safe Muslim country, Dubai was a place he could raise his family without any fear of persecution for their faith. Second, at the time Irfan moved to Dubai, it was a very affordable place to live. Los Angeles had priced Irfan out of living comfortably while supporting his wife and children and at that time—before Dubai reached the prominence of a fancy, glitzy middle eastern city—he could live in Dubai for less than $80,000 per year in expenses, including rent and tuition for his children.

However, when the devastating news of Sharif's cancer reached Irfan's ears in 2010, he packed up his family and life in Dubai and raced back to be by his father's side.

> "Later on, when his life was set in Dubai, he dropped everything because his parents were sick and came back to Montville NJ. He even lived with his

---

[66] Ex. A-24 (Letter from family friend Sayeed Al-Shehab)
[67] Ex. A-21 (Letter from friend Yasmeen Al-Shehab)

parents in the same house so as to help them out on a daily basis as a caretaker, including driving them everywhere to doctors and hospitals."[68]

As witnessed by Fatima, who watched Irfan in action, "He is the thoughtful son, the **only** child of his parents that stayed by their cancer-stricken fathers' bedside in the hospital for weeks on end, tending to his every personal need."[69]

The cancer that ravaged his father shook the bedrock of Irfan's mother being. Irfan understood this, and made it his duty to keep her alive and upright through his father's terminal illness. "Irfan was also his mother's rock. He took care of everything for her, which was especially important because his father developed cancer and slowly declined in his ability to take care of things."[70] Everyone knew how dire his parents' situation was, and therefore how critical Irfan's help was. "Both his parents have serious health issues; one with fourth stage cancer and the other suffering from heart complexities. His presence, for them, is essential. He was the one taking care of them"[71]

Finding a bottomless well of energy and selfless care, Irfan spent nearly twenty-four hours a day caring for his father, and then found some more hours to take care of the rest of the family.

> "Irfan slept in a stiff recliner at the side of my father's hospital bed every night. He would take my father for his follow-up appointments with his oncologist, get him his medication, massage my father when he felt weak. He was our source of strength. He was a strong big brother and a devoted son. Then Irfan did it all over again when my mother went for heart surgery."[72]

*A Triple Loss When His Father Died*

---

[68] Ex. A-30 (Letter from family friend Sarvar Patel)
[69] Ex. A-20 (Letter from former wife Fatima Sami)
[70] Ex. A-5 (Letter from first cousin Jamal Mahmood)
[71] Ex. A-31 (Letter from aunt Nasreen Amanat)
[72] Ex. A-9 (Letter from sister Sana Amanat)

Last summer, as COVID ravaged the world and delivered merciless cruelty on all inmates at MDC, Irfan bore the wrath of the Fates in threefold. His father's cancer returned to inflict great suffering on him—and for the first time, Irfan could not be at his side.  More than the cancer and heart attack, Irfan knew that his mistakes caused his father immeasurable suffering, and Irfan did not have the chance to even speak to him on the phone to atone for his mistakes and apologize. And then, when cancer finally claimed Sharif, the prison walls kept Irfan from fulfilling his religious duties at his father's funeral. This, especially, tears at Irfan—knowing that he let Sharif down in life and in death. Sharif's posthumous letter to this Court heartbreakingly shows the love, intense heartache, and dying wishes of a father to have his son by his side on his deathbed.[73] This last unfulfilled wish and posthumous plea will forever torture Irfan.

Worse still, Irfan is haunted by the fact that he could not be there for his 81-year old beloved mother, who is torn asunder by grief for late husband.

> "Recently his father passed away and him being unable to be with his father in his last days and moments was heart breaking. I see his mother now. Watching her spirit deteriorate as she navigates the loneliness and despair has been particularly gut wrenching."[74]

Until the moment Irfan can take his rightful place on his knees besides his mother and siblings to pray together for the peaceful rest of his father's soul, Irfan's soul will not rest. And, believing that he breached his duty to his father, Irfan has redoubled his commitment to take care of his mother for the rest of her life. Hamida, once the matriarch of a sprawling family and caretaker of countless children, now finds herself entirely alone at 81, with no one to take care of her.[75]  "His aging mother needs him desperately. He was [his parents'] pillar of strength, holding

---

[73] Ex. A-29 (Posthumous Letter from father Dr. Sharif Amanat)
[74] Ex. A-21 (Letter from friend Yasmeen Al-Shehab)
[75] Sana Amanat, Irfan's younger sister, has been caring for their mother as much as she can.

them together."[76] Within an hour of release from confinement, Irfan will move into his mother's house and live there with her—caring for her—for the rest of her life. Nothing could be more important to him, or her.  "Irfan's mother, my sweet sister, has suffered a terrible blow upon losing her husband and at the same time not having her eldest son by her side."[77]

For the past thirty-three months, a huge part of Hamida's heart has been imprisoned with her son, Irfan.  To express her love for Irfan, she wrote this poem for the Court:

### Irfan Amanat

"From serving, caring for his parents, siblings
To adoring, cherishing his wife and four kids;
With tons and more of his nephews nieces,
His two dozen first cousins, his countless friends
And even unknown strangers he meets on way
His *humility and gentle smile would always stay*
Ready at an instants notice to meet the needs of the other"

"How amazing is this man who is so humble, gentle and kind
Of his own needs he does not care, until someone would remind
The Buddhist talk of Bodhisattva, the Sufis a saint divine
Such folks are made once in a while as *"shining trailblazers for others"*
The perfect example of an *ideal* son for the worlds fathers and mothers
With malice towards none with compassion for all
So many of his wonderful qualities to recall!" [78]

A sentence of time-served will give Hamida a chance to share her last years being cared for by the first person she brought into this world.

*Finding Light in the Black Hole*

Irfan came into this world with a beaming, infectious smile, hoping to spend his life

---

However, Sana's job requires her to relocate to Los Angeles; Sana has delayed this move as long as possible, but is set to depart this summer.
[76] Ex. A-3 (Letter from aunt Anjum Mahmood)
[77] Ex. A-4 (Letter from aunt Aziza Mahmood)
[78] Ex. A-32 (Hamida Amanat's poem)

inside of science labs and could not have imagined he would ever see the inside of jail.[79]  Irfan has truly suffered during this particularly horrid period of incarceration through COVID, during which time he never saw his beloved children or family, and did not get to fulfil his duties as the oldest son at his father's funeral. As confirmed by the PSR, enduring imprisonment away from the people he loves, especially during COVID, has made Irfan suicidal more than once.

His friends and family attest to his palpable remorse.  "I know he regrets any poor choices that he has made and the last few years have given him a lot of time to really recognize and process his life and the decisions he has made."[80]

Rather than resent the people or circumstances that led him to the MDC, Irfan chooses instead to accept his punishment with contrition.

> "I am confident that this entire experience has profoundly changed him for the better. He is already a stronger, more thoughtful, more conscientious man with extremely sound judgement...It is well within his character to process the solemnity of the situation, learn and emerge from his mistakes, reformed and eternally indebted for the boon he would be given."[81]

> "Knowing how much this has devastated those who love him is a punishment in itself for someone like Irfan. He will try to make up for that for the rest of his life. He is truly a good-hearted person who worked with the wrong kind of people. If you speak to him for even a few minutes, you will see that goodness, too. He still has so much more good offer the world and I hope he is given the chance to even impact one more life for the better, like he's done for me and so many others."[82]

Head bowed, Irfan fully accepts responsibility for where he is today and on bended knee, begs the forgiveness of the people he has forced to suffer alongside him. These are the hallmarks of a one-time offender who shall return to the right side of the law forever.

### _How Did Irfan End Up Here?_

---

[79] Ex. B-5 (Photo of Irfan as a child)
[80] Ex. A-1 (Letter from life-long friend Dale Sang)
[81] Ex. A-34 (Letter from close friend of Sana, Irfan's sister, Shilpa Lakhani)
[82] Ex. A-9 (Letter from sister Sana Amanat)

*An A+ Student, a Failure at Judging Character*

As told by those who love and know Irfan well, he is the quintessential book-smart scientist who misses social cues obvious to others. From an early age, Irfan showed himself to be a gullible genius—able to do complicated math in his head, but not always able to tabulate the character of the person in front of him.  Friends and family alike know this about him. Irfan's best friend, Dale Sang, writes: "I've always felt that other people have taken advantage of his good nature over the years. He always wants to see the good in others, even when it is not always true and I think this is his greatest strength and weakness."[83]

Sweet and guileless, Irfan always sees the best in everyone, even those who don't deserve it. "He believes the best in people and doesn't always judge people's character, and I believe some people see that vulnerability in him and take advantage of his kindness."[84]

His younger sister, Sana, describes this aspect of Irfan particularly well:

"Knowing Irfan's character firsthand for the last few decades, his mistakes are often marked by shortsightedness. He trusts people too easily, wants to help as much as he can (often to his own his own detriment), and only sees the good in everything and everyone around him. Irfan's downfall is his naiveté and lack of due diligence, not malevolence. He has always struggled with this."[85]

This naivete contributed to Irfan's station in life now—in helping his younger brother and in doing business with Kaleil Tuzman and Steve Maiden, he did not suspect the vast criminal empires he unknowingly walked into.

*"Self-sacrifice is just intrinsic to who Irfan is."*

Of the many cornerstones of Irfan's character, self-sacrifice stands out. No matter how

---

[83] Ex. A-1 (Letter from life-long friend Dale Sang)
[84] Ex. A-21 (Letter from friend Yasmeen Al-Shehab)
[85] Ex. A-9 (Letter from sister Sana Amanat)

much Irfan wanted something, what he wanted more was to see the people he loves be happy. "Growing up, I recall there were many times when he couldn't spend time on something he wanted to do in order to aid a family member. As a teenager I recall feeling very annoyed but [by] this but as an adult, I see the sacrifices he made to ensure his family was taken care of."[86]

Sana narrates this touching scene:

"My brother would proudly bring his kids to the Comics conventions where I was speaking. Those were coveted tickets, and I myself could only get my hands on a few. So instead, Irfan would happily stand outside for hours while his kids attended the festivities inside, pretending that his childhood dreams weren't just through those convention doors. He still has not attended a comics convention with me because he always gives his ticket to his kids, nephews or nieces. Self-sacrifice is just intrinsic to who Irfan is."[87]

Self-sacrifice is also the reason that Irfan departed from his own plans and dreams of creating medical devices, twice. The first time was for his father, Sharif, and the second was for Omar.

While Irfan pursued his path in the medical device field, his brother Omar built a very successful technology company that suddenly began to unravel under the incompetence of poor programmers. Omar struggled to find anyone smart enough—or trustworthy enough—to rescue his business. Big brother Irfan, with absolutely no interest in finance or investment algorithms, laid his own dreams aside to help Omar realize his own.  Quickly, Irfan taught himself the math and science needed to rescue Omar's company[88] and then on Omar's insistence, Irfan spent years working for Omar to ensure Omar's success.

---

[86] Ex. A-1 (Letter from life-long friend Dale Sang)
[87] Ex. A-9 (Letter from sister Sana Amanat)
[88] Irfan's pure love—and incredible talent—for math allowed him to devise a number of trading algorithms he ultimately gave to companies which use them to this day to make millions. Irfan never shared in these profits; his bounty was the pleasure in creating a unique and successful algorithm.

Finally, Irfan's self-sacrifice for Omar landed him here today. As mentioned above, Irfan lives with guilt and blame for the childhood abuses to which he was a victim. Irfan's greatest fear is that he will fail to protect Omar from harm. Thus in 2008, when Omar was in trouble and afraid of what would happen to him, Irfan leapt into the fire to rescue his little brother, with not a penny to gain from his actions. With absolutely no knowledge of the grand criminal sprees carrying on around him in KIT Digital and Maiden Capital, Irfan sent Enable statements, hoping the markets would recover and frozen funds could be returned.

And when Enable could not return the funds as promised, Irfan signed personal guarantees to Tuzman and Maiden. Putting his word before his family, Irfan made good on those guarantees by selling his family's house, their car, and liquidating all of his own assets. Irfan's decision to pay back Tuzman and Maiden left his family homeless; they had to borrow from relatives just to pay rent and eventually, he, Fatima and their four children had to move in with Irfan's aunt. Irfan's repayment to Tuzman and Maiden also left him without any money to pay his children's school tuition; mid-year the children were kicked out of their private school in Dubai and for one year, Irfan home-schooled them.

The Government attempted to paint Irfan as a high-flying international criminal genius by focusing on the acts of others between 2009 and 2012, and pointing to select lascivious bank statement entries to smear his character. But this could not be further from the truth, and what happened after 2012 portrays the real Irfan. In 2010, upon hearing of his father's cancer, Irfan moved his family from Dubai back to New Jersey, so he could take care of his father and mother. Irfan's financial condition—never high-flying—was nearly decimated by the global financial crisis that was out of his control, and then was entirely decimated by his choice to honor his guarantees to Tuzman and Maiden. And so at age 40, Irfan (and his family of six) moved in with

relatives.

In 2012, Irfan returned to his three true loves: science, taking care of his family, and teaching children. In the four years between 2012 to 2016, Irfan spent most of his time caring for his parents, and with the few hours left he worked in medical offices and for his family's daycare, Kidnetic, and made nearly no money—and he couldn't have been happier. In this simple, humble life of self-sacrifice and science, with giggling children hanging off him, Irfan was finally living his dream. And then he was arrested.

All of these facts fill in the blanks of Irfan's role in the story the Court well knows.

**How did someone like Irfan end up here?**
   *Because self-sacrifice defines him.*
**Why did he do it?**
   *To protect his brother.*
**What did he get from it?**
   *Absolutely nothing.*
**What did it cost him?**
   *Absolutely everything.*

*What's Next for Irfan?*

Because four years lapsed between the end of the conspiracy and Irfan's arrest, and two years lapsed between Irfan's arrest and his conviction, this Court need not speculate about what Irfan will do if released—he was already doing it from 2012 until 2018—living a simple life, caring for his parents and children.

Irfan's cousin Jamal, his sister Sana, his four children, and his beloved mother Hamida will be there with open arms on the day Irfan regains his freedom. This will be the first time 7-year old ███ and 14-year old ███ will have seen their father since October 2018; it will be the first time Irfan has seen anyone he loves since the start of the global pandemic in March 2020 when the MDC closed its doors to visitors. They will take him out to lunch, and then deliver him back to the home where he grew up, the once-bustling mini-Ellis Island where Hamida now lives

entirely alone. They will all pray together for the soul of Sharif. And then Irfan will spend the rest of Hamida's days living with her and taking care of her, and the rest of his days taking care of his own children. He will never miss another birthday, graduation, homework assignment, school play, or silly argument about Marvel characters. Irfan will restore his mind to where it belongs—using science to help others; and he will restore his heart to where it belongs—making the people he loves happy.

### III.    THE HARSH CONDITIONS OF IRFAN'S CONFINEMENT AT MDC

#### A.    COVID-19

As of the date of the filing of this memorandum, Irfan has been in custody for thirty-three months at the MDC. These are very difficult facilities for anyone, especially non-violent financial crime offenders. But with the onset of COVID-19, the terms of Irfan's confinement have become brutally harsh. As this Court recently noted while sentencing Michael Avenatti, "Conditions were terrible. Hard to believe they could occur in the United States."[89] The Honorable Paul Oekten has stated that confinement during COVID-19 should count for up to twice the length of the incarceration.[90]

In the words of former Chief Judge McMahon while sentencing an in-custody defendant who, like Irfan, has been incarcerated during COVID:

> [The] MCC and the MDC, two federal correctional facilities located in the City of New York that are run by morons, which wardens cycle (through) repeatedly, never staying for longer than a few months or even a year. So there is no continuity, there is no leadership, there is no ability to get anything done. They lurch from crisis to crisis, from the gun smuggling to Jeffrey Epstein, none of which is the fault of [the defendant] or any of the other inmates I have sentenced or will sentence.
>
> It is the finding of this Court that the conditions to which she was subjected are as disgusting, inhuman as anything I've heard about (in) any Colombian prison,

---

[89] Ex. F

[90] *Id.*

but more so because we're supposed to be better than that…. The fact that you haven't been out for a year is a result of the pandemic. Nobody's been out for a year. Nobody's had visitors. People have gotten locked up all over the country in the SHU when they've gotten sick, and you had the great misfortune to not only to get COVID but to get COVID in the earliest days, when we didn't know what we were doing. And that being so, I think you've suffered triply as a result.

But there is no excuse for the conditions in those two institutions. There is no excuse for the serial leadership that does not allow the office of warden to take control and get control of those facilities, that they just cycle through, most of them at the end of their careers, and it is unfair and unjust. You shouldn't have to suffer for the incompetence of the United States Department of Justice and its subsidiary agency, the Bureau of Prisons.[91]

Recognizing that COVID requires sentencing courts to take the brutal conditions of confinement into consideration, countless federal courts have affirmatively granted downward variances based on COVID. We attach here a chart of such sentences.[92]

Beginning on April 1, 2020, the MDC was placed on full lockdown.[93] During this period, inmates were only allowed out of their cells for between fifteen minutes and one hour per day, three days a week, in order to shower,[94] do laundry, and perhaps to make a short phone call to a relative. Other than those 45 minutes to three hours per week, Irfan and the other inmates at MDC were confined entirely to their cells, in the equivalent of solitary confinement with one cellmate.  This continued for weeks on end, all amidst the fear of the virus spreading rapidly both inside and outside the MDC. At times, those lockdown conditions were eased slightly, allowing inmates out of their cells for three hours per day, five days a week. Nonetheless, even after that

---

[91] https://www.nydailynews.com/new-york/ny-judge-mcc-mdc-20210507-nhcuujw6kjbmnm7qjus5pfrpdm-story.html
[92] Ex. C
[93] Ex. D
[94] Even when permitted to shower, the showers were rarely cleaned as gnats populated the shower area, the drains were clogged, and the showers were filled with slime and a potent odor. On occasion, Irfan was forced to shower with a pile of excrement other inmates had left behind because if he chose not to shower he would not have access to the shower for another week.

easing, complete lockdown resumed during weekends, and are frequently re-imposed during times of additional outbreaks, and these conditions continue as of the date of this submission.

Irfan's personal experience has been even more harrowing during COVID.

In February and March 2020, there were several outbreaks at MDC and many inmates suffered from severe respiratory distress and other COVID symptoms, only to be told it was not COVID and the BOP would not provide testing. Following reports that inmates at MDC tested positive, Irfan and other inmates requested additional information about the positive tests and were immediately placed into solitary confinement for a week as a result of this request. Requests for tests and treatment at MDC were ignored until the end of 2020 despite the numerous COVID outbreaks there.

For months, meals were delivered to cells on carts that were used to take out the trash, still contained garbage, and often were covered in spit. Inmates would beg officers to clean the trays first, and when the officers refused, inmates would refuse to eat the dirty food; when those inmates, including Irfan, requested hot water to make noodles, the officers denied that request. Even more shocking, one particular officer would remove his mask to cough on inmates' food, laughing at the situation.

Also, the floor of Irfan's cell flooded with gray water from a broken toilet above. He was forced to stay in the dirty, leaking cell 23 hours a day, despite requests to be moved or allowed out more frequently. In retaliation for filing a complaint with the DOJ COVID hotline regarding the sanitation issues and lack of COVID testing, Irfan was handcuffed, removed from his cell, and stripped; his cell was tossed, and he was threatened by officers.

In addition, beginning on March 13, 2020, approximately sixteen months before the filing

of this memorandum, and continuing indefinitely into the future, all family, social and legal visits were entirely terminated at MDC and other BOP facilities and only just resumed a few weeks prior to the filing of this memorandum.[95] This means that during this global pandemic, Irfan and other inmates at MDC have not seen their loved ones (or anyone else from outside the facility) despite BOP's recognition of the importance of such visits during this trying time.[96] ("The BOP recognizes how important it is for families to keep in touch, especially during these uncertain times. You need to know how your loved one is doing and they need to know how the virus is affecting you and their community."). While these steps were necessary to prevent the spread of COVID-19, the result is that Irfan has already been severely punished in this case, having already served more than sixteen months in what amounts to near isolation. And his mother and children are suffering and will continue to suffer harshly so long as he is in prison.

Given his mother's advanced age, the fact this his youngest two children are too young to be vaccinated, and the terrifying COVID variants still spreading across the globe, it is safe to assume that as long as Irfan is incarcerated, he will not see his mother or two youngest children.

B.    *Extortion and Violence*

In addition to suffering through the pandemic and isolation at MDC, Irfan has also been subjected to violence and extortion at MDC.  Small in stature and imprisoned for a financial crime, Irfan has been assaulted on many occasions, including while standing on line to use the telephones, which prevented him many times from calling his family.  Irfan has also been

████████████████ on two occasions and extorted for his ration of food many times.

Furthermore, Irfan has been traumatized from the numerous slashings and assaults he has witnessed. On those many occasions, Irfan, the person who is always looking to help others,

---

[95] Ex. D
[96] *Id.*

stood helpless by in fear that he too will be attacked; he then hates himself for failing to protect another.

## IV.  THE GOVERNMENT'S EVIDENCE AT TRIAL, EVEN ACCEPTED ENTIRELY AS TRUE, SHOWED ONLY THAT IRFAN PLAYED A MINIMAL ROLE IN THE CRIMINAL ACTIVITY HERE

At trial, the jury concluded that after a March 2009 phone call in which Irfan Amanat told Steve Maiden and Kaleil Tuzman that Enable's accounts were frozen, he still provided Enable statements and investment confirmations to them until 2012.  The jury concluded that Irfan's statements were false. The Government claims for purposes of this sentencing that Maiden and Tuzman were co-conspirators with Irfan and that Maiden and Tuzman themselves caused losses of over $43,000,000.[97] The Government submits that Irfan is responsible for $8,000,000 of loss in Maiden Capital—the value of the entire collapsed fund; and tags Irfan with $2,000,000 in loss attributable to his actions with KIT Digital. These are numbers the Government uses to calculating the loss for which Irfan is responsible under the Sentencing Guidelines.[98] The Government does credit Irfan with the return of $550,000, for a total loss amount of $9,450,000.[99]

The Government does not claim that Irfan Amanat ever stood to earn a penny from any of this, or that Irfan in fact ever earned a penny from any of this. The Government does not claim that Irfan stole a penny, and, in fact, this Court gave a limiting instruction to the jury that Irfan is not charged with taking the Maiden Capital money from Enable or for defrauding Steve Maiden.[100] Nor does the Government claim that Irfan had any knowledge of the out-of-control

---

[97] *See* Presentence Investigation Report ("PSR") at ¶¶ 69.
[98] *See* PSR ¶¶ 67.
[99] See PSR ¶¶ 67.
[100] Trial Tr. at 133-134.

criminal antics of Steve Maiden, or the entirely corrupt and fraudulent enterprise that was KIT Digital. And no one claims that Irfan ever had any direct contact with a single investor in either Maiden Capital or KIT Digital.  Moreover, there is absolutely no evidence that Maiden or Tuzman shared any of their profits with Irfan, or that there was any agreement they would do so, or that Irfan had any expectation that anyone else would share profits with him.

The Government has offered no evidence Irfan had knowledge of or control over the conduct of Maiden and Tuzman, for which he is now being held accountable, and offered no evidence he could have foreseen it.

Irfan's culpability *viz a vis* Omar is discussed next.

*Irfan is not Omar*

The Government spared no effort to insinuate that Omar and Irfan Amanat are one. To this end, it insisted that the jury see emails between the brothers in 2008, before any conspiracy or wrongdoing is alleged, and implied that these emails show that the brothers pilfered Enable money—or at least habitually pilfered money—together. But what these emails actually reveal is the true relationship between these Brothers Amanat.

Rather than acting in concert, the emails bespeak of an older brother scolding the younger for touching family money without permission; of an older brother chastising the younger for doing things behind his back; of an older brother openly angry and demanding that his younger brother stop entirely, and correct what he has done. While the money at issue in these emails, and causing these fights, did not come from Enable (as wrongly suggested by the Government), these emails without a doubt show the tension and conflict between these brothers. Omar acts behind Irfan's back—Irfan gets angry, scolds him, and tells him to stop. From their back and forth, it is clear that this is not a new dynamic.

From both the different charges against them, and the evidence presented at their trials, it is clear that Omar may have done many things behind Irfan's back; at the very least, he did them without Irfan. For all of those reasons, Irfan should be saddled with none of the conduct or losses attributable to Omar.

*What the trial showed*

We know what Maiden did. We know the evidence presented against Tuzman and Omar. But it is worth parsing Irfan out from all others connected to his conviction, because Irfan—and his conduct—is so different.

Let's briefly set the stage: Both Maiden and Tuzman were investors in Enable as of 2008. Each of them invested and redeemed millions in Enable before 2009. In 2008 and 2009, a Global Recession decimated the world financial market, including some Enable investments. No one has accused Irfan of stealing any Enable funds, ever. In March 2009, when Enable could not redeem Maiden and Tuzman's investments, *Irfan called them and told them this*. This bears repeating: when Enable could not meet its redemption requirements, Irfan *told* Enable's investors the truth! He never lied—or tried to lie—to his own investors about the state of their investment. Rather than begin his own complicated fraudulent enterprise to hide "the Enable Hole" from the Enable investors, Irfan did the right thing by telling them the truth.

But when those investors—who knew the truth about Enable because *Irfan told them*— asked Irfan to send the Enable statements anyway, so they could each trick their own respective investors, Irfan made the mistake of agreeing to this. And that is why he is here. Irfan should have said no, and will regret going along for the rest of his life.

In short, even accepting as true every allegation made by the Government, Irfan's only offense conduct involved emailing account statements to Maiden, and emailing account balance

confirmations to the KIT Digital auditors. Irfan unknowingly joined a runaway fraud train in progress. This train had many compartments of fraud each separate from one another. Irfan showed up at one stop of the runaway fraud, foolishly got on, and stayed in one compartment of the train before exiting. Irfan had no knowledge and involvement with the other compartments, and was unaware of the scope of what was happening in the other compartments of the runaway fraud train.

### *There is no allegation of obstruction of justice against Irfan*

Given the complicated history of this case, we address the "Yahoo email fabrication" issue and "Spyros Enotiades Obstruction" issues here even though neither the Government nor the PSR allege that Irfan obstructed justice.

### *Alleged Yahoo Email Fabrication*

As the Court is aware, the Government presented evidence at Omar Amanat's trial that alleged that Omar obstructed justice under the theory that Omar had purportedly introduced fabricated exculpatory email messages into evidence.[101] It bears repeating that Irfan is not Omar. The Government has never accused Irfan of being involved in this email scheme. However, Your Honor has previously noted "The evidence offered at trial indicates that the fabrication of these emails—which were inserted onto the Yahoo server – would have required technical skills that Irfan Amanat possesses."[102] We respectfully remind the Court of the following: (1) the Government did not pursue the email issue at Irfan's trial whatsoever as the Government did not introduce a single shred of evidence at Irfan Amanat's trial concerning any alleged fabrication of emails, (2) the Government did not introduce any evidence at Omar Amanat's trial that alleged Irfan Amanat was involved in the fabricated email allegations, and (3) the Government has never

---

[101] Omar Amanat/Tuzman Trial Tr. at 6315-16, 6320, 6322 (Dkt. No. 698)
[102] Dkt. No. 1080 at 7

sought an obstruction of justice enhancement for this alleged conduct against Irfan Amanat.

In preparation for sentencing, the Government has specifically acknowledged that it purposefully did not raise these email issues at Irfan's trial and does not intend to raise this issue in connection with sentencing of Irfan.[103]  In fact, Your Honor clarified that point in scheduling sentencing and the Government confirmed that it does not intend to raise this email "fabrication" issue with regards to Irfan, and does not intend to request the Court consider this issue as a Section 3553(a) factor.[104]  We ask the Court to follow the Government's guidance in this respect.

### Obstruction of Justice Regarding Spyros Enotiades

As the Court is aware, upon Irfan's conviction, the Government sought to remand Irfan as a result of alleged conduct that involved a purported attempt to fabricate evidence through the use of Spyros Enotiades, an FBI confidential human source (CHS).  Discovery was obtained as to these allegations and Irfan was very much looking forward to the opportunity to cross-examine Mr. Enotiades regarding these allegations at a *Fatico* hearing.  However, the Government agreed to no longer pursue the obstruction of justice enhancement for this alleged conduct which obviated the need for a *Fatico* hearing.[105]  In addition to not pursuing any enhancement for this alleged conduct, the Government has also agreed not to request these mere allegations be considered as a Section 3553 factor at sentencing.[106]  Here too we request the Court not to consider this as a factor in Irfan's sentencing.

## V.    THE ADVISORY GUIDELINES CALCULATION

Loss calculation is a clumsy, inarticulate way to create a mathematical formula to

---

[103] See Dkt. Nos. 1137 and 1150
[104] See Dkt. No. 1150
[105] See Dkt. No. 1137
[106] See Dkt. No. 1150

calculate the moral harm caused by a defendant's conduct. In a case like Irfan's, where the defendant never stood to gain a cent, and where the Court explicitly instructed the jury that Irfan is not charged with stealing any money, the idea that the result of any loss calculation could properly quantify Irfan's moral harm is absurd. Nonetheless, because this Court must determine the Advisory Guidelines, we address them here.

The Government has indicated that it joins the PSR calculation here, which results in an offense level of 33 for Irfan under the Sentencing Guidelines. This offense level was calculated by taking a base offense level of 7 under U.S.S.G. § 2B1.1(a) and adding an additional 18 points under U.S.S.G. § 2B1.4(b)(1) because the total loss in the Maiden Counts ($8,000,000), plus the total loss in the KIT Digital counts ($2,000,000) minus a $550,000 credit is more than $3,500,000 but less than $9,500,000.[107] The PSR adds eight additional points, disputed below, for a total offense level of 33. Because Irfan has no criminal history, an offense level of 33 results in a Guidelines range of 135-168 months. This range is purely advisory.[108] Additionally, it is inaccurate.

We note that as the PSR points out—and confirmed by the Government—not a single victim of any of the counts has come forward against Irfan, to seek restitution or otherwise. Further, the Government indicated at the time of this filing that no forfeiture is sought.

A. *The Probation Department Recommendation*

The Probation Department recommends a variance downward from this Guidelines range to a sentence of 108 months in custody on Counts 1 and 2, and 60 months on Counts 3 and 6 (to

---

[107] We note that even if the Government and PSR were correct in this tabulation, the astronomical enhancement based on this loss amount in 2021 yields absurd results. As noted by many a court, in 1987, the first year of the Sentencing Guidelines, a fraud with a loss calculation of this amount would result in a sentencing range of 24-30 months. Ex. E, U.S.S.G. §2F1.1, 1987 Fraud Sentencing Guidelines and Sentencing Grid.

[108] *U.S. v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).

run concurrently).[109]

We submit that a full consideration of the harsh terms of Irfan's incarceration to date should result in a lower sentence than that recommended by the PSR. In addition, the Probation Department's recommendation does not account for the fact that during the pandemic many defendants are being released to complete a significant part of their sentences on home confinement. We submit that when those sentences imposed on others are considered, along with all the other factors discussed in this memorandum, the appropriate custodial sentence in this case is time-served, which as of the date of this filing is approximately thirty-three months, (sixteen of which were served in almost complete isolation), and will be more on the date of sentencing.

### B. Challenges to Sentencing Enhancements

The final PSR improperly includes enhancements which did not appear in the initial draft PSR, namely (1) a four-level enhancement claiming that Irfan was a person associated with a "broker or dealer," and (2) a two-level enhancement based on the offense involving "sophisticated means."[110] We submit that it is improper, where the defendants had no opportunity to offer objections, to offer an entirely new basis for a sentencing enhancement for the first time in the Final PSR.[111]

### 1. The PSR Incorrectly Imposes a Four-Level Enhancement For Being a Person Associated With A Broker or Dealer

---

[109] See PSR Sentencing Recommendation, pg. 31.

[110] See PSR ¶¶ 81 and 82.

[111] Mr. Amanat submitted to Probation Officer Johnny Y. Kim objections to the Final PSR which were not included in the Draft PSR and for which Mr. Amanat was denied the opportunity to object. A copy of the June 11, 2021 letter is annexed hereto as Exhibit F. In response, Probation Officer Kim stated, "please address any requested changes to the PSR with the Court at sentencing since the final PSR has already been disclosed to the Court." A copy of the June 14, 2021 email from Probation Officer Kim is annexed hereto as Exhibit G.

In the initial draft PSR, the only four-level enhancement sought was based on the allegation that Irfan "was a person associated with an investment advisor—namely Stephen E. Maiden—pursuant to §2B1.1(b)(20)(A)(iii)."  In correspondence with the Probation Officer Kim, we objected to this enhancement as inapplicable to Irfan.  Tellingly, the Government did not dispute this objection and the Final PSR agreed with our assessment that Mr. Amanat was not "associated with an investment advisor."  However, instead, the Final PSR, without giving Irfan a chance to object, includes a four-point enhancement under a new theory—pursuant to §2B1.1(b)(20)(A)(ii)—claiming that Mr. Amanat was "associated with a broker or dealer." We submit that it is wholly improper to offer an entirely new basis for a sentencing enhancement only in the Final PSR where the defendant is not provided an opportunity to present objections.

Regardless, this four-level enhancement for being "associated with a broker or dealer" is also inapplicable to Irfan.  According to § 3(a)(18) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(18)), "The term 'person associated with a broker or dealer' or 'associated person of a broker or dealer' means any partner, officer, director, or branch manager of such broker or dealer (or any person occupying a similar status or performing similar functions), any person directly or indirectly controlling, controlled by, or under common control with such broker or dealer, or any employee of such broker or dealer, except that any person associated with a broker or dealer whose functions are solely clerical or ministerial shall not be included in the meaning of such term for purposes of section 78o(b) of this title (other than paragraph (6) thereof)."

The Final PSR claims that this newly added enhancement applies because "KIT Digital invested funds with Enable Invest Ltd. with the understanding that Enable would grow the investment through securities. Enable used some of KITD's investment to purchase securities.  Since the defendant was employed as a manager for Enable, he facilitated the purchase

of securities with KITD's investment or directed a broker or dealer with Enable, or someone performing similar functions as a broker or dealer, to facilitate such securities purchases."

However, application of this enhancement wholly disregards the facts here. Mr. Amanat was not a "partner, officer, director, or branch manager of a broker or dealer," and was not "directly or indirectly controlling or controlled by, or under common control with a broker or dealer," nor was there ever any evidence submitted to support such assertion. The Final PSR's purported basis for this enhancement is that KITD invested in Enable and Enable would grow the investment through "securities." Enable, which is not a broker or dealer, purchased foreign currency swaps and futures outside of any exchange, which does not meet the definition of "securities" per the SEC definition. Even assuming *arguendo* that Enable had purchased "securities" through the use of a broker or dealer, Irfan still would not fall under the § 3(a)(18) definition of a person associated with a broker or dealer as he was not employed by a broker or dealer and did not directly or indirectly control a broker or dealer.

### 2. The PSR Incorrectly Imposes a Two-Level Enhancement For "A Substantial Part of the Fraudulent Scheme Was Committed Outside the U.S." or Because the Conduct Constituted "Sophisticated Means"

In the initial PSR, the two-level enhancement was based only on the allegation that "a substantial part of the fraudulent scheme was committed from outside the U.S., as the defendant conducted the activities of Enable Invest Ltd. in Dubai, UAE, pursuant to § 2B1.1(b)(10)." In correspondence with the USPO, we submitted an objection to this two-level enhancement. In response, the Government stated that "[d]uring the relevant time period, Mr. Maiden testified that he understood that Mr. Amanat lived and worked in Dubai. Enable was also based in Dubai and used a bank account located there." However, this is both inaccurate and does not provide a basis for this enhancement. First, Mr. Amanat's role in this scheme was limited to providing

statements to Mr. Maiden, and thus, no matter the length of time Mr. Amanat resided abroad, his

role was not "a substantial part" of the scheme.  Second, Mr. Amanat moved back to the U.S. in

2010 and has resided in the U.S. from 2010 onwards, so he only resided in Dubai for less than

half of the charged time period (March 2009- June 2012).  Third, Omar Amanat and Steven

Maiden were located in the U.S. throughout the entire period of the charged crimes, so any

inducement of Maiden Capital investor funds, all of Maiden's fraudulent trading activity, and

any purported lies by Maiden to Maiden Capital investors all occurred in the U.S.  Lastly,

although Enable had a bank account in Dubai, the record at trial establishes that the bank

accounts at issue in the charges, and any Maiden Capital transfer of funds to Enable, all occurred

at U.S.-based banks.  For all of the above-mentioned reasons, "a substantial part" of the

fraudulent scheme did not occur outside the U.S.

Notwithstanding the above, at the Government's suggestion, the Final PSR also includes

an alternative two-level enhancement pursuant to §2B1.1(b)(10) for "sophisticated means."

First, again, the Final PSR improperly included an additional justification for this enhancement

without providing Irfan the opportunity to offer an objection to an entirely new basis for a

sentencing enhancement.  Moreover, there is no basis for a sophisticated means enhancement for

Irfan Amanat.  The Application Note to §2B.1(b)(10)(c) provides that "sophisticated means"

means "especially complex or especially intricate offense conduct pertaining to the execution or

concealment of an offense."  Irfan's minimal role in the instant crimes was not "especially

complex or especially intricate" as the allegations are that Irfan made fake numbers for the value

of Maiden Capital's investment with Enable and provided these falsified numbers to Maiden,

who then passed along these numbers, in Maiden's own statements, to Maiden Capital investors.

The record at trial provides no basis for a sophisticated means enhancement as there was nothing

about the charged scheme, and Irfan's limited involvement, that was more complex or
sophisticated than other schemes of this type.

### C. The Guidelines Calculation Should Be Reduced Based On Irfan's Minimal Role In Maiden's And Tuzman's Criminal Activity

Irfan Amanat objects to the calculation of an offense level of 33 because, even accepting
the Government's allegations as true, Irfan was no more than a minimal participant in Maiden's
and Tuzman's criminal activity. As such, he is entitled to a four-level reduction in the calculated
offense level under U.S.S.G. § 3B1.2.[112]

### 1. Applicable Law

In order to determine whether a defendant is entitled to an adjustment under section
3B1.2, the Sentencing Guidelines instruct that the Court must consider whether the defendant
"play[ed] a part in committing the offense that makes him substantially less culpable than the
average participant in the criminal activity."[113] The Second Circuit has recognized that "the
average participant" language "specifically refers to the defendant's 'co- participants in the
case at hand.'"[114] In this case, the Government alleges that Maiden and Tuzman were
participants in the criminal activity with Irfan, and the Government therefore includes their

---

[112] U.S.S.G. § 3B1.2 provides, in full, as follows:
> Based on the defendant's role in the offense, decrease the offense level as follows:
> (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels
> (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels
> In cases falling between (a) and (b), decrease by 3 levels.

[113] U.S.S.G. § 3B1.2 cmt. 3.A.

[114] *U.S. v. Kirk Tang Yuk*, 885 F.3d 57, 88 n. 16 (2d Cir. 2018) (quoting U.S.S.G. Amendment 794, Nov. 1, 2015); see also *U.S. v. Perez*, 08-CR-429, 2016 WL4775536, *2 (S.D.N.Y. Sept. 14, 2016) (Cote, J.) (recognizing that "the relevant comparison for a minor role reduction was between the defendant and other actual participants in the crime").

activity for relevant conduct purposes.

The commentary to this Guidelines provision instruct a Court to consider five

factors in evaluating whether an adjustment applies:

(i) the degree to which the defendant understood the scope and structure
of the criminal activity;

(ii) the degree to which the defendant participated in planning or
organizing the criminal activity;

(iii) the degree to which the defendant exercised decision-making
authority or influenced the exercise of decision-making authority;

(iv) the nature and extent of the defendant's participation in the commission
of the criminal activity, including the acts the defendant performed and the
responsibility and discretion the defendant had in performing those acts; and

(v) the degree to which the defendant stood to benefit from the criminal activity.[115]

The commentary goes on to state that "a defendant who does not have a proprietary

interest in the criminal activity . . . *should be considered for an adjustment under this*

*guideline*."[116] Further, the Guideline commentary states: "The fact that a defendant performs an

essential or indispensable role in the criminal activity is *not determinative*. Such a defendant may

receive an adjustment under this Guideline if he or she is substantially less culpable than the

average participant in the criminal activity."[117] Thus, a defendant's role can be *both* essential and

also minimal, thus warranting a reduction.[118]

The commentary also states:

A defendant who is accountable under § 1B1.3 (Relevant Conduct) only for the
conduct in which the defendant was personally involved and who performs a
limited function in the criminal activity may receive an adjustment under this
guideline. For example . . . a defendant who is accountable under § 1B1.3 for a loss

---

[115] U.S.S.G. § 3B1.2 cmt. 3.C.
[116] *Perez*, 2016 WL 4775536, at *2 (quoting U.S.S.G. § 3B1.2 cmt. 3.C) (emphasis added).
[117] U.S.S.G. § 3B1.2 cmt. 3.C *(emphasis added)*.
[118] *See U.S. v. Soborski*, 708 Fed. Appx. 6, 11 (2d Cir. 2017) ("[A] defendant with an essential or
indispensable role may still receive a role reduction").

> amount under 2B1.1 . . . that greatly exceeds the defendant's personal gain from a fraud offense or who has limited knowledge of the scope of the scheme may receive an adjustment under this guideline.[119]

Indeed, the Sentencing Commission significantly amended the role reduction provision and its commentary effective November 1, 2015, in order to make several clarifications, namely (1) that a defendant should be compared to co-participants in the same criminal activity when considering a minor role reduction and (2) that even participants who serve "integral" or "indispensable" roles in the offense can still be considered minor participants.[120] The amendment also added the list of factors, cited above, that a court should consider when determining whether to apply a mitigating role adjustment.[121] The Commission stated that these changes were made based on a study finding "that mitigating role is applied inconsistently and more sparing than the Commission intended."[122]

The commentary also explains the circumstance under which a minimal role adjustment is appropriate: a defendant who is "plainly among the least culpable of those involved in the conduct of a group" is a "minimal participant" and a four-level reduction is warranted.[123] "Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant."[124]

### 2. Irfan Was a Minimal Participant in the Criminal Activity

In this case, all five factors listed in the commentary strongly weigh in favor of a minimal role adjustment. Under U.S.S.G. § 3B1.2 cmt. 3.C, the first factor to consider is "the degree to

---

[119] U.S.S.G. § 3B1.2 cmt. 3.A.
[120] *See* U.S.S.G. Amendment 794, Nov. 1, 2015, *available at* https://www.ussc.gov/guidelines/amendment/794.
[121] *Id.*
[122] *Id.* at Reason for Amendment
[123] U.S.S.G. § 3B1.2(a); *id*. cmt. 4.
[124] *Id.*

which the defendant understood the scope and structure of the criminal activity." Here, as set forth above, even assuming all the facts alleged by the Government, Irfan did not understand the scope and structure of the criminal activity in either the Maiden or KIT Digital counts. Irfan had no way of knowing what these fraudulent enterprises were up to, and the evidence of his intransigence in providing *both* Maiden and KIT Digital the statements and confirmations requested speaks volumes to his intent to participate in their bigger schemes.

Further, Irfan played no role in the "planning or organizing of the criminal activity" (factor two). Those decisions were made *exclusively* by Maiden and the criminal leadership at KIT Digital.  And Irfan never "exercised decision-making authority or influenced the exercise of decision-making authority" over the criminal activity (factor three). Fourth, "the nature and extent of [Irfan's] participation in the commission of the criminal activity" was minimal. Indeed, according to the jury's verdict, Irfan emailed false statements and confirmations.  Irfan was not himself a board member of either Maiden Capital or KIT Digital who had fiduciary duties.

The final factor is "the degree to which the defendant stood to benefit from the criminal activity." There is no evidence suggesting Irfan received a single penny of the profits from Maiden Capital or KIT Digital trading, nor did Irfan stand to have a windfall if KIT Digital's public sale went through.[125]

In stark contrast, according to the Government, Maiden earned huge commissions from his investors due to his fraud, and Tuzman was on the precipice of cashing out to the tunes of over $100,000,000 from his fraud. The commentary to the minimal role adjustment guideline

---

[125] *See United States v. Tatum*, 138 F.3d 1344, 1346 (11th Cir. 1998)("In some cases of fraud, there will be a similar intent to deprive the victim of the full amount fraudulently taken. However, in other cases of fraud, the perpetrator may intend no loss…If on remand the district court finds that there is no actual loss or no intended loss, then there should be no enhancement of the base offense level on account of the amount of the losses.")

says that this is precisely the circumstance in which a role reduction is appropriate.[126]

Without question, Irfan is the least culpable of the participants by a substantial margin. He was the only one with no knowledge of the scope of the criminal activity, he was the only one who did not receive or expect to receive any portion of the illicit profits realized, and he is the only one whose participation was motivated by a misguided act of brotherly protection rather than the naked greed of Maiden and Tuzman. Accordingly, he meets the definition of a "minimal participant" under U.S.S.G. § 3B1.2 cmt. 4 (minimal role applies to those who are "least culpable

… [T]he defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant."), and a four-level reduction is warranted.

Finally, the Sentencing Commission and the Second Circuit have both specifically determined that the fact that Irfan's conduct "enabled the scheme to happen" is not a reason to deny a role reduction.[127]

Therefore, rather than a total offense level of 33, given his minimal role, Irfan's offense level should be 29 (resulting in an advisory Guidelines range of 87-108 months); and as argued above, the offense level should be further reduced by 6 points for the inappropriate enhancements. Based just on these two items, Irfan's offense level should be 23, yielding an advisory Guidelines range of 46-57 months.  However, the PSR and Government incorrectly

---

[126] U.S.S.G. § 3B1.2 cmt 3.A ("a defendant who is accountable . . . for a loss amount . . . that greatly exceeds the defendant's personal gain from a fraud offense or who had limited knowledge of the scope of the scheme may receive an adjustment under this guideline").
[127] *See* U.S.S.G. § 3B1.2 cmt. 3.C ("The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this Guideline if he or she is substantially less culpable than the average participant in the criminal activity."); *Soborski*, 708 Fed. Appx. at 11 ("[A] defendant with an essential or indispensable role may still receive a role reduction").

calculate the loss amount here, and therefore Irfan's advisory range should be even lower.

D.  *The Guidelines Calculation Substantially Overstates Irfan's Culpability Because It Is Almost Entirely Based On Losses Caused By Others Through Conduct Outside Of Irfan's Control*

Regardless of whether this Court adjusts Irfan's offense level based on a minimal role, the vast majority of his Guidelines offense level in this case results from the loss calculation. Many judges in the Southern District of New York and elsewhere have recognized that a significant variance from the Guidelines is appropriate under such circumstances.[128]

The extreme emphasis on loss makes even less sense in a case such as this where the loss was caused entirely by others, without input or control or Irfan.

Accordingly, the Guidelines calculation in this case, which is driven almost entirely by loss that Irfan did not control and did not know about, grossly overstates his culpability. In the next section, we argue that the PSR's loss calculation is legally wrong. But if the Court accepts the PSR's loss calculation, we respectfully request that this Court impose a sentence that is well below the Guidelines range.

## VI.  The Loss Calculation Here[129]

---

[128] *See, e.g.*, *U.S. v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2013) (varying from the Guidelines because they place an "inordinate emphasis . . . on the amount of actual or intended loss."); *U.S. v. Johnson*, No. 16-cr-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. April 27, 2018) (same); *U.S. v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (J. Underhill, concurring) ("the loss guideline [is] fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges.").

[129] We join the in arguments raised in Omar Amanat's sentencing brief at Dkt. No. 792 Pgs. 2-6, 6/18/18 filing regarding Counts 1-3. We also join in the arguments raised in the portions of Tuzman's Sentencing Brief Dkt. No. 793 6/22/18 filing in which he argues that if the Government cannot establish the offenses proximately caused the loss, then no loss amount is warranted (Pgs. 31- 34), and that if the defendant did not profit from the offense, the alternative measure of unlawful gain results in no amount enhancement in connection with Count 6 (Pg. 42). Lastly, we also join in the arguments raised by Tuzman Dkt. No. 1159 at Pg. 4, 11, and 18, regarding recent sentences, ABA Shadow Guidelines, and the trial penalty.  Under the ABA Shadow Guidelines (Ex. H), Irfan's offense would be calculated as follows: +7 (base) +10 (loss

"Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results."[130]

The Honorable Judge Rakoff's shared this salient reasoning and observation in crafting the right sentence for Rajat Gupta who was mechanically tacked with an 18-point enhancement for loss amount "for the resultant but unpredictable monetary gains made by others, from which Mr. Gupta did not in any direct sense receive one penny."[131]

We begin our discussion of loss amount with Judge Rakoff's guidance because this Court must also now wrestle with fashioning a reasonable sentence for Irfan Amanat who did not receive one penny, but nonetheless must engage in a mathematical battle over the loss amount properly attributable to him. As profoundly noted by Judge Rakoff, "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice."[132] Nowhere is this more true than the Sentencing Guidelines' over-sized treatment of loss amount. "The Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense. By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that

---

between $5M-$10M) -3 (low culpability) + 0 (victim impact) +2 (Special Offense Considerations) = 16. The resulting sentencing range is 21-27 months.

[130] *Gupta,* 904 F.Supp.2d *at* 350.

[131] *Id.*

[132] *Id.* at 351.

federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentence would be irrational on their face."[133]

In a concurrence in *United States v. Corsey*,[134] Judge Underhill, sitting by designation, noted the flawed nature of the Guidelines for high-loss cases:

> The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb. ***The higher the loss amount, the more distorted is the guideline's advice to sentencing judges***. As a well-known sentencing commentator has put it, "For the small class of defendants . . . convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges."

Here, the Government and PSR's loss calculation for Irfan perfectly proves Judge Rakoff's hypothesis and Judge Underhill's observation, and if followed by this Court, would lead to an irrational sentence. First, the PSR's offense level calculation of 33 results from an 18-level loss enhancement. In other words, loss amount comprises over 50% of the offense level. Put another way, the loss enhancement proposed by the PSR—and for which no one argues that Irfan received one penny—more than doubles the offense level here.  As in *Gupta*, the PSR's loss calculation "overwhelm[s] all other factors."[135]

Second, we disagree with the loss calculation in the PSR for a variety of reasons set forth below and discussed in detail in this section.

To begin, while conspiracy liability may be "one for all and all for one," the same is not true for loss amount attributable to each unique defendant in a conspiracy.[136] Instead, a court must determine each criminal defendant's loss liability based on factors such as foreseeability,

---

[133] *Id.*
[134] 723 F.3d 366 (2d Cir. 2013),
[135] *Id.* at 353.
[136] *U.S.S.G. § 1B1.3.*

"but for" causation, the defendant's particular scope of conduct, and—as importantly—the court must deduct from that loss calculation any loss pre-dating the defendant's fraud or caused by market factors. Here, the legal principles shaping the mathematical formula result in these questions:

1. What actual losses were caused to Maiden Capital's investors by Irfan's actions of sending the Enable statements to Maiden?
2. What losses would not have occurred "but for" Irfan's conduct of sending Maiden the Enable account statements?
3. What losses did Maiden Capital suffer before March 2009, before Irfan's participation?
4. What losses did Maiden Capital suffer as a result of market factors?
5. What was the scope of Irfan's involvement in Maiden's fraud?
6. What credits against loss apply here?
7. What actual losses were caused to KIT Digital by Irfan's actions of submitting statements of KIT Digital's holdings with Enable?
8. What losses would not have occurred "but for" Irfan's conduct of sending statements to KIT Digital's auditors?
9. What was the scope of Irfan's involvement in the overall KIT Digital fraud?

But regardless of where this Court falls on the abacus of loss that should be properly attributable to Irfan, hinging Irfan's sentence so profoundly on this one factor—especially given that not one penny fell to him—would lead to an unjust and unreasonable sentence. The Sentencing Guidelines direct district courts to use "gain resulting from the offense as an alternative measure of loss" if "there is a loss but it reasonably cannot be determined."[137]  Here, there is certainly no gain, and arguably no loss due to Irfan.

In order to appropriately set the background for our discussion of loss calculation, we note common and important threads in both Maiden Capital and KIT Digital:

- Each company had already borne a massive and healthy fraud before ever meeting Irfan Amanat;
- The extant frauds caused the collapse of both companies;
- Both frauds sprawled into areas unknown and unknowable to Irfan;

---

[137] U.S.S.G. § 2B1.1 cmt. 3(B).

- Irfan was neither accused nor convicted of designing or controlling either of these frauds;
- Irfan's role in each of these frauds was limited to sending or verifying account statements without any direct contact with the investor/victims;
- Both Maiden and KIT had to chase, and often threaten, Irfan to send these statements; and
- Irfan received absolutely nothing—but utter ruination of his life—as a result of these frauds.

We discuss first the loss attributed to Maiden Capital and second to KIT Digital.

### A. Loss Amount Attributable to Irfan

**1. Relevant Facts about Maiden Capital and the Steve Maiden Crime Machine**

For weeks, in two separate trials, this Court heard Steve Maiden describe his veritable carnival of crime and poor trading history. It seems that Maiden never met a crime he did not try and never met a risky opportunity to invest he did not pursue. He lied to his friends and family, engaged in market manipulation, inflated the value of his fund, hid the fact that he was investing money with a known convicted felon (Jim Cohen at Blue Earth Solutions), and stole money from his fund—and he did all of this, and more, before he ever met Irfan.

Maiden testified about the gaseous nature of his fraud, which seemed to seep into every aspect of his fund, Maiden Capital. Most importantly, Maiden never said Irfan was part of—or even knew of—any of it. According to Maiden—and all of the evidence presented by the Government—Irfan's participation in the Maiden crime spree was discrete: from March 2009 until 2012, the one and only thing Irfan did (according to both Maiden and the Government) was email Maiden account statements showing Maiden Capital's balance at Enable. The Government's theory and evidence at trial was that Enable was not able to return Maiden Capital's investment as of March 2009 and therefore all statements sent after that date were false. Critically, there is no suggestion or evidence that Irfan *stole* Maiden Capital's investment *or*

induced that investment by fraud.[138] Moreover, the Enable statements sent to Maiden Capital after March 2009 ranged from approximately $2M to nearly $2.6M, but never more.

There is no evidence to suggest that Irfan had any insight into the Maiden Capital holdings, value, losses, gains, investors, frauds, etc. The evidence at trial was clear that whatever Maiden was doing, he did not tell Irfan, and certainly Irfan was not part of it. Irfan had no idea what Maiden Capital was worth at any point, and certainly did not know whether by March 2009, Maiden had already corrupted his fund with his fraud, gravely illegally inflated the value, or both (as it turns out). As admitted by Maiden, he had deeply infected his fund with fraud related to his investments in Blue Earth Solutions well before March 2009, and after that date also—all unbeknownst to Irfan.

The evidence was also clear that Irfan's entire contact with Maiden Capital was based on his emails to Maiden. Once Irfan sent the account statements, Irfan had no idea—or control over—what Maiden did with them.[139] Indeed Maiden clearly testified that neither Maiden Capital investors nor SSC (his accounting firm) ever saw any of the Enable statements. Any statements ultimately received or seen by Maiden Capital investors came directly from Maiden. In other words, Maiden is the one that made the false statements to his investors—not Irfan.

### 2. The Probation Department Unjustifiably Tags Irfan With $8 Million Of Loss For Because Loss Calculation In Fraud Cases Must Subtract Any Losses Incurred Before The Defendant's Fraud

Disregarding both the U.S.S.G. and the caselaw relevant to loss amount, the PSR tacks Irfan with $8M of loss for his convictions related to Maiden Capital without providing any basis for this calculation. The PSR and Government conjure this $8M figure from whim rather than

---

[138] In fact, this Court provided a limiting instruction to the jury that Irfan was not charged with this.

[139] Trial Tr. 451

legal principals, and simply transfer the total value of investments lost by Steve Maiden and Maiden Capital *from all of Maiden's crimes* onto Irfan's balance sheet for sentencing. This amount puts squarely on Irfan's shoulders the entire value of Maiden Capital and flies squarely in the face of caselaw on point.

Justice Neil Gorsuch, before his elevation to the Supreme Court, decided an instructive Tenth Circuit matter considering the exact calculation issues before this Court. In *United States v. Evans,*[140] the defendant ran a real estate investment fund and his investors purchased securities in his fund. There was no allegation or proof that the initial investment in his fund resulted from any fraud, rather "these were legitimate (if highly risky) investment ventures at their outset."[141] In the coming years, Evans experienced cash flow problems and began committing a series of crimes to hide the losses from his investors, including sending them false statements of their holdings.[142]

Eventually the jig was up and a receiver took control of Evans' investment fund. The receiver recommended that the investors contribute an additional $3M to the fund, which they did. Unfortunately, due to unforeseen circumstances, the entire venture failed.  At sentencing, the government initially argued that Evans caused his investors to lose $9.7M. The government arrived at that figure by a simple subtraction of the amount returned to the investors at the end from the value of the initial investment into the fund. The government then later raised that amount to $12M to include the $3M investment suggested by the receiver. The district court agreed with the government and Evans appealed, relying on U.S.S.G. § 2B1.1 comment note 3(A), "reasonably foreseeable pecuniary harm," to challenge the calculation.

---

[140] *744 F. 3d 1192* (10th Cir. 2014)
[141] *Id*. at 1194.
[142] *Id.*

The Tenth Circuit, however, reversed the district court's method of loss calculation, finding that "§2B1.1 incorporates and requires both factual or 'but for' causation and legal or foreseeable causation."[143] Consequently, the court held that where there is no fraud in the inducement of the investment, it was error for the district court to incorporate into its loss calculation the amount initially invested in the fund. Instead, "the district court should have inquired what loss, if any, the investors would have suffered if Mr. Evans had come clean regarding the status of the securities…This requires a determination of the value of the securities at the time the fraud began, which is the correct starting point for loss calculation in this case. In making that calculation, the fact that the securities had lost value due to a poor or unsustainable business model would not be chargeable to Mr. Evans."[144]

The *Evans* court further held that the "the district court should have considered the effect and foreseeability of non-fraud factors in determining loss," in finding that the additional $3M investment encouraged by the receiver could not be counted as loss against Evans because that $3M loss came from a third party's actions and market conditions.[145]  In coming to this conclusion, the Tenth Circuit held that frauds involving securities require a totally different loss calculation than in loan fraud cases.[146] The *Evans* court reasoned, "Mr. Evans' investors purchased securities whose value necessarily fluctuated. The victims were not guaranteed *any* return, and were aware that the success of their investment hinged on unpredictable factors, including the economy."[147] For those reasons, the court held, "this case calls for a single, more complex inquiry: the reasonably foreseeable amount of loss to the value of the securities caused

---

[143] *Id.* at 1196.
[144] *Id.* at 1196-7.
[145] *Id.* at 1197.
[146] Distinguishing *United States v. Turk*, 626 F.3d 743 (2d Cir. 2010), which held when a fraud involves a loan, the loss is the unpaid principal, not the value of the collateral.
[147] *Id.* at 1198 (emphasis in original).

by Mr. Evans' fraud, disregarding any loss that occurred before the fraud began, and accounting for the forces that acted on the securities after the fraud ended."[148]

This exact complex inquiry is appropriate here. Irfan was not charged, nor was he convicted of participating in any fraud before March 2009, and thus any losses to the value of the Maiden Capital fund before that date—either from Maiden's solo frauds or from market events—cannot be charged to Irfan. Certainly there can be no serious suggestion that those losses would not have resulted "but for" Irfan, as Irfan had nothing to do with them. Further, any losses to the Maiden Capital fund resulting from market events at any time—such as the global financial crisis—likewise cannot be properly added to Irfan's bill. Further still, any losses to the Maiden Capital Fund *after* Irfan sent his final statement from Enable must be deducted from Irfan's tally.

Maiden testified during the first trial that by the time the charged schemes began, he had already lost the bulk of his investor's money through "bad trading" and that he continued to lose the remainder of the money through reckless and negligent trading activities. The following testimony of Maiden is illustrative of these points:

- Maiden admitted he was "engaged in massive gambling" with client money.[149]
- Maiden testified that "the market in early 2008 was filled with unstable, hung over, over-caffeinated gamblers lunging at okey-doke moves" and that Maiden played and he lost.[150]
- Maiden testified that in early 2008 his fund "was getting cock-stomped, down double digits already on the year."[151]
- Maiden described his own trading as "impressively bad trading."[152]
- Maiden testified that "it was an impossible trading environment."[153]
- Maiden refers to his own trading activity as a "casino-style trading cycle" and

---

[148] *Id.*
[149] Omar Amanat/Tuzman Trial Tr. 1089
[150] Omar Amanat/Tuzman Trial Tr. 1090
[151] Omar Amanat/Tuzman Trial Tr. 1091
[152] Omar Amanat/Tuzman Trial Tr. 1091
[153] Omar Amanat/Tuzman Trial Tr. 1092

testified that on most days it felt like he was just rolling dice.[154]

- Maiden even testified that putting aside the monies he invested in Enable and KIT, the rest of money was lost due to bad trading, a terrible market, or investor redemptions.[155]
- Maiden testified that his fund lost $5-6 million due to bad trading and another $5 million to redemptions.[156]

The *Evans* legal framework is just a starting point for calculating Irfan's loss here; relevant cases in this circuit direct this Court to narrow Irfan's loss even more, and relevant Supreme Court cases provide the basis for the Court to reduce the loss amount to zero.

### 3. For Jointly Undertaken Criminal Activity, Loss Attributed To The Defendant Must Be Within The Scope Of Defendant's Agreement And Foreseeable To The Defendant

U.S.S.G. Section 1B1.3 (a)(1)(B) provides that a base offense level shall be determined on the basis of the following:

> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the *jointly undertaken criminal activity,* that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense....[157]

*United States v. Studley,[158]* sets forth a *two-prong* analysis for district courts in this circuit to apply when calculating loss attributable to a defendant under §1B1.3(a)(1)(B). The Second Circuit directed that "the first question for a court applying this section is whether the defendant participated in jointly undertaken criminal activity."[159] Irfan was convicted of participating in crimes with other defendants and conspirators, many of whom cooperated, and many of his

---

[154] Omar Amanat/Tuzman Trial Tr. 1093-4
[155] Omar Amanat/Tuzman Trial Tr. 1119
[156] Omar Amanat/Tuzman Trial Tr. 1120-1124
[157] U.S.S.G. Section 1B1.3 (a)(1)(B)
[158] 47 F.3d 569 (2d Cir. 1995)
[159] *Id.*

sentencing issues stem from the conduct of others. Therefore it is appropriate for this Court to apply § 1B1.3(a)(1)(B) and engage the *Studley* two-prong analysis in determining the loss properly attributable to Irfan.

At the outset, *Studley* points to the Application Notes of §1B1.3(a)(1)(B) and adopts the principle that "the scope of the criminal activity jointly undertaken by the defendant (the 'jointly undertaken criminal activity') is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant."[160] Next, the court discusses the two-prongs suggested in the Application Notes and adopts them as the proper legal analysis. The first prong, as set forth in the notes, states: In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e. the scope of the specific conduct and objectives embraced by the defendant's agreement* ).

The *Studley* court directs that "[t]his determination, as it goes to prong one of the test, must be made before the issue of foreseeability, prong two, is reached."[161] Leaving no doubt, the court held: "It is now plain from the commentary that in order to hold a defendant accountable for the acts of others, a district court must make two findings: 1) that the acts were within the scope of the defendant's agreement and 2) that they were foreseeable to the defendant. We now find that the Guidelines *also* require the district court to make a particularized finding of the scope of the criminal activity agreed upon by the defendant."[162]

The *Studley* court next provides guidance for district courts to determine the scope of the criminal activity that a particular defendant agreed to jointly undertake, finding that "the court

---

[160] *Id*. at 574.
[161] *Id.* at 574.
[162] *Id.* (internal citations omitted. *Emphasis added*)

may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others."[163] After examining one of the illustrations laid out in the notes, the court held that "a defendant's knowledge of another participant's criminal acts is not enough to hold the defendant responsible for those acts…a relevant factor in determining whether activity is jointly undertaken is whether the participants pool their profits and resources, or whether they work independently."[164] After examining another illustration from the notes, the court found that "the fact that the defendant is aware of the scope of the overall operation is not enough to hold him accountable for the activities of the whole operation. The relevant inquiry is what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct."[165]

Applying the inquiry and analyses required by *Studley* to the evidence in this case point clearly to the conclusions that 1) the scope of Irfan's agreement to participate in the Maiden fraud was limited to sending Enable statements to Maiden after March 2009—and nothing more, and 2) therefore, no other conduct by Maiden or anyone else was foreseeable to Irfan. As this Court heard extensively at trial, for years Steven Maiden simultaneously ran multiple frauds, often overlapping co-conspirators, sometimes defrauding co-conspirators. The only part of any of Maiden's operations or businesses in which Irfan was involved (or even had any visibility), was through Maiden Capital's investment in Enable. Irfan did not pool his resources with Maiden, did not profit from Maiden's conduct, and they worked entirely independently of each other.

Irfan's relationship with Maiden—and his limited role in Maiden's fraud on Maiden

---

[163] *Id.* at 575, citing U.S.S.G. §1B1.3 Applic. Note 2, and setting forth various illustrations.
[164] *Id.*
[165] *Id.* at 575.

Capital's investors—may be best illustrated by the admitted conduct of Maiden in three instances. First, Maiden testified that after March 2009, he often had to chase Irfan to receive Enable statements. This speaks loudly of Irfan's reluctance to send the statements to Maiden, and belies any argument that they were working closely as co-conspirators in Maiden's bigger fraud. (Compare the testimony of Robin Smythe and Gavin Campion regarding the smooth, clockwork-like operations and scheming between themselves and Kaliel Tuzman.)  Second, Maiden testified that he had many side agreements, including with Omar Amanat, and these were done behind Irfan's back. Third, and perhaps most significantly, Maiden testified that before March 2009, he had already launched a fraud in his fund to hide his losses in Blue Earth Solutions (BESN), a fund run by Jim Cohen. Maiden knew that Cohen was a felon before he invested in BESN. Yet as he testified, Maiden did not disclose to Irfan either his losses in BESN or Cohen's felon status. Instead, he tried to pump up the price of BESN to recoup some of his own losses and in furtherance of that scheme, he tricked Irfan into investing in BESN by withholding the truth— and instead touted BESN as an excellent investment.

Like the defendant in *Studley*, Irfan "had no interest in the success of [Maiden's] operation as whole, and took no steps to further the operation beyond [sending the Enable statements to Maiden]."[166] For all those reasons, as per *Studley*, this Court should find that Irfan's potential loss calculation is cabined by the limited scope of his own agreement, *i.e.*, to send Enable statements to Maiden showing that Maiden Capital had up to $2.6M invested with Enable.

However, for the reasons explained next, we submit that this Court has a valid legal basis to find that Irfan's loss amount in *both* the Maiden Capital fraud and KIT Digital fraud are zero.

### 4.  Irfan's Conduct Did Not <u>Cause</u> Any Losses To Any Victims, As He Did

---

[166] *Id.* at 576.

**Not "Make" Any False Statements.**

Relying on the Supreme Court's holdings in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,*[167] and *Janus Capital Group, Inc. v. First Derivative Traders,*[168] this Court can find that Irfan was not the "maker" of any of the false statements generated by Maiden Capital and presented to its investors, and therefore is not liable for any loss amount whatsoever.[169] The same is true of Irfan's conduct with respect to KIT Digital.

**5. The Supreme Court's Decision in *Stoneridge* Fairly Provides a Basis for this Court to find No Loss Attributable to Irfan.**

The facts of *Stoneridge* nearly mirror those in both the Maiden Capital and KIT Digital counts. In *Stoneridge*, investors sued entities who allowed the company to mislead its auditor and issue a misleading financial statement.[170] The *Stoneridge* Court dismissed the complaint and held that the public could not have relied on the entities' undisclosed deceptive acts. Significantly, in reaching that conclusion the Court emphasized that "nothing [the defendants] did made it necessary or inevitable for [the company] to record the transactions as it did." [171]

Accepting the jury's verdict that Irfan sent Steve Maiden false Enable statements, *Stoneridge* suggests that Irfan still cannot be held liable for the loss in Maiden Capital because a) the investors could not have relied on Irfan's undisclosed deceptive acts, and b) nothing Irfan did "made it necessary or inevitable for [Maiden Capital] to record the transactions as it did."  As Maiden admits, he is the only person who received the Enable statements; he used the *information* from those statements to pass on to his accounting team, and *never* did any Maiden

---

[167] 522 U.S. 148 (2008)

[168] 564 U.S. 135, 142 (2011)

[169] *See also* this Court's ruling in *In re THE RESERVE FUND SECURITIES AND DERIVATIVE LITIGATION*, Nos. 09 MD.2011(PGG), 09 Civ. 4346(PGG), 2012 WL 12356743 (S.D.N.Y. October 8, 2012).

[170] *Stoneridge*, 522 U.S. at 152-53.

[171] *Id.* at 616.

Capital investor ever see an Enable statement created by Irfan.

### 6.  The Supreme Court's Decision in *Janus* Also Fairly Provides a Basis for This Court to Find No Loss Attributable to Irfan.

Following and expanding on its ruling in *Stoneridge*, the Supreme Court considered the question of "who is the maker" of a false statement to determine liability a Rule 10b-5 civil securities fraud case in *Janus*.  The *Janus* court held "that the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it. Without such authority, it is not 'necessary or inevitable' that any falsehood will be contained in the statement."[172]

As the Court reasoned:

One "makes" a statement by stating it. When "make" is paired with a noun expressing the action of a verb, the resulting phrase is "approximately equivalent in sense" to that verb. 6 Oxford English Dictionary 66 (def.59) (1933) (hereinafter OED); accord, Webster's New International Dictionary 1485 (def.43) (2d ed. 1934) ("Make followed by a noun with the indefinite article is often nearly equivalent to the verb intransitive corresponding to that noun"). For instance, "to make a proclamation" is the approximate equivalent of "to proclaim," and "to make a promise" approximates "to promise." See 6 OED 66 (def.59). The phrase at issue in Rule 10b–5, "[t]o make any ... statement," is thus the approximate equivalent of "to state."

[5] For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances *143 is strong evidence that a statement was made by—and only by—the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame —for what is ultimately said.[173]

Leaving no doubt as to the impact of the *Stoneridge* ruling on *Janus*, the Court stated,

---

[172] *Janus*, 564 U.S. at 144.
[173] *Id.* at 142.

"We see no reason to treat participating in the drafting of a false statement differently from engaging in deceptive transactions, when each is merely an undisclosed act preceding the decision of an independent entity to make a public statement."[174]  Thus under *Janus*, Irfan is not the "maker" of any false statements in either the Maiden Capital *or* the KIT Digital counts, and should not be liable for any loss whatsoever.

The Second Circuit has expressly endorsed looking to civil law in determining loss calculation in criminal cases in *United States v. Rutkoske*.[175]  In *Rutkoske*, the Second Circuit found that the Supreme Court's ruling in *Dura Pharmaceuticals, Inc. v. Broudo*[176]—a civil securities fraud case—provided useful guidance in determining loss amount in a criminal case. "We see no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence."[177]

*Rutkoske* held that "the loss must be the result of the fraud. Many factors may cause a decline in share price between the time of the fraud and the revelation of the fraud. In such cases, '[l]osses from causes other than the fraud must be excluded from the loss calculation.'"[178] Following the rulings in *Stoneridge* and *Janus* ultimately leads to the same place in criminal loss calculation under this Circuit's law as espoused in *Rutkoske*: any loss attributable to Irfan must be the result of his fraud. In other words, in order to count losses against Irfan, the Court must find that "but for" Irfan's fraud, those losses would not have occurred.

The Government tip-toes down the steps of reason, to land softly on the floor of

---

[174] *Id.* at 145.
[175] 506 F.3d 170 (2d Cir. 2007)
[176] 544 US 336 (2005)
[177] *Rutkoske, 506 F. 3d at* 179.
[178] *Citing US v. Ebbers, 458 F.3d 110 (2d Cir. 2006)* (emphasis added, internal citations omitted).

absurdity, in suggesting that Irfan's Enable statements—which were never seen by a single investor in either Maiden Capital or KIT Digital—*caused* the losses in those entities. How could they? This is especially true given that both Maiden Capital and KIT Digital were free-standing fraudulent enterprises before March 2009. The losses clearly came from years of elaborate fraud committed by the people who ran those entities, and were not the result of statements sent by Irfan which no investor ever saw.

### 7.   There Should Be No Loss Attributable to Irfan from KIT Digital

KIT Digital was a proper festival of frauds. Straight from the C-suite, KIT Digital manipulated markets, engaged in illegal roundtripping, found countless recipes to cook its books, and made bogus SEC filings quarterly and annually—all hoping to pull off its ultimate heist: to sell the whole kaboodle and walk away with a gargantuan payout.

Almost none of this sprawling scheme was known to Irfan; his only role was to reluctantly verify—three times—KIT Digital's $2M holdings at Enable to KIT Digital's auditors. Irfan never directly made any statements to KIT Digital's investors or the SEC.

Without repeating the legal analyses above, we submit that each argument above is applicable to the Court's calculation of loss attributable to Irfan. Regarding the KIT Digital count, the reasoning of *Stoneridge* and *Janus* applies with equal force, and the Court can properly find that there is no loss attributable to Irfan for this count.

### VII.   A BALANCED CONSIDERATION OF ALL RELEVANT FACTORS UNDER 18 U.S.C. § 3553(a) DEMONSTRATES THAT A SENTENCE WELL BELOW THE GUIDELINES RANGE IS SUFFICIENT, BUT NO GREATER THAN NECESSARY, TO ACHIEVE THE GOALS OF SENTENCING

18 U.S.C. § 3553(a) directs that a court "shall impose a sentence *sufficient*, *but not greater than necessary*, to comply with the purposes set forth in paragraph (2) of this subsection," which include: "(A) to reflect the seriousness of the offense, to promote respect for

the law, and to provide just punishment for the offense," "(B) to afford adequate deterrence to criminal conduct," "(C) to protect the public from further crimes of the defendant," and "(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."[179] In addition to considering each of these purposes, the court also "shall consider" "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3554(a)(1)), "the kinds of sentences available" (18 U.S.C. § 3554(a)(3)), "the kinds of sentence and the sentencing range established" under the applicable Sentencing Guidelines (18 U.S.C. § 3554(a)(4)), and "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct" (18 U.S.C. § 3554(a)(6)).

Accordingly, the range calculated under the Guidelines is purely advisory and serves as just one of many factors that the Court is required to "consider" when fashioning an appropriate sentence.[180] "[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."[181] Indeed, "[e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the [18 U.S.C.] § 3553(a) sentencing factors."[182]

After thorough consideration of all the relevant factors, Irfan Amanat respectfully submits that an appropriate custodial sentence in this case would be time-served (approximately thirty-three months' imprisonment in the MDC as of the date of this filing on July 16, 2021, and longer by the date of sentencing). As is set forth below, such a sentence is consistent with

---

[179] 18 U.S.C. § 3553(a)(2) (emphasis added).
[180] *U.S. v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005)
[181] *Rita v. U.S.*, 551 U.S. 338, 351 (2007)
[182] *U.S. v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010)

sentences imposed on similarly situated defendants, takes account of the other circumstances of this case discussed herein, and is "sufficient, but not greater than necessary" to achieve the goals of criminal punishment under 18 U.S.C. § 3553(a).

### A. A Sentence Well Below the Guidelines Range Is Consistent With Sentences Imposed On Substantially Similar Defendants Convicted Of Similar Conduct

18 U.S.C. § 3553(a)(6) directs this Court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Cases in this District, as well as nationally, have *frequently* resulted in sentences substantially below the Guidelines range. The national average sentence in 2019 for fraud cases was 21 months, and in the SDNY it was 19 months. The median sentences in both were 12 months. Significantly, 54.2% of fraud cases in the Second Circuit received a variance from the guidelines at sentencing and only 26.2% of fraud cases in the Second Circuit received a guideline sentence.[183]  In 2020, the national mean sentence in fraud cases was 19 months, and the median was 8 months; the Second Circuit mean was 19 months, and the median was 12 months.[184] And in 2020, **59.2%** of fraud cases in this circuit received a downward variance.[185]

### 1. Irfan's Life Of Service To His Community, Friends and Family Warrant Leniency

One of the first factors identified for consideration under 18 U.S.C. § 3553(a) is "the history and characteristics of the defendant." As recognized by this Court in *U.S. v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006):

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.

---

[183] Ex. I, USSC Statistics for 2019
[184] Ex. J, USSC Statistics for 2020
[185] *Id.*

> This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics" of the defendant.

Irfan is not the typical defendant in a financial fraud case. Irfan is not a man motivated by greed or self-interest. He is a man whose actions, both professionally and privately, are motivated by a genuine desire to help others.

The more than 80 letters of support confirm Irfan's boundless generosity. Many of them recount stories of the worst moments in their lives—deaths of family members, diagnoses of serious illnesses—and the common theme for each of them is that Irfan is the one who supported them when they were at their lowest. Irfan has worked incredibly hard his whole life, from studying hard in school, to taking care of everyone around him. And he has done it with humility and respect for everyone. [186]

Unlike the greedy criminals who used Irfan to further their secret criminal enterprises—motivated by their hubris and desire for money—letter after letter shows that Irfan is fulfilled by his personal relationships, not profits.

In his family he has been the lynchpin between generations—the perfect son and father at the same time. His now-widowed mother and four innocent children are the priorities in his life. At only 50 years old, Irfan has much more to offer to the world. An extended incarceration does not serve the ends of justice here.

### B.  A Sentence Well Below The Guidelines Range Will Be More Than Sufficient To Achieve The Goals Of Specific And General Deterrence

18 U.S.C. §3553(a)(2) requires this Court also to consider the need to "afford adequate

---

[186] *See Gupta*, 904 F. Supp. 2d at 353 (issuing below-Guidelines sentence based on letters of support describing defendant's "big heart and helping hand, which he extended without fanfare or self-promotion, to all with whom he came in contact").

deterrence to criminal conduct" and to "protect the public from further crimes of the defendant," which courts have interpreted to mean both specific and general deterrence.[187]

It seems clear that there is no need for specific deterrence in this case as Irfan is extremely unlikely to be a repeat offender. Irfan is a first-time offender who has been convicted of providing account statements after he admitted to Maiden and Tuzman that he was unable to return their money at that time.  Irfan certainly has no intention of maintaining his prior relationship with Maiden, Tuzman, anyone who knows them, or any of the witnesses in the Government's case.

Further, while the Eighth Amendment limits what punishment this Court can impose, it has absolutely no sway with the Fates, who have already extracted the cruelest punishments from Irfan. If anyone were to suggest that for Irfan's involvement here, he should be detained for thirty-three months in the most barbaric conditions during the worst pandemic in 100 years, not be able to see any of his children or family because of the pandemic, have his wife of 24-years divorce him, not be able to care for—or even say goodbye to—his beloved father, and helplessly watch his 81-year old mother become widowed and alone, that would shock the conscience. Irfan has been punished enough, and no further imprisonment is required to ensure that the criminal justice system never hear of him again.

In addition, this case has of course already cost him dearly. Once a role model to all, he has been publicly shamed among his friends, family, and children. Even more important to him, he has now missed crucial years in his children's lives. Irfan would never do anything to jeopardize missing more time with his children.  He knows the emotional and psychological toll that his children have already been forced to pay.  These are harms for which he will spend the

---

[187] *See Gupta*, 904 F. Supp. 2d at 352.

rest of his life atoning. Statistics also show that Irfan is highly unlikely to be a repeat offender. Publications by the U.S. Sentencing Commission confirm that true "first offenders" like Irfan, with no prior convictions or arrests, have an "extremely low recidivism rate".[188] The U.S. Sentencing Commission has also reported that defendants convicted of fraud-related crimes are less likely to recidivate than defendants convicted of any other crimes.[189]

Although Irfan understands that the Court must also consider the needs of general deterrence when fashioning an appropriate punishment, we respectfully submit that the goals of general deterrence have already been achieved and that further prison time will not advance those goals. As discussed extensively, as of this filing he has already served thirty-three months' in prison under very harsh conditions and has been punished much more severely than the typical non-violent financial crimes offender serving the same amount of time. Moreover, scholars have consistently concluded that it is the *certainty* of punishment, rather than its *severity*, that is the most effective deterrent for financial crimes.[190]

---

[188] United States Sentencing Commission, *Recidivism And The "First Offender"* (May 2004), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf at page 17 (reporting a 6.8% recidivism rate for true first time offenders). This study notably does *not* differentiate between different types of crime even though defendants convicted of fraud are the least likely to recidivate

[189] United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (March 2016), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf at 20

[190] *See U.S. v. Velazquez*, No. 16-cr-233, 2017 WL 2782037, *4 (S.D.N.Y. May 26, 2017) ("Current empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, 'increases in severity of punishments do not yield significant (if any) marginal deterrent effects . . . Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence.'") (citation omitted). This is especially true with white-collar offenders. *See*, Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform (Punishment Purposes)*, 58 Stan. L. Rev. 67, 80 (2005). Thus, there is no empirical reason to believe that Irfan's continued incarceration beyond the time he has already served will provide more effective general deterrence.

*C.   An Extended Period Of Incarceration Will Impose Substantial Burdens On Irfan's*
*Mother and His Four Children In The Middle Of A Global Pandemic*

Even before the Supreme Court's ruling in *U.S. v. Booker*[191] clarified that the Sentencing

Guidelines are only advisory, the Second Circuit held that "extraordinary family circumstances"

were a valid basis for granting a downward departure from the Sentencing Guidelines.[192] Post-

Booker, the Second Circuit has continued to recognize that Courts should consider the burden a

sentence will impose on innocent family members when fashioning an appropriate sentence.[193]

Consistent with this guidance, judges within the Southern District have repeatedly issued

sentences well below the Guidelines range in comparable cases based, in part, on determinations

that lengthy incarcerations would place significant burdens on the defendants' family members.

For example, in *United States v. Blaszczak*, Judge Kaplan recently imposed a sentence

well below the Guidelines range on an insider trading defendant who was convicted after trial

based upon the burden that lengthy incarceration would impose on his wife and child. The facts

were as follows: For six years, David Blaszczak sold inside information to hedge fund clients

that they used to realize over $7 million dollars in gains.[194] Blaszczak was paid more than

$700,000 for that information.[195] Judge Kaplan determined that Blaszczack had "aggressively"

pursued sources of inside information that he could sell and was "bold, unapologetic, and giddy

about what he was doing."[196] Under the Sentencing Guidelines, Judge Kaplan calculated an

---

[191] 543 U.S. 220 (2005)

[192] *See U.S. v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992).

[193] *See, e.g.*, *U.S. v. Isola*, 548 Fed. Appx 723, 725 (2d Cir. 2013) (identifying "[defendant's] family circumstances and the effects of his incarceration on his daughter" as one of the factors to be considered under 18 U.S.C. § 3553(a)); *U.S. v. Bills*, 401 Fed. Appx 622, 624 (2d Cir. 2010) (holding that "the likely effects of [defendant's] incarceration on her daughter" were one of the "mitigating factors" that was appropriately considered under 18 U.S.C. § 3553(a)).

[194] Ex. K at 2-3.

[195] *Id*. at 9.

[196] Ex. L at 62:15-24.

offense level of 26, resulting in a sentencing range of 63- 78 months.[197] And yet, Judge Kaplan sentenced Blaszczak to only 12 months and one day in jail, plus two years of supervised release.[198] The sole reason offered on the record for this substantial deviation from the Guidelines was that Blaszczak's wife, who had a degenerative eye disease, and child would be severely burdened by his absence. Judge Kaplan stated: "[t]he wreckage that a long period of incarceration would wreak on her and on your son is horrifying to me. And the sentence I am going to impose on you is going to reflect that."[199]

There can be no doubt that Irfan's absence imposes an enormous burden on his mother and children. We submit that a sentence of time-served instead of extended incarceration would mitigate these risks to his family while satisfying the requirements of Section 3553(a).

### D. *Irfan Has Already Been Punished More Severely Than Similarly Situated Defendants*

18 U.S.C. § 3553(a)(6) directs this Court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." The conditions under which Irfan has been in custody for the last thirty-three months have been much more punitive than those ordinarily imposed on non-violent, first-time financial crime offenders. This fact should be considered in fashioning a fair sentence that is equivalent to the sentences typically imposed on such offenders.

Most first-time white-collar offenders self-surrender after sentencing to a minimum-security BOP camp. But the MDC, where Irfan has been housed is, according to the BOP, designed to hold "extremely dangerous, violent, or escape-prone inmates."[200] A former MDC

---

[197] *Id.* at 22:19-23:1
[198] *Id.* at 72:6-13
[199] *Id.* at 70:19-22
[200] https://www.bop.gov/about/facilities/federal_prisons.jsp?device=mobile, Dienst, Jonathan,

warden stated that it is "one of the most troubled, if not the most troubled facility in the Bureau

of Prisons."[201] In recent winters, both the MCC and MDC have gone for periods without heat or

light in the cells.[202] Judge Berman at a recent sentencing stated the following about both

facilities:

> I've personally become acutely aware of the deficiencies at both the MDC,
> particularly everybody remembers that last winter, the absence of heat, light, hot
> water. It was just a disaster over there during one of the coldest weeks of the
> winter….Frankly it was unacceptable, beyond unacceptable, conditions of an
> emergency to be sure, but based on a seriously deficient system at core, which I
> frankly think is still deficient….To my knowledge, there have been no forthcoming
> serious reviews of the living conditions at either the MCC or the MDC. It is an
> outrage, I have to say, and I'm very disappointed that the Attorney General . . . has
> not implemented appropriate changes….Those of us on the bench in the Southern
> District and Eastern District were fully – not fully, I would say – but anecdotally,
> for each of our cases, apprised of the unfortunate terrible conditions in these two
> federal facilities. They are dirty. They are infused with drugs. . .There is violence

---

Memo: MCC Enters 7th Day of Lockdown, Unclear When Operations Will Return to Normal,
*NBC New York* (Mar. 4, 2020), *available at* https://www.nbcnewyork.com/news/local/crime-
and-courts/mcc-enters-7th-day-of-lockdown- unclear-when-operations-will-return-to-normal-
memo-shows/2312475/?amp, Aratani, Lauren, Rats and raw sewage: Jeffrey Epstein jail
blighted by 'horrible' conditions, *The Guardian* (Aug 17, 2019), *available at*
https://www.theguardian.com/us- news/2019/aug/17/jeffrey-epstein-new-york-metropolitan-
correctional-center-jail., Stahl, Aviva, Prisoners Endure A Nightmare 'Gulag' In Lower
Manhattan Hidden In Plain nightmare-gulag-in-lower-manhattan-hidden-in-plain-sight;
Kudnani, Arun, The Guantanamo In New York You're Not Allowed to Know About, *The
Intercept* (Feb. 5, 2016), *available at* https://theintercept.com/2016/02/05/mahdi-hashi-
metropolitan-correctional-center-manhattan- guantanamo-pretrial-solitary-confinement/;
Goldstein, Joseph, Manhattan Jail That Holds El Chapo Is Called Tougher Than Guantanamo
Bay, *New York Times* (Jan 23, 2017), *available at*
https://www.nytimes.com/2017/01/23/nyregion/el-chapo-guzman-manhattan-jail.html.
[201] Annie Correal and Joseph Goldstein, "It's Cold as Hell": Inside a Brooklyn Jail's
Weeklong Collapse. *New York Times* (Feb. 9, 2019), *available at*
https://www.nytimes.com/2019/02/09/nyregion/brooklyn-jail-no-heat-inmates.html
[202] *See* Brown, Stephen Rex, Federal Jail where Jeffrey Epstein killed himself gets new
leadership, including lawyer at center of heating crisis in Brooklyn lockup, *Daily News* (Jan. 12,
2020), *available at* https://www.nydailynews.com/new-york/ny-mcc-epstein-warden-20200112-
ydboox34k5cxpbi5lzx2mc3gvu-story.html (noting heating issues at both MCC and MDC); *see
also* Annie Correal and Joseph Goldstein, "It's Cold as Hell": Inside a Brooklyn Jail's Weeklong
Collapse. *New York Times* (February 9, 2019), *available at*
https://www.nytimes.com/2019/02/09/nyregion/brooklyn-jail-no-heat-inmates.html

that goes on…[203]

The pre-existing harsh conditions at the MDC have only been exacerbated by the outbreak of COVID-19. Irfan has already experienced much harsher conditions than similarly situated defendants who serve their sentences in less restrictive facilities and circumstances. And judges within the Southern and Eastern Districts regularly consider at sentencing factors beyond a defendant's control that would increase the severity of the sentence. Additionally, it is important to note that, despite the harsh conditions of his confinement, Irfan has been a model prisoner. He has also done his best to be present in his children's lives.

> B.  *A Sentence of Time-Served Serves the Interests of the Federal Prison System and Is Fair to Irfan*

Sentencing Irfan to time-served also serves two other important interests. First, releasing Irfan will greatly reduce his risk of contracting coronavirus, which has spread widely in the federal prison system, where (as of July 14, 2021) 43,168 prisoners have tested positive and 240 have died.[204]

Second, both courts and the Attorney General of the United States have acknowledged that reducing the population inside crowded BOP facilities will reduce the spread of the virus.[205]

Along those lines, on March 26, 2020, the Attorney General issued a directive to the Bureau of Prisons stating that "One of the BOP's tools to manage the prison population and keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain

---

[203] Ex. M at 13:5-15:19.

[204] Federal Bureau of Prisons COVID-19 Resource Page, available at https://www.bop.gov/coronavirus/index.jsp.

[205] *See U.S. v. Nkanga*, 18-CR-713 (JMF), 2020 WL 1529535 *1 (SDNY Mar. 31, 2020), reconsideration denied, 18-CR-713 (JMF), 2020 WL 1695417 (SDNY Apr. 7, 2020) (Judge Furman: "the best – perhaps the only -- way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible").

circumstances." He directed the BOP to consider releasing "inmates who are non-violent and pose minimal likelihood of recidivism" to home confinement, and listed several factors to consider, including the CDC health risk factors of the inmate, whether the inmate was in a low security facility, the inmate's conduct in prison, the inmates score on BOP's recidivism scoring system, whether the inmate has a verifiable reentry plan (including a stable place to serve home confinement) and the inmate's crime of conviction.[206] On April 3, 2020, the Attorney General issued another directive, making the finding under the CARES Act that BOP faces "emergency conditions," thereby granting BOP statutory authority to expand the group of inmates who could be considered for home confinement.[207] The AG further directed that "time is of the essence" and that eligible inmates should be transferred home immediately if they can successfully quarantine at home and even if electronic monitoring was not currently available.[208] Pursuant to these directives, as of the date of this filing, BOP has released more than 3800 federal inmates to home confinement.[209]

In addition, hundreds others have been granted compassionate release either by courts or by BOP. Many of those being released have served only a fraction of their sentence, including, for example, Michael Cohen, who is 53 and was released to home confinement for the remainder of his three year sentence after serving only one year,[210] Paul Manafort, who was released to home confinement after serving only three of his seven year sentence,[211] a former mayor who

---

[206] Ex. N.

[207] Ex. O.

[208] *Id*.

[209] *Id.*

[210] Gurman, Sadie, *Trump's Lawyer Michael Cohen Released To Home Confinement*, *The Wall Street Journal*, (May 21, 2020) *available at* https://www.wsj.com/articles/trumps-former-lawyer-michael-cohen-released-to-home-confinement-11590075443

[211] Faulders, Katherine, *Former Trump Campaign Chairman Paul Manafort Released to Home*

was sentenced to 20 years for bribery but was released to home confinement after only eight years,[212] and a 51-year-old CEO released to home confinement after serving only 4 years of his 7.5 year sentence for tax evasion.[213] Unfortunately, as he had not yet been sentenced, Irfan did not qualify for early release to home confinement like these other defendants.

We submit that under these circumstances, a sentence of time-served serves the ends of punishment and is consistent with BOP's current efforts to reduce the prison population, especially with respect to non-violent offenders who present a low risk of recidivism.

---

Confinement Amid Coronavirus Concerns, *ABC News*, (May 13, 2020) *available at* https://abcnews.go.com/Health/trump-campaign-chairman-paul-manafort-released-home-confinement/story?id=70642927
[212] Former St. Gabriel mayor released early from federal prison, *WAFB9*, (May 28, 2020) *available at* https://www.wafb.com/2020/05/28/former-st-gabriel-mayor-released-early-federal-prison/
[213] Killman, Curtis, Former Arrow Trucking CEO released from prison to go to home confinement, *Tulsa World*, (May 7, 2020), *available at* https://www.tulsaworld.com/news/local/crime-and-courts/former-arrow-trucking-ceo-released-from-prison-to-go-to-home-confinement/article_e51e30a4-2f4f-5f24-9a4e-9280ae9d5cc8.htm

## VIII.   CONCLUSION

Irfan Amanat is an exceptional man who has already been punished extensively as a result of his indictment and conviction in this case. Given his history and characteristics, the facts of his crime, the extraordinarily harsh conditions of his confinement, and the severe burdens that lengthy incarceration will have on his mother and young children, we respectfully request that the Court impose a sentence of time-served.

Dated: July 16, 2021

Respectfully submitted,

CHAUDHRYLAW PLLC

By:____/s/_____
Priya Chaudhry
Seth J. Zuckerman
45 West 29th Street, Suite 303
New York, New York 10001
priya@chaudhrylaw.com
szuckerman@chaudhrylaw.com
Tel.: (212) 785-5550
Fax: (212) 898-9040

*Attorneys for Defendant*
*Irfan Amanat*

## **<u>CERTIFICATE OF SERVICE</u>**

I, the undersigned, hereby certify that on the 16th day of July 2021, I electronically filed this Sentencing Memorandum On Behalf Of Irfan Amanat, and the exhibits annexed thereto, using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.


<u>/s/ Priya Chaudhry</u>
Priya Chaudhry

*Attorney for Defendant Irfan Amanat*