

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 16, 2021

BY CM/ECF

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

   Re: United States v. Irfan Amanat
     15 Cr. 536 (PGG)

Dear Judge Gardephe:

  The Government writes in advance of sentencing for Irfan Amanat ("Irfan") and in response to the Court's order (Dkt. No. 1196) to respond to Irfan's August 12, 2021 supplemental sentencing memorandum (Dkt. No. 1193 ("Irfan Mem.")). As set forth in the Government's August 4, 2021 sentencing memorandum (Dkt. No. 1181 ("Gov. Mem.")), a sentence within the Guidelines recommended range of 87 to 108 months' imprisonment is warranted in this case under the section 3553(a) factors including based on the magnitude of Irfan's offenses, the need to impose just punishment, and the need to afford adequate deterrence.

  In its sentencing memorandum, the Government properly argued that Irfan's prior SEC ban was relevant for sentencing in connection with the proper Guidelines calculation and for consideration under the section 3553(a) factors. Whether or not he was previously convicted of a criminal violation, the import of the prior SEC ban is that Irfan is clearly not a first-time offender of the securities laws; both the SEC and the Third Circuit have affirmed that, prior to the instant scheme, Irfan violated the securities laws. Irfan Mohammed Amanat, S.E.C. Release No. 54708 (Nov. 3, 2006), 2006 WL 4958610, *appeal denied, Amanat v. S.E.C.*, 269 Fed. App'x 217 (3d Cir. 2008) (the "Irfan Ban"). The import of the Irfan Ban is twofold. First, it serves as a proper basis for a two-level enhancement under U.S.S.G. § 2B1.1(b)(9)(C) (applying two-level enhancement for conduct that constitutes "a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines"). The prior SEC bar provides that Irfan "cease and desist from committing or causing any violations or future violations of Section 10(b) or Rule 10b-5 of the Securities Exchange Act of 1934." (the Irfan Ban). Here, through his conviction on Count Six, Irfan was found to have engaged in a conspiracy to commit securities fraud (namely, to violate Section 10(b) and Rule 10b-5), to make false statements in SEC reports, and to mislead auditors. Although the jury's verdict does not clearly state which object or objects they based their conviction on, for Guidelines calculation purposes, the Court can easily find, by a preponderance of the evidence that, by helping KITD, a public company, misreport its cash balance to investors, Irfan conspired to commit and caused the commission of a

section 10(b) violation. Accordingly, the two-level enhancement applies. Although that enhancement was included in Irfan's final PSR (PSR ¶ 80), Irfan did not even challenge it in his original sentencing submission and only now challenges the enhancement in his supplemental submission. But his eleventh-hour challenge is meritless. Irfan argues that because the Government has conceded that it cannot squarely prove that *Enable* traded "securities" as that term is defined by the securities laws, Irfan could not have been involved in a section 10(b) violation with respect to KITD. (Irfan Mem. 7). However, whether or not Enable was involved in securities trading, KITD plainly issued securities that serve as a predicate for a section 10(b) violation and accordingly, Irfan violated that section through his fraudulent conduct in connection with KITD. The Government's view concerning whether Enable traded securities affects only whether Irfan's work with Enable creates an association with a broker-dealer or investment advisor as required for an enhancement under U.S.S.G. § 2B1.1(b)(20). It has no impact on whether Irfan's role in the KITD fraud constitutes a violation of section 10(b) – as a jury found, it does.

Furthermore, Irfan's prior SEC ban is highly relevant for the Court's section 3553(a) consideration. As explained in the Government's memorandum, the fact that Irfan previously violated the securities laws (and was on notice not to re-violate) heightens his culpability and suggests that the sentence imposed needs to be sufficient to afford specific deterrence to Irfan not to continue his pattern of fraud. *See, e.g.*, U.S.S.G. § 2B1.1, Application Note 8(C) (explaining that this section embodies a judgment by the sentencing commission that an individual who does not comply with such a prior order demonstrates "aggravated criminal intent and deserves additional punishment."). Irfan's submission also tries to downplay the seriousness of his prior violation by claiming that SEC bans can be based on recklessness. (Irfan Mem. 4). But here, the SEC and the Third Circuit clearly believed that Irfan's violation was willful. (*See, e.g.*, the Irfan Ban at 219 ("The Commission's Division of Enforcement instituted civil administrative proceedings against Amanat, alleging that he *willfully* violated § 10(b) and Rule 10b–5"); *id.* ("On administrative appeal, the Commission conducted an independent review of the record and reversed, finding that Amanat *willfully* violated § 10(b) and Rule 10b–5."); 220 ("[T]he conclusion reached by the Commission*, i.e.,* that Amanat *willfully* violated § 10(b) and Rule 10b–5, is reasonable and supported by substantial evidence."). The Third Circuit also affirmed the SEC's finding that Irfan "posed a risk of violating the securities laws in the future." *Id.* Accordingly, and for the reasons set forth in the Government's sentencing memorandum, the Court should consider Irfan's prior SEC ban in both its Guidelines calculation and in its consideration of the section 3553(a) factors.

Irfan also complains that the Government supposedly takes inconsistent positions by holding Irfan accountable for the entire Maiden Capital loss while only holding Irfan accountable for the funds at KITD that were lost through Enable. (Irfan Mem. 4-5). This argument is a moot point, and is also incorrect. As a threshold matter, the argument is moot inasmuch as for the reasons set forth in the Government's sentencing memorandum whether Irfan is held liable for the entire Maiden Capital loss, or just the portion that was lost specifically by Enable, has no impact on the Guidelines calculation here. The entire Maiden Capital loss is estimated by the Government to be approximately $7.2 million. (Gov. Mem. 6). When the fund collapsed, Irfan was providing false statements about holdings of approximately $2.5 million at Enable. (*Id.* 7). Whether one combines $7.2 million or $2.5 million with the additional $2 million of loss related to KITD, that

Hon. Paul G. Gardephe
August 16, 2021
Page 3

results in an 18-level enhancement under U.S.S.G. § 2B1.1(b)(1)(J). Accordingly, even if the Court only held Irfan liable for the losses at Enable in connection with both schemes, the Guidelines calculation would remain unchanged.

More fundamentally, however, the Government's argument that Irfan should be held liable for all losses in connection with Maiden Capital but not KITD is appropriate in light of the facts of this case. With respect to Maiden Capital, just as the Court has previously found with respect to Omar, it was easily foreseeable to Irfan, a sophisticated businessman, that losing $2.5 million from a fund run by a single manager whose total worth was only under $8 million and lying about those funds could seriously threaten the entire solvency of the fund. (Dkt. No. 1179 at 33 ("It is reasonable to hold [Omar] Amanat responsible for the collapse of Maiden Capital, because the evidence showed that he was aware that Maiden Capital was a small fund, and that Maiden's investment in Enable represented a significant portion of Maiden Capital's total assets.")). By contrast, KITD was a much larger entity and a publicly-traded media company, and is it far less obvious (without knowing about the other accounting fraud being perpetrated internally) that Enable's lies about approximately $2 million in cash would put the entire company on the brink of insolvency. Accordingly, the Court should find that Irfan, like Omar, should be held accountable for the entire amount of Maiden Capital's losses whether or not he can be reasonably held accountable for the entirety of KITD's losses.

Irfan also complains about the Government's supposed claim that Irfan "squandered [Enable's] money in Dubai," and asserts that that "claim" is inconsistent with the Government's not seeking forfeiture in this case. (Irfan Mem. 6). This line, however, is taken out of context from the Government's sentencing memorandum and bears no connection to the issue of forfeiture. Throughout his sentencing memo, Irfan claims that there is no evidence that he "stole" the money from Enable, and relies on that point as a supposedly mitigating factor. (*See, e.g.*, Irfan's July 16, 2021 Sentencing Memorandum at 35, 52). In response, the Government was compelled to point out that the lack of evidence concerning what happened to Enable's money is not a mitigating factor; it is simply a consequence of the fact that Irfan was based out of Dubai and there is insufficient evidence to fully follow the trail of the dissipated funds. In other words, the Government is not claiming that Irfan personally spent those funds; as set forth in its memorandum, the Government does not have specific evidence of that fact. That is also why the Government is not seeking forfeiture. Equally, however, the Government does not have evidence that Irfan did not steal that money, and Irfan has provided no real evidence (other than his self-serving statements) to explain what actually happened to the money and why he had never recovered it. And the explanations he has provided do not square with the evidence. For example, contrary to Irfan's assertions that the funds were simply frozen at Enable's trading accounts, the evidence at trial showed that millions of dollars were lost through poor trading. (GX-693-D). Given those facts, the lack of evidence of outright theft is simply not a mitigating factor.

Finally, the defendant leans heavily on the current COVID-19 circumstances as a reason for a significant break at sentencing. The Government has never asserted that COVID is a "fantasy"; the Government cannot fathom what that accusation is even based on. While the Government readily acknowledges the difficulties faced by prisoners, and the world at large, over the last approximately eighteen months, the Government does not believe that that should serve as

Hon. Paul G. Gardephe
August 16, 2021
Page 4

a virtual get-out-of-jail-free card. The defendant has been incarcerated pre-sentencing in difficult conditions because he committed serious crimes and presents a real risk of flight. The Government defers to the Court on what, if any, further role those conditions should play in sentencing, but may also be mindful of the fact that post-sentencing, Irfan is likely to be moved to a facility with more space and opportunities than MCC or MDC, and Irfan is currently vaccinated against COVID-19.

        Respectfully submitted,

        AUDREY STRAUSS
        United States Attorney

By: _____/s/_____
        Joshua A. Naftalis
        Andrea M. Griswold
        Daniel Tracer
        Assistant United States Attorneys
        (212) 637-2310/1205/2329

cc:    Defense counsel (by CM/ECF)