UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

IRFAN AMANAT,

                              Defendant.

**MEMORANDUM**
**OPINION & ORDER**

15 Cr. 536 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Irfan Amanat ("Amanat") is charged with participating in fraudulent

schemes involving Maiden Capital – a North Carolina-based hedge fund – and KIT Digital, Inc.

– a software management company based in Prague and New York City.  ((S8) Indictment

("Indictment") (Dkt. No. 198))  The (S8) Indictment charges Amanat with

> conspiring to commit wire fraud in connection with a scheme to defraud Maiden Capital
> investors between March 2009 and June 2012 (Count One);

> substantive wire fraud in connection with that scheme (Count Two);

> aiding and abetting investment adviser fraud carried out by Stephen Maiden – who
> operated Maiden Capital – between March 2009 and June 2012 (Count Three); and

> conspiring to commit securities fraud between 2009 and 2012 by making false statements
> to auditors and in U.S. Securities and Exchange Commission ("SEC") filings to conceal
> KIT Digital's true operating and financial performance.  (Count Six)

(Indictment (Dkt. No. 198))[1]

Amanat proceeded to trial on October 22, 2018.[2]  (Oct. 22, 2018 minute entry)

The Government called seven witnesses at trial and introduced more than 150 exhibits.  The

---

[1]  At trial, Count Six of the S8 Indictment is referred to as "Count Four."  (Trial Transcript
("Tr.") 706)
[2]  On August 9, 2017, this Court granted Amanat's motion for a severance.  (Aug. 9, 2017 Tr.
(Dkt. No. 380) at 5)  Accordingly, he was tried separately and after his co-defendants, Kaliel
Isaza Tuzman and Omar Amanat, who is Irfan Amanat's brother.

Government's proof included testimony from two cooperating witnesses:  Stephen Maiden, the former head of Maiden Capital, and KIT Digital chief financial officer Robin Smyth.  Amanat did not testify and called no witnesses.  On October 29, 2018, a jury found Amanat guilty on all four counts.  (Verdict (Dkt. No. 848))

Amanat has moved for a judgment of acquittal or a new trial under Rules 29 and 33 of the Federal Rules of Criminal Procedure.  (Amanat Br. (Dkt. No. 884))[3]  Amanat argues that (1) the evidence is insufficient as to both the Maiden Capital fraud conspiracy and the KIT Digital fraud conspiracy (id. at 6-16); (2) the Government did not show as to either conspiracy that he did not act in good faith (id. at 16-21); and (3) the Court erred in admitting evidence outside of the periods alleged in the charged conspiracies.  (Id. at 21-23)[4]

For the reasons stated below, Amanat's post-trial motions will be denied.

---

Omar Amanat is charged in Counts One, Two, Three, and Four of the (S8) Indictment, while Tuzman is charged in Counts Four, Five, and Six.  (See Indictment (Dkt. No. 198))  Tuzman and Omar Amanat's trial began on October 23, 2017, and ended on December 26, 2017, with their conviction on all counts.  (Verdict (Dkt. No. 627))  On May 3, 2021, this Court issued a Memorandum Opinion & Order denying Tuzman and Omar Amanat's post-trial motions (the "May 3, 2021 Opinion").  (May 3, 2021 Opinion (Dkt. No. 1145))

[3]  Amanat states that he "joins all post-trial motions of co-defendants Omar Amanat and . . . Tuzman" (Amanat Br. (Dkt. No. 884) at 4), but Amanat was tried separately, and his Rule 29 and Rule 33 arguments must be resolved on the basis of the evidence offered at his trial.

[4]  Citations to page numbers of docketed material correspond to the pagination generated by this District's Electronic Case Files ("ECF") system.  Citations to transcripts correspond to the pagination generated by the court reporter.

## BACKGROUND

I.   **EVIDENCE AT TRIAL**

A.   **Maiden Capital Fraud Conspiracy**

1.   **Maiden's Investment in Enable and Enable's
Issuance of Fabricated Monthly Statements**

Stephen Maiden managed Maiden Capital, a small hedge fund located in

Charlotte, North Carolina.  (Tr. 89)  In June 2008, Amanat's brother, Omar Amanat, asked

Maiden to make an investment in Enable Invest ("Enable"), a Dubai-based asset management

firm operated by Irfan Amanat.  (Tr. 110-15)  Omar Amanat told Maiden that Enable "was a

very safe, very liquid, cash-like investment in Dubai."  (Tr. 114)  Maiden at first declined the

invitation to invest in Enable (Tr. 113), but in August 2008, he invested $1 million in Enable on

behalf of Maiden Capital.  (Tr. 115, 117, 123-24; see also Tr. 201 (Maiden testifying that he

viewed Enable as liquid because that is what he was told by the Amanat brothers prior to

investing))

After Maiden invested in Enable, he began to communicate with Irfan Amanat,

who represented that he had "trading experience, financial trading experience, and also . . .

computer programming experience."  (Tr. 124)  Amanat was Maiden's contact at Enable when

Maiden "had questions about trading at Enable," and Amanat was the person who provided

Maiden with information concerning trades and the status of Maiden Capital's investment in

Enable.  (Tr. 125)

In September 2008, for example, Amanat and Maiden exchanged emails

concerning Maiden Capital's investment in Enable, and Maiden told Amanat "that the value of

the Enable investment would be shared with [his] investors."  (Tr. 128; see also Tr. 129 (Maiden

testifying that "[t]he substance of what [he] said [to Amanat] is that [he] had to e-mail out [his]

3

returns to [his] investors, and [Amanat] said, okay, I understand"); see also Tr. 126-28 (Maiden testifying about an email to Amanat in which Maiden requests information concerning the status of his investment, because he needed to communicate this information to his investors); GX 1504 (Sept. 2, 2008 Maiden email to Amanat: "Hey Irfan – I need to know what my $1 million investment was worth at end of Friday as it was the last day of the month and I therefore need it to price for my [net asset value] that I send to investors. Please send this asap – many thanks.")) Maiden made clear that he would share "the value of the Enable investment . . . with [his] investors." (Tr. 125-29; see Tr. 127 (Maiden testifying that at the end of each month he would price the value of all assets in his fund so that this information could be transmitted to his investors))

After Maiden made the $1 million investment in Enable, he received monthly statements from Enable showing the value of Maiden Capital's investment. (Tr. 137) In September 2008, for example, Amanat told Maiden that his $1 million investment had grown to $1,003,666.67 as of August 31, 2008. (Tr. 129; GX 1504) Amanat and Maiden had "multiple" conversations in which Amanat told Maiden that his investment was "doing well." (Tr. 130-31) In a September 16, 2008 email, for example, Amanat told Maiden: "We are making profits smoothly. I would like to make sure you are able to track and understand it." (Tr. 131-32; GX 1505)

In a September 30, 2008 email, Amanat attached a September 30, 2008 account statement showing that Maiden Capital's $1 million investment had grown to $1,025,666.67. (Tr. 135-38; GX 1507) Concerned that the value of the investment had declined, Maiden asked Amanat about the apparent loss. In an October 1, 2008 email Amanat said, "No, don't worry, you didn't lose money, it's just because you viewed the positions at different times of the day

. . . .”  (GX 1507)  In an October 12, 2008 email, Amanat told Maiden that Maiden Capital's

Enable investment had been "making good profits."  (Tr. 141; GX 1508)

When Maiden received his monthly Enable balance, he provided his fund

administrator – an accounting firm – with the Enable balance.  The accountant, in turn,

transmitted to Maiden Capital investors the "personal investment returns . . .  to the penny [of]

what their investment was worth."  (Tr. 198-99)

In November 2008, Omar Amanat asked Maiden to make an additional $2 million

investment in Enable, explaining that Enable needed a one-week short-term loan.  (Tr. 141-44)

Omar Amanat told Maiden that if he made the loan, Omar Amanat would cause another entity to

invest $5 million in Maiden Capital.  (Tr. 143; see id. (Maiden explaining that a $5 million

investment would be "hugely significant" for his fund, which then held about "10 million or so at

that point, so it would be a 50 percent increase in assets"))

Omar Amanat set forth the terms of the proposed short-term loan in a November

8, 2008 email to Maiden.  (Tr. 144-45; GX 1509).  That email – the subject line of which is

"Term Sheet Binding Agreement" – reads as follows:

> Agreement between Steve Maiden and Omar Amanat
>
> $2 million short term (anticipated to be no more than one week) investment into
> Enable Invest by Maiden Capital.
>
> In return Omar Amanat will cause Trade Up and Saxon International to invest at
> least $5 million (minimum) into Maiden Capital upon signing of the transaction
> with Russel Deleon whereby he invests $250 million as per the attached term
> sheet previously sent (anticipated to be this week[]).
>
> regards
>
> Omar Amanat

(GX 1509 (Nov. 8, 2008 Omar Amanat email to Maiden))

Omar Amanat told Maiden that Maiden Capital's $2 million would be used as "show money" to encourage another investor, Russell Deleon, to invest in Enable. (Tr. 142, 147-48, 430) Maiden decided to make the loan, sending $2 million of Maiden Capital funds to Enable in three separate wire transfers in November 2008. (Tr. 152-55; GX 606 (showing Maiden Capital wire transfers to Enable on November 10, 12, and 18, 2008)) Maiden's understanding was that the $2 million would remain at Enable for only one week. (Tr. 178) By November 21, 2008, however, none of Maiden Capital's money had been returned to Maiden, and he became "alarm[ed]." (Tr. 178) He was not able to reach Amanat, who was the "manager of Enable." (Tr. 178) Maiden noted that his investment in Enable was "a huge investment [for his] fund, almost a quarter of [its assets]." (Tr. 178; GX 1515 (an email on November 21, 2008 from Maiden to Amanat: "Hey irfan – can you please send me your full contact info. It has been tough to get in touch with you this week . . . which is alarming since I have 3 million w/ your fund – about ¼ of my whole fund. While 2 mill is temporary, please go above and beyond to communicate w/ me closely as my business is really at risk in that capital."))

At this same time – November 2008 – the Amanat brothers emailed each other about using Maiden Capital's investment to redeem a portion of KIT Digital's investment in Enable. (Tr. 174-76; GX 3053 (November 10, 2008 email between the Amanat brothers)) Maiden was not aware that KIT Digital had invested in Enable, much less that Maiden Capital's investment in Enable would be used by the Amanats to redeem a portion of KIT Digital's investment in Enable. (Tr. 156; GX 3053)

KIT Digital was a public company headed by Tuzman, who served as chief executive officer and chairman of the board.[5]  (Tr. 37, 39, 98-99)  KIT Digital sold software that "helped to facilitate video being sent over the Internet."  (Tr. 99)  KIT Digital had invested in Enable, but in a November 5, 2008 email to Amanat, Tuzman requested that KIT Digital's investment be redeemed, in light of "unacceptable delays in receiving cash upon request."  (GX 3051; see id. (Tuzman stating that "We will be sending you printed and attested correspondence to this effect tomorrow, but please begin the process of liquidating KIT digital's accounts (including the $3.0 million of KIT digital's funds being held in escrow for Visual Connection) and preparing for transfer as soon as possible."))  Amanat forwarded Tuzman's email to his brother, Omar Amanat, and asked for his help in formulating a response:

> Hey Om[ar],
>
> Can you help me make a decision on how to respond best?
>
> 1) We are sorry to hear of your decision, but will be happy to process your account as always.  Please note, as per my records, I received the request for $1,250,000 on Oct[ober] 28, and so we are still processing that request within our agreed upon two week window.
>
> 2) Keep the story simple: "Sorry, guys.  Have been busy on some matters.  Got caught up.  Remaining funds coming on X date.  Nothing to worry about. How else can I help you?["]

(Id.)

Omar Amanat responded as follows:

> You need to respond that "we understand and will process the termination as soon as practicable.  Please bear in mind that due to recent historic and unanticipated market conditions[,] funds have been placed with one counter-party who has a history of long delays in payments to us but has historically always come through.[]  We apologize for any inconvenience this has caused your firm and are seeking ways to rectify it immediately.["]

---

[5] KIT Digital was originally Roo Group.  (Tr. 212)  The company's name was changed to KIT Digital when Tuzman became its CEO.  (Tr. 499-500)  The new name reflects the initials of Tuzman's name.  (Tr. 500)

(Id.)

      Irfan Amanat responded to his brother's proposed language as follows:

You sure about this response?  Don't want to create any more concern, a little friendlier one would be better, no?

Anyway, trying to free up cash to pay the 1.05 million.  Any more funds you could get would be good. . . .

I think we triage on [KIT Digital] first.  Do you disagree?

(Id.)

      The Amanat brothers ultimately used Maiden Capital's short-term loan to fulfill KIT Digital's redemption request.  (Tr. 176)  As a result, Maiden Capital's $2 million was not returned after the agreed-upon one-week period.  (Tr. 183-86)  Maiden complained to the Amanats about the delay in returning these funds.  (Tr. 183 (Maiden testifying about a December 18, 2008 email to Irfan Amanat, in which he asks whether Maiden Capital is "at least earning interest on [the two million he sent the previous month] while it's sitting there?  Been longer than I hoped."))

      In a December 19, 2008 email to Irfan Amanat, Omar Amanat reported that

[Tuzman] spoke w[ith] Maiden where they apparently discussed difficulties getting money out of Enable.[]  Maiden has tried to reach me and is asking for his $2 [million] back.  In a world where everyone is suspicious.  This is a major problem and red flag for me.  As u know.  I don't have any ability to repay it. . . . This is a major disaster . . . if [M]aiden suspects fraud of some sort and notifies the authorities I'm cooked.  All in all this is some pickle of a situation this time.

(GX 2965; Tr. 185-86)

      In multiple conversations, primarily with Omar Amanat and Tuzman, Maiden was told to maintain Maiden Capital's investment in Enable for a longer period.  (Tr. 186-87)  Omar Amanat told Maiden that if he kept Maiden Capital's "two million there, . . . an arrangement [could be formed], a contract, where [Maiden] would receive additional value in KIT Media,

something called carry, basically profits on KIT Media."[6]  (Tr. 186-87)  Maiden was also told "that KIT Digital was doing really well as a company; that they were close to possibly being sold."  (Tr. 187)

On December 31, 2008, Maiden, Omar Amanat, and Tuzman entered into an agreement in which Maiden agreed to "support [the price of KIT Digital] stock and receive some value, carry in KIT Digital, KIT Media," in return for leaving his "money at Enable and not ask[ing] to have it redeemed. . . ."  (Tr. 189; GX 3035 (December 31, 2008 Agreement))

Meanwhile, Irfan Amanat continued to send monthly statements to Maiden reflecting the purported value of Maiden Capital's Enable account.  In a January 5, 2009 email to Amanat, Maiden expressed concern about one such Enable account statement:  "Hey[,] [I]rfan . . . I'm kind of confused by the returns here.  I had 3,031,346.00 at the beginning of December.  According to this I had 3,039,820.67 at the end of Dec.  So only made about 8k over the month . . . on 3 million of assets? . . . I would have expected quite a bit more. . . ."  (GX 2969; Tr. 203-04)

The Amanat brothers discussed by email how to respond to Maiden's inquiry.  (GX 2969)  Omar Amanat told Irfan to "[c]oordinate [with] me on this.  He needs to show good year end returns.  Say you didn't include the waiving of fees or something."  (Id.)  Amanat responded, "ok am doing."  Amanat asked, "what annual % return?  I am giving 9%, but what is agreed?"  (Id.)  Omar Amanat responded that Maiden "wants to show closer to 17 percent.  It[']s all irrelevant since he can't withdraw. . . ."  (Id.)

---

[6]  KIT Media was a special investment vehicle controlled by Tuzman, which owned shares in KIT Digital.  (Tr. 99; see also Tr. 515 (Smyth testifying about the KIT Media SPIV, "a company controlled by [Tuzman]"; "investors put money into that for them to buy shares in KIT Digital"))

In a February 11, 2009 email to the Amanat brothers, Maiden requested that Enable return $500,000 of Maiden Capital's money. (GX 2975; Tr. 233-34) Maiden explained that he could not "operate [his] business," because he had "almost no free trading cash in [his] account and ha[d] to meet redemptions." (GX 2975) After receiving Maiden's email, Amanat emailed his brother: "Om[ar], can we do anything?" (Id.) Omar Amanat responded: "Yes send him back $500k asap. Oh I forgot, we don't have it!!!!!!!!!! That is why this [is] an absurd question. . . ." (Id.)

### 2.    Maiden Learns that Maiden Capital's Investment in Enable Has Been Lost

During a March 8, 2009 telephone conference with Maiden, Omar Amanat, and Tuzman, Irfan Amanat informed Maiden that Maiden Capital's investment in Enable was lost. (Tr. 101-03; 240-42, 290) Amanat told Maiden that there had "been a problem at the brokerage where [Enable] ke[pt] most of [its] money or all of [its] money. And it's frozen."[7] (Tr. 241; see Tr. 242 (Maiden testifying that Amanat "said that the money was frozen at some brokerage; that [Amanat] could still trade it, but [Maiden] couldn't get any of it"))[8]

Later that day, Maiden called Omar Amanat, who told Maiden to "[t]ake it easy. We'll fix this. We'll work out some sort of arrangement. There's a lot of money at parties related to KIT Media, and we'll work out some settlement." (Tr. 242-43)

---

[7] Although Amanat referred to Maiden Capital's funds as "frozen," over the next three years, there was no suggestion by Amanat or Omar Amanat that the funds had been, or would ever be, unfrozen, or would otherwise be recovered. To the contrary, in their discussions and electronic communications, Amanat, Omar Amanat, Maiden, and Tuzman all treated Maiden Capital's investment as lost. As discussed below, Maiden and the Defendants commonly referred to the loss of Maiden Capital's funds as the "Enable hole." (See, e.g., Tr. 244, 255-59, 298)

[8] During the call, Amanat reported that KIT Digital's investment in Enable had likewise been lost. (Tr. 101-03)

The morning after the March 8, 2009 call, Maiden spoke to a Maiden Capital investor and "lied to [the] investor," stating that "the fund was doing fine." (Tr. 243) Maiden then called Omar Amanat and told him that he had "just lied to [his] investor," and that "[t]his has to be fixed. Like we have to do this call and work out an arrangement." (Tr. 243) Omar Amanat said that he would contact Tuzman that night to "start talking about it." (Tr. 243)

Omar Amanat, Tuzman, and Maiden spoke that evening. (Tr. 244) The three "discussed . . . a settlement agreement, an agreement where some money or value could be transferred to Maiden Capital to try to make [Maiden] whole for this Enable hole." (Tr. 244) They "also talked about [Maiden's need for] cash, how desperate [he] was [to satisfy] cash redemptions. And [Tuzman] suggested having KIT Digital invest some money [in Maiden Capital]." (Tr. 244) Those discussions continued over subsequent months. (See Tr. 97 (Maiden testifying that in the months following the March 8, 2009 call, he had "many discussions" with Omar Amanat in which they discussed what Maiden was telling his investors, and during those discussions, Maiden also told Omar Amanat about his "need[] to send out returns"; in these conversations, Omar Amanat represented that he would help Maiden "get assets to cover the Enable hole"))

Maiden also learned that the Amanats had used Maiden Capital's $2 million loan to Enable to satisfy KIT Digital's redemption of its investment in Enable. (See GX 2978 (Maiden March 9, 2009 email to Irfan Amanat: "But even here you are not being fully transparent. This customer that withdrew the 2 million was obviously Omar – back in [D]ecember when he needed 2 million for the [KIT Digital] deal, convinced me to leave my 2 mil there so he could take his 2 mil out to honor the [KIT Digital] deal. Right? I am not trying to play gotcha – but just want the facts. [W]e are all in this together."))

After the March 8, 2009 call, Maiden "lied to [his] investors" about the financial condition of Maiden Capital.  (Tr. 250)  "[R]ather than do the right thing, which would have been to tell [his] investors [about the Enable loss] and probably sue [Amanat] and Omar and [Tuzman], [he] was instead trying to work together with them . . . to come up with a solution, [with] [Amanat], Omar, [Tuzman]."  (Tr. 250)

Maiden testified that

> [t]he idea of the settlement was to come up with a solution where Maiden Capital would get assets to cover for the Enable loss and also KIT Digital had – we had to find a solution for them as well for their Enable loss. And we – and there was an agreement in the settlement that we would all hold each other harmless, basically release each other and agree not to sue if we did that.

(Tr. 253)

Over the next few months, Maiden, Tuzman, and the Amanat brothers worked toward a settlement agreement "that would solve the issues related to the Enable hole."  (Id. at 255-59; see also Tr. 259 (Maiden discussing his April 30, 2009 email to Tuzman and Amanat concerning the settlement agreement:  "Irfan, please sign all the docs.  I cannot possibly see how you could make out any better from a situation where millions were lost.  We are all bearing your burden here.  I had over 3 million at Enable.  This agreement helps to cover most of that hole for me, but still leaves me out of cash.  That is what I need most.  . . . I can assure you that if this agreement is not signed and the Enable situation is thus not resolved, I will be ruined and will use all legal remedies at my disposal.  Not a threat, just a fact."))

The settlement agreement was ultimately signed (Tr. 261-69; GX 1576 (settlement agreement executed by Amanat and Tuzman)), but Maiden testified that the settlement agreement was not a "static deal."  (Tr. 271)  "It changed over time" as "conditions changed."  (Tr. 271)  As Maiden Capital's "need for capital increased, . . . more value had to

come to Maiden ultimately by the end of it to save [his] fund."  (Tr. 271; see Tr. 271-72 (Maiden testifying that he negotiated additional ways to get money for Maiden Capital with, among others, the Amanat brothers and Tuzman))

On March 10, 2009, Tuzman arranged for KIT Digital to wire Maiden Capital a $200,000 investment.  These funds were designed, in part, to assist Maiden in satisfying pending redemption requests.  (Tr. 289-92; GX 1540R; GX 606)

### 3. Amanat Transmits Phony Enable Account Statements to Maiden for Use in Fabricating Maiden Capital Investor Account Statements

After March 2009, Amanat continued to transmit Enable account statements to Maiden concerning Maiden Capital's investment in Enable.  (Tr. 275-79)  Given that Maiden Capital's investment in Enable had been lost, both Amanat and Maiden were well aware that these statements were false, fraudulent, and fictitious.  (Tr. 281-82, 284-85)  Amanat was also aware that Maiden was using the Enable account statements as the basis for calculating the monthly statements sent to Maiden Capital investors.  (Tr. 284-85)  For example, in a September 2, 2009 email to the Amanat brothers, Maiden states:  "Guys, I need my Enable balance now. Need to put out num[bers]."  (Tr. 277-78)  Each month, Maiden needed "to put out [his] numbers, meaning [his] monthly statements to [his] investors," and Amanat sent him the numbers for Maiden Capital's Enable investment.  (Tr. 278)

After the March 8, 2009 call, Maiden knew that the numbers Amanat provided were fictional, because Maiden Capital's investment in Enable had been lost, and "there was no available money."  (Tr. 281-85)  Over time, Amanat sent Maiden a template spreadsheet so that Maiden could fabricate the fictional returns himself, which were designed to suggest that Maiden Capital's investment in Enable was "essentially stable."  (Tr. 401-02, 284-85)

####     4.     Omar Amanat's Loans to Maiden Capital
####             to Fund Redemption Requests

In March 2011, Maiden received a $1 million redemption request from Alpine

Capital, a Maiden Capital investor.  (Tr. 294-95)  Maiden Capital lacked the funds to satisfy the

redemption request.  (Tr. 294-95)  Omar Amanat agreed to provide a loan to Maiden Capital so

that it could process investor redemptions.  (Tr. 305-08; see id. at 307 (Maiden testifying that he

and Omar Amanat "entered into a lending agreement, a loan agreement, whereby [Omar

Amanat] would loan Maiden Capital money, and part of that was like a monthly stipend for

living expenses because [Maiden] was really out of cash."); Tr. 308 (Maiden testifying that the

loan was "for $1.25 million, and the purpose of the loan was primarily to pay redemptions

because it came right after the Alpine Capital redemption."))

The loan to Maiden Capital was provided pursuant to a written agreement dated

June 2, 2011.  (GX 1692; Tr. 307)  The loan agreement was between Cornucopia Limited – an

entity that Omar Amanat controlled – and Maiden Capital.  (Tr. 307; GX 1692 (June 2, 2011

loan agreement))  The agreement stripped Maiden of his role as Maiden Capital's sole managing

member and gave Cornucopia "control over operations and business decisions of" Maiden

Capital.  (GX 1692 at § 2.12(b))  The agreement also transferred Maiden Capital's assets to

Cornucopia until the loan was repaid.  (GX 1692 at §§ 2.9-2.11)  Omar Amanat's wife at the

time, Helena Houdová, signed the agreement on Cornucopia's behalf.  (Tr. 308)

Pursuant to the agreement between Cornucopia and Maiden Capital, in June 2011,

Enable sent Maiden Capital $330,000 in four separate wire transfers.  (Tr. 308-10; GX 609

(Bank of America records documenting a $250,000 wire on June 2, 2011; a $50,000 wire on

June 6, 2011; a $10,000 wire on June 20, 2011; and a $20,000 wire on June 30, 2011))

Maiden testified that the loan agreement did not "put a stop to the redemption issues that [he] was having," which "were continuing to get worse.  [He] had a half dozen or so investors asking for money back by the summer of 2011."  (Tr. 310-11)

### 5.    July 2011 Meeting to Address Maiden Capital's Financial Condition

On July 16, 2011, Maiden, Omar Amanat, and Tuzman met at KIT Digital's offices in Manhattan to "discuss how to solve the Maiden Capital problem, meaning [the] redemptions that [Maiden] couldn't meet."  (Tr. 295-97, 300; GX 1808 (Tuzman April 1, 2011 email to Maiden, the Amanat brothers, and others:  "Gentlemen, I think it is vital that we all meet in person once and for all"); see Tr. 298 (Maiden testifying that "the source of the need for money in Maiden Capital" was the "Enable hole"))

In a July 16, 2011 text message to Maiden before the meeting, Omar Amanat urged Maiden to make his case as to why it was necessary to keep Maiden Capital afloat:

> Be aggressive today:  Say it doesn't matter who did what.  Paint a stark nightmare scenario if your fund goes under.  Trustee is appointed.  He will quickly realize all money was lost in KIT Digital and everyone here will be sued.  Securities laws violations have occurred.  Criminal behavior.  Jail time.  Bottom line:  Fund needs to be made whole or ship will sink.

(Tr. 300-02; GX 1785-D (July 16, 2011 Omar Amanat text message to Maiden))  Maiden understood Omar Amanat's reference to "the violations that have occurred" to mean "the false returns from Enable, Maiden Capital's false returns going out. . . ."  (Tr. 302)

The primary topic of conversation at the July 16, 2011 meeting "was how to get value – how the various parties at the table essentially and others party to the settlement could share value with Maiden Capital to increase the value that Maiden Capital investors got."  (Tr. 298)  By the end of the meeting, Maiden thought the resolution would be "more value than we had previously negotiated would be coming to Maiden Capital investors."  (Tr. 298)

Maiden Capital's financial difficulties continued after the meeting, however.  In an August 10, 2011 text message to Omar Amanat, Maiden said that they needed to talk about Alpine Capital:  "I have a call with [Alpine Capital] at 7:30 a.m.  I need to tell them I can send them 250 to keep them from litigating and blowing everything up."  (Tr. 304; GX 1785-F) Maiden explained that "if [Alpine Capital] had sued [him], everything – Enable – [he] would have had to sue Enable or they would have sued Enable.  Somebody would have gone to the authorities.  KIT Digital would have problems.  We'd all have problems."  (Tr. 305)

**6.     Collapse of Maiden Capital**

After the July 16, 2011 meeting, Enable continued to wire funds to Maiden Capital so that Maiden could process redemption requests.  Between July and December 2011, Enable wired a total of $240,000 to Maiden Capital.  (GX 606 (Maiden Capital's Bank of America records) at 246 ($10,000 wire on July 21, 2011), 250 ($40,000 wire on August 19, 2011), 253 ($10,000 wire on September 20, 2011), 257 ($10,000 wire on October 21, 2011), 260 ($10,000 wire on November 21, 2011), 264 ($150,000 wire on December 8, 2011 and $10,000 wire on December 23, 2011))

This infusion of cash was not sufficient to permit Maiden to process all of his investors' redemption requests, however.  Jesse Ellington – who operated Solaris Capital, a small hedge fund that had invested in Maiden Capital – testified that in August 2011, Maiden did not satisfy a redemption request despite several follow-up phone calls and emails.  (Tr. 611-12, 614, 617-18, 620-22; see also Tr. 620-22 (Ellington testifying that Maiden explained that he had a "liquidity problem," and that he "didn't have the cash available to allow [Ellington] to get [the] money back"; Maiden stated that he had invested in KIT Digital, and that it was "going to be a huge success"))

In 2012, Maiden arranged a call between Ellington and Omar Amanat.  (Tr. 622-23)  According to Ellington, Omar Amanat provided more details about KIT Digital and "what a great company it was. . . ."  (Tr. 623)  Maiden Capital did not satisfy Ellington's redemption request in 2012, however.  (Tr. 623)

In June or July of 2012, Ellington received a call from another Maiden investor – Jim Bradshaw.  (Tr. 624)  Bradshaw told Ellington "that there [were] issues with Maiden [Capital]; that he was an investor; and he was trying to get his money back.  And there were major problems.  And he was going to probably get an attorney involved with the group of investors that were invested."  (Tr. 624)  Ellington decided to join that group.  (Tr. 624)  In late 2012, Ellington learned that Maiden had been arrested.  (Tr. 624-25)

### B.     KIT Digital Accounting Fraud Conspiracy

In 2009, Tuzman, Robin Smyth, and Gavin Campion – respectively, KIT Digital's chief executive officer, chief financial officer, and president (Tr. 39-40) – launched a scheme to inflate the company's revenue and assets.  (Tr. 490-94, 501)  The scheme involved "creat[ing] fake invoices which increased the revenue of the company," as well as "creat[ing] fake transactions which enabled [Tuzman, Smyth, and Campion] to generate cash that [they] could round-trip to give to other people to send back to KIT [Digital] to repay those fake invoices." (Tr. 492)  Through the phony "roundtripping" transactions, Tuzman, Smyth, and Campion inflated KIT Digital's revenue by "tens of millions of dollars."  (Tr. 492-93)  The accounting fraud scheme also involved inflating KIT Digital's cash reserves and assets.  (Tr. 489-92)

As a public company, KIT Digital was required to report its financial results in regular filings with the SEC, including in its annual Form 10-K filings.  (Tr. 312-13)  In a Form 10-K filing, a company discloses its "financials[,] . . . balance sheet, cash flow statement, [and]

17

income statement . . . [and] describe[s] how the company did that year." (Tr. 313)  Form 10-K

filings are audited, such that a "third-party accounting firm validates the numbers put forth by the

company." (Tr. 314; see also Tr. 314-15)  Between 2009 and 2012, KIT Digital's SEC filings

falsely and fraudulently inflated the company's financial performance, revenue, and assets. (Tr.

489-94, 501, 503-06, 542-44)

   The evidence at trial showed that Amanat assisted Tuzman, Smyth, and Campion

in perpetrating the accounting fraud conspiracy at KIT Digital.  Amanat provided Smyth with

false statements regarding the amount of cash Enable was holding for KIT Digital, and he

likewise provided false audit confirmations regarding the amount of cash Enable was holding for

the company that assisted Smyth in hiding fraud from KIT Digital's auditors. (Tr. 490-91)  The

false and fraudulent statements and audit confirmations Amanat provided assisted Smyth in

"hid[ing] [the] fraud from the auditors," and "gave cover" to Smyth "to be able to show them to

the auditors to indicate that the company had stated and confirmed that [it] had cash at Enable."

(Tr. 491)

   Smyth first met Amanat in May 2008 in Dubai, at a dinner arranged by Tuzman.

(Tr. 507)  During the summer of 2008, Smyth and Amanat discussed whether Enable could

perform a cash management function for KIT Digital. (Tr. 508-09)  Smyth told Amanat that he

"needed a low-risk security, low-risk investment" for KIT Digital's cash. (Tr. 509)  Smyth

explained that the "security of [KIT Digital's] money was very important." (Tr. 509)  Amanat

told Smyth that he would put KIT Digital's cash in "low-risk investments and that he guaranteed

the return of [KIT Digital's] money." (Tr. 510)  Amanat sent Smyth a PowerPoint presentation

that described an investment in Enable as having "no market risk [and] monthly liquidity" –

representations that were important to Smyth. (Tr. 511-12)

Before investing in Enable, Tuzman, Smyth, and Campion obtained approval
from KIT Digital's board of directors.  (Tr. 512-13)  In a memorandum to the board – entitled
"KIT [D]igital, Inc. Cash Management" – they assured the board that "Smyth has spent
significant time with . . . Amanat . . . discussing both [KIT Digital's] cash/risk management
requirements, together with [KIT Digital's] ideal operational protocols."  (GX 700; see also Tr.
513-17)  The board approved the investment.  (Tr. 518)

In August 2008, KIT Digital entered into a written agreement with Enable
concerning Enable's management of KIT Digital's cash.  (Tr. 518-22; GX 707 (August 2008
Agreement))  Smyth signed the agreement on behalf of KIT Digital, and Amanat signed the
agreement on behalf of Enable.  (Tr. 519; GX 707)  Section 2.1.5. of the agreement provides:
"The recipient personally guarantees that he will return the capital sum to the investor in
accordance with the terms of the agreement."  (Tr. 521; GX 707)  The agreement further
provides that if "a demand in writing for the return of any amount of money" is submitted to
Enable, the requested funds will be transmitted within fourteen days.  (Tr. 522; GX 707)  The
agreement also provides that if Enable is "threatened with insolvency," it will return KIT
Digital's money "[i]mmediately."  (Tr. 522; GX 707)  Pursuant to this agreement, over time, KIT
Digital wired $6.5 million to Enable.  (Tr. 512, 518, 520)

On its balance sheet, KIT Digital classified its investment in Enable as "[c]ash
and cash equivalents."  (Tr. 523)  When KIT Digital requested a return of funds from Enable at
various points in 2008, however, it encountered difficulties in obtaining the requested funds.  (Tr.
523-25)  In December 2008 – after Amanat had agreed to return $1 million to KIT Digital –
Smyth deposited two checks he had received from Enable.  (Tr. 525-526)  Both checks bounced.
(Tr. 526)  Although Enable eventually returned the $1 million to KIT Digital – via three wire

transfers – after this experience, Smyth had "severe, extreme doubts that there was cash [at Enable] backing up [KIT Digital's] investment." (Tr. 526-27)  KIT Digital nonetheless continued to represent in its SEC filings that its Enable investment was "cash and cash equivalents," even though Smyth believed that this representation was false. (See Tr. 527-28 (Smyth discussing KIT Digital's 2008 Form 10-K, which reported that Enable was holding $3 million in cash for KIT Digital; Smyth believed that this representation was false))

During the March 8, 2009 call with Maiden, Omar Amanat, and Tuzman, Amanat reported that both Maiden Capital's Enable investment and KIT Digital's Enable investment had been lost. (Tr. 101-03, 240-42)  Amanat nonetheless continued to supply KIT Digital with false audit confirmations representing that Enable was holding millions of dollars in cash for KIT Digital. (Tr. 545)  For example, on March 4, 2010, Amanat emailed Smyth a false audit confirmation for KIT Digital's 2009 Form 10-K. (GX 2998; Tr. 552-53)  That form indicates that KIT Digital had a "balance" of "2,031,609.43" at Enable as of December 31, 2009. (Tr. 553; GX 2998)

On March 8, 2011, Smyth contacted Amanat about an audit confirmation for KIT Digital's 2010 Form 10-K. (Tr. 545-47)  Smyth copied KIT Digital's outside accounting firm on the email so that the audit manager would know that he "was chasing the audit certificate, the confirmation from Enable." (Tr. 546)  In the March 8, 2011 email, Smyth wrote: "Irfan, Can you please arrange for the audit confirmation to [be] complete[d] and returned. . . ." (GX 3297) Attached to the email was the following audit confirmation request:

Dear Mr. Amanat:

In connection with an audit of the financial statements of KIT Digital Inc of December 31, 2010 and for the year then ended, our independent auditors, Grant Thornton LLP wish to determine whether our records concerning our holdings in Enable Investment Limited agree with your records as the investee company.

> Please confirm to Grant Thornton LLP the following information about our holdings as of the close of business on December 31, 2010.
>
> According to our records, the following is held by KIT digital, Inc.
>
> $2,067,844.14 USD, in an asset management account at 1 Month LIBOR + 150bp
>
> Please attest to the accuracy of the above by signing this letter. . . .

(Id. (emphasis omitted); see also Tr. 547)

The Amanat brothers discussed whether to provide the false audit confirmation regarding KIT Digital's alleged cash holdings at Enable. In a March 14, 2011 email to Amanat, Omar Amanat wrote: "Rather than blow up the Enable cash on the balance sheet and exposing the lie at this stage, it may be ok to let [Tuzman] hang himself. . . ." (GX 3084) In a March 16, 2011 email to Omar Amanat and others, Tuzman demanded that Enable provide the requested audit confirmation. (GX 1293-R) Tuzman explained that without the audit confirmation, "KIT [D]igital [would] have a material deficiency in its audit (no, this is not a bad receivable, it would be mis-classified cash) and will pursue legal action against Enable immediately." (GX 1293-R) On March 16, 2011 – the day that KIT Digital's Form 10-K was to be signed by Tuzman and Smyth – Amanat provided the false audit confirmation to Smyth. (Tr. 550-52; GX 3009)

In a March 10, 2012 email, Smyth again asked Amanat to complete an audit confirmation concerning the cash that Enable was allegedly holding for KIT Digital. (See GX 3031) Smyth wrote: "Irfan[,] Hope you are well[.] I need to get a[n] audit confirmation on the Enable amount as we did last year. Can you sign the attached and send back by return[.]" (GX 3031) Amanat did not provide the confirmation. Accordingly, on March 13, 2012, Smyth sent another email to Amanat with the subject line "Audit Confirmation":

> Irfan
>
> It is past the deadline. . . .

> I fear that if I do not get a confirmation signed now we will be forced to start calling the loan and following that through.  And a series of other consequences.
>
> I do not want to do that but I need [to] get this signed and the auditors are very concerned.
>
> Can you just at this stage sign it and send it back to me IMMEDIATELY.

(GX 3031 (emphasis in original))

In an email later that day, Amanat asked Smyth what the deadline was for providing the audit confirmation.  (GX 3031)  Smyth responded that he was "trying to file 10K tomorrow[.]  Need this before I can file[.]  So I am past the auditor deadline to get a confirmation to them[.]"  (Id.)  In a later email, Smyth wrote:  "Irfan[,] To be clear the deadline was last Friday. . . ."  (Id.)  Amanat replied:  ". . . I am trying to coordinate with Enable tonight, I am positive and I will let you know how they respond in a few hours."  (Id.)  Amanat did not provide the audit confirmation, however.  (Id.)

In a March 15, 2012 email to Amanat, Smyth wrote:  "Please handle this immediately.  I may need someone from Enable to speak to the auditors by phone but we will see.  I am trying to avoid the auditors forcing us to call in the cash here and pursuing an unpleasant path, but it may be unavoidable."  (Id.)

On March 22, 2012, Smyth and Tuzman became aware that KIT Digital's outside auditors had gained access to Tuzman's March 16, 2011 email to Omar Amanat, in which he demanded that Enable provide the requested audit confirmation for KIT Digital's 2010 Form 10-K.  (Tr. 560-63; GX 1293-R)  As discussed above, in that email Tuzman had stated that, absent the audit confirmation, "KIT Digital [would] have a material deficiency in its audit" and would "pursue legal action against Enable immediately."  (GX 1293-R)  Once Smyth learned that the outside auditors had seen the March 2011 email chain, he became concerned that "they would

not accept the fact that there was any money – any of KIT Digital['s] cash at Enable."  (Tr. 566)

Smyth's fears were realized.

After reviewing the March 2011 email chain, the auditors refused to permit KIT

Digital to classify the alleged Enable investment as "cash and cash equivalent[s]" on its 2011

Form 10-K.  (Tr. 567)  KIT Digital was forced to "write off the amount outstanding that [it] had

on the books as cash with Enable and . . . had to bring that down to zero."  (Tr. 567)

The auditors' concerns regarding the alleged cash account at Enable led to a much

broader review of all of KIT Digital's cash holdings.  The auditors' inquiries "made it

impossible" for Smyth to keep hidden the accounting fraud at KIT Digital, and the fraud

ultimately "came to light."  (Tr. 568)  In March 2012, KIT Digital's board sought and obtained

Tuzman's resignation.  (Tr. 396; see Tr. 396-97 (Maiden testifying that Tuzman stated that he

was asked to resign "[b]ecause of the Enable mess, because of hiding the Enable situation"))

Smyth was terminated for cause in November 2012, and arrested in September 2015.  (Tr. 494,

568)

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    Rule 29

Rule 29(a) of the Federal Rules of Criminal Procedure provides that a court shall,

upon a defendant's motion, "enter a judgment of acquittal of any offense for which the evidence

is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "A defendant challenging the

sufficiency of the evidence to support his conviction carries a heavy burden."  United States v.

Oguns, 921 F.2d 442, 449 (2d Cir. 1990).

"In evaluating a sufficiency challenge," a court "'must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'"  United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012) (quoting United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008)).  "So long as the inference is reasonable, 'it is the task of the jury, not the court, to choose among competing inferences.'"  United States v. Kim, 435 F.3d 182, 184 (2d Cir. 2006) (quoting United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995)).  In assessing a sufficiency challenge, a court "looks at 'the evidence in its totality,'" United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quoting United States v. Glenn, 312 F.3d 58, 63 (2d Cir. 2002)), "'not in isolation but in conjunction.'"  United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984) (quoting United States v. Geaney, 417 F.2d 1116, 1121 (2d Cir. 1969)).

Under Rule 29, the critical question "is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  United States v. Downing, 297 F.3d 52, 56 (2d Cir. 2002) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis in Jackson).  "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."  Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam).  "The Second Circuit has observed that '[t]hese strict rules are necessary to avoid judicial usurpation of the jury function.'"  United States v. DiPietro, No. S502 Cr. 1237 (SWK), 2005 WL 1863817, at *1 (S.D.N.Y. Aug. 5, 2005) (quoting Mariani, 725 F.2d at 865).

While a defendant raising a sufficiency challenge "carries a heavy burden," Oguns, 921 F.2d at 449, it is "not an impossible one."  United States v. Kapelioujnyj, 547 F.3d

149, 153 (2d Cir. 2008) (citing United States v. Jones, 393 F.3d 107, 111 (2d Cir. 2004)).  "[A]

conviction based on speculation and surmise alone cannot stand."  United States v. D'Amato, 39

F.3d 1249, 1256 (2d Cir. 1994) (citing United States v. Wiley, 846 F.2d 150, 155 (2d Cir. 1988)).

**B.**     **Rule 33**

Under Rule 33 of the Federal Rules of Criminal Procedure, "a court may vacate

any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).

"Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new

trial to avert a perceived miscarriage of justice."  United States v. Sanchez, 969 F.2d 1409, 1413

(2d Cir. 1992).  In contrast to a Rule 29 motion, a defendant seeking a new trial under Rule 33 is

not required to show insufficiency; a new trial motion may be granted where a jury's verdict is

contrary to the weight of the evidence.  United States v. Ferguson, 246 F.3d 129, 135-36 (2d Cir.

2001).

The Second Circuit has explained that

> [t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand
> would be a manifest injustice.  The trial court must be satisfied that competent,
> satisfactory and sufficient evidence in the record supports the jury verdict.  The
> district court must examine the entire case, take into account all facts and
> circumstances, and make an objective evaluation.  There must be a real concern
> that an innocent person may have been convicted.  Generally, the trial court has
> broader discretion to grant a new trial under Rule 33 than to grant a motion for
> acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority
> sparingly and in the most extraordinary circumstances.

Ferguson, 246 F.3d at 134 (quotation marks and citations omitted).

Under Rule 33, a "court may weigh the evidence and credibility of witnesses."

United States v. Autuori, 212 F.3d 105, 120 (2d Cir. 2000) (citing Sanchez, 969 F.2d at 1413).

"The district court must strike a balance between weighing the evidence and credibility of

witnesses and not 'wholly usurp[ing]' the role of the jury," however.  Ferguson, 246 F.3d at 133

(quoting <u>Autuori</u>, 212 F.3d at 120) (alteration in <u>Ferguson</u>).  Finally, in contrast to the analysis

under Rule 29, a district court considering a Rule 33 motion need not view the evidence in the

light most favorable to the Government.  <u>United States v. Lopac</u>, 411 F. Supp. 2d 350, 359

(S.D.N.Y. 2006) (citing <u>United States v. Ferguson</u>, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999),

<u>aff'd</u>, 246 F.3d 129 (2d Cir. 2001)).

## II.   <u>ANALYSIS</u>

### A.   <u>Amanat's Insufficiency Arguments</u>

Amanat was convicted of (1) conspiracy to commit wire fraud in connection with

Maiden Capital investors (Count One); (2) committing wire fraud in connection with Maiden

Capital investors (Count Two); (3) aiding and abetting Maiden's investment adviser fraud (Count

Three); and (4) conspiracy to commit securities fraud in connection with the accounting fraud

scheme at KIT Digital (Count Six).  (Indictment (Dkt. No. 198); Verdict (Dkt. No. 848))

In seeking a judgment of acquittal, Amanat argues that "[t]he [G]overnment failed

to provide sufficient evidence at trial that [he] joined a conspiracy to commit the frauds in

Counts One and Six of the S8 Superseding Indictment."  (Amanat Br. (Dkt. No. 884) at 6)

According to Amanat, "the [G]overnment did not introduce any evidence that [he] knowingly

agreed to join a conspiracy, [cognizant] of its unlawful purpose."  (<u>Id.</u> at 4)  As discussed below,

this argument is not persuasive.

### 1.   <u>Maiden Capital Fraud</u>

Amanat argues that the Government did not offer evidence sufficient to

demonstrate that he "agreed with Maiden to defraud Maiden Capital investors. . . ."  (Amanat Br.

(Dkt. No. 884) at 6)

The evidence at trial demonstrated that Amanat was Maiden's primary contact to discuss Maiden Capital's Enable investment.  (Tr. 125, 128-29)  After Maiden's initial investment in Enable, Amanat sent Maiden monthly statements showing the value of Maiden Capital's investment.  (Tr. 137)  As discussed above, the evidence showed that Amanat was well aware that the Enable account figures he provided to Maiden were used in generating the account statements that Maiden Capital provided to its investors each month.  (Tr. 126-29, 198-99; GX 1504)

The evidence at trial also demonstrated that – after Tuzman demanded that KIT Digital's investment in Enable be redeemed – Amanat and his brother decided to approach Maiden about providing a short-term loan to Enable of $2 million.  (Tr. 156, 174-76; GX 3053) They then used Maiden Capital's investment not as "show money" – as Omar Amanat had promised – but instead to finance the redemption of KIT Digital's investment that Tuzman had demanded.  (Tr. 152-56, 174-78, 430; GX 1515; GX 3051; GX 3053)  After the "short- term loan" was not returned within the agreed-upon period of time, Maiden began seeking the return of his fund's money.  (Tr. 183-86)  Amanat and his brother Omar candidly discussed the fact that Maiden Capital's $2 million was gone, that there was no "ability to repay it," and that if Maiden suspected fraud and notified the authorities – Omar Amanat, who had obtained the $2 million from Maiden – would be "cooked."  (GX 2965; Tr. 185-86)

Omar Amanat and Tuzman persuaded Maiden not to demand immediate redemption of Maiden Capital's investment in Enable, promising that – if he agreed to enter into an agreement to manipulate KIT Digital's stock – Maiden Capital would "receive some value, carry in KIT Digital [or in] KIT Media," Tuzman's special investment vehicle.  (Tr. 186-87, 189)  In a December 2008 agreement, Maiden agreed to this arrangement.  (Tr. 189; GX 3035)

In early 2009, Amanat continued to supply Maiden with false information concerning the value of Maiden Capital's investment in Enable. The Amanat brothers agreed on what fabricated numbers Amanat would report to Maiden, with Omar explaining to Amanat that Maiden needed to report "good year end returns." (Tr. 203-06; GX 2969)

The evidence was clear, however, that both Amanat and Omar Amanat understood that Maiden Capital's Enable investment had been lost. For example, in February 2009, when Maiden asked Amanat for the return of $500,000 of Maiden Capital's Enable investment, and Amanat asked his brother what could be done, Omar Amanat responded that Amanat's query was "absurd," because they did not "have it!!!!!!!!!!" (Tr. 233-35; GX 2975)

In a March 8, 2009 conference call with Maiden, Omar Amanat, and Tuzman, Amanat admitted to Maiden that Maiden Capital's investment in Enable had been lost. (Tr. 101-03; 240-42, 290) And, as Maiden testified, "rather than do the right thing, which would have been to tell [his] investors and probably sue [Amanat] and Omar and [Tuzman], [he] [decided] to work together with them . . . to come up with a solution." (Tr. 250)

As discussed above, over the next three years, Amanat, Omar Amanat, Tuzman, and Maiden worked together to cover-up the fraud perpetrated on Maiden Capital's investors. Amanat played a critical role in that effort, because he provided the false and fabricated monthly Enable account statements to Maiden, which Amanat knew were used in generating the monthly statements that Maiden sent to Maiden Capital investors. (Tr. 126-29, 198-99, 275-82, 284-85; GX 1504)

In sum, viewing "the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witnesses credibility and its assessment of the weight of the evidence,"

Coplan, 703 F.3d at 62, the evidence was sufficient to demonstrate that Amanat agreed with

Omar Amanat and Maiden to defraud Maiden Capital investors.[9]

### 2.   KIT Digital Accounting Fraud Conspiracy

Amanat argues that the Government did not offer evidence sufficient to

demonstrate that he "joined a conspiracy to defraud KIT Digital investors."  (Amanat Br. (Dkt.

No. 884) at 13)

The evidence at trial showed that KIT Digital's CEO, CFO, and President –

Tuzman, Smyth, and Campion respectively – entered into a conspiracy to commit accounting

fraud at the company.  As discussed above, in furtherance of the conspiracy, the conspirators

made SEC filings that misrepresented KIT Digital's revenue and assets, and provided false

information to KIT Digital's outside auditors regarding the company's revenue and assets.  (Tr.

489-94, 501, 503-06, 543-44)  The evidence at trial showed that Amanat knowingly assisted

Smyth in making false statements to KIT Digital's auditors and investors concerning the

---

[9]  Amanat's argument regarding Maiden's role in defrauding his investors (Def. Br. (Dkt. No. 884) at 8-10) provides no basis for finding the evidence regarding Amanat's fraudulent intent insufficient.  Amanat also argues that his brother, Omar Amanat, had personally guaranteed that Maiden Capital's investors would recover their investment in Enable, and that he believed that his brother "would repay Maiden Capital's investment upon a redemption request."  (Id. at 18; see id. at 10-13)  This argument is not persuasive.

Maiden testified that Omar Amanat "never followed through on" any promise of personally guaranteeing Maiden Capital's investment in Enable (Tr. 435), and there is no contrary evidence.  While the parties entered into a settlement agreement, they "continued to negotiate side agreements, because the settlement was an ongoing document," and "everything was condition[ed] upon the settlement actually occurring, which never occurred, so it didn't mean anything."  (Tr. 439)

In sum, there is no evidence that Omar Amanat ever personally guaranteed that Maiden Capital investors would recover their investment in Enable, or that Irfan Amanat ever believed that Omar Amanat had issued any such guarantee.  Moreover, there was ample evidence that Irfan Amanat understood that Omar Amanat lacked the funds to make the Maiden Capital investors whole.

company's cash, by repeatedly supplying Smyth with false audit confirmations and statements concerning KIT Digital's cash holdings at Enable.  (Tr. 490-93)

As discussed above, pursuant to an August 1, 2008 cash management agreement, KIT Digital provided millions of dollars in cash to Enable.  (Tr. 518-22; GX 707 (August 2008 Enable-KIT Digital cash management agreement), GX 1576)  During the March 8, 2009 conference call with Maiden, Omar Amanat, and Tuzman, Amanat disclosed that KIT Digital's investment in Enable had been lost.  (Tr. 101-03, 240-42)  As Omar Amanat stated in an April 20, 2009 email to his brother Irfan, "[t]he reality is [that] we lost a public compan[y's] cash through poor risk management. . . ."  (GX 3069-A)

The evidence showed that Amanat knew that KIT Digital's auditors required audit confirmations regarding KIT Digital's balance with Enable, and that Amanat knew that "[w]ithout th[e] confirmation[s] KIT [D]igital [could not] get a clean audit."  (GX 3090; Tr. 350-51, 530-31)  And so, for several years between 2009 and 2012, Amanat supplied Smyth with false audit confirmations concerning the amount of KIT Digital's cash that Enable was purportedly holding for the company.  (Tr. 545-53)  Amanat knew that the false audit confirmations would provide the basis for false statements in KIT Digital's SEC filings, including its annual Form 10-K filings.  (Tr. 545-47, 552-53; GX 2998, GX 3297, GX 3009, GX 3031, GX 3090)

Smyth testified that Amanat's false statements and false audit confirmations regarding KIT Digital's Enable account assisted him in lying "about the level of cash [KIT Digital] had in the company as well as the assets [it] had."  (Tr. 490-92; see also Tr. 491 (Amanat's false "statements [concerning] the cash [KIT Digital] had at Enable . . . as well as [his false] audit confirmations allow[ed] [Smyth] to hide fraud from the auditors.")) In March 2011,

30

for example, Amanat confirmed that KIT Digital had more than $2 million in an interest-bearing account at Enable.  (Tr. 547-48, 550-52; GX 3297, GX 3009)  This confirmation was false, because Amanat had disclosed in March 2009 that Enable had lost KIT Digital's cash investment.  (Tr. 101-03, 240-42)  Amanat was aware that this false confirmation would be used as the basis for false statements in KIT Digital's Form 10-K for 2010 concerning the company's cash assets.  (Tr. 545-48; GX 3297)  Amanat also provided Smyth with a false audit confirmation in March 2010, knowing that the false confirmation would be used to support false statements in KIT Digital's Form 10-K for 2009.  (Tr. 552-53; GX 2998)

Accordingly, there was ample evidence at trial that Amanat knowingly joined the accounting fraud conspiracy at KIT Digital.  He provided to KIT Digital's outside auditors false information concerning the company's cash holdings at Enable, knowing that this information would be utilized in the preparation of the company's annual 10-K filings.[10]

---

[10]  Amanat argues that KIT Digital's cash holdings in Enable were guaranteed by Capricorn Investment Advisors in a written agreement, such that "KIT Digital's board was not misled about the Enable holding."  (Amanat Br. (Dkt. No. 884) at 16)

At trial, Smyth testified that in April 2009 Tuzman "obtained a security agreement from Enable for [KIT Digital's] $2 million remaining investment amount."  (Tr. 576-77)  "[T]he purpose of that agreement was to provide collateral for the remaining amount that was invested in Enable . . . ."  (Tr. 577)  The "collateral . . . provided were securities."  (Tr. 577)  This "agreement was countersigned by a guarantor who owned those securities," and the "gist of the agreement was, if KIT Digital couldn't get the 2 million, it could then have the guarantor give those securities to KIT Digital to liquidate. . . ."  (Tr. 577-78)  Capricorn was a party to this agreement.  (Tr. 578)

As an initial matter, there is no evidence that KIT Digital ever recovered any of its lost cash as result of this agreement.  Moreover, even assuming that this agreement was in place, it does not alter the evidence demonstrating that Amanat falsely confirmed to KIT Digital's outside auditors that Enable was holding $2 million in cash for KIT Digital.

B.    <u>Amanat's Good Faith Arguments</u>

Amanat contends that "[t]he [G]overnment failed to provide sufficient evidence such that a reasonable jury could find that . . . [he] did not act in good faith" and instead acted with "intent to defraud." (Amanat Br. (Dkt. No. 884) at 16-17)  This argument substantially overlaps with Amanat's insufficiency arguments and likewise fails.

There was ample evidence at trial demonstrating that Amanat did not act in good faith, either as to Maiden Capital investors or as to KIT Digital shareholders.  With respect to the scheme to defraud Maiden Capital investors, the evidence showed that by March 2009, Amanat knew that Maiden Capital's investment in Enable had been lost. (Tr. 101-03, 240-42, 290)  He nonetheless continued to transmit false and fraudulent Enable account statements to Maiden that showed account balances amounting to millions of dollars. (Tr. 275-79, 281-82, 284, 450)  And Amanat did so knowing that these false statements would be used by Maiden in generating the monthly accounts statements that he sent to Maiden Capital investors. (Tr. 94, 278, 284)  The evidence further demonstrates that Amanat provided the false account statements to Maiden as part of an effort to cover-up his loss of Maiden Capital's investment in Enable.  In sum, there is ample evidence that Amanat did not act in good faith in connection with Maiden Capital's investment in Enable.[11]

As to the KIT Digital accounting fraud scheme, the evidence at trial showed that KIT Digital invested its cash in Enable pursuant to a cash management agreement (Tr. 512, 518-20), and that Enable lost KIT Digital's investment at some point prior to March 8, 2009. (Tr. 101-03, 240-42)  As discussed above, the evidence also showed that Amanat agreed to cover-up

---

[11]  Amanat's claim that Omar Amanat personally guaranteed Maiden Capital investors' investment in Enable (<u>see</u> Def. Br. (Dkt. No. 884) at 18) is rejected for reasons explained above.

the loss of KIT Digital's investment by providing false audit confirmations to KIT Digital's outside auditors, knowing that these false audit confirmations would be used to support false statements in KIT Digital's SEC filings concerning the company's cash holdings.  (Tr. 350-52, 489-93, 501, 503-06, 530-31, 543-53)  In sum, there is ample evidence that Amanat did not act in good faith in connection with KIT Digital's investment in Enable.[12]

### C. Amanat's Rule 33 Argument

Amanat argues that he should be granted a new trial because the Court "admitted exhibits and testimony from outside of the alleged conspiracy period that unduly and unfairly prejudiced him at trial."  (Amanat Br. (Dkt. No. 884) at 21)  He notes that – prior to trial – he moved to exclude evidence he deemed "would be unfairly prejudicial," that "the Court determined to admit this evidence as background to the charged conspiracy," and that "[i]n the wake of his conviction," he is "renew[ing] his objection to the Court's ruling."  (Id. at 21-22) Amanat contends that certain exhibits "violated Rule 403[,] as the prejudicial effect substantially outweighed the probative value."  (Id. at 22)  Amanat further argues that five exhibits received in evidence involve "exactly the same conduct as the charged conduct, and therefore [constitute] improper propensity evidence."  (Amanat Reply Br. (Dkt. No. 905) at 11 (emphasis in original))

The S(8) Indictment charges that the Maiden Capital fraud conspiracy took place between March 2009 and June 2012 (Indictment (Dkt. No. 198)), and that the KIT Digital accounting fraud conspiracy took place between 2009 and 2012.  (Id.)

---

[12]  To the extent that Amanat's good faith argument is premised on his knowledge "that Capricorn had guaranteed KIT Digital's investment in Enable" (see Def. Br. (Dkt. No. 884) at 21), that argument is rejected for the reasons explained above.

Amanat contends that GX 1507, GX 1536, GX 1537, GX 2968, and GX 2969 were improperly admitted, because they "fell outside the alleged conspiracy period." (Amanat Br. (Dkt. No. 884) at 21)  These exhibits are summarized below:

- GX 1507 is an email chain in which Maiden questions Amanat about a September 30, 2008 Enable account statement that he recently received.  On October 1, 2008, Maiden writes:  "Looks like I lost 1k over 2 weeks vs last quote of $1.013 million you gave me.  Does this make sense?"  Later that day, Amanat responds:  "No, don't worry, you didn't lose money, it's just because you viewed the positions at different times of the day. . . ."  (GX 1507)

- GX 1536 was not received at trial.

- GX 1537 is a January 30, 2009 email chain in which Maiden questions Amanat about an Enable account statement that he recently received:  "So this says $3.625 million – so this is only up 25k from last month – last month the fund made 70k.  You sure you aren't charging fees?  Or was performance that much worse this month?"  Amanat responds:  "I did make less this month, but let me review, to make sure there were no fees."  (GX 1537)

- GX 2968 is a January 5, 2009 email chain in which Maiden questions Amanat about an Enable account statement:  "Hey [I]rfan – I'm kind of confused by the returns here.  I had 3,031,346.00 at the beginning of December.  According to this I had 3,039,820.67 at the end of Dec.  So only made about 8k over the month?  This on 3 million of assets – i[n]cluding waiving fees?  I would have expected quite a bit more.  Was it a bad month for the strategy?"  Copying Omar Amanat, Amanat responds:  "Let me review – I believe I forgot to include the fee waiver you agreed with Omar, so let me review and adjust to reflect that."  (GX 2968)

- GX 2969 is a January 5, 2009 email chain between the Amanat brothers concerning Maiden's query earlier that day about the Enable account statement.  Omar Amanat writes:  "Coordinate w me on this.  He needs to show good year end returns.  Say you didn't include the waiving of the fees or something."  Irfan responds:  "ok am doing[.]"  Irfan Amanat then asks Omar Amanat:  "what annual % return?  I am giving 9%, but what is agreed?"  Omar Amanat responds:  "He wants to show closer to 17 percent.  Its all irrelevant since he can't withdraw until we sell kitd or besn."  Irfan Amanat then asks:  "17%  Are you sure?  That changes my statement drastically.  Please confirm, then I will the addition as fee waivers."  Later, Irfan Amanat writes:  "Ok I will add $60k as fee waiver (2% on 3 mil).  That will bring his return to 16.5%[.] Agreed?"  Omar Amanat replies: "Ok[.]"  (GX 2969)

Amanat also complains that GX 1508 and GX 1528-A were improperly admitted, because they "served only to highlight that Irfan Amanat was not truthful about Maiden Capital's

investment status in fall 2008."  (Amanat Br. (Dkt. No. 884) at 22)  GX 1508 and GX 1528-A

are summarized below:

- GX 1508 is an October 11-12, 2008 email chain in which Maiden questions Amanat about Enable's recent performance.  Maiden writes:  "Hey – jim said he noticed that the enable account did great yest – is that right?  Can you unwind to capture some of those gains?  Curious how you think about it."  Amanat responds:  "unfortunately, you can't unwind at the prices on the weekends . . . .  When the markets open Monday morning, you get the correct pnl.  Having said that, I am happy to say we have been making good profits.  Even with the currency volatility and market meltdown, trading has been smooth and profitable – no huge profits, but with the markets are going psychotic these days, I am happy to be taking things safe. . . ."  Maiden replies:  "Hey I know you can't trade weekends.  It sounded like jim saw it during trading day.  Do you ever take off spreads when they blow out like 2 std dev or something to maximize returns?"  Amanat replies:  "Yup, as you can guess, of course! . . ."  (GX 1508)

- GX 1528-A is an email chain from January 2009 that includes communications among Maiden, Amanat, and others.  On January 13, 2009, an Enable employee sends Maiden an attachment that is an account opening form.  On January 21, 2009, Maiden writes to Amanat:  "Hey – this needs to be signed by someone at Enable – I have nothing with a signature from anyone at Enable – pls do this asap by the end of today.  Thank you.  I will send you a similar form for the additional $2 million I added to the account."  That same day, Amanat responds:  "Did enable already send you the signed form for the 1 mil deposit, or was that not what you needed?  Send them the form for the 2 mil and I'll make sure it gets signed. . . ."  Maiden responds later that day:  "Hey – I got that form on the 1 million – but it only had my signature.  Nothing from enable.  I will send you the 2 million form soon to get your signature as well.  Can you pls call me?  What is your business number?  The number I tried was disconnected and you didn't answer your cell."  Later that same day, Amanat responds by stating that he did not realize the form was not countersigned, and that both forms will be signed.  Maiden responds that same day:  "Ok cool.  What is your number pls – actually do you have an organization chart with phone numbers for the folks working at enable if I can't get you on the phone too (emails and phone numbers)?  Also – how much capital is currently at enable in each of the funds?  Thanks[.]"  Amanat responds that the easiest way to reach him is via Skype, and provides Maiden with his cellphone number – a foreign number with area code + 971 – as well as a number for the "desk" – with the same area code – noting that if he cannot be reached to call the latter number, which "is more for trading issues, [but] they can try to get answers for you."  Amanat also writes that "[t]hey should be sending you the other docs you needed, it should be done today."  Maiden follows up by asking Amanat for his Skype number and complaining that Amanat and Enable are "quite unresponsive on some of these issues."  Amanat apologizes and asks Maiden for a "list of what [he] want[s], I will provide it."  Maiden responds with a list of questions and comments, including:  "[h]ow much assets are at various funds"; "[a]re you going to get a third party administrator as you have stated"; "[a]re you going to get a third party auditor as you have stated"; "I would like contact info for all the people at enable"; "I need a better walk

through of how you make money . . . I can't take any chances not knowing what I'm investing in.  Certainly not accusing enable of ponzi – but I just don't sleep well without a better understanding of what you're doing. . . ."  On January 22, 2009, Amanat replies as follows:  "[y]our current equity at Enable is 3,122,300"; "I want to get an audit as soon as possible, to avoid any doubts about the strategy.  In the meanwhile I am happy to open my trading books to you. . . ."; "I have been hesitant to reveal details of the trading, but in this . . . environment I am happy to be fully transparent to you."  (GX 1528-A)

At an October 16, 2018 pre-trial conference, the Court addressed the parties' motions in limine.  (See generally Oct. 16, 2018 Tr. (Dkt. No. 843))  The Court noted "that having sat through a two-month trial involving much of the same evidence that will be presented at Irfan Amanat's trial, [the Court is] much better equipped to address the parties' motions in limine than is generally the case."  (Id. at 3)

At the October 16, 2018 conference, the Court noted that Amanat had "moved to preclude evidence of certain conduct and communications that pre-date March 2009, which is the beginning of the fraudulent scheme charged in Counts One through Three."  (Id. at 23 (citing Def. Br. (Dkt. No. 828) at 11-22))  That evidence fell into three categories (id.), only the first of which is relevant to Amanat's new trial motion.

The first category of evidence challenged by Amanat consisted of "'emails between Irfan Amanat and Stephen Maiden between October 2008 and January 2009 attaching Enable account statements and discussing the status of Maiden's investment.'"  (Id. at 23-24 (quoting Def. Br. (Dkt. No. 828) at 12))  The Court noted that "[t]he emails to which Amanat objects were admitted during the 2017 trial [of Irfan Amanat's co-defendants, Omar Amanat and Kaliel Isaza Tuzman,] as GX 1507, GX 1508, GX 1528-A, GX 2967, GX 2968, and GX 3062-A."  (Id. at 24)[13]

---

[13]  GX 2967 at the 2017 trial is substantially similar to GX 2969 at Irfan Amanat's trial.  Amanat does not challenge this Court's admission of GX 3062-A.  Accordingly, this exhibit will not be discussed further.  In his new trial motion, Amanat objects to the Court's admission of GX 1537.

After summarizing these exhibits, the Court noted that all of them – except for GX 3062-A, which is not at issue here – "were admitted without objection during the 2017 trial." (Id. at 26)  Noting Amanat's argument that none of the exhibits had probative value, the Court "conclude[d] that all of these emails constitute relevant background evidence."  (Id.)

The Court explained that these

> emails [are] necessary to explain Maiden's understanding of Amanat's role at Enable, and the course of dealings among the co-conspirators from March 2009 onward.  Absent the emails and related testimony, it would not be clear why Maiden relied on Irfan Amanat (rather than Omar Amanat) to provide him with false Enable account statements and to answer questions about Enable, as well as why Irfan participated in the conference call among the alleged conspirators in March 2009, during which, according to the government, Irfan told Maiden that his investment in Enable was gone.

(Id. at 26-27)

The Court further explained that the emails are "probative of Irfan Amanat's knowledge that the loss of Maiden Capital's investment in Enable had created a 'hole' in Maiden's fund, and [are] thus probative of Irfan's intent and motive to conceal the losses from Maiden Capital's investors once Maiden joined the scheme in March 2009."  (Id. at 27)

The Court acknowledged Amanat's arguments that (1) the emails "should be precluded under Rule 403, because evidence that he sent false and misleading emails and Enable account statements to Maiden in 2008 may cause the jury to convict him based on misconduct that pre-dates the conspiracy"; and (2) "the potential prejudice to him is greater than that suffered by Omar Amanat at the 2017 trial, because it was Irfan who sent the false Enable statements to Maiden."  (Id. (citing Def. Br. (Dkt. No. 828) at 13-14))  However, the Court explained that

---

(Def. Br. (Dkt. No. 884) at 21)  Amanat did not move to exclude this exhibit prior to trial, and he did not object to its admission at trial.  Finally, Amanat objects to GX 1536 (id.), but this exhibit was not received in evidence, and thus will not be discussed further.

"'[t]he Second Circuit has declined to find probative evidence which is properly used at trial unduly prejudicial under Rule 403 where "it did not involve conduct more inflammatory than the charged crime."'" (Id. at 28 (quoting United States v. Brown, 2017 WL 2493140, at *2 (S.D.N.Y. June 9, 2017) (quoting United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006))))

The Court went on to deny Amanat's motion to preclude the exhibits admitted at the 2017 trial as GX 1507, GX 1508, GX 1528-A, GX 2967, and GX 2968. (Id.) The Court concluded that these exhibits – which demonstrate "that Irfan Amanat sent false and misleading emails and Enable account statements to Maiden in 2008 and early 2009" – are relevant background information for the reasons discussed above. (Id.) The Court further concluded that these exhibits are "not unfairly prejudicial, because this evidence is no more inflammatory than the false Enable account statements [Amanat] allegedly sent to Maiden after March 2009." (Id.) The Court invited Amanat "to submit a proposed limiting instruction making clear that he is not charged with any conduct that occurred prior to March 2009." (Id.)[14]

In his new trial motion arguing that these exhibits should not have been admitted, Amanat merely repeats the same arguments he made in his motion in limine. These arguments are rejected for the same reasons set forth at the October 16, 2018 hearing. (See Oct. 16, 2018 Tr. (Dkt. No. 843) at 22-28) These exhibits are relevant background evidence that help explain Maiden's dealings with Amanat and his understanding of Amanat's role at Enable. They provide necessary context as to the circumstances in which Amanat provided Maiden with Enable

---

[14] On the second day of trial, defense counsel submitted a proposed limiting instruction (Tr. 68), and the Court noted that it intended "to instruct the jury that a conviction cannot be predicated on acts that took place prior to the onset of the charged conspiracy." (Tr. 72) The Court instructed defense counsel to alert the Court whenever he "want[ed] [the Court] to give [the limiting instruction[]." (Tr. 75) As discussed below, during trial, the Court repeatedly instructed the jury that a conviction could not be predicated on statements or conduct that took place prior to March 2009, when the Indictment alleged that the conspiracy had begun.

account statements, and why Amanat was involved in the March 8, 2009 conference call and the

events that took place after that call.  Because these exhibits show Amanat's central role in

dealing with Maiden in the early months of Maiden Capital's investment in Enable, they are

probative of his intent and motive to conceal losses from Maiden Capital's investors.  Finally, as

the Court noted in denying Amanat's motion in limine concerning these exhibits, they are no

more inflammatory than post-March 8, 2009 emails and account statements admitted in evidence

which show Amanat's role in providing false Enable account statements to Maiden.[15]

        Although the challenged exhibits were admitted as relevant, probative, and not

unfairly prejudicial, the Court repeatedly instructed the jury that a conviction could not be

predicated on statements or conduct that took place prior to March 2009, when the Indictment

alleged that the conspiracy had begun.

        In its preliminary instructions, the Court informed the jury that from time to time

it would instruct the jury that certain evidence could be considered only for a limited purpose,

and that the jury was required to abide by the Court's instruction.  (See Tr. at 6 ("If I instruct you

that some evidence is received only for a limited purpose, then you must follow that

instruction."))

        On the second day of trial, the Court gave a limiting instruction concerning

evidence of statements made prior to the time period charged in the Indictment:

> Ladies and gentlemen, you may recall that in my preliminary instructions I told
> you that from time to time evidence is admitted only for a limited purpose, and
> this is one of those times.
>
> So we have heard some testimony already about statements that Omar Amanat
> allegedly made to Mr. Maiden related to Enable in the summer of 2008 prior to
> Maiden Capital investing in Enable.  I want to emphasize to you that Omar

---

[15] This same reasoning applies to GX 1537, which Amanat did not object to in his in limine
motion or at trial.

> Amanat's statements about Enable in 2008 were made before the time period of
> the crimes charged in the indictment. So the time period that is charged in the
> indictment begins in March of 2009; and, as I have said, we have heard about
> some statements that allegedly were made in the summer of 2008. So that
> precedes the time period that is charged in the indictment.
>
> So this evidence from what I will refer to as the pre[-]conspiracy time period, the
> time period before March 2009, this evidence is being admitted for the limited
> purpose of providing background to the crimes that are charged in the indictment.
> However, you should be aware that a guilty verdict as to any count cannot be
> predicated on acts that took place prior to March of 2009.

(Tr. 119-20 (emphasis added))

When GX 1507 was admitted into evidence, the Court repeated its limiting

instruction concerning evidence of statements made prior to the time period alleged in the

Indictment:

> Ladies and gentlemen, another limiting instruction similar to the one I gave you a
> moment ago.
>
> Mr. Irfan Amanat is charged in the indictment with a number of crimes that
> allegedly were committed between March 2009 and 2012. You have heard some
> evidence already regarding alleged events that took place in 2008 and early 2009.
> Those events occurred before the time period of the crimes charged in the
> indictment. This evidence, as I have told you, is being admitted for the purpose of
> providing background to the crimes charged in this case. But it is important that
> you understand that Mr. Irfan Amanat is not charged in the indictment with
> committing any crimes that occurred during the period before March 2009.
> Therefore, as I have told you, a guilty verdict in this case cannot be predicated on
> acts that took place prior to March 2009.
>
> It is also important for you to know that Mr. Irfan Amanat is not charged in this
> case with defrauding Mr. Maiden. In particular, he is not charged with sending
> false Enable account statements to Mr. Maiden or making false representations
> related to Mr. Maiden's account at Enable prior to March of 2009. Instead, Mr.
> Amanat is charged with joining a scheme with Mr. Maiden to defraud Maiden
> Capital investors beginning in March of 2009; and, at the end of the trial, you
> will be asked to determine whether the government has proven beyond a
> reasonable doubt that Mr. Irfan Amanat is guilty of the crimes charged in the
> indictment based on conduct that took place, as I have said, between March 2009
> and 2012.

(Tr. 133-34 (emphasis added))

On October 23, 2018 – the second day of trial – the jury heard a substantial amount of testimony concerning events that had taken place prior to the time period charged in the Indictment.  Accordingly, the Court repeated its limiting instruction regarding such evidence before the jury left for the day:

> Ladies and gentlemen, before we break for the day, I do want to remind you of an instruction I gave you earlier.
>
> We heard a great deal of testimony today about matters that took place in 2008 and 2009, prior to March of 2009.  I do want to remind you that Mr. Irfan Amanat is charged with crimes that took place between March 2009 and 2012, and that, as I told you earlier, a guilty verdict here cannot be predicated on acts that took place prior to March 2009.  We have received evidence on these matters solely as background to what happened from March 2009 going forward.  So I wanted to reiterate that limitation to you.

(Tr. 324-25 (emphasis added))

And in its charge to the jury, the Court stated:

> From time to time, I received certain evidence for a limited purpose.  For example, I instructed you that evidence of events that took place, or statements that were made, prior to March 2009 could be considered solely as background evidence, and that a guilty verdict on any count could not be predicated on pre-March 2009 statements and conduct.  Where evidence was admitted for a limited purpose, you must follow the limiting instructions I have given, and use the evidence only for the purpose I indicated.

(Tr. 816)

"[T]he law recognizes a strong presumption that juries follow limiting instructions," United States v. Snype, 441 F.3d 119, 129 (2d Cir. 2006), and there is no reason to doubt that the jury followed the Court's instructions here.

Accordingly, Amanat's Rule 33 motion will be denied.

## CONCLUSION

For the reasons stated above, Defendant Irfan Amanat's motion for a

judgment of acquittal or for a new trial (Dkt. No. 883) is denied.

Dated:  New York, New York
        August 30, 2021                          SO ORDERED.

                                                 _____
                                                 Paul G. Gardephe
                                                 United States District Judge