L98GamaS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4              v.                           15 Cr. 536 (PGG)

5  IRFAN AMANAT,

6                                           Sentence
            Defendant.
7  ------------------------------x

8                                           New York, N.Y.
9                                           September 8, 2021
                                            1:00 p.m.
10

11 Before:

12                 HON. PAUL G. GARDEPHE,

13                                           District Judge

14                        APPEARANCES
15
   AUDREY STRAUSS
16      United States Attorney for the
        Southern District of New York
17 JOSHUA NAFTALIS
        Assistant United States Attorney
18
   PRIYA CHAUDHRY
19      Attorney for Defendant

20 Also Present:

21 JULIE D'AMATO, Special Agent

22

23

24

25

L98GamaS

1          (In open court)

2          THE DEPUTY CLERK:  United States of America v. Irfan

3    Amanat.

4          Counsel for the government, please state your

5    appearance.

6          MR. NAFTALIS:  Good afternoon, your Honor.  Joshua

7    Naftalis.  With me at counsel table is Special Agent Julia

8    D'Amato with the FBI.

9          THE DEPUTY CLERK:  Counsel for the defendant, please

10   state your appearances.

11         MS. CHAUDHRY:  Good afternoon, your Honor.  Priya

12   Chaudhry and Seth Zuckerman.  We're here for the defendant,

13   Irfan Amanat, who is seated between us.

14         THE COURT:  This matter is on my calendar for purposes

15   of sentencing.  Before proceeding further, I will address the

16   recent amendment to Rule 5 of the Federal Rules of Criminal

17   Procedure.  As required by Rule 5(f), I direct the government

18   to comply with its obligations under *Brady v. Maryland* and its

19   progeny to disclose to the defense all information, whether

20   admissible or not, that is favorable to the defendant, material

21   to either guilt or to punishment and known to the government.

22   Possible consequences for noncompliance with this order may

23   include dismissal of charges, exclusion of evidence and

24   professional discipline and court sanction on the attorney or

25   attorneys responsible.  I have entered a written order that

L98GamaS

1    more fully describes the government's obligations and the

2    possible consequences of failing to meet those obligations.

3    And I direct the government to review and comply with that

4    order.

5               Mr. Naftalis, does the government confirm that it

6    understands its obligations and has fulfilled them?

7               MR. NAFTALIS:  Yes, of course, your Honor.

8               THE COURT:  In preparation for sentencing, I have read

9    the revised presentence report dated June 4th, 2021.  I have

10   read defense counsel's July 17th, 2021 sentencing submission,

11   as well as all of the accompanying exhibits.  I have also read

12   the government's August 4th, 2021 sentencing submission.  I

13   read defendant's supplemental sentencing submission filed on

14   August 12th and the accompanying exhibits.  And I have read the

15   government's supplemental sentencing submission filed on August

16   16th, 2021.

17              Ms. Chaudhry, have you revised the presentence report

18   and recommendation and discussed it with Mr. Amanat?

19              MS. CHAUDHRY:  I have, your Honor.

20              THE COURT:  Mr. Amanat, have you read the revised

21   presentence report and recommendation and discussed it with

22   your counsel?

23              THE DEFENDANT:  I have, your Honor.

24              THE COURT:  Defense counsel made a number of

25   objections to the factual portions of the presentence report.

L98GamaS

These objections are set forth at Pages 25 through 28 of the presentence report.  In many instances the probation department adopted the changes proposed by defense counsel.

        To the extent that the probation department did not make the changes requested by the defense, I will address those objections now.  I want to be clear that I am addressing objections to the factual portions of the presentence report at this point.  I will discuss objections to the guidelines calculations later.

        The defense objects to Paragraph 34 of the presentence report to the extent that it alleges that there was a quid pro quo arrangement between Enable and KIT Digital, in which KIT Digital agreed to send its spare cash to Enable in exchange for Enable's investment in KIT Media.  There was evidence at trial that KIT Digital sent $6.5 million of its cash to Enable for cash management and that Enable had previously invested in KIT Media.  (Trial Tr. 511-15)  While the jury could have found that these matters were not unrelated, there was no explicit testimony about there being a quid pro quo.  Accordingly, to the extent that Paragraph 34 suggests that there was a quid pro quo arrangement, I will ignore that assertion.

        The defense objects to Paragraph 43 which discusses a December 18, 2008 email between Irfan Amanat and his brother Omar Amanat.  That email was admitted at trial.  (GX 2965, Trial Tr. 184-86).  The grounds for the objection is that the

L98GamaS

email was sent before the onset of the conspiracy to defraud

Maiden Capital investors, as charged in the indictment.  The

objection is overruled for the reasons set forth in my opinion

denying the Defendant's post-trial motions (Dkt. No. 1204 at

Pages 33-42).  This email is necessary background to the

charged conspiracy.  Moreover, at sentencing, I am of course

free to consider any background information concerning a

defendant's criminal conduct.  Clearly, the objection is

overruled.

          Defense counsel objects to Paragraph 46 to the extent

that it says that, in a March 2009 telephone call with Stephen

Maiden, Omar Amanat, and Tuzman, the defendant said that Maiden

Capital's investment in Enable was lost.  Defense counsel says

that her client used the term "frozen."  Defense counsel also

objects to the extent that this paragraph and Paragraph 59

report that Enable was insolvent.  The probation officer

changed the word "lost" to "frozen" in Paragraph 46, but the

references to insolvency remain.

          These issues are likewise addressed in the opinion

denying the defendant's post-trial motions.  See Dkt. No. 1204

at p. 10 and n. 7.  As discussed in the opinion, it is true

that Irfan Amanat reported that Maiden's investment was

"frozen."  See id. and Trial Tr. 241.  But over the next three

years, all the relevant parties -- Irfan Amanat, Omar Amanat,

Tuzman, and Stephen Maiden -- all treated Maiden Capital's

L98GamaS

<table>
<tr><td>1</td><td>investment in Enable, and KIT Digital's investment in Enable,</td></tr>
<tr><td>2</td><td>as lost.  As to Maiden Capital, the lost investment was</td></tr>
<tr><td>3</td><td>referred to as the "Enable hole."  See, for example, Trial Tr.</td></tr>
<tr><td>4</td><td>255-59,   The Government also introduced multiple emails at</td></tr>
<tr><td>5</td><td>trial in which Omar Amanat and Irfan Amanat discussed the fact</td></tr>
<tr><td>6</td><td>that they could not repay the investors' funds that Irfan</td></tr>
<tr><td>7</td><td>Amanat had lost.  See, for example, GX 2965, GX 2975 and Trial</td></tr>
<tr><td>8</td><td>Tr. 185-86.  In an April 20, 2009 email from Omar Amanat to</td></tr>
<tr><td>9</td><td>Irfan Amanat, Omar commented that investors' money had been</td></tr>
<tr><td>10</td><td>lost due to "poor risk management."  (GX 3069-A)  A company's</td></tr>
<tr><td>11</td><td>inability to pay its obligations constitutes insolvency.  The</td></tr>
<tr><td>12</td><td>objection is overruled.</td></tr>
<tr><td>13</td><td>        Defense counsel objects to Paragraph 54 to the extent</td></tr>
<tr><td>14</td><td>that it states that Irfan Amanat had knowledge of the monthly</td></tr>
<tr><td>15</td><td>statements that Stephen Maiden sent out to Maiden Capital</td></tr>
<tr><td>16</td><td>investors.  This issue is also discussed in the decision</td></tr>
<tr><td>17</td><td>denying the defendant's post-trial motions.  The defendant</td></tr>
<tr><td>18</td><td>provided monthly statements to Maiden concerning Maiden</td></tr>
<tr><td>19</td><td>Capital's investment in Enable, and the Defendant was well</td></tr>
<tr><td>20</td><td>aware that the information he provided would be used by Maiden</td></tr>
<tr><td>21</td><td>to calculate the value of each Maiden Capital investor's</td></tr>
<tr><td>22</td><td>account each month.  (Dkt. No. 1204 at 4, 9, 13)  Plainly, the</td></tr>
<tr><td>23</td><td>objection is overruled.</td></tr>
<tr><td>24</td><td>        Defense counsel objects to portions of Paragraph 133,</td></tr>
<tr><td>25</td><td>which discuss the defendant's prior employment at Tradescape,</td></tr>
</table>

L98GamaS

1    where he was the chief technology officer.  The defendant's

2    employment at Tradescape is relevant in the sense that the SEC

3    enforcement order entered against him in 2006 arises out of his

4    work for Market XT, whose parent was Tradescape.  And the SEC

5    enforcement order is a relevant consideration in imposing

6    sentence on the defendant.  To the extent that Paragraph 133

7    also discusses Omar Amanat's bankruptcy, the sale of

8    Tradescape, what happened to the proceeds from the sale, all of

9    this information will be disregarded in sentencing the

10   defendant.

11           Ms. Chaudhry, do you have any additional objections to

12   the factual portions of the presentence report?

13           MS. CHAUDHRY:  I do not.

14           THE COURT:  Does the government have any objections to

15   the factual portions of the presentence report?

16           MR. NAFTALIS:  No, Your Honor.

17           THE COURT:  Except as set forth above, I hereby adopt

18   the factual portions of the presentence report.

19           I will impose sentence.  In accordance with the

20   sentencing guidelines, I am required to consider what the

21   guidelines recommend.  Here, the jury convicted Mr. Amanat of

22   conspiracy to commit wire fraud, wire fraud, aiding and

23   abetting investment adviser fraud, and conspiring to commit

24   securities fraud.  Pursuant to the grouping rules of the

25   sentencing guidelines, the probation department grouped all

L98GamaS

1    four counts of conviction.  The probation department imposed

2    the following enhancements to the base offense level of seven.

3    Eighteen levels were added because the probation department

4    determined that the loss amount is 9.45 million, an amount that

5    falls between the range of 3.5 million and 9.5 million set

6    forth in the sentencing guidelines.

7            The probation department imposed a two level

8    enhancement pursuant to §2B1.1(b)(9)(C) because by engaging in

9    the offense conduct, Mr. Amanat violated a 2006 SEC enforcement

10   order that required him to cease-and-desist from violating

11   §10(b) of the Securities and Exchange Act.

12           Probation department imposed a two level enhancement

13   under Section 2 B1.1(b)(10)(B) and (C) because a substantial

14   part of the fraudulent scheme was committed from outside of the

15   United States and because the offenses otherwise involved

16   sophisticated means and the defendant intentionally engaged in

17   and caused the conduct constituting sophisticated means.

18           The probation department imposed a four level

19   enhancement pursuant to §2B1.1(b)(20)(A)(ii) because the

20   offense involved a violation of the securities laws and ,at the

21   time of the offense, the defendant was a person associated with

22   a broker-dealer.

23           In the presentence report, these calculations result

24   in a total offense level of 33, .

25           The probation department went on to determine that

L98GamaS

1    Mr. Amanat has no criminal history points and that he thus

2    falls within criminal history category I.

3         Based on an offense level of 33 and a criminal history

4    category of I, the probation department concluded that the

5    applicable guidelines range is 135 to 168 months' imprisonment.

6         The defendant has raised a number of objections to the

7    guidelines calculation set forth in the presentence report.  I

8    will address those objections now.

9         I'll begin with the loss amount enhancement.  The

10   presentence report finds a loss amount of $9.45 million.  That

11   falls, as I noted, within a guidelines range of between

12   $3.5 million and $9.5 million, and that correlates with an

13   18-level enhancement.  (PSR  79); see also id.  67.

14        The Government contends that the loss amount for the

15   Maiden Capital fraud -- Counts One through Three -- is

16   $7.2 million representing a total loss to investors of

17   $7.75 million minus $550,000 that Omar Amanat wired back to

18   Maiden Capital before the fund collapsed.  As to the KIT

19   Digital accounting fraud count, the government contends that

20   Irfan Amanat should be held liable for the $2 million in KIT

21   Digital cash that was lost at Enable, and which Irfan Amanat

22   covered up over the next three years through false account

23   statements and false audit confirmations.  (Govt. Sent. Br.

24   (Dkt. No. 1181) at Pages 10-13)

25        The defense contends that the proper loss amount is

L98GamaS

1   zero.  (Def. Sent. Br. (Dkt. No. 1162) at Page 67)  As to

2   Maiden Capital, Amanat argues that the collapse of the fund was

3   caused by multiple frauds committed by Stephen Maiden, and that

4   Amanat's role in the fraud was limited to providing phony

5   account statements to Maiden.  (Id. at Page 59)  Amanat further

6   argues that he had no "insight into the Maiden Capital

7   holdings, value, losses, gains, investors, frauds, et cetera

8   [and] had no idea what Maiden Capital was worth at any point,"

9   and contends that he "had no idea or control over what Maiden

10   did with" the account statements he sent to Maiden.  (Id. at

11   Page 60).

12          I have already rejected Mr. Amanat's arguments

13   regarding his knowledge of what Maiden did with the Enable

14   account statements.  As I have found, there was ample evidence

15   at trial that he understood that the phony Enable account

16   statements that he provided each month to Maiden would be used

17   to calculate the account statements that Maiden provided to its

18   investors each month.

19          As to Mr. Amanat's liability for the loss suffered by

20   Maiden Capital investors, it is reasonable to hold him

21   liable -- like his brother -- for the total loss suffered by

22   Maiden Capital investors, $7.75 million.  It was foreseeable to

23   Mr. Amanat that Maiden Capital's loss of its $3 million

24   investment in Enable would lead to the total collapse of the

25   fund, because he was aware that this investment constituted a

L98GamaS

quarter of the fund's total assets.

I want to emphasize at the outset that the Maiden Capital fraud was the direct result of Irfan Amanat's loss of Maiden Capital's $3 million investment.  He was not a bystander to this fraud or a minor player as the defense contends. Instead, he was the percipient cause of the fraud and the "but for" cause of the fraud in the sense that his conduct necessitated the fraudulent cover-up over the next three years that was perpetrated by him, his brother, Omar Amanat, and by Stephen Maiden.

The evidence at trial showed that Irfan Amanat was aware that Maiden Capital was a small fund and that Maiden's investment in Enable represented a significant portion of the fund's assets.  (See Trial Tr. at 176-178 (Maiden testifying about a November 21, 2008 email he sent to Irfan Amanat in 2008 after investing funds in Enable, in which he wrote: "Hey, Irfan, can you please send me your full contact info.  It has been tough to get in touch with you this week.  Now I partly understand why, which is alarming, since I have three million with your fund, about one quarter of my whole fund.  While two million is temporary, please go above and beyond to communicate with me closely as my business is really at risk in that capital.")  See also GX 1515.

Accordingly, Maiden made clear to Irfan Amanat -- at the very outset of the relationship -- that Maiden Capital's

L98GamaS

1    investment in Enable constituted a large percentage of his

2    fund's total assets, and that the size of that investment meant

3    that Maiden Capital itself was "at risk" in making such a large

4    investment in Enable.  Accordingly, it was foreseeable to Irfan

5    Amanat that the disclosure that Maiden Capital's $3 million

6    investment in Enable had evaporated, and that that loss was

7    fraudulently covered up for the next three years, would lead to

8    the collapse of Maiden Capital and a total loss for its

9    investors.  Accordingly, as with Omar Amanat, it is reasonable

10   to hold Irfan Amanat responsible for the full $7.75 million

11   loss suffered by Maiden Capital investors.

12        I note that the government credits Irfan Amanat for

13   $550,000 that Omar Amanat wired to Maiden to help him keep

14   Maiden Capital afloat prior to its collapse in 2012.  (Govt.

15   Sent. Br. (Dkt. No. 1181) at Pages 10-13)  But as I pointed out

16   in a loss amount opinion that I issued concerning Omar Amanat,

17   Maiden testified that at the time of his fund's collapse in

18   2012, he owed his investors $7.75 million.  (July 29, 2021

19   Opin. (Dkt. No. 1179) at Pages 33-34 (citing Trial Tr. 1168))

20   Accordingly, even after the $550,000 that Omar Amanat wired to

21   Maiden is taken into account, the collapse of Maiden Capital

22   resulted in a $7.75 million loss to its investors.

23        As to the KIT Digital accounting fraud, Irfan Amanat

24   repeatedly submitted false audit confirmations indicating that

25   Enable was holding $2 million of KIT Digital's cash.  This was

L98GamaS

```
1   false.  Acknowledging that Irfan Amanat did not have knowledge
2   of unrelated accounting fraud ongoing at KIT Digital --
3   including a very significant round tripping scheme -- Irfan
4   Amanat was aware that KIT Digital's $2 million in cash had been
5   lost and that it was wrong and fraudulent for him to represent
6   to KIT Digital's outside auditors that Enable was in fact
7   holding $2 million in cash for KIT Digital.  Accordingly, it
8   was foreseeable to Irfan Amanat that his conduct would result
9   in a $2 million loss to KIT Digital investors.  I conclude that
10  the loss amount as to the KIT Digital accounting fraud charge
11  as to Mr. Amanat is $2 million.
12          At this juncture, I will also point out that
13  Mr. Amanat's objection to the government's $7.2 million loss
14  amount on Counts One, Two and Three is largely a moot point.
15  Maiden Capital invested $3 million in Enable (Aug. 30, 2021
16  Opin. (Dkt. No. 1204) at Pages 3, 6) all of which was lost.
17  Irfan Amanat spent the next three years covering up that loss,
18  issuing phony account statements to Maiden, which he knew that
19  Maiden would use as the basis for the monthly statements Maiden
20  was sending out to Maiden Capital investors.  Indeed, as late
21  as 2012, Irfan Amanat was still sending out account statements
22  to Maiden indicating that Maiden Capital's holdings at Enable
23  amounted to $2.5 million.  (GX 1735)  From the $3 million that
24  Maiden Capital invested in Enable and which was lost, one may
25  subtract the $550,000 that Omar Amanat wired to Maiden to
```

L98GamaS

forestall the collapse of Maiden Capital.  Accordingly, looking

solely at Maiden Capital's lost investment in Enable, the loss

amount for Counts One, Two and Three would be $2.45 million.

Combined with the $2 million loss amount applicable to the KIT

Digital accounting fraud, the most conservative loss amount is

$4.45 million, which falls within the $3.5 million to

$9.5 million range that leads to an 18 level enhancement.

        To the extent that Amanat argues that *Stoneridge*

*Investment Partners LLC v. Scientific-Atlanta, Inc.,* 522 U.S.

148 (2008) and *Janus Capital Group, Inc. v. First Derivative*

*Traders,* 564 U.S. 135 (2011) require a different result, I am

not persuaded.  Neither case addresses the calculation of loss

for purposes of the sentencing guidelines.  *Stoneridge*

addresses the reach of the private right of action under §10(b)

and Rule 10(b)(5).  *Janus* addresses a private action under Rule

10b-5, and whether a mutual fund investment adviser could be

found liable for statements made in a client's prospectus.  I

don't find these cases persuasive for purposes of calculating

loss amount here.

        Accordingly, I conclude that the loss amount for all

counts of conviction, conservatively estimated, would be at

least $4.45 million, which correlates with an 18 level

enhancement.  The more accurate loss amount -- and the amount I

will apply -- is $9.75 million, reflecting the $7.75 million

loss suffered by Maiden Capital investors and the $2 million

L98GamaS

1    loss suffered by KIT Digital investors.  Under §2B1.1(b)(1)(K)

2    of the sentencing guidelines, a loss amount of $9.75 million

3    results in a 20 level increase.

4             Now, I want to mention tangentially at this point

5    that, while I am required under the law to conduct this

6    extensive analysis of loss amount, I'm keenly aware of the

7    criticism of the sentencing guidelines' loss provisions and the

8    affect they can have on a proper sentencing.  And I'm acutely

9    sensitive to that point.  And the fact that I have gone through

10   this level of analysis should not in any way indicate that the

11   sentencing here is going to be premised on loss amount.  I am

12   required under the law to conduct this analysis.  However, I

13   have freedom under the law to vary from the guidelines range.

14            The PSR imposes a four-level enhancement under

15   §2B1.1(b)(20)(A)(ii) of the Sentencing Guidelines because the

16   defendant's offense involved a violation of the securities laws

17   and, at the time of the offenses, the defendant was associated

18   with a broker-dealer.  (PSR  82)

19            Defense counsel objects to this enhancement, arguing

20   that Irfan Amanat was not in fact associated with a

21   broker-dealer.

22            The government agrees that the four-level enhancement

23   is improper noting, among other things, that there is no

24   evidence that Enable purchased securities on behalf of KIT

25   Digital.  (Govt. Sent. Br. (Dkt. No. 1181) at Pages 8-9)

L98GamaS

1              Accordingly, defendant's objection to Paragraph 82 of

2       the presentence report is sustained, and no four-level

3       enhancement will be imposed.

4              The PSR imposes a two-level enhancement because a

5       substantial part of the fraudulent scheme was committed from

6       outside the United States and because the offense involved

7       sophisticated means.  (PSR  81)

8              Mr. Amanat objects to this two-level enhancement,

9       arguing that although he operated from Dubai between 2008 and

10      2010, he returned to the United States in 2010.  He also argues

11      that he merely sent out phony account statements and that this

12      conduct was not sophisticated in any way.  (Def. Sent. Br.

13      (Dkt. No. 1162) at Pages 46-50)

14             As discussed in the opinion denying the defendant's

15      post-trial motions, the fraudulent schemes in which Mr. Amanat

16      participated were quite complex, as suggested by the fact that

17      the conspirators continued to keep the fraud going for more

18      than three years.  For years, Irfan Amanat constructed

19      completely phony account statements each month purporting to

20      show the value of Maiden Capital's investment in Enable.  The

21      Amanat brothers were also running what was, in effect, a Ponzi

22      scheme, robbing Peter to pay Paul.  For example, they induced

23      Maiden to invest $2 million in additional funds in Enable,

24      characterizing it as a short term loan needed as "show money,"

25      to induce another investor to make a significant investment in

L98GamaS

1    Enable.  After obtaining the $2 million from Maiden, they

2    immediately used Maiden Capital's investment to redeem KIT

3    Digital's investment in Enable.  And as time passed and Maiden

4    Capital began to see redemption requests, Omar Amanat arranged

5    for more than $500,000 to be wired to Maiden so that he could

6    satisfy the redemption requests and thus forestall discovery of

7    the fraud.  And throughout the more than three-year period of

8    these fraudulent schemes, the conspirators had countless

9    discussions about how to cover the "Enable hole," deciding

10   eventually that the solution was the sale of KIT Digital.  The

11   false audit confirmations that Mr. Amanat supplied to KIT

12   Digital's outside auditors also served the Maiden Capital

13   fraud, in the sense that they assisted in making KIT Digital's

14   financial condition look more favorable than it actually was,

15   thus making the company a more attractive candidate for

16   purchase.  Accordingly, the two-level sentencing enhancement is

17   warranted pursuant to 2B1.1(b)(10)(C) for use of sophisticated

18   means.

19        The evidence at trial also showed that a substantial

20   part of the fraudulent scheme was committed from Enable's

21   headquarters in Dubai.  Mr. Amanat was based in Dubai between

22   2008 and 2010 when key developments in the fraud schemes took

23   place.  See Trial Tr. Pages 93-95.  During these early years,

24   Mr. Amanat provided the phony account statements to Maiden from

25   Dubai.  It is also worth noting that Mr. Amanat's move to Dubai

L98GamaS

took place in or about 2007.  (PSR  Paragraphs 128-29)  The SEC

issued a cease-and-desist order -- which imposed a five-year

ban on Amanat -- on November 3, 2006.  Although Amanat

attributes his move to Dubai to anti-Muslim sentiment in the

United States and to the fact the cost of living is less in

Dubai (Def. Sent. Br. (Dkt. No. 1162) at 26), it is reasonable

to infer that the move was, at least in part, an attempt to

escape US law enforcement and regulators.  In any event, the

phony account statements Mr. Amanat generated for several years

in Dubai were crucial in perpetrating and maintaining for three

years the scheme to defraud Maiden Capital investors.

Accordingly, the two-level enhancement is also warranted

pursuant to §2B1.1(b)(10)(B).

        The PSR imposes a two-level enhancement pursuant to

§2B1.1(b)(9)(C) of the sentencing guidelines because, in

committing the offense conduct, Mr. Amanat violated an SEC

enforcement order issued in November 2006.  (PSR  80)

        Defense counsel objects to the enhancement, arguing

that Mr. Amanat was not associated with a broker-dealer and

that he was convicted of conspiracy to violate §10(b), and not

of a substantive §10(b) violation.  (Def. Supp. Sent. Br. (Dkt.

No. 1193) at 10)

        §2B1.1(b)(9)(c) of the Guidelines provides:  "If the

offense involved (C) a violation of any prior, specific

judicial or administrative order, injunction, decree, or

L98GamaS

process not addressed elsewhere in the guidelines increase by 2

levels."

        The 2006 SEC enforcement order against Irfan Amanat

provides, in part, that he "cease-and-desist from committing or

causing any violations or future violations of §10(b) or Rule

10b-5 of the Securities Exchange Act of 1934."  (See Def. Supp.

Sent. Br., Ex. C (Dkt. No. 1193-3) at PAge 25)

        Mr. Amanat argues that because the government

conceded -- for purposes of the four-level enhancement I

discussed a moment ago -- that Amanat was not associated with a

broker-dealer, the two-level enhancement for violating the SEC

enforcement order is not applicable.  (Def. Supp. Sent. Br.

(Dkt. No. 1193) at 10)  This argument is not persuasive,

because the defendant does not have to be associated with a

broker-dealer for the two-level enhancement to apply.

        Count Six of the Indictment charges Mr. Amanat with a

conspiracy to commit securities fraud, and alleges that, in

furtherance of the alleged conspiracy, he repeatedly supplied

KIT Digital's auditors with false and fraudulent audit

confirmations regarding the amount of cash that Enable was

holding for KIT Digital, knowing that this information would be

cited in the company's Form 10-K filings.

        I conclude that Mr. Amanat participated in the charged

conspiracy to commit securities fraud and that his conduct

violated the 2006 enforcement order.

L98GamaS

Accordingly, the two-level enhancement pursuant to §2B1.1(9)(C) is properly imposed.

Mr. Amanat contends that his offense level should be reduced by four levels because he was a minimal participant in the offenses of conviction.  (Def. Sent. Br. (Dkt. No. 1162) at Pages 50-55)

If Mr. Amanat had been convicted only of the KIT Digital accounting fraud, it is possible that a role in the offense reduction might be appropriate.  There was an ongoing and very complex accounting fraud conspiracy taking place at KIT Digital, most of which was not known to Mr. Amanat.  In particular, the company's CEO and CFO were engaged in a complex round tripping scheme that involved moving around the company's money to make it look like the company was generating significant amounts of revenue.  In this context, Mr. Amanat's false and fraudulent audit confirmations regarding $2 million in cash were a small part of a much larger accounting fraud conspiracy.

But in determining whether a role in the offense reduction is appropriate, I am to consider the aggregate conduct.  Accordingly, I must consider all of the offenses of conviction grouped together, the Maiden Capital fraud together with the KIT Digital fraud.  (U.S.S.G. §3D1.3(b) and cmt. n. 3.

As I have already discussed, Mr. Amanat's role in the Maiden Capital fraud was much more significant.  Indeed, he was

L98GamaS

the but-for cause of the fraud, in the sense that his loss and
diversion of the money Maiden Capital put into Enable led to a
more than three-year coverup and the ultimate collapse of
Maiden Capital.

          Commentary to §3B1.2 of the Guidelines provides that a
"minimal participant" designation is intended to cover
defendants who are plainly among the least culpable of those
involved in the conduct of a group.  Under this provision, the
defendant's lack of knowledge or understanding of the scope and
structure of the enterprise and of the activities of others is
indicative of a role as minimal participant."  Citing U.S.S.G.
§3B1.2, cmt. n. 4.

          In determining whether to grant a role in the offense
reduction, the court considers:

          (i) the degree to which the defendant understood the
scope and structure of the criminal activity;

          (ii) the degree to which the defendant participated in
planning or organizing the criminal activity;

          (iii) the degree to which the defendant exercised
decision-making authority or influenced the exercise of
decision-making authority;

          (iv) the nature and extent of the defendant's
participation in the commission of the criminal activity,
including the acts the defendant performed and the
responsibility and discretion the defendant had in performing

L98GamaS

those acts;

       (v) the degree to which the defendant stood to benefit from the criminal activity.

       Citing U.S.S.G. §3B1.2, cmt. n. 3(C).

       The Second Circuit has explained that a "minimal" role adjustment is appropriate for a defendant who is "plainly among the least culpable of those involved in the conduct of a group," and a "minor" role adjustment is appropriate for a defendant "who is less culpable than most other participants." On numerous occasions the Second Circuit has reiterated that a reduction pursuant to U.S.S.G. §3B1.2 will not be available simply because the defendant played a lesser role than his co-conspirators.  To be eligible for a reduction, the defendant's conduct must be minor or minimal as compared to the average participant in such a crime.  *United States v. Kirk Tang Yuk,* 885 F.3d 57, 88 (2d Cir. 2018)

       As discussed in the opinion denying Mr. Amanat's post-trial motions (Aug. 30, 2021 Opin. (Dkt. No. 1204), he was a central and full participant in the Maiden Capital fraud conspiracy and he had an understanding of its full scope. Indeed, as I have pointed out, the fraud conspiracy against Maiden Capital was in large part designed to protect Mr. Amanat and Enable both from civil suits and possible criminal fraud charges.  His fabrication each month of the fraudulent account statements was critically important to the fraud scheme.  And

L98GamaS

1  his emails with his brother make clear that he fully understood

2  the criminal nature of his actions.

3          I conclude that no role in the offense reduction is

4  appropriate.

5          Does the defendant have any additional objections to

6  the guidelines calculations?

7          MS. CHAUDHRY:  We do not.

8          THE COURT:  Does the government have any objections to

9  the accuracy of the guidelines calculations as I have reported

10  them?

11          MR. NAFTALIS:  No, your Honor.

12          THE COURT:  Based on my independent evaluation of the

13  sentencing guidelines, I find that the offense level is 31, the

14  criminal history category is I ,and the applicable guidelines

15  range is 108 to 135 months' imprisonment.

16          I'd hear from you Ms. Chaudhry as to an appropriate

17  sentence.

18          MS. CHAUDHRY:  Before I begin my remarks, I would like

19  to introduce the people who are here in this courtroom, the

20  people who are downstairs in the overflow courtroom and the

21  people on the phone.  I won't list everyone, since many of them

22  are minor children and I don't want their names in the

23  transcript.  But I want the Court to know that here are

24  Mr. Amanat's mother, his sister, three of his children, his

25  ex-wife, her brothers, many people the Court has already heard

L98GamaS

from through letters, and cousins and people who love him all
over the world listening on the phone.  And on behalf of all of
those people, they have asked me to express their greetings,
salutations and gratitude to the Court.

Your Honor, when I first met Irfan in the summer of
2019, I made the same mistake as everyone else and
mispronounced his last name.  Polite, respectful and shy Irfan
did not correct me.  But a few days later when I spoke to his
father, Sharif, he introduced himself as Dr. Amanat.  I was
stunned.  Because I know the meaning of the word "amanat" in
Urdu.  It's a special word that has no English equivalent, but
I'll do my best to translate it.  Amanat means availment of
something that is very precious to its owner and is given to a
faithful person to keep it safe.  But more than that, the owner
believes that the one to whom he gives his valuable treasure,
his amanat can take better care of it than the owner himself.

In July of 2019, a very sick and dying Sharif said to
me, Irfan is your amanat now, Priya.  I trust you to take care
of him.  Please bring him home.  His mother needs him.  Soon
after I promised Sharif that I would in fact treat Irfan as my
amanat, Sharif's health took a turn for the worst and I was
never able to speak with him again.  And then eight months
later, the entire world took a turn into an unimaginable
apocalypse.  And since then, my promise to Irfan's father has
swollen steadily as all of our world's have shrunk.

L98GamaS

1          Since March of 2020, Irfan experienced the worst of

2     our collective COVID nightmare as a prisoner at the MDC.  From

3     March 2020 until May 2021, Irfan did not see a single soul from

4     the outside world; not a smile from a child, not a handshake

5     from a cousin, not the soft eyes of his beloved mother.  In

6     fact, today is the first time any of the people who love Irfan

7     have seen him since before COVID became part of the global

8     vocabulary.

9          Irfan has survived all of the horrors and terrors of

10    COVID completely alone.  During those 14 months, I was only

11    able to speak to Irfan on the phone, as even lawyers were not

12    permitted in the MDC.  The human voice is amazing.  It tells

13    the truth, speaks our stories when words fail us.  Irfan's

14    words during those months were of his dying father, his

15    broken-hearted mother, his fatherless children, and the hell

16    they were living and dying through.  But his voice betrayed his

17    own terror.  His day and night fear of whether he would

18    survive, and if he did survive, would he be permanently mangled

19    as a person for what he had seen.

20         More than once, Irfan told me he hoped he would not

21    survive this.  And his voice told me that he meant it.  His

22    voice, through the many tears, spoke of his shame and regret,

23    despair, self-loathing and guilt.  I once asked Irfan why he

24    believed he was in jail.  And his answer was, because I'm weak,

25    because I didn't stop that monster when I was 12, I didn't save

L98GamaS

my brothers and cousins.  And now that I'm a man, I'm still

weak.  I was too afraid to do the right thing then and too

afraid to do the right thing now.  And then he said that he

believed he deserved all of the suffering he has endured.  He

just wished he could have spared the people he loves.

What pained Irfan the most was that he could not, for

once in his life, sacrifice himself to save someone he loves.

He could not save his father, comfort his mother, help his

children, take the burden from his sister's shoulders or

protect his younger brother Omar.  Many times during that black

year, Irfan asked me to ask you, your Honor, if he could

exchange his own life for Omar's freedom.

While the MDC walls and COVID kept him away from his

father's death bed, Irfan was desperate that his mother not

face this devastation alone.  And so he asked me if we could

offer that Irfan serve a decade in prison so that Omar could be

released even for a week to be with their mother.  Irfan loves

his mother more than anything in the world, and he knows that

his mother has a special soft spot for Omar.  And he was

willing to sacrifice himself to give his mother the shoulder of

her special son to cry on during their father's funeral.  And

that is who Irfan is.  Sacrifice defines him.

Also, Omar defines him.  Last month, this court heard

Omar and correctly said that he has been spectacularly

successful.  That is true and has always been true.  This court

L98GamaS

1   is required to compare these brothers in order to determine

2   what sentence would be appropriate for each.  But they have

3   been compared to each other their whole lives.  Omar is

4   talented, bold, larger than life, wildly generous, and

5   sometimes just wild.  Omar is super models, movie stars and

6   private jets.  Irfan is TI85 calculators, jokes about the solar

7   systems and dad jeans.  Omar is Icarus and Irfan is his older,

8   nerdy brother.  In this story, when Icarus flew too close to

9   the sun, his older brother leapt upon him, and they both came

10  crashing to the ground and destroyed themselves.

11          As the government concedes, Irfan is less culpable

12  here than Omar.  And we hope the Court agrees and that the

13  Court's sentence reflects that.

14          Since May of 2021, Irfan has only seen his lawyers.

15  And what we have seen is a fraction of the man that we met.  He

16  has lost over 20 pounds, gained about 20 years, and all but

17  given up hope as anyone living in the heart of darkness that is

18  the MDC would do.  On the final judgment in this case, your

19  Honor will write a few words or numbers which are supposed to

20  define the punishment for Irfan.  But the real punishment will

21  not be written on the judgment here.  It can never be.  Irfan's

22  real punishment has been missing the lives of his children,

23  failing to fulfill his duty to god at his father's death bed.

24  Each tear his mother has shed because of him, those tears have

25  been drowning Irfan for three years.  Irfan's lifelong

L98GamaS

1    punishment will begin the first time he walks into his

2    childhood home and sees his father's empty chair and his own

3    missing wedding ring.  Irfan's actions cost him his father and

4    his wife; two of the biggest loves of his life.  That is the

5    unwritten part of his sentence.

6            Irfan's actions cost him three years of fatherhood to

7    his beloved four children.  That is the unwritten part of his

8    sentence.

9            His heart is broken, and he has broken the hearts of

10   everyone in this room and the room downstairs and on the phone

11   and one particular heart in heaven watching over Irfan still.

12   That is the unwritten part of his sentence.

13           Now, Irfan wishes only to be there until the last

14   breath of the woman who was there for his first breath.  From

15   this moment on, Irfan is your amanat, your Honor.  His father

16   entrusted him to me.  And now, I entrust him to you.  I ask you

17   to permit this man to return home today so that he can spend

18   the rest of his life taking care of his mother and being a

19   father to his children.  Thank you.

20           THE COURT:  I'll hear from the government.

21           MR. NAFTALIS:  Thank you, your Honor.

22           I'll only say a few things, because your Honor is very

23   familiar with this case, including as expressed in its thorough

24   opinions recently.  We recognize the new guidelines range.  And

25   we stand by our view that Mr. Amanat is less culpable than his

L98GamaS

brother Omar.  But we still do not believe that a sentence of
time served is appropriate here.  A significant prison sentence
remains appropriate.

  Your Honor has already addressed many of the arguments
that I'll make.  First, the defendant engaged in two serious
fraud schemes.  And it's somewhat ironic that his last name I
now know stands for bailee, which brings me back to law school,
when you trust someone with property or money, you become a
bailor, I guess it is.  That's what happened here.  That's what
Enable was.  It was an investment fund.  And he betrayed that
trust and destroyed Maiden and Maiden Capital and lied about it
for years.  And your Honor has cited all the ways in which he
knew exactly what he was doing, that he was not an innocent
bystander.

  And of course, there was the KIT Digital fraud, where
he continued to lie to people, including KIT Digital investors
which entrusted their money to KIT Digital, and they too were
left with huge losses.  The defendant was not an innocent
bystander, as your Honor said.  He was an integral part of this
scheme, though less culpable than Mr. Tuzman and his brother.
But millions of dollars went to waste and thousands of people
lost their job as a result.

  Second, the defendant has already violated the
securities laws.  His SEC ban went into effect shortly before
this scheme began.  And he moved to Dubai.  He knew full well

L98GamaS

```
1   he should not be lying to people, ripping them off or violating
2   securities laws.  And instead, he repeated his offenses not
3   once, but twice.
4           And the last point I'll make, your Honor, is while
5   Ms. Chaudhry's remarks to the Court were well done, what
6   continues to be missing throughout these papers is any
7   acceptance of responsibility or apologies for the destruction
8   left in the wake of the defendant's crimes.  He is not weak.
9   He is not afraid to do the right thing.  He may not be as showy
10  as Omar, but he's clearly intelligent and knew exactly what he
11  was doing.  And it's sad that he wasted all of his skills and
12  promise helping his brother commit crimes, but that's why we're
13  here and that's what happened.  Thank you, your Honor.
14          THE COURT:  Mr. Amanat, is there anything you wish to
15  say before the Court imposes sentence?
16          THE DEFENDANT:  Yes, I do, your Honor, Judge Gardephe,
17  if you can hear me clearly.
18          Judge Gardephe, thank you for the opportunity to speak
19  and thank you to everyone here to support me.  Your Honor,
20  since this is my first time addressing the Court.  I'd like to
21  begin by fully apologizing to those I've hurt.  I acknowledge
22  what Mr. Traceer said, and he's right.  I lost money.  And so
23  to the investors and the investors' families and to my family
24  and friends, I am profoundly sorry.  I never intended to cause
25  anyone harm.  But I know that I have.  And I make no excuses
```

L98GamaS

 1   because there is none.

 2           I will continue to grapple with the guilt and

 3   consequences of my acts for the rest of my life.  That fact

 4   that I did cause harm to people, it pains me.  It's not who I

 5   wanted to be.  Because growing up, I simply wanted to help

 6   people.  I mean, as a child, I was just terrible at sports, but

 7   I was fascinated by science, science fiction, Star Wars and

 8   Star Trek, but more fascinated with the possibility of helping

 9   science, of having science to help people, to improve other

10   people's lives.

11           And at graduate school, my biomedical research, which

12   I choose, was in rehabilitation, rehabilitative engineering and

13   in prosthetics and on helping people with disabilities like

14   Parkinson's, who couldn't use computers, couldn't use a

15   keyboard or a mouse.  And I wanted them to share what I

16   enjoyed, just like I remember sharing my computer and my

17   telescope with all my cousins.  I enjoyed that.  I did.

18           I transitioned into finance at the request of my

19   brother and father.  I thought it was for a semester or two

20   before I went on to continue for my Ph.D.  But there, again, I

21   enjoyed building software to help small investors.  Those who

22   know me can attest, I never splurged on fancy cars, clothes or

23   watches.  I was happiest living in my childhood home, taking

24   care of my parents and my children and all of my nephews and

25   nieces.  Happier taking them to the playground or 7-Eleven than

L98GamaS

to any five star hotel or fancy restaurant.  My idea of luxury

was time.  It was time having a cup of coffee at Dunkin Donuts

with a friend or a family member or the time to be able to take

my friends or their friends to Comic Con, even if I didn't go

in, I was happy to take that time.  My goal was always to help

people and put a smile on their faces.

It crushes me that I have fallen so far short of that

goal that I had as a kid.  I went astray.  It was my own

actions and mistakes that have led me here to prison.  I know

that.

And it's still difficult to speak of my time in

prison.  My lawyer has spoken to the truth of it.  But I have

to speak about what that time meant to me.  Everyone at MCC and

MDC went through hardships, not just me.  And I feel for all of

them.  But the hardships changed me, you know, my dreams, the

sign of a soul yearning for a future or thinking back to the

past, those were a luxury.  It was a waste and an illusion as

well because only the stark reality of the present, the

responsibilities of your own life mattered at MDC.

But the truth is, I failed.  I failed my most

important responsibilities.  I was not the kind of father I

wanted to be.  I'm sorry.  I just haven't seen them in years.

They're standing just a few feet away from me right now.  It's

the first time I've seen them in two years.  There are light

years of missing time between us.  I missed my daughter's 18th

L98GamaS

birthday last month, where every father should be.  And two
years ago, I wasn't at college to move my son into his college
dorm, where I always wanted to be since he was a kid.  And my
youngest two, I love to death.  They used to fight with each
other to see who I would carry out of the car when they used to
pretend to be asleep, and so I would happily carry both of them
at the same time.  But now, today, I don't know, they've grown
so much, I don't know if I can carry one of them.  I know over
the past two years, I wasn't there to comfort them during their
imagined and all too real nightmares that they had and the
world had.  I failed to shelter them from the storm.

            And it's not just my fatherhood I failed.  I wasn't
the type of husband or son I wanted to be when I grew up.  Last
year, my wife of 20 years filed for divorce, which I fully
understand and accept.  She had to struggle courageously by
herself.  I could not support her.  And despite that, I
appreciate her and her brothers being here today.

            But then, also, last year, after she filed for
divorce, just almost exactly a year ago, or just a few weeks
after that, my father passed away, just a few days after his
birthday.  And that I still have a hard time accepting.  It's
going to be impossible to convey the depths of my grief because
he was truly a kind and a decent man.  The memory of him is not
enough.  To recall him is to recall his humanity, his spirit
and his smile.  My earliest memories of him, it may be arcane,

L98GamaS

1    but I was confused to the difference between hydrocarbon and a

2    carbohydrate, and he explained it to me.  And then he also

3    taught me of humanity.  He was kindest to the person who was

4    being meanest to him.  I didn't understand that at the time.

5    Or just him being a dad.  One of my earliest memories of him is

6    just sitting next to him watching his favorite movie, It's A

7    Wonderful Life -- people don't remember it now -- but the whole

8    family used to gather around and watch it for Christmas; one of

9    my friends remembered it.  That's the things he taught me;

10   science, humanity and how to be a dad.  But now, my father's

11   memories in my dreams wind up with me shedding tears.

12            One my greatest regrets is that I was not there to say

13   good-bye to my father or grieve beside my mother and sister and

14   children as I should have, as I was supposed to.  And even

15   though my brother -- whatever differences I had -- he was at

16   MDC, just one floor above me, I know, in solitary, we might as

17   well have been on different planets.  We could not give comfort

18   or solace to each other.

19            My mother once told me how she felt when her father

20   passed away.  She told me very simply.  She said, it felt like

21   the sky had been split apart and the sky was torn.  I didn't

22   know what she was talking about then, but I know what she means

23   right now.

24            So I know my actions have involved all sorts of

25   shredding and shedding of tears, of illusions and of the

L98GamaS

fantasy that I would never hurt someone, let alone the people I

love.  But I have hurt them.

      So I ask myself in prison again and again, how is it

that I know something like this will not happen again?  How do

I know that for sure?  And there's only one answer and only one

word, and that answer is love.

      I know how -- now that word has actually slipped from

my lips -- how embarrassing it's hanging over here in the

courtroom.  I imagined it for the past two days.  Because the

word has been overused and abused for a millenia.  But I'm not

speaking the fairytale dreams of love.  I'm talking the

reality.  I'm talking of the love spoken in the scriptures and

the psalms.  The love which makes the heart bleed.  The love

that requires hard work, time, patience and sacrifice, which

requires tangible acts with your hand and often -- all too

often -- pain.  And it may be strange a realization of the

importance of love came in prison, which is completely devoid

and barren of it.

      And I'm a scientist and I know.  Just as you need the

total darkness of the darkest night sky to be able to open your

pupils fully to see the light from the distant stars, the heart

needs suffering in order to expand fully, in order to

understand, accept and give love.  Because only when you suffer

and accept pain do you know you truly love someone.

      Regarding the heart suffering, I know, the Bible in

L98GamaS

1    Romans says, rejoice in your suffering and afflictions.  In the

2    Quran it says ask for the burdens that you can bear.  And the

3    Sufi faith says simply, god breaks your heart again and again

4    and again and again until it remains open.

5              So it is with a broken and open heart that I fully

6    know and I fully say that I love my children, my mother, my

7    sister, my brother, my entire family, my nephew, my nieces, my

8    cousins, my uncles, my aunts, my friends.  My friends are the

9    community of souls who chose to and stayed by my side during my

10   suffering and affliction, as they suffered themselves because

11   of me, but whose side I want to stand by during their time of

12   suffering and affliction.  I want to join and remain with them

13   all.  I want to be by my friends' side when they need me.  I do

14   not want to miss my children as they grow up.  And I will not

15   miss my mother in the twilight of her years.  I will not.  For

16   that love, I know I will not come back here.

17             I also know I will spend the rest of my life working

18   to heal the rifts I have caused.  Because loving them doesn't

19   mean forgetting the past.  But it means remembering and healing

20   the wounds we each cause and carry by carrying and caring for

21   each other.

22             Three years ago, on the eve of the trial, just before,

23   I took my children, my friends, their children to see the solar

24   eclipse that happened in America.  I wanted them, I needed them

25   to experience it all and have that memory with me.  And to my

L98GamaS

daughter, I explained a scientific fact about the moon.  You

know, compared to the sun, the moon is tiny and insignificant.

It's a pebble compared to Everest.  In fact, the moon is 400

times smaller than the sun, but it's also 400 times exactly

closer to us on Earth, to people.  And that closeness, that

proximity to humanity, that's what makes the moon appear as

large as the sun.  You can see it during the eclipse.

     In that same way, I ask for that closeness to my

children, my family, my friends, to join them.  And in that

shared closeness and rejoicing and suffering to let my heart

expand to encompass theirs and theirs to encompass mine.  And

with that and their sacrifice -- with their sacrifice, love and

support, I hope to become a helpful and loving member of

humanity that my parents taught me to be.

     So I thank you, your Honor, and the Court for your

time and patience in listening and understanding during the

entire trial, including everything that's been said about me;

the good and the bad that I did.  I am sorry this is how you

got to meet and to know me.  But I promise to you to be a

better man, better father, better friend and a better son.

     Most importantly, I again express my deep sorrow and

ask for forgiveness to investors that I had harmed, to

investors who were misled by me and others and lost money.

There is a pain in my heart because of that, because my own

father had, in the 90s, lost money by a broker of his accounts.

L98GamaS

1    And I know the investors experienced that same pain my father

2    did.  I am truly sorry.

3              I also apologize to my children and their brave

4    mother, who is here, for the pain I caused and I could not

5    protect them from.  Their resilience is incredible.  I don't

6    know if I had faith in it.  But they had it.  My son was in

7    high school when I came to prison, and he's already halfway

8    through college on his own.  And my daughter on her own won a

9    scholarship to University of Minnesota.  Their mother managed

10   all of this on her own.  I am humbled and proud of them.  Their

11   courage and perseverance inspires me to be a better father.

12             To my friends and family who are here and are

13   listening and their sacrifice for me and giving their support,

14   thank you so much.  Your incredible letters -- which I just

15   read two months ago for the first time -- their letters brought

16   light to my dark prison cell.  And all the children who wrote

17   the letters, especially, I don't know if I want to say their

18   names in court, but I know all their names by heart, I say it

19   every night.  Everyone who wrote those letters, especially the

20   children, the fact that they remember me means more to me than

21   any Forbes list or anyone else.  So I ask all of you to forgive

22   my mistakes for hurting you, for letting you down instead of

23   picking you up, because -- I'm sorry, I didn't write this

24   down -- but I wanted to mention my earliest memory, actually my

25   first memory, the first prayer that my parents taught me, it's

L98GamaS

a simple prayer.  It may seem silly.  But when you translate it
and in every book I've ever read it, it basically says, in the
name of god, the most gracious, the most merciful.  And I
didn't understand that.  I mean, I know, even as a kid, I
understood merciful.  But I didn't understand gracious.  I
thought it meant elegant or someone who had good table manners,
said thank you or please.  So I asked my dad.  And you know, my
English was better than his.  He was an immigrant.  But he
understood things better than me always.  And he explained it
to me simply that mercy is forgiving someone who fully deserves
it.  And graciousness is not -- it's wrong, it's grace -- it's
forgiving someone if they fully don't deserve it.

        And I just remembered that a few hours ago, because I
was struggling to decide what defines my father and the eulogy
I wanted to give to him.  I couldn't think of it.  And it hit
me now, my father had grace.  So I know I need to ask everyone,
everyone -- investors I harmed, the family and friends I let
down, the Court and the government for the time I'm taking
right now -- I ask for everyone's mercy and I also ask for
everyone in god's grace.  Thank you, your Honor.

        THE COURT:  In deciding upon an appropriate sentence,
I have considered all the factors listed in Title 18 United
States Code §3553(a), including the nature and circumstances of
Mr. Amanat's offenses, his personal history and
characteristics, the need for the sentence imposed to reflect

L98GamaS

1    the seriousness of his offenses, the need to promote respect

2    for the law, to provide just punishment and to afford adequate

3    deterrence to criminal behavior.

4           Beginning with the nature and circumstances of the

5    offenses, Mr. Amanat was charged with participating in two

6    complex fraudulent schemes -- one of which was aimed at

7    defrauding investors in a small hedge fund called Maiden

8    Capital and the other aimed at defrauding the shareholders of

9    KIT Digital, a public company.  I have discussed these schemes

10    in some detail today, and I described the schemes in much

11    greater detail in the opinion denying Mr. Amanat's post-trial

12    motions.  (Dkt. No. 1204)  Suffice it to say that both schemes

13    involved conduct that was blatantly and flagrantly wrong and

14    illegal.  That would have been obvious to someone fresh out of

15    business school, but it had to have been crystal clear to

16    Mr. Amanat, who had worked in the financial space for many

17    years.  It is obvious that you can't lie to someone about what

18    is happening with their investment; it's obvious that you can't

19    generate statements every month fabricating financial

20    performance of an investment; and it's obvious that you can't

21    sign audit confirmations indicating that you are holding

22    millions of dollars for a public company when in fact you have

23    lost all the company's money.

24           As is often true, particularly in white collar crimes,

25    the reasons why Mr. Amanat committed these crimes remain

L98GamaS

1    entirely obscure.  He is a very intelligent person, he has an

2    incredibly supportive family, he is gifted and has always been

3    gifted.  Why would he descend to this level of fraud?  But this

4    has been an issue at least since 2002, when he engaged in fraud

5    as the chief technology officer of Tradescape.

6         As to Mr. Amanat's history and characteristics, he is

7    50 years old.  He is the eldest of four children.  His parents

8    are both highly educated.  His father has a Ph.D. in

9    pharmacology and his mother was a schoolteacher.  He was raised

10   in a supportive and stable home, first in Elmhurst, NY, and

11   later in suburban New Jersey.  He has a large extended family,

12   which is a community in itself.

13        He was a gifted child, and obtained entry to Hunter

14   College High School.  It's probably more difficult to get into

15   than most colleges in the United States.  He then attended

16   Johns Hopkins University, graduating in 1993 with a bachelor's

17   degree in biomedical engineering.  His goal was to be involved

18   in the development of medical devices.  He went on to take

19   graduate courses in the same field at Rutgers University

20   between 1996 and 1998.

21        At some point, as we have heard, Mr. Amanat was

22   diverted from his interest in biomedical engineering and

23   medical devices.  In 1996, he became the chief technology

24   officer for a start up online securities trading firm owned by

25   his brother, Omar Amanat, who was the company's chief executive

L98GamaS

officer.  While in this position, he became the subject of an

SEC enforcement proceeding, in which the Commission alleged

that he had engaged in a large-scale wash trades in order to

obtain rebates from NASDAQ.  In November 2006, the commission

issued a cease and desist order against him, which found that

he had committed securities fraud in engaging in these wash

trades.  I think the scheme yielded $50,000.  Again, why?  As a

result of this conduct, he was barred from the industry for

five years, and a $60,000 civil penalty was imposed.  He was

also enjoined from committing or causing any violations of

§10(b) or Rule 10b-5.

         After his time at Tradescape, Mr. Amanat worked as a

technology consultant for a brokerage firm in Glendale,

California.  He then moved to Dubai, where he started Enable

Invest Limited, a financial and investment firm.  He started

several other financial consulting firms in Dubai.  He returned

to the United States in 2010 to take care of his father, who

had been stricken by cancer.  He has also worked as a

consultant for a medical laboratory testing services company

and for a medical clinic and a private physician.

         As to his personal life, in 1999, Mr. Amanat was

married.  The couple have four children.  And as we have heard,

in 2020, Mr. Amanat and his wife were divorced.

         As to medical condition, Mr. Amanat has no significant

physical problems.  As to mental health, he has previously

L98GamaS

sought counseling for anxiety, stress and depression.  There is
no history of significant substance abuse.

Mr. Amanat has no criminal record.  He's made a good
adjustment to incarceration under extremely difficult
conditions at the MDC.  He's taught classes to other inmates.
He's had no disciplinary infractions in over 34 months of
incarceration.

In preparation for sentencing, I have read countless
letters of support -- more than 80 -- from the defendant's
family members and friends, many of whom are in the courtroom
today, as well as in an overflow courtroom.  Certain themes
emerge from the letters.  Mr. Amanat is a very kind and
kindhearted person who has helped a lot of people.  Many
commented on his intelligence.  Many commented on the fact that
he's a good father, a good son, a good uncle, a good cousin, et
cetera.

To summarize, the sentencing guidelines recommend a
sentencing range of 108 to 135 months' imprisonment.  The
probation department has recommended a sentence of 108 months,
based on an incorrect guidelines range of 135 to 168 months'
imprisonment.  The government seeks a sentence within the
guidelines range that they have calculated of 87 to 108 months'
imprisonment.  The defendant seeks a sentence of time served
which would amount to about 34 months' imprisonment.

With all of this in mind, I will now describe the

L98GamaS

1     sentence I intend to impose.  And then I will ask the parties

2     if there's anything further they wish to say.

3            Mr. Amanat, despite his extraordinary gifts and his

4     many admirable personality traits engaged in highly culpable

5     criminal conduct for more than three years.  He was a central

6     figure in two separate, but closely related fraud schemes.  He

7     showed no concern for the investors in the small hedge fund run

8     by Stephen Maiden.  And he agreed to assist the officers of KIT

9     Digital in defrauding the company's shareholders.

10            The SEC enforcement order issued against Mr. Amanat in

11     November 2006 should have deterred him from again committing

12     securities fraud.  It did not.  He moved to Dubai.  And within

13     less than two years, he was engaged again in fraud, lying to

14     Stephen Maiden about the performance of his $1 million

15     investment and preparing false monthly statements regarding the

16     performance of that investment.  He lost Maiden Capital's money

17     and he lost KIT Digital's money, and then he spent the next

18     three years lying about what had happened to those investments,

19     preparing false monthly statements and signing false audit

20     confirmations.

21            Many of those who wrote letters to me said that they

22     cannot square Mr. Amanat's conduct in this case with their own

23     experience of him.  Indeed.  But it happened.  And there's no

24     explanation for why.

25            There is much to say, however, in mitigation.  The

L98GamaS

| | |
|---|---|
| 1 | fact that the defendant has been a good father and a good son, |
| 2 | a loyal friend, a resource to countless relatives and the fact |
| 3 | that he has lived a life of kindness.  The suffering that the |
| 4 | defendant has already endured as a result of this case, |
| 5 | including the failure of his 20-year marriage, the inability to |
| 6 | assist his father during his dying days and not being present |
| 7 | at his father's funeral, the terrible conditions that the |
| 8 | defendant has endured at the MDC over the past 34 months, |
| 9 | including the lockdown since the pandemic arrived in March of |
| 10 | 2020, the lack of showers and hot food and the lack of family |
| 11 | visits.  Having considered all the circumstances, I conclude |
| 12 | that a substantial variance from the guidelines range of 108 to |
| 13 | 135 months' imprisonment is appropriate.  A sentence within |
| 14 | that range is not necessary either to deter Mr. Amanat or |
| 15 | others similarly situated. |
| 16 | Having considered all the circumstances, I intend to |
| 17 | impose an aggregate sentence of four years imprisonment.  With |
| 18 | respect to supervised release, I intend to impose an aggregate |
| 19 | sentence of three years on the following conditions: |
| 20 | Mr. Amanat will not commit another federal, state or |
| 21 | local crime.  He will not unlawfully possess a controlled |
| 22 | substance.  He will refrain from unlawful use of a controlled |
| 23 | substance.  He will submit to one drug test within 15 days of |
| 24 | release from imprisonment, at least two periodic drug tests |
| 25 | thereafter.  He will cooperate in the collection of DNA, as |

L98GamaS

1    directed by the probation officer.  I intend to impose the 12

2    standard conditions of supervised release set forth in the

3    presentence report, along with the following special condition:

4         Mr. Amanat will submit his person and any property,

5    residence, vehicle, papers, computer or other electronic

6    communication or data storage device under his control to a

7    search on the grounds that there's a reasonable suspicion that

8    violation of his supervised release may be found.  Any search

9    is to be conducted at a reasonable time and in a reasonable

10   manner.  Failure to submit to a search may be grounds for

11   revocation of release.  Mr. Amanat will inform any other

12   residents that the premises may be subject to search pursuant

13   to this condition.

14        As to a fine, I find that Mr. Amanat lacks the ability

15   to pay a fine.  Accordingly, I will not impose one.

16        I am required to impose a $400 special assessment.

17        The government is not seeking an order of forfeiture

18   or an order of restitution.  Accordingly, neither will be

19   imposed.

20        Ms. Chaudhry, is there anything further you wish to

21   say?

22        MS. CHAUDHRY:  No.  Thank you.

23        THE COURT:  Mr. Amanat, is there anything further you

24   wish to say?

25        THE DEFENDANT:  No.  Thank you.

L98GamaS

| | |
|---|---|
| 1 | THE COURT:  Mr. Naftalis, anything further for the |
| 2 | government? |
| 3 | MR. NAFTALIS:  No.  Thank you, your Honor. |
| 4 | THE COURT:  Mr. Amanat, for the reasons I just stated, |
| 5 | it is the judgment of this court that you be sentenced to four |
| 6 | years imprisonment and three years supervised release on each |
| 7 | of Counts One, Two, Three and Six with all terms to run |
| 8 | concurrently.  Your terms of supervised release will be subject |
| 9 | to the mandatory standard and special conditions of supervised |
| 10 | release I just listed.  You are ordered to pay a special |
| 11 | assessment of $400. |
| 12 | I will say for the record that this sentence would |
| 13 | have been the same regardless of the sentencing guidelines |
| 14 | calculations regarding loss amount.  Although I concluded that |
| 15 | the appropriate loss amount is 9.75 million, the sentence would |
| 16 | have been the same.  Even if the loss amount was limited to |
| 17 | 4.45 million, reflecting only the amount of money that Maiden |
| 18 | Capital investors lost in Enable and the $2 million that KIT |
| 19 | Digital shareholders lost in Enable.  I granted a significant |
| 20 | variance for the reasons I outlined, but I concluded a |
| 21 | significant sentence was necessary given the nature and |
| 22 | circumstances of the criminal conduct. |
| 23 | Mr. Naftalis, are there any open counts? |
| 24 | MR. NAFTALIS:  Your Honor, we move to dismiss any |
| 25 | underlying indictments. |

L98GamaS

1        THE COURT:  That motion is granted.

2        Ms. Chaudhry, do you wish me to say anything as to

3   assignment and designation?

4        MS. CHAUDHRY:  Your Honor, we ask that the Court

5   recommend that the Bureau of Prisons designate Mr. Amanat to

6   the closest facility from New Jersey, which I think might be

7   Fort Dix.

8        THE COURT:  I'll recommend to the Bureau of Prisons

9   that Mr. Amanat be designated to the facility located in Fort

10  Dix, New Jersey.  Failing that, another suitable institution in

11  New Jersey so that he may maintain ties with his family and

12  friends during his remaining period of incarceration.

13       Mr. Amanat, I am required to advise you of your appeal

14  rights.  You have the right to appeal your conviction,

15  including the sentence I just imposed.  With few exceptions,

16  any notice of appeal must be filed within 14 days of judgment

17  being entered in your case.  Judgment will likely be entered

18  tomorrow.  Your attorneys will discuss with you whether or not

19  you wish to file a notice of appeal.  If you are not able to

20  pay the costs of appeal, you may apply for leave to appeal *in*

21  *forma pauperis*.  If you request, the clerk of the court will

22  prepare and file a notice of appeal on your behalf.

23       Mr. Naftalis, anything else for the government?

24       MR. NAFTALIS:  No.  Thank you, your Honor.

25       THE COURT:  Ms. Chaudhry, anything else for the

L98GamaS

1    defense?

2              MS. CHAUDHRY:  Thank you, your Honor.  Good afternoon.

3              THE COURT:  We're adjourned.

4              (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25